Nos. 23-2323, 24-1095

# United States Court of Appeals for the Federal Circuit

**SWARM TECHNOLOGY LLC,**
*Appellant*,

v.

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Cross-Appellants*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in *Inter Partes* Reviews Nos. IPR2022-00283, IPR2022-00633

## APPELLANT SWARM TECHNOLOGY LLC'S PRINCIPAL BRIEF

Michael K. Kelly
Christine N. Jones
Daniel J. Anderson
**NEWMAN JONES, PLLC**
14747 N. Northsight Blvd.
Suite 111-143
Scottsdale, Arizona 85260
mkelly@newmanjones.com
(480) 686-7762

Meredith Martin Addy
**ADDYHART P.C.**
10 Glenlake Parkway
Suite 130
Atlanta, Georgia 30328
meredith@addyhart.com
(312) 321-4200

***Attorneys for Appellant Swarm Technology LLC***

April 8, 2024

# EXEMPLARY PATENT CLAIMS

**U.S. Patent No. 9,852,004 ("'004 Patent"), Claim 3**

3. [3pre] A processing system, comprising:

[3a] a task pool;

[3b] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

[3c] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

[3d] a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

[3e] wherein:

the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis ***without any communication with the controller***;

[3f] the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and ***the first agent is configured to search the task pool for a task of the first type***;

[3g] the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and ***the second agent is configured to search the task pool for a task of the second type***;

[3h] the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload; and

[3i] the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

[3j] and further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

[3k] when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;

[3l] when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform; and

[3m] when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.

Appx0157-1058, 14:42-15:36 (emphasis added).

**Patent Owner's Contingent Motion to Amend, Proposed Substitute Claim 13** (underlined terms provided in amendment)

13. [13pre] A processing system, comprising:

[13a] a task pool;

[13b] a controller configured to populate the task pool with a plurality of first tasks having indicia of a first task type and a plurality of second tasks having indicia of a second task type;

[13c] a first autonomous co-processor configured to perform tasks of the first type and configured to successively: proactively interrogate the task pool to retrieve a first task from the task pool without being instructed to do so by the task pool; deliver the first task to the first autonomous co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first autonomous coprocessor and the controller;

[13d] a second autonomous co-processor configured to perform tasks of the second type and configured to successively: proactively interrogate the task pool to retrieve a second task from the task pool without being instructed to do so by the task pool; deliver the second task to the second autonomous co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second autonomous co-processor and the controller;

[13e] wherein after the first autonomous co-processor updates the task pool to reflect completion of the first task, the task pool is configured to send a notification to the controller indicating that the first task is completed;

[13f] wherein after the second autonomous co-processor updates the task pool to reflect completion of the second task, the task pool is configured to send a notification to the controller indicating that the second task is completed; and,

[13g] wherein the processing system is configured to dynamically accept the first autonomous co-processor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis ***without any communication with the controller***.

Appx1841-1842 (emphasis added).

# CERTIFICATE OF INTEREST

Counsel for Appellant Swarm Technology LLC ("Swarm") certifies the following:

1. Please provide the full names of all entities represented by undersigned counsel in this case.

   **Swarm Technology LLC**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **None/Not Applicable**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **None/Not Applicable**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Daniel R. Pote, Jennings Strouss & Salmon**

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   Juniper Networks, Inc. v. Swarm Technology LLC, No. 3:20-cv-3137 (N.D. Cal.)

   Swarm Technology LLC v. Amazon.com, Inc., No. 2:21-cv-438 (D. Ariz.)

   Juniper Networks, Inc. v. Swarm Technology LLC, Nos. 23-1980, 23-2076 (Fed. Cir.)

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

April 8, 2024

*/s/ Michael K. Kelly*
Michael K. Kelly

# TABLE OF CONTENTS


EXEMPLARY PATENT CLAIMS .................................................. Claims Page 1

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF AUTHORITIES ......................................................................... vi

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES .......................................................................1

INTRODUCTION ...........................................................................................2

STATEMENT OF THE CASE .........................................................................3

I. The Inventor and His Company, Swarm Technology LLC ........................... 3

II. The Swarm Patents ..................................................................................... 4

III. The Prior Art ............................................................................................ 5

A. U.S. Patent Application Publication No. 2007/0124363 ("Lurie")...... 5

B. The Ethernet Specification ("Ethernet") ........................................... 12

IV. Proceedings Before the Board .................................................................. 13

SUMMARY OF THE ARGUMENT ..................................................................14

ARGUMENT ..................................................................................................17

I. STANDARD OF REVIEW ............................................................................ 17

II. NEITHER LURIE NOR ETHERNET DISCLOSES OR SUGGESTS AN "AGENT … CONFIGURED TO SEARCH THE TASK POOL" AS REQUIRED IN CLAIMS 2-12 ............................................................ 18

A. The Claim Limitation "Agent ... Configured to Search the Task Pool" Should be Interpreted Under its Plain Meaning as Supported by the '004 Patent Specification ..................................................... 18

B. Nowhere Does Lurie or Ethernet Disclose an "Agent ... Configured to Search the Task Pool" ................................................ 19

1. Lurie's ATD Assigns Specific Predetermined Tasks to Lurie's TCWs; the TCW's Do Not Search for or Assign Tasks to Themselves ............................................................... 19

2. Ethernet Fails to Disclose What Information Goes in a Packet to Allow the Data Frame to Search ............................. 22

C. The Board Fails to Show a Suggestion to Modify Lurie to Include an "Agent … Configured to Search the Task Pool" .......................... 23

1. Contrary to the Plain Language of Lurie, the Board Manufactures a Suggestion that the TCW's Search the ATD . 23

a. The Board Admits that Lurie Fails to Disclose TCWs that Search for and Select the Appropriate Task........... 23

b. The Board Contradicts its Own Finding that Lowenthal's Testimony is Not "Supported" ................. 27

2. Lowenthal's Testimony that a POSITA Would Modify Lurie Such that the TCW "Searches" the ATD is Conclusory ........................................................................ 28

a. Lowenthal's ¶194 Fails to Support Modifying Lurie Such that the TCW Searches the ATD. ......................... 29

b. Lowenthal's Conclusory ¶¶204-205 Misstate Lurie's Disclosure ..................................................................... 31

c. Lowenthal's ¶207 Relies on its Misstatement to Render its Ultimate Conclusion ................................... 32

3. The Board Wrongly Held that Swarm Waived its "Search the Task Pool" Argument and then Declined to Address it..... 33

III. CLAIMS 13 AND 14 ARE PATENT ELIGIBILE UNDER § 101............ 35

A. *Alice* Step 1: The Substitute Claims are Directed to Specific Parallel Multiprocessor Computing Architecture .............................. 36

1. Both the Claims and the Specification Teach a Specific, Improved Parallel Multiprocessor Architecture ...................... 36

2. The Board's Incorrect Application of a "Scrum Board" Analogy Ignores the Claim as a Whole .................................. 43

3. The Contrast Between the Walmart Digital Scrum Board and the Substitute Claims Highlights their Eligibility............. 46

B. *Alice* Step 2: The Substitute Claims Contain Inventive Concepts, Including Autonomous Co-Processors that Successively and Proactively Interrogate a Task Pool without Communication with the CPU, Rendering the Claims Patent Eligible ................................ 48

1. Under the Board's Reasoning, No Claim Would Pass *Alice* Step 2 ......................................................................... 48

2. The Board Erred By Ignoring the Unconventional Modifications of Claimed Structural Elements that Create the Inventive Concept ............ 50

3. The Board's Ignored Swarm's Expert Testimony About the Unconventionality of Substitute Claims ............ 52

IV. THE SUBSTITUTE CLAIMS SATISFY THE WRITTEN DESCRIPTION REQUIREMENT OF § 112 ............ 54

A. The Board's Construction of "Without Any Communication" Contradicts the Plain Meaning of the Claims and the Specification.. 54

B. The '332 and '696 Applications Provide Ample Written Description Support for the Claims Under the Proper Construction . 61

1. The Applications Provide Express/Inherent Support ............ 62

2. The Applications Provide a Reason to Exclude Communication with the Controller ............ 65

3. The Applications Distinguish Between the Negative Limitation and Alternatives to the Negative Limitation.......... 67

C. Contrary to the Board's Assertion, Swarm Properly Complied with 37 C.F.R. § 42.121 ............ 68

CONCLUSION ............ 69

CERTIFICATE OF COMPLIANCE............ a

ADDENDUM............ b

## TABLE OF AUTHORITIES

### Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (Fed. Cir. 2018). .......... 50, 54

*Accenture Glob. Servs. v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) .......... 41

*Alice Corp. Pty. V. CLS Bank Int'l*,
573 U.S. 208 (2014) .......... 43, 48

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) .......... 26, 28

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) .......... 61

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
569 U.S. 576 (2013) .......... 35

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......... 49

*Becton, Dickinson & Co. v. Tyco Healthcare Grp.*,
616 F.3d 1249 (Fed. Cir. 2010) .......... 56

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) .......... 17

*Cook Grp., Inc. v. Bos. Sci. Scimed, Inc.*,
809 F. App'x 990 (Fed. Cir 2020) .......... 52

*D3D Techs., Inc. v. Microsoft Corp.*,
2024 U.S. App. LEXIS 3813 (Fed. Cir. Feb. 20, 2024) .......... 32

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018) .......... 44

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) .......... 36

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .................... 36, 46

*Genzyme Therapeutic Prod. Ltd. v. Biomarin Pharm. Inc.*,
825 F.3d 1360 (Fed. Cir. 2016) .................... 52

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) .................... 66

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) .................... 29, 31, 32

*In re Rudy*,
956 F.3d 1379 (Fed. Cir. 2020) .................... 17

*In re Sang-Su Lee*,
277 F.3d 1338 (Fed. Cir. 2002) .................... 32

*In re Van Os*,
844 F.3d 1369 (Fed. Cir. 2017) .................... 29

*Inphi Corp. v. Netlist, Inc.*,
805 F.3d 1350 (Fed. Cir. 2015) .................... 61

*Internet Pats. Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) .................... 45

*InTouch Techs., Inc. v. VGo Commc'ns., Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) .................... 30

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) .................... 29

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) .................... 43

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .................... 35, 45, 54

*Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*,
878 F.3d 1336 (Fed. Cir. 2018) .................... 17, 57

*Novartis Pharms. Corp. v. Accord Healthcare, Inc., et al.*,
38 F.4th 1013 (Fed. Cir. 2022) ........ 61, 67

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ........ 56

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........ 56

*Santarus, Inc. v. Par Pharm., Inc.*,
694 F.3d 1344 (Fed. Cir. 2012) ........ 61

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ........ 17

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ........ 29, 30

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ........ 39, 40

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ........ 1

35 U.S.C. § 101 ........ passim

35 U.S.C. § 103 ........ 13

35 U.S.C. § 112 ........ 17, 65, 67, 68

35 U.S.C. § 141(c) ........ 1

35 U.S.C. § 316(d)(3) ........ 55

**Regulations**

37 C.F.R. § 42.100(b) ........ 57, 59

37 C.F.R. § 42.121 ........ 68, 69

## STATEMENT OF RELATED CASES

The following case titles and numbers represent cases known to Counsel for Appellant that are pending in this Court or another court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal: *Juniper Networks, Inc. v. Swarm Technology LLC*, No. 3:20-cv-3137 (N.D. Cal.); *Swarm Technology LLC v. Amazon.com, Inc.*, No. 2:21-cv-438 (D. Ariz.); *Juniper Networks, Inc. v. Swarm Technology LLC*, Nos. 23-1980, 23-2076 (Fed. Cir.).

## JURISDICTIONAL STATEMENT

On June 20, 2023, the Patent Trial and Appeal Board ("Board") issued a Final Written Decision ("FWD") determining all claims of U.S. Patent No. 9,852,004 unpatentable and denying Swarm's Contingent Motion to Amend. On August 18, 2023, Swarm filed this appeal (Fed. Cir. No. 23-2323), which is now consolidated with Fed. Cir. No. 24-1095. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Whether the Board legally erred in holding claims 2 – 12 obvious, by applying a claim construction that was contrary to the plain language of the '004 Patent, and when examined under the proper claim construction, the prior art failed to disclose or suggest the claimed "agent … configured to search the task pool"?

2. Whether the Board legally erred in denying Swarm's Contingent Motion to Amend ("MTA") when the proposed substitute claims 13 and 14 ("claims 13 and 14") recite improvements to the operation and functionality of a computer, recite inventive concepts, and are directed to patent eligible subject matter?

3. Whether the Board legally erred in denying Swarm's MTA when, under the proper claim construction of "without any communication," claims 13 and 14 are supported by the original applications.

## INTRODUCTION

This case is about whether the parallel multiprocessor computing architecture of Swarm Technology LLC, a startup company, should be invalidated by prior art that fails to teach or suggest at least one of the claim limitations requiring an "agent … configured to search the task pool."

The "agent … configured to search the task pool" limitation appears in appealed claims 2 and 3 (and dependent claims 4 – 12).[1] If this Court agrees that the cited art fails to disclose or suggest this claim element, then all appealed claims (claims 2 – 12) remain patentable.

[1] Swarm does not appeal the Board's obviousness determination of claim 1.

The claimed parallel multiprocessor computing architecture exemplifies patent eligible subject matter and is well supported by the original applications. Relying on both an improper eligibility analysis and an incorrect claim construction, the Board erred in denying Swarm's MTA advancing substitute claims 13 and 14. This Court should reverse the Board's denial of Swarm's MTA and hold that claims 13 and 14 are directed to patent eligible subject matter and have written description support.

## STATEMENT OF THE CASE

### I. THE INVENTOR AND HIS COMPANY, SWARM TECHNOLOGY LLC

Alfonso Íñiguez was born in Tijuana, Mexico, in 1965 and received a Bachelor of Science degree in Computer Engineering from the Universidad Autónoma de Guadalajara, México, in 1989. He thereafter emigrated to the U.S. where he pursued and was awarded a Master of Science in Electrical Engineering from the University of Arizona in 1995. Appx2011. Subsequently, he enjoyed a brilliant career working for some of the nation's most prestigious semiconductor companies.

Mr. Íñiguez and his wife, Alejandra, founded Swarm Technology LLC ("Swarm") more than a decade ago in Mesa, Arizona. Swarm designs, develops,

and markets solutions for solving complex computational problems using parallel multiprocessor computing systems. *Id.*

Mr. Íñiguez and his family have presented his patented technology at trade shows and other industry events, such as the: i) "Internet of Things World Conference 2018;" ii) "IoT Tech Expo North America 2017;" iii) "International Conference on Intelligent Robots and Systems (IROS) 2017;" and iv) "Internet of Things World Conference 2017."

Mr. Íñiguez also authored a 2017 peer reviewed paper published by the International Conference on Agents and Artificial Intelligence, the most prestigious Artificial Intelligence conference in the World. It is rare to include a company researcher, as opposed to a university researcher, as a featured author at this Conference. Appx2016.

## II. THE SWARM PATENTS

On January 25, 2013, Mr. Íñiguez filed the first in a series of patent applications with the USPTO. Appx0143. The USPTO subsequently awarded the following patents to Mr. Íñiguez: U.S. Patent No. 9,852,004 ("the '004 Patent); U.S. Patent No. 10,592,275 ("the '275 Patent"); and U.S. Patent No. 9,146,777 ("the '777 Patent). Appx0143; Appx0159; Appx1697.

Prior to Mr. Íñiguez's invention, conventional multiprocessing systems included a central processing unit ("CPU") and one or more co-processors.

Appx0151, 1:56-57. The processing "architecture" included a primary controller, which distributed tasks directly to a plurality of co-processors. *Id.*, 1:57-59. This conventional approach is disadvantageous because a significant amount of the CPU's processing cycles (bandwidth) is consumed by managing task distribution, while the co-processors often remain idle awaiting new tasks from the CPU. *Id.*, 1:61-2:3.

Mr. Íñiguez's invention modifies the architecture (e.g., arrangement, operation, and interrelationship) of the components of multiprocessor systems by interposing an intermediate device – the task pool – between the CPU and the coprocessors. Appx0152, 4:30-48.

The claims encompass various improvements to the function and operation of a multiprocessor computing system, including a system architecture where each co-processor is configured to successively retrieve tasks from that task pool, and where each co-processor includes an agent configured to search the task pool for a task appropriate for that co-processor. Appx0157, 14:34-41; *see also* Appx0157-0158, 14:66-15:6.

## III. THE PRIOR ART

### A. U.S. Patent Application Publication No. 2007/0124363 ("Lurie")

Similar to the prior art systems described by the '004 Patent, Lurie discloses, the "dynamic distribution of technical computing tasks from a technical computing

client [TCC] to remote technical computing workers [TCWs] for execution of the tasks on multiple computers systems." Appx1249, ¶0043.

Lurie describes that computing tasks can be distributed *from* the TCC *to* the TCWs in accordance with various operating modes, including:

7. **direct distribution mode** (Appx1252-1253, ¶¶0068-0070; Appx1225, FIG. 3A; Appx1230, FIG. 5A);

8. **automatic distribution mode ("ATD mode")** (Appx1253-1254, ¶¶0071-0073, Appx1226, FIG. 3B; Appx1231, FIG. 5B); and

9. **batch automatic distribution mode ("batch mode")** (Appx1254-1255, ¶¶0074-0079; Appx1227-1228, FIGs. 3C, 3D; Appx1232-1233, FIGs. 5C, 5D).

The direct distribution system of FIG. 3A teaches the TCC determines, selects, assigns, and distributes particular tasks to specific TCWs, respectively. *See e.g.*, Appx1252-1253, ¶¶0068-0069; Appx1256, ¶0085.




Appx1225, FIG. 3A.

The ATD mode system of FIG. 3B teaches the TCC delegates to the ATD mechanism the selection, assignment, and distribution of tasks to the TCWs. Appx1253, ¶¶0071-0072; Appx1256, ¶0086.



*Fig. 3B*

Appx1226, FIG. 3B.

In ATD mode, the TCC submits tasks (e.g., Taskl-TaskN-M) to the ATD mechanism which "make[s] the[m] available for distribution to any of the [TCWs] 270A-270N." Appx1253, ¶0072. The ATD mechanism "provides notification … to the [TWC] 260 of the availability of the task." Appx1256, ¶0086. In response to the notification, "the [TCW] obtains (step 544) the task provided (step 540) from the automatic task distribution mechanism 260." *Id.*

The batch mode system of FIG. 3C teaches that the TCC 250 defines a job (containing multiple tasks). Appx1254, ¶0074; Appx1256, ¶¶0087-0088.




Fig. 3C

Appx1227, FIG. 3C.

The TCC submits the job containing all the associated tasks to the job manager. Appx1254, ¶0074. The job manager provides the tasks to the ATD mechanism for distribution to the TCWs in the same fashion as in ATD mode. *See* Appx1256, ¶0086 (describing task notification and distribution in ATD mode); Appx1256, ¶¶0087-0088 (describing same in batch mode).

In any of the above embodiments, the system (i.e., the TCC or ATD mechanism) determines and selects the TCW to work on a particular task based on

operational and/or performance characteristics of the TCWs. Appx1255, ¶0081. For example, each TCW may have a profile describing its operational and performance characteristics that can be accessed by the TCC or ATD. Notably, the TCWs do not (and logically would not) access information about themselves and they do not assign tasks to themselves. *Id*. (explaining that determining the TCW to work on a task involves "discover[ing]" the "operational and performance characteristics" of the TCWs "through [an] interface of the [TCW] …."). If Lurie intended the TCWs to determine, select, assign, or distribute tasks to themselves, Lurie would simply have said so.

FIG. 6A shows an object-oriented implementation of Lurie's system comprising an object exchange repository 662 such as Javaspace or simply, a "space." Appx1257, ¶0090.




*Fig. 6A*

Appx1234, FIG. 6A.

The TCC and TCWs interact with the object exchange repository space. Appx1257, ¶0090. Lurie's spaces are "associative" in that "objects in the space can be located by associative lookup rather than by memory location or identifier …." Appx1257, ¶0091. Functions that can be performed on the space include: "[a] write operation" that "writes an object, such as a task object, to the space;" a read operation that "obtains a copy of the object from the space and leaves the object intact in the space;" and a take operation that "*is the equivalent of a read* [but] removes the object from the space." Appx1257, ¶0091 (emphasis added).

In other words, in Lurie's ATD mode and batch mode embodiments, to the extent a TCW "takes" a task from the ATD mechanism, the TCW simply "reads" or "obtains" the particular task previously assigned to it by the ATD. *Id.*, Appx1258, ¶0097.

### B. The Ethernet Specification ("Ethernet")

Ethernet discloses a unified standard for establishing a local area network capable of providing "high speed data exchange among computers and other digital devices located within a moderate-sized geographic area." Appx1296. Among other things, Ethernet discloses the use of a "Data Link Layer compris[ing] the construction and processing of frames." Appx1314-1315.

As depicted in Figure 6-1 of Ethernet, a Data Link Layer Frame can include addressing fields "to identify the source and destination stations for the frame." *Id.* Furthermore, the Data Link Layer Frame includes a Data Field which contains between 46 and 1,500 octets (bytes) of binary data. Appx1315-1317. Ethernet does not disclose or suggest what information is, or could be, represented by the data in a data field. Instead, Ethernet simply states that within the data field parameters "full data transparency is provided, in the sense that any arbitrary sequence of octet values may appear in the data field." Appx1317.

## IV. PROCEEDINGS BEFORE THE BOARD

Amazon filed its Petition for *inter partes* review of the '004 Patent on December 8, 2021. Appx0341. The Petition challenged the validity of all claims (1-12) under 35 U.S.C. § 103. Specifically, Ground 1 challenged claim 1 as being unpatentable over Lurie; Ground 2 challenged claims 2-3 and 6-11 over Lurie and Ethernet; Ground 3 challenged claims 4-5 over Lurie, Ethernet, and Sanders; and, Ground 4 challenged claim 12 over Lurie, Ethernet, and Chow. Appx0353.

Following Patent Owner's Preliminary Response filed April 11, 2022 (Appx1708), the Board issued its Institution Decision on June 29, 2022. Appx1744. Swarm filed its Patent Owner Response (POR) on September 28, 2022. Appx2230. In its POR, Patent Owner repeatedly argued that Lurie/Ethernet failed to disclose or suggest the "search" element recited in claims 2 and 3. *See* Appx2234, Appx2261-2262, Appx2269, Appx2282, Appx2283, Appx2289.

Swarm filed its MTA on September 21, 2022 (Appx1806), and the Board issued Preliminary Guidance on January 10, 2023. Appx3304. The Board's Preliminary Guidance aligns with Swarm's non-obviousness position, agreeing that Lurie's ATD mechanism assigns tasks to the TCWs, and thus Lurie's TCWs do not select their own tasks, nor do they search the ATD mechanism:

> Lurie describes, for example, that "[t]he automatic task distribution [ATD] mechanism 260 provides notification (step 538) to the [TCW] 260 of the availability of the task," and, "[i]n response to receiving

> the notification (step 540), the technical computing worker obtains (step 544) the task provided (step 540) from the automatic task distribution [ATD] mechanism 260." Ex. 1007 ¶ 86. ***Here, the [TCW] obtains only the task for which it was notified by the automatic task distribution mechanism.*** The other cited portions of Lurie similarly fail to teach a [TCW] "proactively" retrieving a task from the automatic task distribution mechanism.
>
> * * *
>
> Accordingly, based on the current record, it appears that Petitioner has not shown a reasonable likelihood that proposed substitute claim 13 would have been obvious based on the asserted grounds.

Appx3318-3321 (emphasis added).

Notwithstanding these findings, and that no facts changed and no new information came to the Board's attention between the Board's Preliminary Guidance and the FWD, the Board changed course and instead relied on what it called Petitioner's Expert Dr. Lowenthal's "persuasive" opinions to the contrary that "it would have been obvious to a person having ordinary skill in the art for each task to include information about itself to ensure the TCW selecting it can perform it." Appx0042; *compare* Appx3320.

Swarm timely appealed.

## SUMMARY OF THE ARGUMENT

1. The Board legally erred in finding claims 2 – 12 obvious because none of the references disclose or suggest the "agent … configured to search the task

pool." The Court, therefore, should reverse the Board's decision for this reason alone, making the remaining issues involving Swarm's MTA moot.

The plain meaning of "agent … configured to search the task pool" involves interrogating the contents of the task pool and evaluating various candidate tasks to identify an appropriate task. When this construction is applied to Lurie, Lurie's TCWs do not search for tasks and this claim limitation is missing from Lurie, as well as Lurie combined with Ethernet.

The Board's determination that Lurie and Ethernet could be combined and modified to suggest the claimed "agent … configured to search the task pool" fails. In order to make that determination, the Board had to apply an incorrect construction of the "search" limitation that read out the "search" requirement. As the Board admitted, Lurie does not disclose TCWs that search for tasks. Rather, in each and every embodiment, Lurie's TCWs retrieve only that task previously assigned to them by the ATD mechanism. Ethernet merely discloses a protocol for where information goes in a packet but Ethernet provides no indication of what type of information should go into the payload enable "searching." Therefore, the combination is missing a required claim limitation and obviousness should be reversed. Further, the Board pointed to no teaching or suggestion that Lurie should somehow be modified. Indeed, it would be illogical and counterproductive for the TCWs to also

search for tasks when Lurie solely discloses the ATD assigns the specific task to the TCW.

Lowenthal's testimony, relied upon by the Board for modifying Lurie's TCWs to perform the claimed search function, is insufficient because it is based solely on Lowenthal's own speculation and finds no support in the prior art. Lowenthal simply fills the gaps in the prior art with his own unsupported conclusions. Therefore, this Court should reverse the Board's obviousness decision.

2. In addressing the MTA, the Board legally erred in finding that claims 13 and 14 are not patent eligible under 35 U.S.C. § 101. Claims 13 and 14 recite a parallel multiprocessor computing architecture that exemplifies patent eligible subject matter. Relying on an improper eligibility analysis centered around an analogy, rather than addressing *Alice's* "directed to" inquiry, the Board denied Swarm's MTA. Accordingly, this Court should reverse the Board's denial of Swarm's MTA and hold that claims 13 and 14 are directed to patent eligible subject matter.

3. The Board also legally erred in concluding that the specification fails to disclose the claim element "wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis *without any communication with the controller*." The only way the Board could reach this

conclusion is by applying an erroneous claim construction that contradicts the plain meaning of the claims and the specification. Accordingly, this Court should reverse the Board's denial of Swarm's MTA and hold that claims 13 and 14 find written description support in the original applications.

## ARGUMENT

### I. STANDARD OF REVIEW

The Board's ultimate claim construction is reviewed *de novo* and its underlying factual findings for substantial evidence. *Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*, 878 F.3d 1336, 1341 (Fed. Cir. 2018). For obviousness, the Court reviews the Board's ultimate legal conclusion *de novo* and its underlying factual determinations for substantial evidence. *In re Rudy*, 956 F.3d 1379, 1383 (Fed. Cir. 2020). Patent eligibility under 35 U.S.C. § 101 is a question of law, and may be based on underlying factual determinations. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018). Whether a claim satisfies the written description requirement under 35 U.S.C. § 112 is a question of fact reviewed for substantial evidence. *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1344 (Fed. Cir. 2016).

## II. NEITHER LURIE NOR ETHERNET DISCLOSES OR SUGGESTS AN "AGENT … CONFIGURED TO SEARCH THE TASK POOL" AS REQUIRED IN CLAIMS 2-12

This Court should reverse the Board's obviousness decision because the cited references fail to disclose or suggest the "search element" of claims 2-12:

> [3f] the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and ***the first agent is configured to search the task pool for a task of the first type***;
>
> [3g] the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the ***second type, and the second agent is configured to search the task pool for a task of the second type***;

Appx0157-0158, 14:66-15:6 (emphasis added).

### A. The Claim Limitation "Agent ... Configured to Search the Task Pool" Should be Interpreted Under its Plain Meaning as Supported by the '004 Patent Specification

The parties did not specifically dispute the meaning of the "search" element before the PTAB. However, in determining obviousness, the Board applied an implied construction that contradicts the plain meaning of the claim in light of the '004 Patent specification.

The plain meaning of "search the task pool" requires the ability to evaluate and choose among different tasks within the task pool in order to selectively retrieve

one with an appropriate task type.[2] In every '004 Patent embodiment, searching involves interrogating the contents of the task pool, and evaluating various candidate tasks to choose an appropriate task. Appx0154, 8:24-28 (" … a cell 12 acquires a task from the task pool by sending an agent 30 to interrogate (search for) the task pool and retrieve an available task 22 … that has a task type that can be performed by the [co-processor]."); *see also* Appx0031 (FWD citing PO Resp. 21 [sic 31] (Appx6511)); *accord* Appx0155, 9:18-22, 9:32-34; Appx0157, 13:16-18, 13:45-48; Appx0158, 15:1-2, 15-5-6 (claim 3).

### B. Nowhere Does Lurie or Ethernet Disclose an "Agent ... Configured to Search the Task Pool"

#### 1. Lurie's ATD Assigns Specific Predetermined Tasks to Lurie's TCWs; the TCW's Do Not Search for or Assign Tasks to Themselves

Lurie provides no disclosure that its TCWs have the ability to "search" for their own tasks as required by the '004 Patent. Rather, in each and every automated distribution embodiment of Lurie,[3] the ATD (*e.g.*, via a job manager or job runner) determines which tasks are to be performed by each TCW, and the ATD assigns a

---

[2] "Searching means locating a particular element in a collection of elements." https://ncert.nic.in/textbook/pdf/lecs106.pdf, Chapter 6 (last visited April 4, 2024).

[3] In addition to Lurie's ATD embodiments, Lurie also describes a direct distribution mode in which the TCC determines, selects, and assigns ("distributes") tasks directly to the TCWs. The Petition does not focus on direct distribution embodiments. Appx4087.

selected task to a particular TCW. *See e.g.*, Appx1255, ¶0081; Appx1259, ¶¶0100, 0103. At the point where a task is "distributed," or handed off from the ATD to a TCW, Lurie explains that the TCW receives the task from the ATD mechanism. Appx1257, ¶0091. Lurie refers to this final step in its task distribution protocols as the TCW performing a "take" or "read" operation from the ATD mechanism. *Id.* For example, as shown in in Fig. 3B, the Tasks are distributed by the ATD 260 to the TCWs 270.




Appx1226, FIG. 3B.

Lurie nowhere discloses or suggests a TCW scrolling through tasks in the ATD to determine, based on the TCW's qualifications, which task the TCW should assign to itself. By contrast, the foundational operating principle in Lurie is that the ATD determines, selects, assigns, and distributes tasks to the TCWs in each and every ATD embodiment, without exception. Consequently, in no event do Lurie's TCWs search for or select tasks, nor are they equipped to do so. Because of this arrangement and protocol, modifying Lurie's TCWs to search for their own tasks as suggested by Petitioner's expert Lowenthal, would be wholly incompatible with Lurie's detailed task distribution protocols, including the bedrock principle that task determination, selection, assignment, and distribution protocols are the sole province of the ATD, and not the TCWs. Without exception, in every automatic distribution embodiment of Lurie the ATD determines, selects, assigns, and distributes specific tasks to specific TCWs. Lurie simply uses the defined term "take" to refer to the final step in that distribution process. Indeed, the Board was apparently aware that Lurie's TCWs do not search the ATD. The Board specifically noted that "the [TCW] obtains only the task for which it was notified by the automatic task distribution mechanism." Appx3320.

In direct distribution mode, tasks are "*directly distributed* by the technical computing client to one or more technical computing workers." Appx1249, ¶¶0043, 0047. In the ATD mode, the task assignment "intelligence" resides in the ATD

mechanism. *See e.g.*, Appx1255, ¶0081 (describing that the system (i.e. the TCC or ATD mechanism) "determine or select the [TCW] to work on a task by operational and/or performance characteristics of the [TCW]."); Appx1259, ¶0100 ("[t]he job runner 667 can have such logic to determine from the worker pool 668 which [TCW] should be assigned and sent a task from the job queue 267."); *id.*, ¶0103 (same); Appx1256, ¶0086 ("[t]he automatic task distribution mechanism 260 provides notification (step 538) to the technical computing worker 260 of the availability of the task. In response to receiving the notification (step 540), the technical computing worker obtains (step 544) the task provided (step 540) from the automatic task distribution mechanism 260."). Accordingly, in ATD mode, the TCC distributes the tasks indirectly to the TCWs using the ATD as an intermediary. Appx1249-1250 ¶0050.[4] Lurie provides no support for the notion that the TCC and ATD mechanism somehow delegate their task assignment roles to the TCWs. Therefore, in no event do the TCWs participate in searching for, assigning, or selecting tasks.

### 2. Ethernet Fails to Disclose What Information Goes in a Packet to Allow the Data Frame to Search

Ethernet also provides no disclosure of how to search, much less what to search. Ethernet merely discloses a protocol for where information goes in a packet,

---

[4] The Board's conclusion that the necessary task assignment intelligence can somehow be transferred to the TCWs during ATD mode finds no evidentiary support in Lurie (or Ethernet) or Lowenthal. *See* Sec. II.C.2., *infra*.

but Ethernet provides no indication of what type of information should go into the payload to enable "searching." *See,* SOC, III.B., *supra*; Appx1315-1317. Specifically, Ethernet discloses packet portions, including a source, destination, and payload. *Id.* Ethernet does not teach anything about what to put in the payload other than data. Appx1317 ("The data field contains a sequence of n octets."). Thus, Ethernet does not address the content of any payload carried by an ethernet packet and therefore adds nothing to Lurie regarding "an agent … configured to search the task pool."

## C. The Board Fails to Show a Suggestion to Modify Lurie to Include an "Agent … Configured to Search the Task Pool"

### 1. Contrary to the Plain Language of Lurie, the Board Manufactures a Suggestion that the TCW's Search the ATD

#### a. The Board Admits that Lurie Fails to Disclose TCWs that Search for and Select the Appropriate Task

First, the Board recognizes "[t]he clearest statement [from Lurie], which Petitioner relies on" to show that a TCW purportedly "selects tasks from the task pool":

> Additionally, in any of the embodiments depicted in FIGS. 3A-3D, ***the system can determine or select the [TCW]*** 270A-270N to work on a task by operational and/or performance characteristics of the [TCW] 270A-270N and/or workstation 170A-170N.

Appx0040 (quoting Appx1255, ¶0081) (emphasis added).

The Board ignores that the quoted sentence itself treats "the system," on the one hand, as separate from the "technical computing workers," on the other hand. Moreover, the Board ignores the critical context of the remainder of ¶0081, which explains that each TCW has a profile describing its operational and performance characteristics that can be accessed by the TCC or ATD mechanism. *Id.* (explaining that determining the TCW to work on a task involves "***discover[ing]***" the "operational and performance characteristics" of the TCWs "***through [an] interface*** of the technical computing worker ….") (emphasis added). By interpreting "the system" of ¶0081 to be inclusive of the TCWs, the Board advances the contrived notion that TCWs *discover* information about themselves by interfacing themselves in order to "determine or select the [TCW] to work on a task …." *Id.* If Lurie intended the TCWs to determine, select, assign, or distribute tasks to themselves, Lurie would simply have said so.[5]

Indeed, the "system" refers to the entire distributed network computing system, *see, e.g.*, FIGs 3B, 3C, 3D, systems 310, 315, 320 (respectively), which includes the specific embodiments where the Task is provided to the TCW (*see, e.g.*, TCW in each FIGs. 6A, 6B, 6C). None of these Lurie "systems" include an

[5] Judge Howard: "If Lurie meant the TCWs, shouldn't it have -- it would have just said 'the TCWs.' Everywhere else where they're referring to TCWs, Lurie refers to TCWs, and where it means the ATD mechanism, it refers to that." Appx4086-4087.

embodiment or a suggestion for the TCW to select the Task. Regardless, the Board concludes from this "clearest statement," and without further support or citation to the '004 Patent specification or the Lowenthal testimony that "the assignment or selection of tasks can be done by ***either the ATD Mechanism, the TCW's, or a combination of the two***." Appx0041 (emphasis added).

Next, the Board interprets Lurie, contrary to the plain language, to find that the ATD "make[s] [the tasks] available for ***distribution to*** *any* of the [TCWs]," to mean that the ATD's are not distributing the tasks, but the TCW's "are selecting the tasks from the ATD." Appx0041 (quoting Appx1253, ¶0072) (emphasis added, other italics in original). The Board then posits that its conclusion must be correct, else Lurie would have specified that the ATD's distribute the task to the TCWs. Appx0041. Yet, this conclusion flies in the face of Lurie.[6]

Additionally, the Board's conclusion is at odds with its earlier position:

> Petitioner has not shown, at this stage of the proceeding, any disclosure in Lurie where a [TCW] obtains a task without first being notified that the task is available. Accordingly, Lurie's [TCW] appears to be dependent upon notification from the [ATD] mechanism for obtaining and performing each task ….

Appx3320.

[6] Recall, "ATD" means "automatic *task distribution*" mechanism. *See also* Arg. Sec. II.B.1, *supra* (showing that Lurie specified the ATD's distribute the task to the TCWs).

Yet, nothing changed between this statement and the FWD. Although the Board is entitled to change its mind between its Preliminary Guidance and Final Judgment, the Board's factual predicate (that the TCW's somehow select their own tasks) and legal conclusions (that Lurie discloses or suggests TCWs configured to search the task pool) must nonetheless be supported by substantial evidence. *See, e.g., Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366 (Fed. Cir. 2016) (reversing PTAB and holding that reliance on "common sense" without further analysis was not enough). Here, there is no evidence whatsoever – much less substantial evidence – that supports the Board's modified findings and conclusions regarding the obviousness of the claimed agent "configured to search the task pool for a task of a first type."

Even if one accepts the conclusion that Lurie ¶0072 *does not specify* that the ATD is distributing the tasks to the TWC's, which is contrary to the plain meaning of the paragraph, and contrary to the Figures, Lurie certainly *does not suggest* at ¶0072 or anywhere else that the TCW is distributing the tasks. Instead, Lurie specifically teaches that the ATD distributes the tasks for all of its embodiments. *See, e.g.,* Appx1249, ¶0044 ("The [ATD] mechanism can distribute tasks to [TCWs] that are anonymous to any [TCCs]."); *see also* Appx1249, ¶¶0045, 0048; Appx1251, ¶0061 ("The [ATD] mechanism 260 allows the [TCC] 250 to delegate the management of task distribution to the [ATD] mechanism 260."); Appx1252, ¶0064;

Appx1254, ¶¶0074 (describing FIG. 3C's "taking" of "Task1."), 0077 (the TCWs "receives tasks from" the [ATD]); Appx1255 ¶¶0078, 0082; Appx1256 ¶¶0086, 0087 (TCW "registers to receive a task from the job manager 265 or ATD 260"); Appx1257 ¶¶0088 ("the task is sent, by the job manager 265 to the [TCW] 270 as notification to perform the task"); *see also* Arg. Sec. II.B.2, *supra*. Indeed, what would be the purpose of an "automatic task distribution mechanism" if it did not distribute the tasks but held them for the TCW to search through? Additionally, why would the TCW come back to the ATD to search for a task after the ATD had distributed it to the TCW?

#### b. The Board Contradicts its Own Finding that Lowenthal's Testimony is Not "Supported"

In order for the Board to conclude that Lurie and Ethernet could somehow be combined and modified for the "TCW to search the ATD [] to select a task to perform," the Board claims to have been persuaded by Lowenthal's testimony, which the Board posits "is supported by the evidence of record." Appx0042. However, this statement expressly contradicts the Board's prior analysis concluding that Lowenthal's testimony about how Lurie could use its TCW's to search ATD's was not supported by either Lurie or Ethernet:

> At this stage of the proceeding, however, we are not persuaded by Petitioner's obviousness argument because its declarant points to no evidence in Lurie to support this argument [that Lurie's TCW retrieves a task], but rather states that Lurie "does not (and does

> not need to) explain how the TCW then retrieves its next task." Ex. 1040 ¶146 [Appx2904].
>
> Petitioner's declarant relies instead on Andrews (Ex. 1011) to meet the missing element of proactively interrogating the task pool to retrieve tasks. *See* Ex. 1040 ¶146. But Andrews is not included in Petitioner's asserted grounds ….

Appx3320-3321 (referring to nonobviousness of substitute claims) (emphasis added).

Yet Amazon presented no additional facts between Lowenthal's statement in his Supplemental Declaration (Appx2904, ¶146) and the FWD, nor does the Board point to any facts that it initially overlooked. Appx0042. Instead, the Board makes the unsupported and general statement that it now relies on Lowenthal. Contrary to the Board's position, it is required to provide a reasoned analysis for why it changed its mind based on the same facts. *See, e.g., Arendi*, 832 F.3d at 1366.

### 2. Lowenthal's Testimony that a POSITA Would Modify Lurie Such that the TCW "Searches" the ATD is Conclusory

The Board's newly found reliance on Lowenthal to support its determination that a POSITA would "have the TCW dispatch an agent to select a task that the TCW can perform" is conclusory at best. Appx0041 (citing Appx0780-0784, ¶¶203-205, 207). This Court has repeatedly emphasized that "[r]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal

conclusion of obviousness." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

Rather than point to a specific location in the prior art that teaches or suggests modification of a TCW such that it has the ability to search the ATD or to "dispatch an agent to select a task," Lowenthal simply redefines Lurie to include the elements of claim 3, relying solely on his opinion of an alleged POSITA's "knowledge." Appx0776-0784, ¶¶ 194, 203-205, 207. Yet such rationale for combining references is not sufficient. "Absent some articulated rationale, a finding that a combination of prior art would have been 'common sense' or 'intuitive' is no different than merely stating that the combination 'would have been obvious.'" *In re Van Os*, 844 F.3d 1359, 1360 (Fed. Cir. 2017). Such conclusory opinions should be reversed because they are "not sufficient and [] fraught with hindsight bias." *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358-60 (Fed. Cir. 2019).

**a. Lowenthal's ¶194 Fails to Support Modifying Lurie Such that the TCW Searches the ATD.**

The Board's FWD relies on Lowenthal ¶194 for the proposition that a POSITA would understand that Lurie's system "must have the ability to determine which TCW should ***be assigned*** which tasks …." Appx0039. Yet ¶194 only posits that the tasks have "indicia of task type," and that the characteristics of the TCWs "correspond to the task types." Appx0776, ¶194, citing Appx1255, ¶0081. From that, the Board draws the mistaken conclusion that:

> One obvious way to [determine which TCW should be assigned which tasks] is to use indicia of a task type, "*i.e.*, technical computing command, indicator of the command to be executed, or indicator of the 'operational and/or performance characteristics' that a particular TCW must have to complete the task."

Appx0039 (relying on Appx0776, ¶194 (citing Appx1255, ¶0081)). While Swarm disagrees with Lowenthal's unsupported conclusion, logically, even if accepted at face value, nothing in ¶194 teaches, much less supports, that the TCWs search the ATD.

The Court reversed the Board in *TQ Delta* because, rather than provide a reasoned analysis as to the propriety of combining references, "[t]he Board relied almost exclusively on the testimony of Cisco's expert" that a POSITA would not have combined the prior art references. 942 F.3d at 1357 (reversing holding for patentee). *TQ Delta* determined that the expert's declaration failed because it was "[u]ntethered to any supporting evidence, much less contemporaneous evidence, [the declaration] 'fail[s] to provide any meaningful explanation for why one of ordinary skill in the art would be motivated to combine these references *at the time of this invention*.'" *Id*. at 1362 (citing *InTouch Techs., Inc. v. VGo Commc'ns., Inc.*, 751 F.3d 1327, 1353-54 (Fed. Cir. 2014)). Such is the case here, where the Board relies on Lowenthal's testimony that is based on layered assumptions.

### b. Lowenthal's Conclusory ¶¶204-205 Misstate Lurie's Disclosure

The Board relies on Lowenthal ¶¶204-205 to support its conclusion that a POSITA would understand that a TCW is dispatching agents to select a task and that agent would also "search for tasks the TCW can perform." Appx0041. Yet an analysis of these two paragraphs fails to support the logical leap from selecting to searching.

First, Lowenthal simply assumes that Lurie's TCW dispatches an agent to search for a task ("so that the agent can search for and find a task type"). Appx0781. Even assuming that a data frame could be analogous to an agent, Lowenthal provides no evidence that the agent would be programmed to search the ATD. Moreover, ¶204 also fails to articulate how or why it would be obvious to modify Lurie to have its TCW dispatch an "agent" which carries a "payload" or perform a search of the ATD, referencing the function the co-processor is configured to perform. *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."). Again, under Lurie, the ATD assigns pre-selected tasks, so there is no reason for a TCW to send an "agent" or have a "payload" configured to "search for" and "find" an appropriate task in the first place.

Reliance on ¶205 is also misplaced because Lowenthal wrongly testifies that "Lurie further discloses that the ***search undertaken by an agent*** …." Appx0782,

¶205 (emphasis added). Yet, nowhere does Lurie disclose any "search" performed by the TCW, whether through "associative lookup" or otherwise. Nor does Lowenthal point to a suggestion for Lurie to search by a TWC or a TCW's alleged agent. *See, e.g.*, *D3D Techs., Inc. v. Microsoft Corp.*, 2024 U.S. App. LEXIS 3813, *7 (Fed. Cir. Feb. 20, 2024) (non-precedential) (quoting Board and agreeing that "[i]t takes a logical leap to suggest that eliminating displayed tissue means eliminating the data underlying the displayed tissue."). Here, even if a POSITA would combine Lurie with Ethernet, it takes a logical leap to go from Ethernet to what is required in the payload of the Ethernet protocol to configure the TCW to search the ATD.

#### c. Lowenthal's ¶207 Relies on its Misstatement to Render its Ultimate Conclusion

Lowenthal's ultimate conclusion relies on its own conclusory misstatement. But "[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements." *In re Kahn*, 441 F.3d at 988. The requirement for articulated reasoning with some rational underpinning to support legal conclusions is rooted in the Administrative Procedure Act to ensure due process and non-arbitrary decision making. *In re Sang-Su Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002).

Nevertheless, Lowenthal "summarizes" the above conclusory paragraphs by concluding that "the combination of Lurie and Ethernet [] discloses 'a first agent configured to search the task pool for a task of the first type,'" and that "it would

have been obvious to a POSITA to make that combination." Appx0783, ¶207. Yet, neither reference discloses "a first agent … configured to search the task pool." Lowenthal only reaches his conclusion by assuming a data frame in Ethernet is equivalent to an agent, and then further assuming that the Ethernet data frame also has search capabilities, which neither Ethernet nor Lurie teach or suggest. On top of that, only by assuming, without support, that a POSITA would be motivated to make such a combination, can Lowenthal even conclude that the combination would be obvious.

The Board erred when it accepted Lowenthal's declaratory statements which failed to provide a reasoned analysis as to the propriety of combining references or the manner of combining them.

#### 3. The Board Wrongly Held that Swarm Waived its "Search the Task Pool" Argument and then Declined to Address it

In its analysis of Claim Elements 3F and 3G, the Board failed to address the merits of Swarm's search argument: that the combination fails to teach or suggest searching the task pool. Instead, the Board determined that Patent Owner "did not raise the argument in Response." Appx0049. But that is demonstrably false. Instead, the record is replete with Swarm's assertion that Amazon failed to show the "search" limitation in the prior art. For example, in Swarm's Response:

- "Among other things, Petitioner fails to show that any of its cited references, alone or in combination, discloses or suggests: … an

'agent,' [or] a system configured to 'search the task pool for a task of the first type,' … as variously recited in the claims." Appx2234;

- "Even when Lurie is implemented over Ethernet, the combination fails to disclose or suggest an 'agent' configured to 'search' a task pool as those terms are properly viewed in the context of the '004 claims …." Appx2261-2262;

- "[A] co-processing cell which acquires a task from the task pool by sending an agent to interrogate (search) the task pool and retrieve an available task …. The cited references fail to disclose or suggest this element." Appx2261;

- "Using a payload containing a first function assists the agent in searching the task pool and selecting an appropriate task for the co-processor …. The cited references fail to disclose or suggest this function." Appx2261;

- "Yet during cross-examination, Dr. Lowenthal refused to even answer questions involving whether ***searching for a task*** requires a cell to discriminate among various task types within the task pool." Appx2269 (emphasis added);

- "Regarding the first element of Claim 2, Petitioner incorporates their previous discussion of Claim 3 and characterizes it as 'Lurie disclosing multiple coprocessors configured to retrieve, deliver, and process tasks, where ***a first task includes indicia of a first task type*** **and** ***an agent of a first co-processor is configured to search for a task of the first type***,' citing only to Lowenthal Decl. ¶238 for support." Appx2282 (emphasis in original);

- "A careful review of Lurie, however, reveals that ***Lurie does not disclose*** **the [*first agent is configured to search the task pool for a task of the first type*]** quoted by Dr. Lowenthal in his ¶238; that language appears *only* in Claim 3." Appx2283 (emphasis added); and

- "This would be properly understood by a POSITA as teaching the need for such a centralized system as opposed to teaching a distributed system where there is no ATD and where the TCW's search for and choose for themselves the tasks they will perform." Appx2289.

Given the centrality of this language to this appeal, there was plainly no forfeiture of the argument. Based on the absence of disclosure in the references for the "search the task pool" claim limitations and the conclusory nature of Lowenthal's relied-upon paragraphs, the Court should reverse the Board's obviousness determination.

## III. CLAIMS 13 AND 14 ARE PATENT ELIGIBILE UNDER § 101[7]

Whether a claim is drawn to patent-eligible subject matter is a question of law, which this Court reviews *de novo* and any underlying factual determinations are reviewed for substantial evidence. *In re Rudy*, 956 F.3d 1379, 1383 (Fed. Cir. 2020). Judicially recognized exceptions to eligible subject matter arise when "when the claims are not directed to a specific invention and instead improperly monopolize 'the basic tools of scientific and technological work.'" *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 576 (2013)).

Here, claims 13 and 14 are not directed to any abstract idea. Instead, claims 13 and 14: i) are directed to specific parallel multiprocessor computing architecture; ii) recite improvements to the operation and functionality of parallel multiprocessor computing systems; and iii) provide an inventive concept that incorporates

---

[7] Substitute claim 13 is set forth at the beginning of this brief. *See also* Appx1815-1816 (substitute claims 13 and 14).

unconventional multiprocessor arrangements and operations not previously known in the industry. The Board's holding should be reversed.

### A. *Alice* Step 1: The Substitute Claims are Directed to Specific Parallel Multiprocessor Computing Architecture

The "directed to" inquiry requires courts to consider the claims, in light of the specification, to determine whether "***their character as a whole*** is directed to excluded subject matter." *McRO,* 837 F.3d at 1312 (citation omitted, emphasis added).

#### 1. Both the Claims and the Specification Teach a Specific, Improved Parallel Multiprocessor Architecture

Claims satisfy *Alice* step one when they are "directed to a specific implementation of a solution to a problem," such as an improvement in the functioning of a computer. *Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1339 (Fed. Cir. 2016) (relating to a specific improvement in the software arts); *see also DDR Holdings, LLC v. Hotels.com, L.P*., 773 F.3d 1245 (Fed. Cir. 2014) (claims satisfy Section 101 where "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."). The '004 Patent does just that.

The specification explains that in traditional parallel multiprocessor computing architectures "[t]he CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to

the CPU, which continues to distribute additional threads to the co-processors as needed." Appx0151, 1:57-61. This traditional architecture is known as a "'controller/responder' architecture [where] the CPU is configured to directly manage and control the computational activity of the co-processors." Appx1913, *see also* Appx1827-1828.

The '004 Patent discloses that the controller/responder architecture suffers from various drawbacks, for example:

a) a substantial amount of the controller's bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks; responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors (Appx0151, 1:61-2:1);

b) dynamic changes to the system (by adding or removing co-processors) requires communication with the controller which creates additional overhead burden on the CPU (Appx0155, 10:45-57);

c) the system's co-processors are frequently idle while awaiting a new computational task assignment from the controller (Appx0151, 2:1-3); and

d) because task distribution is managed by the controller, if the controller becomes overloaded with processing demands, or if the controller becomes temporarily disconnected or unavailable, the processing activity of the coprocessors

may quickly come to a halt (impacting the system's reliability) (Appx0151, 1:61-2:7). *See also* Appx1828-1829; Appx1913-1915.

Claims 13 and 14 recite improvements that address these problems of CPU overloading, co-processor underutilization, and system reliability. In particular, claim 13 recites:

> a controller configured to populate the task pool with a plurality of [tasks] …
>
> a [first/second] autonomous coprocessor … configured to successively:
>
> proactively interrogate the task pool to retrieve a [first/second] task from the task pool without being instructed to do so by the task pool;
>
> process the [first/second] task;
>
> generate first resulting data; and
>
> update the task pool to reflect the completion of the [first/second] task,
>
> all without any communication between the [first/second] autonomous co-processor and the controller ….

Appx1841-1842.

By configuring the controller to deposit tasks into a task pool, and configuring autonomous co-processors to proactively retrieve and process tasks without any communication with the controller and without being instructed to do so by the task pool, "the processing capacity of the [co-processors] may be more fully exploited, inasmuch as the [co-processors] need not wait idly for an instruction from the CPU

11. This approach has the additional benefit of reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool." Appx0154-0155, 8:63-9:2. The '004 Patent teaches that its solution is "more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU." Appx0155, 9:2-5.

Swarm's expert, Dr. Nelson, highlights "[t]he CPU's bandwidth is no longer consumed with: searching for co-processors that are available to accept new computational processing tasks; task distribution to co-processors; waiting for tasks to be completed before distributing new tasks; responding to interrupts and other messages from the co-processors." Appx1830; *see also* Appx1919-1920. Moreover, the use of autonomous and proactive co-processors to retrieve and process tasks without communication with the CPU renders the parallel multiprocessor system "more resilient to CPU overloading, temporary disconnection, or unavailability of the CPU." Appx1831; *see also* Appx1930-1931.

Therefore, claim 13 is recites improvements to the function and operation of the computing system itself, enabling the system to "operate faster and more efficiently, with increased processing capacity, flexibility, fault tolerance, and reliability." Appx1931. This case is similar to *Visual Memory*, where this Court reversed because the claims were "directed to an improved computer memory system" rather than "the abstract idea of categorical data storage." *Visual Memory*

*LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017). As here, the specification in *Visual Memory* explained multiple benefits that flowed from the "improved memory system" with "programmable operational characteristics defined by the processor …." *Id.* at 1259. The Court recognized the savings in efficiency and increased performance. *Id.* at 1259-60; *see also* Appx0151, 1:61-2:3 (explaining problems with prior art systems) and Appx0154-0155, 8:63-9:2 (explaining improvements in both CPU and co-processor bandwidth based on unconventional arrangement).

The Board, however, found *Visual Memory* "inapposite" stating that the focus on the claims was on the asserted improvement in computer capabilities whereas here "[a]ny improvement in computer functionality comes from applying the concept of a scrum board …." Appx0095-0096. But the Board's reasoning mirrors that of the district court that was reversed in *Visual Memory*. As this Court explained "[t]o be sure, the concept of categorical data storage underlies the [claims] …. But that is not enough to doom a claim under §101 because the claims are not so limited …." *Visual Memory LLC*, 867 F.3d at 1262. "None of the claims recite all types and all forms of categorical data storage" *Id.* at 1259. Similarly, claim 13 is not limited to the abstract idea of a scrum board. Rather, claim 13 recites a specific parallel multiprocessor computing architecture.

The Board's reliance on *Accenture* is also misplaced. Not only was Accenture's hardware schematic "composed of generic computer components," but Accenture's system was that of "a typical hardware configuration of a workstation …." *Accenture Glob. Servs. v. Guidewire Software, Inc*., 728 F.3d 1336, 1343 (Fed. Cir. 2013). Here, while the '004 Patent acknowledges its invention can be implemented using off-the-shelf components and computers "that may be modified or otherwise configured to implement the functionality described,"[8] the operation and functionality of those components, and indeed the specific parallel multiprocessor computing system recited by claim 13 as a whole, are not generic or typical, and represent patent-eligible improvements over prior computing systems. Where, as here, the claims are directed to specific improvements in the functioning of a computer, they survive *Alice* step 1.[9]

In *Accenture* the invention was directed to improving the processing of "insurance-related tasks," rather than improvements to the operation of a computer itself. *Accenture*, 728 F.3d at 1343 (Fed. Cir. 2013). *Accenture* represents

---

[8] Appx0153, 5:45-49.

[9] *Visual Memory*, 867 F.3d at 1262 ("[n]or is the [] use of conventional computer components, by itself, fatal to patent eligibility where the claims 'are directed to an improvement in the functioning of a computer.'"); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1344–45 (Fed. Cir. 2018) (finding eligibility for "an asserted improvement based on assigning certain functions to particular computer components and having them interact in specified ways.").

quintessentially patent-ineligible use of a computer in its ordinary capacity to improve the performance of an economic task. *See Enfish*, 822 F.3d at 1336. In contrast, here the improvements are to the computing system itself, independent of *what* the system is being used to compute. Whether it be "data encryption; graphics, video, and audio processing; direct memory access; mathematical computations; data mining; game algorithms, [etc.]," the improvement in computing is achieved. Appx0152, 4:10-23.

By specifically claiming the solution to the problem in parallel multiprocessor computing architecture, claim 13 is not directed to an abstract idea and that should be the end of the *Alice* inquiry. *See, e.g., Enfish*, 822 F.3d at 1335, 1339 (holding "some improvements in computer-related technology when appropriately claimed are undoubtedly not abstract, *such as a chip architecture … and the like*.") (emphasis added).[10]

---

[10] The Arizona District Court agreed, holding that the original '004 Patent claims focus on problem in computing functionality and create "a *new 'multiprocessor architecture*' that 'reduces CPU management overhead' and 'more effectively harnesses and exploits available co-processing resources.'" Appx1966 (emphasis added). While this finding was made at the 12(b)(6) stage, the Arizona Court also took note that Swarm's allegations were "grounded in the contents of the '004 Patent itself." *Id.*; *but see Juniper Networks Inc. v. Swarm Tech. LLC*, 3:20-cv-03137-JD, Dkt. 92 (N.D. Cal. Aug. 1, 2022).

### 2. The Board's Incorrect Application of a "Scrum Board" Analogy Ignores the Claim as a Whole

The Board began its eligibility analysis with the scrum board analogy in mind, and then found the substitute claims ineligible pointing out the analogy with extracted pieces of the claims. Appx0090-0092.[11] The Board's "analogous to" analysis fails to consider the character of the claims "as a whole" and does not constitute a proper "directed to" analysis under *Alice*. Indeed, the Board's "analogous to" test serves only to confirm the unremarkable proposition that "[a]t some level, 'all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)).

The Board erred by separating out "elements italicized" from claim 13, (Appx0091) which it then held could be "completely performed by humans using pen and paper." Appx0092. According to the Board,

> the claim simply replaces the manager with a controller, the scrum board with a task pool, and the workers with autonomous co-processors in order to apply the well-known process to a specific computer environment.

*Id.*

---

[11] Analyzing claim 13 under the PTO Guidelines, the Board did find that the claims fell within the statutory category of a 'machine' under 35 U.S.C. § 101, but it's analysis then went directly to the "scrum board." *See* 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50, 51 (October 2019 Update) (the "Guidelines"). Appx0087.

"It is not enough, however, to merely trace the invention to some real-world analogy." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018). While the Board now claims that its "conclusion is not based on whether the proposed substitute claims are analogous to a scrum board" (Appx0092), that is belied by the Board's earlier unequivocal statements in its Preliminary Guidance: "we find that these limitations in proposed substitute claim 13 are *analogous to* a way of managing a project by posting a number of tasks and then having people separately perform the tasks." Appx3314 (emphasis added). The Board's analysis has not changed between its Preliminary Guidance and its Final Written Decision. Appx0092; *see also* Appx0099-0100 (analogizing claim elements to "a manager who no longer has to assign specific tasks to workers," and "a worker who picks up a new task from the scrum board after she completes the current task she is working on.").

Yet neither the '004 Patent specification nor the claims are related to "organizing human activity," "managing personal behavior or relationships or interactions between people," or "[m]ental processes," as asserted by the Board. Appx0092. Rather, the '004 Patented invention "involves autonomous co-processors configured to proactively retrieve tasks from a task pool populated by a central processing unit." Appx151, 1:14-18. The co-processors "interact with the

task pool without being instructed to do so by the CPU or by the task pool." Appx0151, 2:37-40. This architecture addresses a controller's "need for additional processing power," by "harness[ing] the processing power of underutilized computer resources located within the vicinity of, or otherwise available to, the user." Appx0156, 12:2-5. "Consequently, the smart phone [] becomes a co-processor seamlessly assisting the laptop [], thereby enhancing [a] video game experience. … Indeed, even the processing power of an available light-bulb [] may become a co-processor to the laptop." Appx0156, 12:18-24. Corporate scrum boards aren't particularly useful for "harnessing" people off the street.

Regardless, contrary to the Board's analysis, step one of *Alice* does not ask what the claims are "*analogous to*" at a high level of abstraction, but rather, "the claims are considered in their entirety to ascertain whether their character as a whole is *directed to* excluded subject matter." *McRO*, 837 F.3d at 1312 (quoting *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)) (emphasis added). The character of claim 13 as a whole is directed to an improved parallel multiprocessor computing architecture, not organizing human activity via a scrum board, digital or otherwise. As the Arizona District Court noted regarding the eligibility of the original '004 Patent claims, "[t]he Court understands the [scrum board] analogy but disagrees that it carries the day for purposes of step one." Appx1966.

Accordingly, this Court should reverse the PTAB's eligibility conclusions and hold claims 13 and 14 patent eligible under 35 U.S.C. § 101.

### 3. The Contrast Between the Walmart Digital Scrum Board and the Substitute Claims Highlights their Eligibility

A critical question in the eligibility analysis is whether the claimed improvement is to the functioning and operation of the computing system (eligible), or whether the claimed improvement is to an economic or other process brought about by merely performing the process on a computer (ineligible). *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).

In 2014, Walmart attempted to patent a "Hybrid Digital Scrum Board." Appx2104-2125. The Walmart patent is not at issue in this appeal. However, the contrast between Walmart's attempt to patent the use of generic computers to automate project management of employees via a digital scrum board and Swarm's parallel multiprocessor computing architecture, highlights the Board's mistake in finding the substitute claims ineligible. Appx0092. The comparison of the two inventions highlights the difference between claims directed to economic or other tasks for which a computer is used in its ordinary capacity and claims having a plain focus on an improvement to computer functionality itself.

For reference, FIG. 2 of Walmart's patent application is reproduced here:




FIG.2

Appx2122. Walmart's patent application disclosed and claimed an "electronic scrum board" (200) with "electronic sticky notes" (214) that remote users could "view and manipulate" over a network of generic computing devices. Appx2118, claim 1. Rightfully, the USPTO rejected Walmart's patent application as directed to "the abstract idea [of] generating an electronic scrum board, which is a project management activity that consists of a series of steps that can be carried out with a pen and sticky-note pad." Appx2128-2129; *see also* Appx2134-2135. Critically, nothing about the Walmart patent application improved the functionality or operation of computers themselves, rather, the Walmart application claimed improvements to conventional business processes by using generic computers to

automate project management (e.g., managing a team of software developers working on a software development project). Appx2104.

In stark contrast to Walmart's Digital Scrum Board, claim 13 does not describe an invention used for managing teams or their projects. Rather, it improves upon the prior art computing systems by modifying their fundamental operation and functionality and presents an unconventional architecture for accomplishing these improvements. Arg. Sec. III.A.1-III.A.2, *supra*; *see also* Appx1827-1833.

### B. *Alice* Step 2: The Substitute Claims Contain Inventive Concepts, Including Autonomous Co-Processors that Successively and Proactively Interrogate a Task Pool without Communication with the CPU, Rendering the Claims Patent Eligible

Although the Court need not reach *Alice* step 2, if it does, claims 13 and 14 contain "'inventive concept[s]' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (2014) (quoting *Mayo*, 566 U.S. at 72). For example, the claims require an autonomous coprocessor that successively and proactively interrogates a task pool without instruction to do so by the task pool and without any communication with the controller. Appx1841-1842.

#### 1. Under the Board's Reasoning, No Claim Would Pass *Alice* Step 2

The Board erroneously abstains from this step-two analysis, including review of the factual evidence, reasoning that "not every §101 determination contains genuine disputes over the underlying facts material to the §101 inquiry." Appx0101

(citation omitted). And, based on its refusal to consider the underlying facts, the Board mistakenly decides to look no further, deciding that because "[t]he '004 Patent describes implementing the claimed system with generic computer components," then "the additional limitations beyond the abstract idea cover merely conventional activity and do not provide an inventive concept." *Id*. Yet, the Board's determination is both logically and legally incorrect. Logically, a claim only reaches *Alice* step 2, if it is directed to an abstract idea, but according to the Board, if the claim reaches *Alice* step 2, then the "additional limitations beyond the abstract idea cover merely conventional activity," so it will never pass step 2. *Id.*

However, that is not the law. For example, in *Bascom* the Court held that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). The inventive concept in *Bascom* was the "installation of a filtering tool at a specific location, remote from end-users, with customizable filtering features specific to each end user." *Id.* Bascom described resulting advantages as allowing the server to associate individual accounts with website requests by recognizing the address from the content requestor. *Id.*

Similarly, here, the inventive concept is the specific arrangement of the autonomous co-processor to successively and proactively interrogate the task pool

to retrieve and perform tasks without communication with the CPU and without being instructed to do so by the task pool. Appx1813-1814; *see also Visual Memory*, 867 F.3d at 1262 ("[n]or is the [] use of conventional computer components, by itself, fatal to patent eligibility where the claims 'are directed to an improvement in the functioning of a computer.'"); *Ancora Techs.*, 908 F.3d at 1344–45 (finding eligibility for "an asserted improvement based on assigning certain functions to particular computer components and having them interact in specified ways.").

### 2. The Board Erred By Ignoring the Unconventional Modifications of Claimed Structural Elements that Create the Inventive Concept

By dismissing the claimed controller, task pool and co-processors as nothing more than "generic components," (Appx0094) the Board wholly ignored how each of the claimed operational, inter-operational, and arrangement limitations render the controller, task-pool, and co-processors non-generic and unconventional. Yet, whether the claim elements, or their operation or combination, are well-understood, routine, or conventional in the field or industry is a question of fact that falls under step 2. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

Prior to Swarm's invention, conventional operation of co-processors in the parallel multiprocessor computing field was, fundamentally, that of a responder to another device within a 'controller/responder' paradigm. Appx1827-1831; *see also*

Appx1913-1915, ¶¶25-29; Appx3337-3338; Appx3391-3392, ¶53; Appx0151, 1:56-2:7. In contrast to traditional co-processors (i.e., responders), the Substitute Claims recite co-processors that: 1) are autonomous, 2) proactively interrogate the task pool to retrieve a task from the task pool, 3) engage in the second step without being instructed to do so by the task pool, and 4) perform these activities without any communication with the controller. Appx1841-1842; *see also* Appx3337-3338; Appx3390-3391, ¶¶48-49, 52.

Yet, the Board summarily dismisses Swarm's non-conventionality evidence stating that it did not agree with Swarm that Lurie teaches the "conventional controller/responder paradigm" because Lurie purportedly teaches a system "in which the TCWs search the ATD mechanism for tasks …." Appx0102. Here, the Board errs because its conclusion does not follow from its premise. Even if TCWs search the ATD Mechanism (they do not), that is insufficient to show that the TCWs are not acting as "responders" under the conventional controller/responder paradigm (i.e. searching *in response to* a notification).

Moreover, the Board errs because its finding regarding Lurie is in direct conflict, and cannot be reconciled, with its other findings. The Board's Final Written Decision in the '275 Patent IPR describes precisely how Lurie's TCWs do operate according to the controller/responder paradigm. Appx0134-0137. Specifically, the Board found that "Lurie's TCW 270 only takes a task after receiving a kickoff

notification, and therefore, it is not acting proactively. … In our view, *Lurie's TCWs 270A-N are reactive*—not proactive—because they require receipt of a kickoff notification to retrieve a first task." Appx0136-0137 (emphasis added). Thus, the Board confirms that Lurie does teach the conventional controller/responder architecture from which the Substitute Claims depart.

### 3. The Board's Ignored Swarm's Expert Testimony About the Unconventionality of Substitute Claims

The Board also failed to consider Swarm's expert testimony about the non-generic and unconventional nature of the claim elements. Appx0100-0103 (failing to cite Ex. 2013 (Appx3389-3411 (Dr. Nelson's expert testimony regarding unconventionality)). "It is well established that the Board must consider all record evidence in its final written decision." *Cook Grp., Inc. v. Bos. Sci. Scimed, Inc.*, 809 F. App'x 990, 1001 (Fed. Cir 2020) (nonprecedential) (citing *Genzyme Therapeutic Prod. Ltd. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1367 (Fed. Cir. 2016)).

Swarm's expert explained the unconventionality of the autonomous co-processors in that they act "independently" of the CPU 11 and other coprocessors; and that they may "interact" with the task pool without being instructed to do so by the CPU or the task pool. Appx3390-3391, ¶50; *see also* Appx3337-3338. Dr. Nelson also explained how the co-processors are proactive when they determine that they have processing capacity. Appx3391, ¶51; *see also* Appx3338-3339.

Relying on Amazon's own conventional background and prior art, Swarm's expert meticulously demonstrated how each of Amazon's references embodied the conventional controller/responder system from which claims 13 and 14 depart. Appx3389-3411; Appx3337-3340. As an example:

> **Lurie**, **Chow**, **Batheja**, **Bates**, and **Cirne**[] ***do not disclose co-processors that are autonomous and proactive***, but rather they describe precisely the conventional responder-type devices from which the Substitute Claims depart. Each of the purported co-processors acts under the instruction or control of another entity.
>
> In **Lurie**, the ***controlling entity is ATD mechanism***. *See e.g.*, Ex. 1007, [0100] (an "automatic task distribution mechanism 260 can be responsible for determining the technical computing worker 270A-270N to be assigned a task and to send the task to the assigned technical computing worker 270A-270N."); see also id., [0087] ("In an exemplary embodiment, the technical computing worker registers to receive a task from the job manager 265 or automatic task distribution mechanism 260 as notification to perform computing on the task.").
>
> In **Chow**, the ***controlling entity is the single system kernel which governs all activities of all processors***. *See e.g.*, Ex. 1008, [0017] ("the multiprocessing system 100 must be tightly coupled.") (emphasis added).
>
> In **Batheja**, the ***controlling entity is the inference engine***. *See e.g.*, Ex. 1012 at 4 ("the inference engine makes a decision on the worker's current availability status and passes an appropriate signal back to the worker. … The worker enters the running state in response to a Start or Resume signal.").
>
> In **Bates**, the ***controlling entity is the PPU***. *See e.g.*, Ex. 1013, [0063] ("In this code, a PPU process

> initializes an STM instance. STM Kernels are launched and the PPU process adds SPU Program images.”).
>
> In **Cirne**, ***the controlling entity is the scheduler*** (running on the home machine). See e.g., Ex. 1055 at 11 (“The Scheduler chooses which machine runs each task, submits the tasks for execution, and monitors their progress.”).
>
> ***These conventional systems provide significant evidence that the Substitute Claims recite an unconventional system***.

Appx3401-3402 ¶78 (emphasis added); Appx3339-3334. The Board’s disregard of this factual evidence and proclaiming that the terms are conventional without analysis of the claim as a whole is plainly incorrect. *See e.g., McRO,* 837 F.3d at 1312; *see also Aatrix*, 882 F.3d at 1128.

The Court should therefore reverse the Board and hold that claims 13 and 14 are patent eligible.

## IV. THE SUBSTITUTE CLAIMS SATISFY THE WRITTEN DESCRIPTION REQUIREMENT OF § 112

### A. The Board’s Construction of “Without Any Communication” Contradicts the Plain Meaning of the Claims and the Specification

Claim limitation 13[g] recites “wherein the processing system is configured to dynamically accept the first <u>autonomous</u> co-processor, the second <u>autonomous</u> co-processor, and an additional <u>autonomous</u> co-processor into the processing system on a plug-and-play basis ***without any communication with the controller***.” Appx1842 (underlining in original, other emphasis added).

The Board erroneously determined that the applications from which the ’004 Patent issued[12] did not provide written description support for limitation 13[g]. Appx0079-0084. The Board’s particular focus here was on the negative limitation “without any communication.” Appx0080. Notably, this claim limitation—“without any communication”—appears in identical fashion in both substitute claim 13 and original claims 1 and 3 of the ’004 Patent. Appx0157 (’004 Patent, claims 1 and 3) and Appx1841-1842 (presenting claim 13 as a markup of original claim 1). Therefore, the limitation at issue, “without any communication,” was not added by amendment in Swarm’s MTA and was compliant with statutory requirements. *See* 35 U.S.C. § 316(d)(3) (“An amendment under this subsection may not enlarge the scope of the claims of the patent or introduce new matter.”).

The limitation, “without any communication,” appears three times within each of claim 13 and claims 1 and 3 of the ’004 Patent. Specifically, the “without any communication” limitation is recited as applied to two particular operations performed by the claimed parallel multiprocessor computing system. The first operation relates to computational task retrieval, processing, and reporting by the co-processors “all ***without any communication*** between the [first/second] autonomous

[12] The ’004 Patent issued from U.S. Patent Application No. 14/340,332 (the “’332 Application”) (Appx1849-1885), which claimed priority to U.S. Patent Application No. 13/750,696 (the “’696 Application”) (Appx1886-1901). The ’332 Application incorporates the ’696 Application by reference.

co-processor and the controller ….” Appx1841-1842 (emphasis added)*; see also* Appx0156, 11:31-34 (“Significantly, the retrieval of tasks and the processing of data by the [co-processors] may occur without direct communication between the CPU and the various [co-processors].”).[13] The second operation relates to “dynamically accept[ing] the [co-processors] into the processing system on a plug-and-play basis ***without any communication*** with the controller ….” Appx1842 (emphasis added).

The Board erred by adopting a construction of “without any communication” that is directly at odds and logically inconsistent with the plain language of the claims. *Becton, Dickinson & Co. v. Tyco Healthcare Grp.*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) (“A claim construction that renders asserted claims facially nonsensical ‘cannot be correct’” (citation omitted)); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) (“this court strives to reach a claim construction that does not render claim language in dependent claims meaningless”); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) (“the claims themselves provide substantial guidance as to the meaning of particular claim terms.”). Specifically, the Board erred in finding that the claim limitation “[without] any communication” means “[without] both direct and indirect communication.” Appx0084.

---

[13] Neither Petitioner nor the Board has challenged the negative limitation as used in the first operation.

Notably, the Board's conclusory claim construction requirement that "[a]ny communication includes both direct and indirect communication," was made without any *Phillips* analysis or citation to intrinsic or extrinsic evidence. Appx0084; *See* 37 C.F.R. § 42.100(b) ("a claim proposed in a motion to amend … shall be construed using the same claim construction standard that would be used to construe the claim in a civil action …."); *see also Monsanto Tech. LLC v. E.I. DuPont De Nemours & Co.*, 878 F.3d 1336, 1341 (Fed. Cir. 2018) (holding that "[c]laim construction must … be explicit, at least as to any construction disputed by the parties") (internal citation omitted).

Even a cursory review of the surrounding claim language confirms that the Board's construction of "without any communication" to include "without any [indirect] communication" cannot be logically reconciled with the express language of the claims and the specification. Consider, for example, the first operation described above. Substitute Claim 13 recites:

i. "a controller configured to populate the task pool with first tasks;" and

ii. "a first autonomous co-processor … configured to successively: proactively interrogate the task pool to retrieve a first task from the task pool … all without any communication between the first autonomous co-processor and the controller …."

Appx1841.

When the controller populates the task pool with a task that is eventually retrieved and processed by the co-processor, an indirect communication has

occurred between the co-processor and the controller via the task pool. Indirect communication again occurs when, as claim 13 describes, the co-processor updates the task pool to reflect completion of the task and the task pool sends a task completion notification back to the controller. *Id.* Thus, claim 13 expressly requires indirect communications between the co-processor and controller, via the task pool. Therefore, it logically cannot be that such operations occur "without any [indirect] communication," when in fact the foregoing operations are simultaneously defined to require indirect communications. *Becton,* 616 F.3d at 1255 ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct'").

As another example, consider dependent claim 10 of the '004 Patent, which expressly requires that *all* communications between the controller and co-processor occur via indirect communication. Appx0158, 16:28-31 ("wherein the controller is configured to communicate with the first co-processor and the second co-processor *only indirectly* through the task pool.") (emphasis added). Again, it logically cannot be that the co-processor and controller operate "without any [indirect] communication" while simultaneously requiring the controller to communicate with the co-processors via indirect communication ("only indirectly through the task pool"). *See Ortho-McNeil*, 520 F.3d at 1362 ("this court strives to reach a claim construction that does not render claim language in dependent claims meaningless").

The requirements of claim 10 that "the controller is configured to communicate with the first and second co-processors only indirectly through the task pool" further confirm that the proper construction of "without any communication" in claims 1, 3, and claim 13, is—and can only be—"without any *direct* communication." Appx0158, 16:28-31.

This construction is consistently supported by embodiments from the '004 Patent specification where, for example, "some or all of the co-processing cells may connect directly to the task pool 13, such as by a wired configuration that does not require a switching fabric 14 for communication." Appx0155, 10:45-48; *see also* Appx0152, 4:44-46 ("[i]n some embodiments, the CPU 11 communicates with the cells 12 only indirectly through the task pool."). After analyzing these embodiments in detail, Dr. Nelson testified that "[a] POSITA would understand that in such a configuration, the co-processors are inherently incapable of communicating with the CPU directly." Appx3385; *see also* Appx3383-3389, ¶¶32-46.

Again, it is critical to note that the Board made no attempt to analyze or support its construction in view of the claims or the specification. Appx0084; *see* 37 C.F.R. § 42.100(b). Nor did the Board consider how its construction of "without any communication" to include "without any [indirect] communication" would undermine the entirety of its decision finding original claims 1-12 unpatentable over the Lurie/Ethernet combination. To wit, it has been the fundamental position of

Amazon since its Petition that "Lurie expressly confirms that ***the TCC does not communicate with the TCWs*** during this process, ***as the ATD Mechanism 'provides a level of indirection' between the TCC and the TCWs***." Appx0379-0380 (emphasis added) (also citing Appx1251 (Lurie ¶0061); Appx1253 (Lurie ¶0071); Appx1257-1258 (Lurie ¶0092); Appx0758 (Lowenthal, ¶¶150-151)).

Having erroneously construed the phrase "without any communication," it was impossible for the Board to correctly determine whether there was written description support for it. Therefore, the Board could not have had substantial evidence on which to base its finding on written description support. While the Board correctly acknowledged Swarm's showing that "the '332 application adds processors without any *direct* communication," the Board erred by dismissing Swarm's arguments, and in concluding that Swarm failed to show written description "without any …indirect communication via the task pool." Appx0084; *see also* Appx3329-3332 (showing Swarm's written description support for the "without any communication" limitation).

Under the correct construction of "without any communication" to mean "without any ***direct*** communication," the Court need not remand to the Board, but can reverse the Board's ruling because under this claim construction, Amazon did not contest satisfaction of the existence of written description requirement. Appx0084.

Nevertheless, Swarm has shown ample written description support.

### B. The ’332 and ’696 Applications Provide Ample Written Description Support for the Claims Under the Proper Construction

The test for determining compliance with the written description requirement is “whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.” *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). Where, as here, a claim element may be styled as a negative limitation, “there is adequate written description when, for example, ‘the specification describes a reason to exclude the relevant [element].’” *Novartis Pharms. Corp. v. Accord Healthcare, Inc., et al.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (quoting *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012)). Support for the negative limitation “could be found in ‘statements in the specification expressly listing the disadvantages of using’ that element,” or, alternatively where “the specification ‘distinguishes among’ the element and alternatives to it.” *Id*. (quoting *Santarus*, 694 F.3d at 1351 (first quote); (quoting *Inphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1357 (Fed. Cir. 2015) (second quote)). In addition, “the written description requirement may be satisfied when a skilled artisan would understand the specification as *inherently disclosing the negative limitation*.” *Novartis*, 38 F.4th at 1017-18 (emphasis added).

Therefore, here, Swarm need only show the ’332 and ’696 Applications (hereinafter, the “Applications”) include one of: i) express or inherent disclosure of the negative limitation; ii) a reason to exclude or a list of disadvantages of using the relevant element in the disclosure; or, iii) distinguishing between the negative limitation and alternatives to it in the disclosure.

### 1. The Applications Provide Express/Inherent Support

Substitute Claim element [13g] recites that the “processing system is configured to dynamically accept” co-processors into the system “without any communication with the controller.” Appx1842. FIG. 1 of the Applications (reproduced below) depicts a system (10) comprising: a CPU/controller (11), co-processors (12A-12n), and task pool (13). *See* Appx1888, Appx1855-1856.



FIG. 1

Appx1900, FIG. 1 (identification added).

FIG. 1 depicts various potential connections/communication paths between the devices of the system, including a communication path via a central switching fabric (14). Appx1887-1888; Appx1852; Appx1855. However, not all embodiments described by the Applications utilize the switching fabric. For example, "[t]he CPU 11 may communicate with the task pool 13 directly," as opposed to communicating via the switching fabric. Appx1888; Appx1855; Appx1900, FIG. 1 (showing connection between CPU 11 and switching fabric 14 as optional).

The Applications further explain that the co-processors 12 "may connect directly to the task pool 13, such as by a wired configuration that does not require a switching fabric 14 to handle communications." Appx1895; Appx1867. According

to Dr. Nelson, by wiring the co-processors directly to the task pool without the switching fabric, "a POSITA would understand … the co-processors are inherently incapable of communicating with the CPU directly." Appx3331; Appx3385; *see also* Appx3383-3389 (Dr. Nelson testifying a POSITA would understand that the inventor of the '696 Application was in possession of Substitute Claim element [13g] at the time of filing.").

Dr. Nelson's analysis is consistent with the description that "[i]n some embodiments, the CPU 11 communicates with the cells 12 *only indirectly* through the task pool." Appx1855 (emphasis added). Thus, this embodiment provides express/inherent written description support for the addition of co-processors to the system without any communication with the controller. Appx3330-3331.

The Board dismissed this evidence as insufficient to show written description support because the embodiments still allowed for "indirect communication via the task pool." Appx0084. However, the Board's determination was based on the Board's erroneous construction of "without any communication" to include "without any [indirect] communication." Under the correct construction, Swarm's showing of the dynamic acceptance of co-processors without any direct communication with the controller is entirely sufficient.

Further confirming that the above-described acceptance of co-processors is accomplished without communication with the controller, the Applications describe

that "co-processors may be added and removed without reprogramming the CPU 11 to account for the changes to the system 10." Appx1867; Appx1895. That is, the whole process of co-processor acceptance into the system can be managed by the task pool. Appx1866 ("[t]o guard against undesirable connections, the CPU 11 may provide the task pool 13 with a list of or, alternatively, criteria for identifying trusted and/or untrusted cells *as well as authentication requirements or protocols*.") (emphasis added).[14]

Because the Applications provide express/inherent written description support for a system configured to accept co-processors "without any communication with the controller," claims 13 and 14 satisfy §112.

**2. The Applications Provide a Reason to Exclude Communication with the Controller**

The Applications also describe reasons to exclude communication with the CPU/controller. The Applications describe that "[a] multiprocessor architecture [is] thus needed which *reduces CPU management overhead* …." Appx1851; *see also*

[14] While not controlling or dispositive for purposes of written description support, it is notable that Amazon asserted, and the Board agreed, that Lurie discloses the dynamic acceptance of co-processors "without any communication" with the controller because Lurie TCWs are described to "dynamically register[] with … the ATD Mechanism (not the TCC)." Appx0382; Appx0024-0025. In similar fashion, the co-processors of the '004 Patent "may connect directly to the task pool," and the task pool can administer "authentication requirements or protocols." Appx1866-1867.

Appx1886. This "[CPU] management may include: … responding to other messages from co-processors." Appx1850; Appx1886. The Board erroneously dismisses this evidence because it does not specifically call for the reduction or elimination of CPU communication when adding an additional co-processor. Appx0082. Such *in haec verba* recitation is not required. *See ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009) (holding "[s]uch description need not recite the claimed invention *in haec verba* but must do more than merely disclose that which would render the claimed invention obvious"). And the Board misses the larger point, the reduction of CPU management overhead is an overarching goal of the '004 Patent and provides reason to exclude communication with the controller wherever possible. Appx3329-3330 ("a POSITA would understand the specification to convey that the inventor intended, as a major objective of the '696 Application, to provide a multiprocessor system that reduces or eliminates any CPU processing time spent managing or communicating with co-processors.").

Co-processor autonomy provides yet another reason to exclude communication. A significant "object of the invention" is "that the co-processors be capable of acting autonomously." Appx1887; Appx1851. Acting autonomously is described as, *inter alia,* "act[ing] independently of the CPU …." Appx1892. For example, the co-processors autonomously (independently of the CPU) "seek[] labor within the task pool []." *Id.* As a result, "the system [is] more efficient than

traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU." Appx1893. "A POSITA would understand the '696 Application to convey that the inventor intended the multiprocessor system to have co-processors act autonomously (i.e. independently of the CPU) in all facets of their operation." Appx3330; Appx3384. This would include autonomy of the co-processor joining the system (independently of the CPU).

Because the Applications provide multiple reasons to exclude communication with the controller during acceptance of co-processors, including reduction of CPU management overhead and co-processor autonomy, claims 13 and 14 satisfy §112.

### 3. The Applications Distinguish Between the Negative Limitation and Alternatives to the Negative Limitation

Written description support for a negative limitation can be found "where 'the specification "distinguishes among" the element and alternatives to it.'" *Novartis* 38 F.4th at 1016. Here, the Applications are not simply silent regarding a positive recitation of communication between the CPU and co-processors. Instead, alternative embodiments are presented where on the one hand, "the CPU 11 may [] communicate directly with the [co-processors] without using the task pool as an intermediary," and on the other hand "the CPU 11 communicates with the [co-processors] only indirectly through the task pool," Appx1855-1856.

Alternatives are also incorporated into FIG. 1 and its supporting description. The Applications describe an embodiment where the CPU and co-processors can be connected by the switching fabric, which "facilitates communication" between the devices. Appx1852. And alternatively, the co-processors can be directly wired to the task pool, without a switching fabric, such that each of the co-processors are inherently incapable of direct communication with the controller. Appx1867. Importantly, this "wired" embodiment is described to "facilitate dynamic expansion and contraction of the system …." *Id.*; *see also* Appx1895.

Because the Applications distinguish between the negative limitation and its alternatives, claims 13 and 14 satisfy §112.

Because claims 13 and 14 are patent eligible under §101 and have written description support under §112, this Court should reverse the Board's determination that Swarm failed to satisfy the statutory and regulatory requirements of the MTA.

### C. Contrary to the Board's Assertion, Swarm Properly Complied with 37 C.F.R. § 42.121

The Board mistakenly asserts that "Patent Owner only cites to paragraphs in the '696 application," and that "Patent Owner does not cite to a corresponding section of the '332 application, which is necessary to show written description support." Appx0083, n.22; *see also* Appx0080, n.21. This is incorrect. Swarm set forth the written description support in its MTA, citing both the original disclosure ('332 Application) and the earlier-filed disclosure ('696 Application) as required by

37 C.F.R. § 42.121. Appx1812-1816. Swarm additionally set forth written description support in its Reply to Amazon's Opposition to the MTA, again citing to both the '332 and '696 Applications. Appx3329-3332.

## CONCLUSION

This Court should reverse the Board's decision that claims 2-12 of the '004 Patent are obvious. Additionally, this Court should reverse the Board's decision that substitute claims 13 and 14 are not patentable.

April 8, 2024

Respectfully submitted,

/s/ *Michel K. Kelly*

Michael K. Kelly
Christine N. Jones
Daniel J. Anderson
**NEWMAN JONES, PLLC**
14747 N. Northsight Blvd.
Suite 111-143
Scottsdale, Arizona 85260
mkelly@newmanjones.com

Meredith Martin Addy
**ADDYHART P.C.**
10 Glenlake Parkway
Suite 130
Atlanta, Georgia 30328
meredith@addyhart.com
(312) 321-4200

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

***Swarm Technology LLC v. Amazon.com, Inc.***
Nos. 23-2323, 24-1095

This brief complies with the relevant type-volume limitation of the Federal Rule of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally-spaced typeface and includes 13,979 words.

Dated: April 8, 2024

By: /s/ *Meredith Martin Addy*
Meredith Martin Addy

# ADDENDUM

PTAB Judgment .......................................................................... Appx0001

PTAB Final Written Decision ........................................................ Appx0107

U.S. Patent 9,852,004 B2 ............................................................ Appx0143

U.S. Patent 10,592,275 B2 .......................................................... Appx0159

Trials@uspto.gov
571-272-7822

Paper 43
Date: June 20, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AMAZON.COM, INC. and
AMAZON WEB SERVICES, INC.,
Petitioner,

v.

SWARM TECHNOLOGY LLC,
Patent Owner.

---

IPR2022-00283
Patent 9,852,004 B2

---

Before MICHAEL R. ZECHER, GREGG I. ANDERSON, and SCOTT B. HOWARD, *Administrative Patent Judges*.

HOWARD, *Administrative Patent Judge*.

JUDGMENT
Determining All Challenged Claims Unpatentable
Denying Patent Owner's Motion to Amend
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

Amazon.com, Inc. and Amazon Web Services, Inc. (collectively "Petitioner") filed a Petition requesting *inter partes* review ("IPR") of claims 1–12 of U.S. Patent No. 9,852,004 B2 (Ex. 1001, "the '004 patent"). Paper 2 ("Pet."). Swarm Technology LLC ("Patent Owner") filed a Preliminary Response. Paper 5. We instituted an *inter partes* review of claims 1–12 of the '004 patent on all grounds of unpatentability alleged in the Petition. Paper 6 ("Institution Decision" or "Inst. Dec.").

After institution of trial, Patent Owner filed a Corrected Response (Paper 16, "PO Resp."), Petitioner filed a Reply (Paper 19, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 24, "PO Sur-reply").

Patent Owner also filed a Contingent Motion to Amend the '004 patent (Paper 12, "MTA"), to which Petitioner filed an Opposition (Paper 20, "MTA Opp."). We issued Preliminary Guidance (Paper 22, "Prelim. Guid.") concerning the Contingent Motion to Amend. Following the Preliminary Guidance, Patent Owner filed a Reply to Petitioner's Opposition (Paper 23, "MTA Reply"), and Petitioner filed a Sur-reply to Patent Owner's Reply (Paper 35, "MTA Sur-reply").

An oral hearing was held on March 29, 2023, and the record contains a transcript of this hearing. Paper 42 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that all the challenged claims are unpatentable. Additionally, because we determine that Patent Owner has not met the statutory and regulatory requirements associated with filing a motion to amend and

Petitioner has shown by a preponderance of the evidence that the proposed substitute claims are unpatentable, we deny Patent Owner's Contingent Motion to Amend.

### *B. Real Parties in Interest*

Petitioner identifies Amazon.com, Inc. and Amazon Web Services, Inc. as the real parties in interest. Pet. 78.

Patent Owner identifies Swarm Technology LLC as the real party in interest. Paper 3, 1 (Patent Owner's Mandatory Notices).

### *C. Related Matters*

The parties identify the following district court proceedings involving the '004 patent: (1) *Juniper Networks, Inc. v. Swarm Technology LLC*, No. 3:20-cv-03137-JD (N.D. Cal.) ("California proceeding") and (2) *Swarm Technology, LLC v. Amazon.com, Inc.*, No. 2:21-cv-00438-DJH (D. Az.) ("Arizona proceeding"). Pet. 79; Paper 3, 1–2. The parties also identify the following *inter partes* review proceeding involving the '004 patent: *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2021-01445.[1] Pet. 79; Paper 3, 2.

Additionally, the parties identify a number of patents and patent applications related to the '004 patent and *inter partes* review proceedings involving some of those patents. Pet. 79; Paper 3, 2–3.

---

[1] We issued a Final Written Decision finding that the petitioner had not shown by a preponderance of the evidence that claims 1–12 of the '004 patent were unpatentable. *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2021-01445, Paper 62; *see also id.*, Paper 64 (denying request for rehearing).

*D. The ’004 Patent*

The ’004 patent is titled “System and Method for Parallel Processing Using Dynamically Configurable Proactive Co-Processing Cells” and is generally directed to “a processing architecture which involves autonomous co-processors configured to proactively retrieve tasks from a task pool populated by a central processing unit.” Ex. 1001, code (54), 1:14–18.

According to the ’004 patent, “[c]omputer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user’s perspective the applications appear to be processed in parallel.” Ex. 1001, 1:42–47. The ’004 patent further states that “[t]rue parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors.” Ex. 1001, 1:47–50. “A typical multiprocessor system includes a central processing unit (‘CPU’)[2] and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed.” Ex. 1001, 1:56–61 (footnote added).

The ’004 patent identifies a problem with using the CPU to control the distribution of tasks:

> Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be

[2] The challenged claims use the term “controller” instead of CPU. *See* PO Resp. 2.

> completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

Ex. 1001, 1:61–2:3. The ’004 patent addresses that problem using a system that reduces CPU management overhead and which “more effectively harnesses and exploits available co-processing resources.” Ex. 1001, 2:4–7.

Figure 1 of the ’004 patent is reproduced below.




FIG. 1

Figure 1 “is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric.” Ex. 1001, 3:56–59. More specifically, Figure 1 shows “a single or multi-core CPU 11 and one or more solidarity or co-processing cells 12A-12[n] configured to communicate with a task pool 13 through a cross-bar switching fabric 14. The solidarity cells 12 may also communicate with each other through the switching fabric 14 or

through a separate cell bus (not shown)." Ex. 1001, 4:30–36. "The CPU 11 may communicate with the task pool 13 directly or through the switching fabric 14. One or more memory units 15 each contain data and/or instructions" to perform computations. Ex. 1001, 4:36–39.

### *E. Illustrative Claim*

Claims 1 and 3 are independent, reproduced below, and are illustrative of the claimed invention.

> 1. [1pre] A processing system, comprising:
>
> [1a] a task pool;
>
> [1b] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;
>
> [1c] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and
>
> [1d] a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;
>
> [1e] wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller.
>
> 3. [3pre] A processing system, comprising:
>
> [3a] a task pool;
>
> [3b] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

[3c] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

[3d] a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

[3e] wherein:

the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

[3f] the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type;

[3g] the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type;

[3h] the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload; and

[3i] the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

[3j] and further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination

address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

[3k] when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;

[3l] when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform; and

[3m] when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.

Ex. 1001, 14:10–32, 14:42–15:35.

*F. Prior Art and Asserted Grounds*

Petitioner asserts that claims 1–12 would have been unpatentable based on the following grounds:

| **Claim(s) Challenged** | **35 U.S.C. §[3]** | **Reference(s)/Basis** |
|---|---|---|
| 1 | 103(a) | Lurie[4] |

[3] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. §§ 102, 103 that became effective on March 16, 2013. Because the '004 patent claims the benefit of the priority date of U.S. Patent Application No. 13/750,696, which was filed before March 16, 2013, and neither party has argued that the provisions of the AIA apply, we apply the pre-AIA versions of the statutory bases for unpatentability. *See* Ex. 1001, code (63).

[4] US 2007/0124363 Al, published May 31, 2007 (Ex. 1007).

| Claim(s) Challenged | 35 U.S.C. §[3] | Reference(s)/Basis |
|---|---|---|
| 2, 3, 6–11 | 103(a) | Lurie, Ethernet Specification[5] |
| 4, 5 | 103(a) | Lurie, Ethernet Specification, Sander[6] |
| 12 | 103(a) | Lurie, Ethernet Specification, Chow[7] |

Petitioner also relies on the testimony of David Lowenthal (Ex. 1003 (Declaration of Dr. Lowenthal); Ex. 1040 (Supplemental Declaration of Dr. Lowenthal)) and Ingrid Hsieh-Yee, Ph.D. (Ex. 1005 (Declaration of Ingrid Shieh-Yee, Ph.D.)). Dr. Lowenthal was cross-examined by Patent Owner. Ex. 1035; Ex. 2015. Patent Owner relies on the testimony of Dr. Brent Nelson (Ex. 2004 (Declaration of Dr. Brent Nelson); Ex. 2011 (Declaration of Dr. Brent Nelson); Ex. 2013 (Supplemental Declaration of Dr. Nelson)). Dr. Nelson was cross-examined by Petitioner. Ex. 1036; Ex. 1067.

## II. ANALYSIS

### *A. Legal Standards*

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set out a framework for assessing obviousness under 35 U.S.C. § 103(a) that requires consideration of four factors: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) if in evidence, "secondary considerations" of non-obviousness such as

[5] The Ethernet, A Local Area Network, Data Link Layer and Physical Layer Specifications, dated Sept. 30, 1980 (Ex. 1009). All citations are to the native pagination.

[6] US 2012/0192201 A1, published July 26, 2012 (Ex. 1010).

[7] US 2005/0132380 A1, published June 16, 2005 (Ex. 1008).

"commercial success, long felt but unsolved needs, failure of others, etc." *Id.* at 17–18. "While the sequence of these questions might be reordered in any particular case," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007), the U.S. Court of Appeals for the Federal Circuit has repeatedly emphasized that "it is error to reach a conclusion of obviousness until all those factors are considered," *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).[8]

*B. Level of Ordinary Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed.

[8] Because neither party addresses objective evidence of non-obviousness, we focus solely on the first three *Graham* factors.

Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

Petitioner argues that a person having ordinary skill in the art "would have had a bachelor's degree in computer science, computer engineering, or a related field, and about five years of industry or academic research experience in parallel or distributed computing, system architecture, or an equivalent." Pet. 4 (citing Ex. 1003 ¶¶ 40–42). Petitioner further argues that "[a] post-graduate degree or additional formal education can compensate for less experience, and vice-versa." Pet. 4 (citing Ex. 1003 ¶¶ 40–42).

Patent Owner does not address the level of skill in the art. *See* PO Resp.

Because Petitioner's formulation of the level of ordinary skill in the art appears to be consistent with the '004 patent and the asserted prior art and is not challenged by Patent Owner, we adopt it and apply it in our obviousness evaluations below.

*C. Claim Construction*

We apply the same claim construction standard used in the federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), which is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b) (2021). Under the *Phillips* standard, the "words of a claim 'are generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13.

Petitioner states that "[t]he prior art relied on in this Petition discloses the subject matter of the challenged claims under any reasonable construction, including their plain meaning." Pet. 5.

Patent Owner states that claim 1 of the '004 patent "is properly construed to recite a plurality of first tasks <u>having indicia of a first task type</u>, and a plurality of second tasks <u>having indicia of a second task type</u>." PO Resp. 5 (emphasis in original). Patent Owner argues that "[t]he plain meanings of various other claim limitations are discussed in the context of particular claims and in view of the specification." PO Resp. 6.

*1. Having Indicia of a First/Second Task Type*

*a) The Parties' Arguments*

Patent Owner argues that the first and second tasks recited in claim 1 require "having indicia of a [first/second] task type." PO Resp. 5 (emphasis omitted). According to Patent Owner, a person having ordinary skill in the art "would understand that the task groupings are associated with corresponding 'indicia' of a 'type' of task which itself is associated with the functionality necessary for a co-processor to perform that type of task." PO Resp. 5–6 (citing Ex. 2011 ¶ 42).[9] Specifically, Patent Owner argues, "[w]henever a task or groups of tasks are described in the '004 Patent, it is clear to a [person having ordinary skill in the art] that the tasks are to be

[9] The parties refer generically to declaration and cross-examination testimony without citing the specific exhibit being referenced. Such citations without the exhibit number are unhelpful in cases such as this where there are multiple declarations and depositions for each declarant. The parties may want to simply cite the exhibit numbers in future proceedings before the Board. When reviewing the entire trial record, we have done our best to identify which specific document the parties are citing from.

apportioned by task type, rather than using arbitrary subsets." PO Resp. 6; *see also* Ex. 1001, 6:42–48, 12:43–44; PO Sur-reply 5–6.

Patent Owner also argues that it "does not seek to import 'new limitations into the claim.'" PO Sur-reply 6 (quoting Pet. Reply 2). Instead, Patent Owner argues that it "seeks to prevent Petitioner from ignoring the plain meaning of the claimed 'first' and 'second' pluralities of tasks (i.e., that they are qualitatively distinct in some way), in favor of a contrived interpretation in which the first and second groups of tasks are arbitrary." PO Sur-reply 6.

Petitioner argues that Patent Owner "is urging the Board to commit the '"cardinal sin" of claim construction by importing limitations from the written description into the claims.'" Pet. Reply 2–3 (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002)). Petitioner further argues that Patent Owner "points to no clear disavowal of claim scope to support adding these 'indicia' limitations, as there is none." *Id.* at 3.

Petitioner also argues that, because "these 'indicia' limitations are expressly recited in dependent claim 2 and independent claim 3," "[c]laim 1 is therefore broader in that respect, including tasks with and without such indicia." Pet. Reply 3 (citing *Springfield Co. v. Staubli Corp.*, No. 97-1458, 1998 WL 180493, at *2 (Fed. Cir. Apr. 17, 1998) (unpublished)). According to Petitioner, "construing claim 1 to require these 'indicia' impermissibly renders the 'indicia' language in claims 2 and 3 superfluous." *Id.* (citing *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008)).

*b) Our Analysis*

Based on the fully developed record, we do not agree with Patent Owner that the first and second task recited in claim 1 require "having indicia of a [first/second] task type." Rather, as Petitioner persuasively argues, Patent Owner is attempting to improperly read into independent claim 1 limitations from the Specification that are separately claimed in dependent claim 2 and independent claim 3.

We begin our claim construction analysis, as always, "with the words of the claims themselves." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006). "[W]ords of a claim are generally given their ordinary and customary meaning," i.e., "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (internal quotation marks and citation omitted). "The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history." *Teleflex*, 299 F.3d at 1324. A person having ordinary skill in the art "is deemed to read [a] claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "A patent's specification, together with its prosecution history, constitutes intrinsic evidence to which the PTAB gives priority when it construes claims." *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1361−62 (Fed. Cir. 2018).

Claim 1 recites, in relevant part, "a controller configured to populate the task pool with *a plurality of first tasks and a plurality of second tasks*." Ex. 1001, 14:12–13 (emphasis added). Although claim 1 recites two separate pluralities of tasks, it provides no further limitations on those tasks.

There is no recitation of the tasks having any indicia of different types. *See* Ex. 1001, 14:10–32. Nor is there any discussion of how the tasks are separated into "a plurality of first tasks and a plurality of second tasks." Ex. 1001, 14:12–13. Thus, based on the plain meaning of the words of the claim, there is no requirement that the tasks have an indicia.

The lack of a requirement of an indicia in claim 1 is corroborated by looking at dependent claim 2 (which depends from claim 1) and independent claim 3. Claim 2 further defines the plurality of first and second tasks and recites that the first and second tasks "includes indicia of a [first/second] task type." Ex. 1001, 14:33–41. The fact that claim 2 specifically recites indicia is strong evidence that claim 1 is broader and encompasses tasks that both have and do not have indicia of a task type. Patent Owner's construction would render these limitations identified in claim 2 meaningless, which would be improper. *Ortho-McNeil Pharm.*, 520 F.3d at 1362 ("[T]his court strives to reach a claim construction that does not render claim language in dependent claims meaningless." (citing *Rambus Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1093 (Fed. Cir. 2003))).

Moreover, like claim 2, independent claim 3 specifically recites tasks having an indicia of task type. *See* Ex. 1001, 14:66–15:6. Claims 2 and 3 thus clearly demonstrate that when the applicant wanted to claim a task having an indicia of a task type, the applicant knew how to do so. The applicant's decision to do so in claims 2 and 3, but not claim 1, supports Petitioner's argument that the applicant did not intend to require an indicia in claim 1.

Additionally, nothing in the words of claim 1 indicates that the tasks cannot be arbitrarily assigned. That is, there is no language in claim 1 that

requires the division of tasks based on type of tasks or what tasks different types of processors must perform.

Nor does Patent Owner's citation to the Specification support its proposed construction. As Patent Owner argues, the Specification describes dividing "an aggregate computational problem into" groups of different types of tasks and that some co-processors will only be able to perform certain tasks. PO Resp. 6 (quoting Ex. 1001, 6:42–48); *see also* PO Resp. 6 ("For support for the phrase 'indicia' of a 'task type,' see, for example, [Ex. 1001,] 12:43–44."). However, there is nothing in the cited portions of the Specification that demonstrates that the applicant was acting as his own lexicographer or giving a special meaning to the word task. Although the sections discuss different task types, there is no discussion of indicia. *See* Ex. 1001, 6:42–48, 12:43–44. Moreover, each of those sections are either in a section that is optional (*see* Ex. 1001, 6:34–55 ("The system 10 *may* . . ." (emphasis added))) or describes an exemplary embodiment (Ex. 1001, 12:43–46 ("In an *embodiment* . . ." (emphasis added))). Such optional language does not evidence an attempt by the applicant to act as his own lexicographer. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning" and must "'clearly express an intent' to redefine the term." (quoting *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008) (internal quotation marks omitted))).

Nor is there anything in the Specification that would prohibit the use of arbitrary tasks. Although the cited section in column 6 refers to tasks that can only be performed by certain cells, as discussed above, the section

begins with the word "may" and nothing in the Specification indicates that the applicant intended to limit the scope of the claims in this way.

Finally, although it is extrinsic evidence, we considered the cited testimony of Dr. Nelson. *See* PO Resp. 6 (citing Ex. 2011 ¶ 42). The cited testimony reads as follows:

> Under the aforementioned claim interpretation standard, it is my opinion that claim 1 of the '004 Patent is properly construed to mean "a plurality of first tasks having indicia of a first task type and a plurality of second tasks having indicia of a second task type." That is, in the context of the '004 Patent, the task grouping is associated with corresponding "indicia" of a "type," which itself is associated with the functionality necessary to perform that type of task. Whenever a task or groups of tasks are described in the '004 Patent, it is clear to a [person having ordinary skill in the art] that the tasks are to be apportioned by task type, rather than using arbitrary subsets.

Ex. 2011 ¶ 42 (emphases omitted). Dr. Nelson simply offers unsupported, conclusory testimony that parrots the words of Patent Owner's briefs. As such, it is entitled to little or no weight. *See Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential) (Institution Decision) ("Dr. Jones does not cite to any additional supporting evidence or provide any technical reasoning to support his statement. Thus, the cited declaration testimony is conclusory and unsupported, adds little to the conclusory assertion for which it is offered to support, and is entitled to little weight.").

Accordingly, we do not adopt Patent Owner's proposed construction of claim 1. No further construction is necessary.

*2. Remaining Limitations*

To the extent that other claim limitations need construction, the parties address those constructions "in the context of particular claims." *See* PO Resp. 6. We do the same in our analysis below.

*D. Asserted Obviousness in View of Lurie*

Petitioner argues that claim 1 would have been obvious over Lurie. *See* Pet. 14–33. For the reasons set forth below, Petitioner has shown by a preponderance of the evidence that challenged claim 1 is unpatentable.

*1. Summary of Lurie*

Lurie is titled "Instrument-Based Distributed Computing System" and is directed to "providing an instrument-based distributed computing system that accelerates the measurement, analysis, verification and validation of data in the distributed computing environment." Ex. 1007, code (54), ¶ 2.

Lurie describes an "automatic distribution mode" of a distributed computing environment. Ex. 1007 ¶ 19. Lurie includes technical computing client 250 ("TCC") which "can be a technical computing software application that provides a technical computing and graphical modeling environment for generating block diagram models and to define mathematical algorithms for simulating models." Ex. 1007 ¶ 55. It further includes a number of technical computing workers 270A-N ("TCWs") which "can be a technical computing software application that provides a technical computing environment for performing technical computing of tasks, such as those tasks defined or created by the technical computing client 250." Ex. 1007 ¶ 58.

In an embodiment, Lurie further describes Automatic Task Distribution Member 260 ("ATD Mechanism") which can be "one or more application software components to provide for the automatic distribution of

tasks from the [TCC] to the [TCWs]." Ex. 1007 ¶ 61. This embodiment is shown in Figure 3B, which is reproduced below.




*Fig. 3B*

Figure 3B "is a block diagram of [Lurie's] automatic distribution mode" embodiment which depicts (1) tasks and results flowing between the TCC and the ATD Mechanism and (2) tasks and results flowing between the ATD Mechanism and the TCWs. Ex. 1007 ¶ 19, Fig. 3B. More specifically, the ATD Mechanism of the system "is intended to provide a configuration where the user does not want to control which [TCW] executes a particular task." Ex. 1007 ¶ 71. Instead, the TCC is in communication with the ATD Mechanism, which, in turn, is in communication with the various TCWs. Ex. 1007 ¶ 71. "Under this mode of operation, the [TCC] is not required to have any specific knowledge of the [TCWs], e.g., the name of the workstation running a [TCW], or the availability of the [TCW] to perform technical computing of a task." Ex. 1007 ¶ 71. The TCC submits tasks to

the ATD Mechanism "to make the[m] available for distribution to any of the technical computing workers 270A-270N." Ex. 1007 ¶ 72. "A [TCW] takes a task from the [ATD Mechanism] for technical computing of the task, computes a result for the task and provides the result to the [ATD Mechanism]." Ex. 1007 ¶ 72. The TCC is then able to obtain the results from the ATD Mechanism. Ex. 1007 ¶ 72.

An alternative "batch mode" embodiment is illustrated in Figure 3C, which is reproduced below. *See* Ex. 1007 ¶ 20.




*Fig. 3C*

Figure 3C "is a block diagram of the batch automatic distribution mode of operation." Ex. 1007 ¶ 20. The "batch mode . . . is intended to provide a configuration where the user can specify a group of related tasks as a job and provide the batch of tasks, or the job, to the [ATD Mechanism]." Ex. 1007 ¶ 73. In this embodiment, the TCC "is in communication with the job manager 265 on the server 160" and "[t]he job manager 265 interfaces and communicates with the [ATD Mechanism] running on the same server 160."

Ex. 1007 ¶ 73. As with the Figure 3B embodiment, "[e]ach of the [TCWs] 270A-270N is in communication with the [ATD Mechanism]." Ex. 1007 ¶ 73.

In batch mode, "[i]nstead of submitting each task separately as depicted in FIG. 3B, the [TCC] submits the job containing all the associated tasks to the job manager 265." Ex. 1007 ¶ 74. "The job manager 265 obtains the tasks from the job and provides the tasks to the [ATD Mechanism] for [TCWs] 270A-270N to take and compute results." Ex. 1007 ¶ 74. Lurie describes the operation of the components as follows:

> For example, [TCC] defines a job, Jobl, with a set of three tasks: Taskl, Task2 and TaskN-M. The [TCC] then submits Jobl to the job manager 265. The job manager 265 obtains Jobl and obtains each of the tasks, Taskl-TaskN-M from Job 1. Then, . . . the job manager 265 submits each of the tasks to the [ATD Mechanism] for technical computing by a [TCW]. [TCW] 270A may take Taskl from the [ATD Mechanism], compute a Resultl for Taskl and provide the Resultl to the [ATD Mechanism]. [TCW] 270B and [TCW] 270N, in a similar fashion, compute and provide results for Task2 and TaskN-M respectively. The job manager 265 then obtains the set of results for the completed job of Jobl and provides the results of each of the tasks to the [TCC].

Ex. 1007 ¶ 74. When there are multiple jobs, "the job manager 265 may handle jobs in a first-in first-out (FIFO) manner. In this case, the job manager 265 does not process the next job until all the tasks from the current job have been processed by the [ATD Mechanism]." Ex. 1007 ¶ 75.

*2. Anticipation or Obviousness*

In the Institution Decision, we noted that, because Petitioner argued that Lurie discloses each of the limitations recited in claim 1, it was unclear why Petitioner identified this ground under section 103(a) and not under section 102(b). Inst. Dec. 7 n.2. We stated that "[t]he parties may wish to

address whether Petitioner's argument is, in fact, that claim 1 is anticipated as opposed to obvious and what impact, if any, that has on our analysis." Inst. Dec. 7 n.2.

Patent Owner argues that "the Petition consistently and unambiguously argues that Claim 1 is anticipated by Lurie, and makes no serious effort to show that Claim 1 is obvious in view of Lurie." PO Resp. 14. According to Patent Owner, that is consistent with the testimony of Dr. Lowenthal who testified that "Lurie discloses all elements in [c]laim 1." PO Resp. 14 (quoting Ex. 1035, 53:17–22)[10] (emphasis omitted); *see also* PO Resp. 15 (arguing Petitioner does not "attempt to identify the differences between the cited art and the '004 claims as required by *Graham*," 383 U.S. 1); PO Sur-reply 3 (arguing that "Petitioner declined to identify any differences between Lurie and claim 1, and further declined to identify any motivation a [person having ordinary skill in the art] might have to modify Lurie"). Patent Owner further argues that "[i]nterpreting [the ground based on Lurie] under § 103(a) instead of § 102(b) at this juncture would substantially change the dynamics of this proceeding." PO Resp. 16; *see also* PO Sur-reply 5.

Petitioner argues that, just because "Lurie teaches each and every element of the claims does not render them patentable or require any change to the Board's [preliminary] analysis." Pet. Reply 2. According to Petitioner, "[t]he claims still would have been obvious because 'a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for

[10] The Response cites to the Lowenthal Declaration. PO Resp. 14. This is a typographical error that we have corrected.

"anticipation is the epitome of obviousness."'" Pet. Reply 2 (quoting *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1373 (Fed. Cir. 2019)).

*Realtime*, which Patent Owner does not address, is directly on point and dispositive of the issues raised by both parties. In *Realtime*, as in this proceeding, the petitioner argued that certain claims would have been obvious over a single reference. 912 F.3d at 1370–71. The Board found that reference disclosed every limitation recited in independent claim 1. *Id.* at 1372. The U.S. Court of Appeals for the Federal Circuit found there was no error in applying section 103 to an anticipatory reference:

> While Realtime argues that the use of O'Brien as a single anticipatory reference would have been more properly raised under § 102, it is well settled that "a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for 'anticipation is the epitome of obviousness.'" *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (quoting *In re Fracalossi*, 681 F.2d 792, 794 (CCPA 1982)); *cf. Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1278 n.3 (Fed. Cir. 2017) (noting the Board's conclusion that a prior art reference rendered certain claims obvious "by virtue of its anticipation of them"). The Board therefore did not err when it concluded that claim 1 was invalid under § 103 based on O'Brien alone.

*Id.* at 1373. The Federal Circuit further found that, because "[t]he Board's decision rested solely on the arguments and grounds proffered by [the petitioner] in its petition, for which [the patent owner] both had notice and the opportunity to respond," there was no violation of any notice requirements. *Id.*

Accordingly, although we limit Petitioner to the arguments and evidence set forth in the Petition, we can properly analyze Petitioner's asserted ground under 35 U.S.C. § 103(a).

*3. Analysis of Claim 1*

*a) Undisputed Limitations*

The preamble of claim 1 recites "[1pre] [a] processing system." Ex. 1001, 14:10. Petitioner argues Lurie teaches the preamble. Pet. 15–16. Specifically, Petitioner argues Lurie teaches that its "'computing system' (i.e., processing system) handles 'tasks that are processed and/or managed collectively.'" Pet. 15 (citing Ex. 1007, code (57); Ex. 1003 ¶ 107).[11]

Claim 1 further recites "[1a] a task pool." Ex. 1001, 14:11. Petitioner argues Lurie teaches this limitation. Pet. 16–20. Specifically, Petitioner argues Lurie's ATD Mechanism "is a task pool because it is a data or memory structure configured to hold, store, monitor, populate with, and update tasks, and make them available to TCWs." Pet. 17 (citing Ex. 1003 ¶¶ 111–115). Petitioner also argues that the ATD Mechanism "can be implemented using a technology known as Javaspace, creating a 'space' or 'object exchange repository' in which tasks reside, i.e., a task pool." Pet. 18 (citing Ex. 1003 ¶¶ 116–117).

Claim 1 further recites "[1e] wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller." Ex. 1001, 14:28–32. Petitioner argues that Lurie teaches this limitation.

---

[11] There is no dispute that Lurie teaches a processing system. Accordingly, we need not decide whether the preamble is limiting. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

Pet. 31–33. Specifically, Petitioner argues that Lurie has multiple TCWs and that Lurie "discloses dynamic acceptance of its TCWs (co-processors) without any communication with the TCC (controller)." Pet. 31 (citing Ex. 1003 ¶ 161). According to Petitioner, "Lurie explains that the TCC need not have any 'specific knowledge' of a TCW, including its 'name' or 'availability,' for a co-processor to participate in the system." Pet. 32 (quoting Ex. 1007 ¶ 71). Petitioner also argues that "Lurie's TCWs can be activated using an activation daemon, to start and stop the TCW," and that "[r]egistration with the activation daemon, and subsequent activation of the TCW, permits the TCW to be dynamically accepted at any time, and constitutes acceptance on a plug-and-play basis." Pet. 32 (citing Ex. 1007 ¶ 108; Ex. 1003 ¶¶ 166–169).

After reviewing Petitioner's arguments and evidence, including the Lowenthal Declaration (Ex. 1003), which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that Lurie teaches the preamble and limitations [1a] and [1e].

*b) A Controller Configured to Populate the Task Pool with a Plurality of First Tasks and a Plurality of Second Tasks.*

*(1) Petitioner's Arguments*

Claim 1 further recites "[1b] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks." Ex. 1001, 14:12–13.

Petitioner argues that Lurie teaches that limitation. Pet. 21–24. Specifically, Petitioner argues that Lurie's TCC is a controller that is "configured to populate the task pool (ATD Mechanism) with a plurality of first tasks and a plurality of second tasks." Pet. 21 (citing Ex. 1003 ¶¶ 122–

124). According to Petitioner, Lurie teaches that the TCC "'submits one or more tasks . . . to the [ATD Mechanism],' which 'obtains the tasks . . . to make the[m] available for distribution to any of the [TCWs].'" Pet. 21 (quoting Ex. 1007 ¶ 72 and citing Ex. 1007, Fig. 3B; Ex. 1003 ¶ 125).

Petitioner sets forth two theories as to why Lurie teaches the plurality of first tasks and plurality of second tasks. First, Petitioner argues that Lurie's Task1 through TaskN-M can be subdivided in many different ways to create a plurality of first tasks and a plurality of second tasks. Pet. 22–23 (citing Ex. 1003 ¶¶ 127–129).

Second, Petitioner focuses on Lurie's batch mode. *See* Pet. 23–24. Petitioner argues that, in batch mode, the TCC populates the task pool with a plurality of jobs and that each job has a plurality of tasks:

> In "batch mode," a "group of related tasks" is collectively referred to as a "job," such that "a plurality of first tasks" associated with one job (e.g., Task1 through TaskN-M associated with Job1 in Figure 3C), and "a plurality of second tasks" associated with another job, are populated in the task pool by the TCC. . . . In this mode, the TCC submits a job "containing all the associated tasks to the job manager," and the job manager "obtains the tasks from the job and provides the tasks to the automatic task distribution mechanism 260 for technical computing workers 270A-270N to take and compute results."

Pet. 23 (citing Ex. 1007 ¶¶ 73–74, Figs. 3B, 3C; Ex. 1003 ¶¶ 130–131). Petitioner also argues that "[t]he job manager and the ATD Mechanism are capable of managing multiple jobs," and that "[m]ultiple jobs would include

a second job, consisting of a plurality of second tasks associated with that second job." Pet. 24 (citing Ex. 1007 ¶ 75; Ex. 1003 ¶ 133).[12]

*(2) Patent Owner's Arguments*

Patent Owner argues that neither of Petitioner's two theories are sufficient. PO Resp. 16–20; PO Sur-reply 5–6. Specifically, Patent Owner argues that Lurie does not teach tasks "having indicia of a [first/second] task type." PO Resp. 16 (emphasis omitted); PO Sur-reply 5–6. Patent Owner further argues that there is no reason in Lurie to include indicia of a task type. PO Resp. 18–19. According to Patent Owner, this is shown by the absence of a "TaskType" indicia when Lurie discusses what is contained in a task object. PO Resp. 19–20.

With regard to Petitioner's first theory, Patent Owner also argues that the division of tasks is arbitrary. PO Resp. 6. According to Patent Owner, "whenever a task or groups of tasks are described in the '004 Patent, it is clear that the tasks are partitioned by task type, rather than using arbitrary subsets." PO Resp. 17.

*(3) Our Analysis*

Based on the fully developed record, we are persuaded that Petitioner has sufficiently shown that Lurie teaches that the TCC (controller) populates the ATD Mechanism (task pool) with a plurality of first tasks and a plurality of second tasks. As shown in Lurie Figure 3B, the TCC populates the ATD Mechanism with various tasks Task1 through TaskN-M. Ex. 1007 Fig. 3B; Ex. 1003 ¶¶ 127–128. A person having ordinary skill in the art would have

---

[12] In its Reply, Petitioner also argues that Lurie teaches indicia of task types. *See* Pet. Reply 3–6. Because we determine that indicia are not required by claim 1 (Section II.C.1.b., *supra*), we do not discuss the details of Petitioner's arguments here.

understood that the tasks could be divided in various ways, including "a plurality of first tasks (*e.g.*, Task1 and Task2) and a plurality of second tasks (*e.g.*, Task3 and Task4, or TaskN and TaskM)." Ex. 1003 ¶ 128. Although we agree with Patent Owner that this division is arbitrary, that argument is not commensurate with the scope of the claim. *See* Section II.C.1.b, *supra* (disagreeing with Patent Owner's claim construction prohibiting arbitrary division of tasks).

Accordingly, Petitioner sufficiently shows that, under its first theory, Lurie teaches limitation [1b].

Although we are persuaded by Petitioner's first theory, we are not persuaded by Petitioner's second theory. Specifically, although Petitioner identifies the TCC as the controller, based on Lurie's teachings, it appears that the job manager populates the ATD Mechanism with tasks, not the TCC. *See* Ex. 1007 ¶ 74 ("Instead of submitting each task separately as depicted in FIG. 3B, the technical computing client 250 submits the job containing all the associated tasks to the job manager 265. . . . The job manager 265 obtains the tasks from the job and provides the tasks to the automatic task distribution mechanism 260 for technical computing workers 270A-270N to take and compute results."), Fig. 3C (showing job manager 265 populating the ATD Mechanism). Because the TCC (controller) does not populate the ATD Mechanism (task pool) with tasks, the TCC in the batch mode does not teach this disputed limitation. Accordingly, for the rest of the Decision, we will focus solely on Petitioner's first theory.[13]

---

[13] Independent claim 3, the only other independent claim, recites the same limitation. *See* Ex. 1001, 14:44–45.

*c) First and Second Co-processor*

*(1) The Parties' Arguments*

Claim 1 recites "[1c] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller." Ex. 1001, 14:14–19. Claim 1 further recites "[1d] a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller." Ex. 1001, 14:21–27.

Petitioner argues that Lurie teaches limitation [1c]. Pet. 24–29. Specifically, Petitioner argues that one of Lurie's TCWs is a first co-processor which "'takes a task from the [ATD Mechanism]' and delivers the task to where it will be processed by the co-processor (retrieve and deliver the first task)." Pet. 24–25 (quoting Ex. 1007 ¶ 72 and citing Ex. 1003 ¶ 136). Petitioner also argues that the "TCW (co-processor) then 'computes a result for the task' (processing the task and generating resulting data)" to "generate[] a result (first resulting data)." Pet. 25 (quoting Ex. 1007 ¶ 72 and citing Ex. 1003 ¶¶ 139–140). Petitioner also argues that the TCW "then 'provides the result [back] to the [ATD Mechanism],' thereby updating the ATD Mechanism (task pool) to reflect completion, as indicated by the result." Pet. 25 (quoting Ex. 1007 ¶ 72 and citing Ex. 1003 ¶¶ 141–143). According to Petitioner, because the ATD Mechanism "makes the results . . . available to the [TCC]," "the TCC does not communicate with the TCWs."

Pet. 25 (quoting Ex. 1007 ¶ 72 and citing Ex. 1007 ¶¶ 61, 72, Figs. 3B, 6A; Ex. 1003 ¶¶ 144–145); *see also* Pet. 27–29 (expanding upon argument). In discussing the ATD Mechanism, Petitioner directs us to Lurie Figure 6A, which shows Object Exchange Repository 662. Pet. 26.

Petitioner also argues that Patent Owner's argument that "Lurie's co-processors do not retrieve tasks 'autonomously and proactively'" is "irrelevant." Pet. Reply 6 (citing PO Resp. 21–22). According to Petitioner, Patent Owner is impermissibly importing "such limitations from the specification" and that the statements relied on do "not constitute lexicography or a clear disavowal of claim scope." Pet. Reply 7.

Petitioner similarly argues that Patent Owner is improperly trying to read an "agent" into claim 1 and we should find that argument unpersuasive for similar reasons. Pet. Reply 7.

Petitioner also argues that Lurie does not teach the old paradigm that the '004 patent overcomes. Pet. Reply 7–8. According to Petitioner, "Lurie expressly states that its co-processors take tasks, rather than being assigned them by a controller." Pet. Reply 8 (citing Pet. 9–10; Ex. 1003 ¶¶ 73–77).

With regard to limitation [1d], Petitioner argues that "Lurie discloses multiple TCWs (co-processors), as shown in Figure 3B." Pet. 29 (citing Ex. 1007 Fig. 3B, ¶¶ 71, 72; Ex. 1003 ¶ 154). Petitioner further argues that for the same reason Lurie teaches

> "a *first* co-processor" (first TCW) configured to retrieve a *first* task from the task pool, deliver the *first* task to the co-processor, process the *first* task, generate *first* resulting data, and update the task pool to reflect completion of the *first* task for element [1c], Lurie also discloses a "*second* co-processor" (second TCW) configured to retrieve a *second* task from the task pool, deliver the *second* task to the co-processor, process the *second* task,

> generate *second* resulting data, and update the task pool to reflect completion of the *second* task.

Pet. 30–31 (citing Pet. § V.A.1.c; Ex. 1003 ¶¶ 156–158).

According to Patent Owner, "the '004 Patent describes the co-processor as 'a cell 12 [that] acquires a task from the task pool by sending an agent 30 to interrogate (search for) the task pool and retrieve an available task 22 that requires completion, is not locked, and that has a task type that can be performed by the cell.'" PO Resp. 21 (quoting Ex. 1001, 8:24–28 and citing Ex. 2011 ¶ 53) (alternation in original). Patent Owner further states that "the '004 Patent explains that 'the retrieval of tasks and the processing data by the cells may occur without direct communication between the CPU and the various cells,'" and "that 'a co-processor may interact with the task pool *without being instructed to do so by the CPU or by the task pool*.'" PO Resp. 21 (first quoting Ex. 1001, 11:31–34 and then quoting Ex. 1001, 2:38–40) (emphasis in original).

Patent Owner argues that, in contrast, "Lurie affirmatively teaches away from a co-processor configured to autonomously and proactively 'retrieve' a task." PO Resp. 22 (citing Ex. 2011 ¶ 56); *see also* PO Resp. 21–24 (describing Lurie in detail). More specifically, Patent Owner argues that the Object Exchange Repository embodiment Petitioner relies on "is substantively the same as the conventional 'controller/responder' paradigm that the '004 Patent expressly overcomes." PO Resp. 23 (citing Ex. 1007 ¶ 93; Ex. 2011 ¶ 59); *see also* PO Resp. 23–24 (making a similar argument). According to Patent Owner, "Lurie does not describe any embodiment where a TCW autonomously, without a predicate instruction or notification, retrieves a task from the Object Exchange Repository." PO Resp. 23 (citing Ex. 2011 ¶ 60).

*(2) Our Analysis*

Based on the fully developed record, we are sufficiently persuaded by Petitioner's argument that Lurie teaches limitations [1c] and [1d]. Specifically, Lurie recites that multiple TCWs (first co-processor and second co-processor) "take[] a task from the [ATD Mechanism] 260 for technical computing of the task, compute[] a result for the task and provide[] the result to the [ATD Mechanism] 260." Ex. 1007 ¶ 72, Fig. 3B. A person having ordinary skill in the art would have understood "that the task is then delivered to the first co-processor after the task is retrieved in order for the co-processor subsequently to process the task." Ex. 1003 ¶ 138. A person having ordinary skill in the art would also have realized that providing the results back to the ATD Mechanism teaches "updating the task pool to reflect completion of the first task." Ex. 1003 ¶ 141. Additionally, Lurie shows that the TCWs communicate only with the ATD Mechanism and not the TCC. *See* Ex. 1003, Figs. 3B, 5B, 6A, ¶¶ 61, 72, 94; *see also* Ex. 1003 ¶¶ 144–151.

We do not agree with Patent Owner's arguments. Patent Owner has not identified any claim language that requires the co-processors to be pro-active or autonomous. *See* PO Resp. 21–22. That language appears in the Specification; however, we do not read such requirements from the Specification into the claim. *See Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." (citations omitted)). Here, Patent Owner has not shown that the applicant acted as his own lexicographer or otherwise disclaimed the scope of the claim. Accordingly, we decline to read the pro-active or autonomous features described in the Specification into the claims.

*d) Conclusion Regarding Claim 1*

For the reasons set forth above, Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claim 1 would have been obvious over Lurie.

*E. Asserted Obviousness in View of Lurie and Ethernet Specification*

Petitioner argues that claims 2, 3, and 6–11 would have been obvious over Lurie and Ethernet Specification. *See* Pet. 33–63. For the reasons set forth below, Petitioner has shown by a preponderance of the evidence that challenged claim 2, 3, and 6–11 are unpatentable.

*1. Ethernet Specification*

Ethernet Specification "contains the specification of the Ethernet, a local area network." Ex. 1009, i. Ethernet Specification "is intended as a design reference document, rather than an introduction or tutorial." Ex. 1009, i.

Relevant to Petitioner's argument, chapter 6 provides the "Ethernet Data Link Layer Specification." Ex. 1009, 19–44. Figure 6-1 is reproduced below.




Figure 6-1: Data Link Layer Frame Format

Ex. 1009, 20. Figure 6-1 depicts a "Data Link Frame Format" which includes a destination, source, type, data, and frame check sequence. Ex. 1009, 20.

2. *Claim 3*

a) *Preamble and Limitations [3a] and [3e]*

The preamble of claim 3 recites "[3 pre] [a] processing system." Ex. 1001, 14:42. For the same reasons discussed above for claim 1, Petitioner argues Lurie teaches this limitation. Pet. 36.

Claim 3 further recites "[3a] a task pool." Ex. 1001, 14:43. For the same reasons discussed above for claim 1, Petitioner argues Lurie teaches this limitation. Pet. 36.

Claim 3 further recites "[3e] wherein: the processing system is configured to dynamically accept the first co-processor, the second co-

processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller." Ex. 1001, 14:60–65. For the same reasons discussed above for claim 1, Petitioner argues Lurie teaches this limitation. Pet. 37.

After reviewing Petitioner's arguments and evidence, including the Lowenthal Declaration (Ex. 1003), which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that Lurie teaches all of the undisputed limitations of claim 3 discussed in this subsection.

*b) A Controller Configured to Populate the Task Pool with a Plurality of First Tasks and a Plurality of Second Tasks*

Claim 3 further recites "[3b] a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks." Ex. 1001, 14:44–45. The parties each rely on the same arguments discussed above for the identical limitation in claim 1. *See* Pet. 36; PO Resp. 24. For the same reasons discussed above in claim 1, we find Lurie teaches this limitation.[14]

*c) First and Second Co-processor Limitations*

Claim 3 recites "[3c] a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller." Ex. 1001, 14:46–51. Claim 1 further recites "[3d] a second co-processor configured to

[14] We note claim 3 explicitly recites that the tasks include "indicia of a [first/second] task type." We address that argument below.

successively: retrieve a second task from the task pool; deliver the second task to the second coprocessor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller." Ex. 1001, 14:53–59. The parties each rely on the same arguments discussed above for the identical limitations in claim 1. *See* Pet. 36–37; PO Resp. 24. For the same reasons discussed above in claim 1, we find Lurie teaches these limitations.

*d) First and Second Task Including Indicia*

Claim 3 recites "[3f] the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type." Ex. 1001, 14:66–15:2. Claim 3 also recites "[3g] the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type." Ex. 1001, 15:3–6.

*(1) Petitioner's Arguments*

With regard to limitation [3f], Petitioner argues the combination of Lurie and Ethernet Specification teaches that limitation. *See* Pet. 37–43. Specifically, Petitioner argues that a person having ordinary skill in the art "would have understood that these first tasks and second tasks could be of different task types, and that for the co-processor to receive a certain task, there must be a means for identifying an appropriate task for that co-processor." Pet. 38 (citing Ex 1003 ¶¶ 189–190). More specifically, Petitioner points to different types of MATLAB function and commands, different versions of MATLAB, different software, and different hardware components that show that Lurie teaches a heterogenous environment that

requires a means for identifying the correct task for the TCW. Pet. Reply 3–5 (citing Ex. 1007 ¶¶ 41, 43, 46, 55, 58, 65, 81; Ex. 1003 ¶¶ 187–208; Ex. 1040 ¶¶ 36–39, 42–43; Ex. 1036, 26–27).

Petitioner further argues that, because "'the system can determine or select' a TCW that is appropriate 'to work on a task' based on [the] characteristics" of the TCW, Lurie "teaches or suggests that its tasks have indicia of task type (i.e., indicator of the command to be executed, or indicator of the 'operational and/or performance characteristics' that a particular TCW must have to complete the task), and the 'operational and/or performance characteristics of the [TCWs]' correspond to task types that the TCW is configured to perform." Pet. 39 (quoting Ex. 1007 ¶ 81) (citing Ex. 1003 ¶¶ 193–194); *see also* Pet. Reply 13.

Petitioner also argues that, in Lurie, the tasks reside in a "'space' in the ATD Mechanism." Pet. 39 (citing Ex. 1003 ¶¶ 195–196; Ex. 1007 ¶ 91). Such spaces are "associative in that objects in the spaces can be located by [an] associative lookup rather than by memory location or identifier, e.g., in a shared memory solution." Pet. 39 (quoting Ex. 1007 ¶ 91). According to Petitioner, a person having ordinary skill in the art "would have understood that to be 'located by associative lookup,' each task object must include indicia of its task type or space association." Pet. 39 (citing Ex. 1003 ¶ 198).

Petitioner also argues that it would have been obvious to a person having ordinary skill in the art "to use Ethernet (or similar networking protocol) data frames as agents when implementing Lurie to search the ATD Mechanism for a task of a first type to be performed by a TCW." Pet. 40 (citing Ex. 1003 ¶¶ 199–200). Petitioner further argues that a person having ordinary skill in the art would use a data frame dispatched with "a payload that includes an index, name, or function pointer associated with a particular

task type or list of task types that the TCW can perform." Pet. 41 (citing Ex. 1007 ¶ 81; Ex. 1003 ¶ 203). According to Petitioner, "[b]ecause Lurie specifies that task objects can be located by associative lookup," the agent would perform the "associative lookup, matching the operational and/or performance characteristics of the TCW with tasks of the appropriate type based on the index, name, or function pointer provided in the agent's payload." Pet. 41 (citing Ex. 1007 ¶¶ 81, 91; Ex. 1003 ¶ 205).

With regard to limitation [3g], Petitioner relies on the same arguments discussed above for limitation [3f]. Pet. 43–44.

*(2) Patent Owner's Arguments*

Patent Owner argues that "there are a number of scenarios in which it is not necessary for a system to include a mechanism for identifying task types – most notably, as in Lurie, when there is effectively only one task type (e.g., MATLAB commands)." PO Resp. 18 (citing Ex. 2011 ¶ 49). According to Patent Owner, because each TCW "can be a MATLAB-based worker, application, module," "there is no need to define 'indicia' of a 'task type' in such an embodiment." PO Resp. 18 (first quoting Ex. 1007 ¶ 58, second citing Ex. 2011 ¶ 50); *see also* PO Resp. 18–19 (arguing that the '004 patent is for a heterogenous computer environment whereas Lurie is for a homogeneous computer environment (citing Ex. 2011 ¶ 50)). Patent Owner further argues that determining or selecting a TCW to work on a task "falls short of disclosing 'indicia' of a 'task type' as required by the present claims, as well as the partitioning of tasks into 'first' and 'second' tasks based on such indicia." PO Resp. 19 (citing Ex. 2011 ¶ 51).

Patent Owner also argues that Lurie's "batch mode" embodiment describes different properties for a task; however, task type is not included. PO Resp. 19–20 (citing Ex. 1007 ¶¶ 120, 123; Ex. 2011 ¶ 52).

*(3) Our Analysis*

Based on the fully develop record, we are sufficiently persuaded by Petitioner's argument that Lurie in combination with Ethernet Specification teaches limitations [3f] and [3g]. Specifically, we are persuaded that Lurie does not teach a homogeneous environment. Instead, Lurie describes a heterogeneous environment in which different TCWs can use different processors (*see* Ex. 1007 ¶¶ 41, 65; Ex. 1040 ¶¶ 42–43), run different operating systems (*see* Ex. 1007 ¶ 65; Ex. 1040 ¶¶ 42–43), run different versions of MATLAB with different libraries, modules, or software components (*see* Ex. 1007 ¶¶ 53, 55, 65, 81; Ex. 1040 ¶¶ 36–39), or different software altogether, such as LabVIEW or Mathcad (Ex. 1007 ¶ 46). Because of this heterogeneous environment, a person having ordinary skill in the art would have understood that Lurie's system must have the ability to determine which TCW should be assigned which tasks for maximum efficiency. *See* Ex. 1007 ¶ 81. One obvious way to do so is to use indicia of a task type, "*i.e.*, technical computing command, indicator of the command to be executed, or indicator of the 'operational and/or performance characteristics' that a particular TCW must have to complete the task." Ex. 1003 ¶ 194.

As discussed below in Sections II.E.2.e.(3) and II.E.2.f.(3), *infra*, we agree with Petitioner that a person having ordinary skill in the art would have modified Lurie to use Ethernet Specification's data frame as an agent and that the frame would include, *inter alia*, a payload indicating a first function which the processor sending the data frame is configured to perform. That data frame would be sent by the co-processor to obtain a task from the task pool.

Lurie does not explicitly state whether the TCW selects tasks from the task pool or the tasks as assigned by the ATD Mechanism. *See* Ex. 1007 ¶ 81 (indicating the system—but not which component of the system—determines or selects which TCW will perform which task). However, considering the disclosure of Lurie, as a whole, Petitioner sufficiently shows that the TCW selects or determines which tasks it will perform.

The clearest statement, which Petitioner relies on, is as follows: "Additionally, in any of the embodiments depicted in FIGS. 3A-3D, *the system can determine or select* the technical computer worker 270A-270N to work on a task by operational and/or performance characteristics of the technical computing worker 270A-270N and/or workstation 170A-170N." Ex. 1007 ¶ 81 (emphasis added). The components of the system vary in the different embodiments referenced in Figures 3A–3D. For example, the components of the system in Figure 3A are the TCC—which clearly assigns the tasks—and the various TCWs. Ex. 1007, Fig. 3A, ¶ 69; Ex. 1040 ¶ 25.

Figure 3B adds the ATD Mechanism to the system. Ex. 1007, Fig. 3B. Unlike the Figure 3A embodiment, it is clear that the TCC does not control which TCW is assigned specific tasks. Ex. 1007 ¶¶ 61 ("The technical computing client 250 does not need to know the specifics of the technical computing worker 270. . . . As such, the automatic task distribution mechanism provides a level of indirection between the technical computing client 250 and the technical computing worker 270."), 71 ("Referring now to FIG. 3B, the automated task distribution mode embodied in system 310 is intended to provide a configuration where the user does not want to control which technical computing worker 270A-270N executes a particular task. . . . Under this mode of operation, the technical computing client 250 is not required to have any specific knowledge of the technical

computing workers 270A-270N, e.g., the name of the workstation running a technical computing worker 270A-270N, or the availability of the technical computing worker 270A-270N to perform technical computing of a task."); Ex. 1040 ¶¶ 26–28. Thus, based just on paragraph 81, the assignment or selection of tasks can be done by either the ATD Mechanism, the TCWs, or a combination of the two.

Read in context with another portion of the Specification, it is clear that it is the TCWs that are selecting the tasks from the ATD Mechanism. Lurie describes how the ATD Mechanism obtains the tasks from the TCC to "make the[m] available for distribution to *any* of the [TCWs]." Ex. 1007 ¶ 72 (emphasis added). Having the tasks available for selection by any of the TCWs implies that the ATD Mechanism is not assigning the tasks to specific TCWs. Had the ATD Mechanism been responsible for assigning tasks, then paragraph 72 would have described how the task was made available to the assigned TCW as opposed to any TCW. That leaves the TCWs as the only components remaining for determining how they are selected for each task.

Moreover, even if Lurie is silent as to how TCWs are determined/selected for each task, it would have been obvious to a person having ordinary skill in the art to have the TCW dispatch an agent to select a task that the TCW can perform. Ex. 1003 ¶ 203. A person having ordinary skill in the art would have understood that this would allow the agent to search for tasks that the TCW can perform. Ex. 1003 ¶¶ 204–205. Doing so would maximize the efficiency of the system. Ex. 1003 ¶ 207.

Having determined that Petitioner has sufficiently shown (1) that Lurie teaches that the TCWs select tasks to be performed or (2) that it would have been obvious to do so, Petitioner also persuasively demonstrates that it

would have been obvious to include indicia of a task type in order to assist the system in determining the appropriate TCW to perform each task. *See* Ex. 1003 ¶¶ 190–208. That is, in order for the TCW to search the ATD Mechanism to select a task that it can perform, the TCW or its agent must have the ability to determine the type of task in order to determine whether the TCW can perform that task. In light of Dr. Lowenthal's persuasive testimony, which is supported by the evidence in the record, it would have been obvious to a person having ordinary skill in the art for each task to include information about itself to ensure the TCW selecting it can perform it. That information would be an indicia of a task type. *See* Ex. 1003 ¶¶ 190–208 Accordingly, the combination of Lurie and Ethernet Specification teaches limitations [3f] and [3g].

We do not agree with Patent Owner's arguments. Contrary to Patent Owner's arguments, Lurie does not disclose or teach a homogeneous environment. Instead, as discussed above, Lurie describes a heterogeneous environment in which there are different types of hardware, operating systems, different software, and versions of the same software. Although Patent Owner explains why indicia of a task type would not be needed in a homogeneous environment in which every TCW was functionally identical, Patent Owner does not address the actual system described in Lurie.

Nor do we agree with Patent Owner's argument that Lurie does not explicitly recite a task type or other indicia when describing the task object. Petitioner's theory is not that Lurie explicitly recites the claimed indicia. Instead, Petitioner's argument is that it would have been obvious to do so when combining the teachings of Lurie and Ethernet Specification. *See* Pet. 37–43. "The question in an obviousness inquiry is whether it would have been obvious to a person of ordinary skill in the art to combine the relevant

disclosures of the two references, not whether each individual reference discloses all of the necessary elements." *Game & Tech Co. v. Wargaming Grp. Ltd.*, 942 F.3d 1343, 1352 (Fed. Cir. 2019) (citing *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008)). Thus, it is of no moment that Lurie does not explicitly recite using indicia.

*e) Co-processors Including Agents*

Claim 3 further recites "[3h] the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload; and [3i] the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload." Ex. 1001, 15:7–12.

*(1) Petitioner's Argument*

Petitioner argues that the combination of Lurie and Ethernet Specification teaches these limitations. Pet. 44–47. Specifically, Petitioner argues that Lurie teaches that the "TCWs communicate with the ATD Mechanism via well-known networks such as LAN, WAN, or the Internet," and that such communications use a standard protocol such as Ethernet. Pet. 45 (citing Ex. 1007 ¶¶ 51–52, Fig. 1B; Ex. 1003 ¶ 213). Petitioner further argues that Ethernet Specification teaches "data frames, which comprise a source field address (source address), a destination field address (destination address), and a data field (payload)." Pet. 45 (citing Ex. 1009, 21–22, Fig. 6–1; Ex. 1003 ¶ 214). According to Petitioner, the source field identifies the source, such as a TCW, sending the frame; the destination field identifies where the frame is going, such as the ATD Mechanism; and the data field allows any type of data. Pet. 46 (citing Ex. 1003 ¶¶ 215–217; Ex. 1009, 21–22); *see also* Pet. Reply 9 (citing Ex. 1003 ¶¶ 201–204)

Petitioner also argues that, because the ’004 patent says that “an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload,” Ethernet Specification’s data frame is an agent. Pet. 46 (quoting Ex. 1001, 8:30–33); *see also* Pet. Reply 8–9. Consistent with the Specification of the ’004 patent, Petitioner further argues that “the parent of the ’004 Patent, U.S. Patent 9,146,777 [(‘the ’777 patent’)] expressly recites in claim 1 that ‘the first agent is a data frame.’” Pet. Reply 9 (quoting Ex. 1059, 7:59–60) (emphasis omitted).

With regard to Patent Owner’s argument that an agent must be “an active, functional software module,” Petitioner argues that Patent Owner is attempting to read examples from in the Specification into the claims. Pet. Reply 10. Petitioner also argues that Patent Owner’s expert would not explain what “an active, functional software module” is. Pet. Reply 10 (citing Ex. 1036, 83–87).

*(2) Patent Owner’s Arguments*

Patent Owner argues that Ethernet Specification’s “data frame is just that – a frame of data.” PO Resp. 25. According to Patent Owner, it is not an agent because an agent “is an active, functional software module configured to, for example, ‘interrogate’ the task pool ([Ex. 1001,] 2:23-24), ‘seek’ a task to perform (*id*. 2:24), ‘monitor’ the task pool (*id*. 2:42), and ‘interact’ with the task pool to ‘obtain available tasks’ (*id*. 3:16).” PO Resp. 25; *see also* PO Sur-reply. 7.

With regard to a statement in the ’004 patent (Ex. 1001, 8:30–33), Patent Owner argues that “Petitioner overreads this analogy into an equivalency, failing to note that the ‘payload’ of the data frame is simply data.” PO Resp. 25–26 (citing Ex. 2011 ¶ 65). According to Patent Owner,

Ethernet Specification's data frame cannot be an agent because it lacks agency. PO Resp. 25–26 (citing Ex. 2011 ¶ 65).

Patent Owner also argues that, even if Lurie and Ethernet Specification were combined, "the result would simply be an agent-less implementation of [the] Lurie architecture that executes MATLAB commands in a distributed fashion." PO Resp. 26–27 (citing Ex. 2011 ¶ 68). Specifically, Patent Owner argues that, although Lurie describes "the properties and methods of a wide range of object classes," it does not include an "agent" class of object. PO Resp. 27 (citing Ex. 1007 ¶¶ 120–136; Ex. 2011 ¶ 69).

Patent Owner also argues that claim 3 recites that the "first agent is configured to *search* the task pool for a task of [the] first type." PO Sur-reply 7 (quoting Ex. 1001, 15:1–2) (emphasis in original). Patent Owner further argues "that neither Lurie nor Ethernet, alone or combined, disclose or suggest an agent configured to ***search*** the task pool." PO Sur-reply 7 (emphasis in original).

*(3) Our Analysis*

Based on the fully developed record, we are sufficiently persuaded by Petitioner's argument that Lurie in combination with Ethernet Specification teaches limitations [3h] and [3i].

Specifically, Lurie teaches that the TCW will communicate with the ATD Mechanism over a variety of networks, including a Local Area Network (LAN). Ex. 1007 ¶ 51. A person having ordinary skill in the art would have known that "[s]tandard protocols such Ethernet, are well known and successful methods of implementing networked communication over a LAN or WAN." Ex. 1003 ¶ 213 (citing Ex. 1009, cover).

"Ethernet Specification discloses that, according to the Ethernet standard, Ethernet networks employ the use of data frames when sending information." Ex. 1003 ¶ 214 (citing Ex. 1009, 19). An exemplary data frame is shown in Figure 6–1 of Ethernet Specification, which is reproduced below.




Figure 6-1: Data Link Layer Frame Format

Ex. 1009, 20. Figure 6-1 illustrates a data link layer frame format which includes a destination, source, type, data, and frame check sequence. Ex. 1009, 20.

"The 'source' field identifies 'the station sending the frame' either by its unique 'physical address' or 'multicast address.'" Ex. 1003 ¶ 215 (quoting Ex. 1009, 21). When used with Lurie, this field would identify the

TCW sending the task. Ex. 1003 ¶ 215. And because there are multiple TCWs (*see* Ex. 1007, Fig. 3B), there will be data frames sent from each TCW. *See* Ex. 1003 ¶ 221.

"The 'destination' field identifies 'the station(s) for which the frame is intended,' which may also be a physical or multicast address." Ex. 1003 ¶ 216 (citing Ex. 1009, 21). When used with Lurie, this field would identify the ATD Mechanism. Ex. 1003 ¶ 216.

"The 'data' field allows for any type of data, up to 1500 octets in length, to be transmitted." Ex. 1003 ¶ 217 (citing Ex. 1009, 22). A person having ordinary skill in the art would have understood that this field would include a payload. Ex. 1003 ¶ 217.

As that term is used in the '004 patent, a person having ordinary skill in the art would have understood that a data field is an agent. *See* Ex. 1003 ¶ 214. The '004 patent explicitly recites that "an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload." Ex. 1001, 8:30–33.[15] Consistent with the Specification of the '004 patent, the parent of the '004 patent expressly recites in claim 1 that "the first agent is a data frame." Ex. 1059, 7:59–60 (the '777 patent).

We do not agree with Patent Owner's arguments.

First, Patent Owner bases its arguments on the description of an agent found in the "Summary of the Invention" section in the Specification of the '004 patent. Patent Owner simply recites some language from the

---

[15] This is not to say that an agent is limited to data frames. Rather, this supports Petitioner's argument that an agent is broad enough to encompass a data frame.

"Summary of the Invention" describing an agent "[i]n a preferred embodiment." Ex. 1001, 2:20–3:49; *see also* PO Resp. 25 (citing the '004 patent). However, these requirements were not included in the claims and the '004 patent states that "it is intended that the inventions disclosed herein not be limited to the particular embodiments disclosed." Ex. 1001, 14:3–7. Because the applicant was not acting as a lexicographer and there was no disclaimer, we decline to read descriptions of an embodiment from the specification into the claim. *See Phillips*, 415 F.3d at 1323.

Second, we disagree with Patent Owner that Petitioner is reading too much into the analogy in column 8 of the '004 patent. As discussed above, the '004 patent makes it clear that a data frame is analogous to an agent in that each have the same features: "In this context, an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload." Ex. 1001, 8:30–33. Although not all data frames will be agents—thus the analogy—the '004 patent makes it clear that data frames can be agents. And, as discussed in Section II.E.3.c, *infra*, Petitioner has sufficiently shown that the data frames sent by the TCWs in Lurie as modified by Ethernet Specification act as agents which search the ATD Mechanism for tasks that the TCW can perform. Stated differently, the data frames sent by the TCW are agents because they function as agents.

Third, Patent Owner's argument that a data frame is just data is inapposite. All computer code is just a series of zeros and ones; that is, code is just data. *See* Ex. 1040 ¶ 50; Ex. 1036, 88:21–89:15 (agreeing that an agent is ones and zeros). Moreover, as discussed above, we disagree that the data frame in the combination of Lurie and Ethernet Specification is passive; instead, it searches for tasks.

Fourth, it is of no moment that Lurie does not include an agent task. Petitioner's argument is not based solely on the teachings of Lurie; instead, it is based on the combination of Lurie and Ethernet Specification. "The question in an obviousness inquiry is whether it would have been obvious to a person of ordinary skill in the art to combine the relevant disclosures of the two references, not whether each individual reference discloses all of the necessary elements." *Game*, 942 F.3d at 1352 (citing *Cohesive*, 543 F.3d at 1364).

Finally, Patent Owner raised its argument about "search the task pool" for the first time in its Sur-reply. *Compare* PO Resp. 25–27 (no discussion of the ability to search), *with* PO Sur-reply 7 (discussing the requirement to search). Because Patent Owner did not raise the argument in its Response, the argument was belated and, therefore, forfeited. *See* Paper 7, 9 (Scheduling Order) ("Patent Owner is cautioned that any arguments not raised in the response may be deemed forfeited."); 37 C.F.R. § 42.23(b) ("A sur-reply may only respond to arguments raised in the corresponding reply . . . .").

*f) Agents Including a Payload*

Claim 3 also recites "[3j] and further wherein: when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform." Ex. 1001, 15:14–20. Claim 3 further recites "[3l] when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address

associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform." Ex. 1001, 15:25–31.

*(1) Petitioner's Arguments*

Petitioner argues that Lurie in combination with Ethernet Specification teaches these limitations. Pet. 48–50, 51–52. Specifically, Petitioner argues that Lurie and Ethernet Specification teach that the TCWs take tasks from the ATD Mechanism and deliver them to the TCW using an agent that includes a source address, destination address, and payload. Pet. 48. Petitioner further argues that a person having ordinary skill in the art would have understood that in order to retrieve a task, the agent would need to "have a source address corresponding to that of the TCW (the 'source' of the querying agent) and a destination address corresponding to that of the ATD Mechanism (the 'destination' of the querying agent)." Pet. 49 (citing Ex. 1003 ¶ 224). Petitioner further argues that a person having ordinary skill in the art would know that in order for the agent to search for a task, "the agent must be able to reference the function of the co-processor, which is stored as the payload, either directly or by index." Pet. 49–50 (citing Ex. 1003 ¶ 228).

Petitioner also argues that it would have been well within the ability of a person having ordinary skill in the art to include "within the payload . . . the task or list of tasks encoded using an index, name, or function reference/pointer, or otherwise, appropriate for that particular TCW." Pet. Reply 14–15 (citing Ex. 1003 ¶¶ 203, 204, 228).

Petitioner also argues this would apply for each TCW, and thus both a first agent and a second agent. Pet. 51–52.

*(2) Patent Owner's Arguments*

Patent Owner argues that neither Lurie not Ethernet Specification teach these disputed limitations. PO Resp. 28–37; PO Sur-reply 8–16. Specifically, Patent Owner argues that Lurie does not teach a payload and would not include a payload because "assigning specific tasks to specific TCWs is performed at the system level (e.g., Lurie's TCC or ATD mechanisms)." PO Resp. 28–29 (citing Ex. 2011 ¶¶ 92–93); *see also* PO Resp. 29–32 (discussing how tasks are assigned in Lurie), 33–35; PO Sur-reply 8–9, 11–14.

Patent Owner also argues that Lurie's agent cannot have a payload because there are "effectively an infinite number of MATLAB functions to perform." PO Resp. 35–36.

Patent Owner also argues that Petitioner's arguments are based on Dr. Lowenthal's unsupported "musings." PO Resp. 33 (discussing Ex. 1003 ¶ 228). Patent Owner further argues that we should give little weight to Dr. Lowenthal's testimony because he refused to answer questions about searching for a task. PO Resp. 36 (citing Ex. 1035, 138:11–140:16); PO Sur-reply 10 (citing Ex. 2015, 51:19–52:6, 54:4–9).

*(3) Our Analysis*

As discussed above in Section II.E.2.d.(3), a person having ordinary skill in the art would have understood that Lurie teaches that the TCW selects which tasks it will perform. Additionally, as discussed in Sections II.E.2.e.(3) and II.E.2.h, a person having ordinary skill in the art would have used an ethernet data frame, such as the one shown in Ethernet Specification, to search for the tasks in the ATD Mechanism. *See also* Ex. 1007, Fig. 6A (showing a TCW taking a task). In order to conduct such a search, a person having ordinary skill in the art would have understood that

the data frame must include a reference to the tasks the TCW can perform and that would be included as the payload. Ex. 1003 ¶ 228. Moreover, this must be done both for a first agent associated with a first TCW and a second agent associated with a second TCW. *See* Ex. 1003 ¶ 233. Accordingly, Lurie in combination with Ethernet Specification teaches limitations [3j] and [3l].

We do not agree with Patent Owner's arguments. First, although Patent Owner states that none of the references teach these limitations, Patent Owner's arguments focus exclusively on Lurie alone. *See* PO Resp. 29–37 (discussing Lurie); PO Sur-reply 8–14. However, Petitioner's arguments are based on modifying Lurie to include Ethernet Specification's data frame to search for tasks. "The question in an obviousness inquiry is whether it would have been obvious to a person of ordinary skill in the art to combine the relevant disclosures of the two references, not whether each individual reference discloses all of the necessary elements." *Game*, 942 F.3d at 1352 (citing *Cohesive*, 543 F.3d at 1364).

Second, Patent Owner's argument is premised on its contention that in Lurie, either the ATD Mechanism or the TCC assigns the tasks to the TCW. *See, e.g.*, PO Resp. 29; PO Sur-reply 13. However, as we found in Section II.E.2.d.(3), *supra*, either (1) Lurie teaches an embodiment in which the TCW selects and takes tasks from the ATD Mechanism or (2) it would have been obvious to modify Lurie so that the TCW selects the tasks. For the same reasons discussed in that section, we disagree with Patent Owner's argument that only the TCC or ATD Mechanism assigns tasks.

Third, we do not agree with Patent Owner that the large number of MATLAB commands prevents them from being identified in the data frame. As Petitioner persuasively argues, this can be accomplished using "index,

name, or function pointer referencing the function that the co-processor is configured to perform." Ex. 1003 ¶ 204.

Fourth, we disagree with Patent Owner's argument that we should not rely on Dr. Lowenthal's testimony. Contrary to Patent Owner's contention, Dr. Lowenthal provides the basis for his testimony in paragraph 228 by citing back to previous testimony. *See* Ex. 1003 ¶ 228 (referring back to his testimony regarding limitation [3f]). Moreover, when paragraph 228 is read in context with the preceding paragraphs, it is apparent that Dr. Lowenthal is relying on the citations to the references in those paragraphs. *See* Ex. 1003 ¶¶ 222–228. Although our rules require an expert to disclose underlying facts and data, nothing in our rules requires it to be recited in each paragraph of testimony. *See* 37 C.F.R. § 42.65(a).

Nor do we find anything in the cross-examination testimony Patent Owner directs us to that requires us to discount Dr. Lowenthal's testimony on how Lurie works. The questions in the first deposition related to the '004 patent, not the operation of Lurie. *See* Ex. 1035, 137:13–16. Although Dr. Lowenthal's inability to answer question on how the '004 patent operates might justify our discounting his testimony regarding the operation of the '004 patent, we fail to see a connection between that testimony and Dr. Lowenthal's testimony regarding how Lurie when modified by Ethernet Specification works. With regard to the testimony in Dr. Lowenthal's second deposition, contrary to Patent Owner's contention, we fail to see where Dr. Lowenthal refused to answer a question; to the contrary, Dr. Lowenthal provided substantive responses to Patent Owner's questions. *See* Ex. 2015, 51:19–55:23.

*g) Returning from the Task Pool*

Claim 1 recites "[3k] when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task," and "[3m] when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task." Ex. 1001, 15:20–24, 32–36.

Petitioner argues that a person having ordinary skill in the art "would have understood that an agent in Lurie returning from the automatic task distribution system to the TCW with a task would have a source address corresponding to that of the automatic task distribution system (the 'source' of the agent) and a destination address corresponding to that of the TCW (the end destination)." Pet. 50–51 (citing Ex. 1003 ¶ 230). Petitioner further argues that the payload includes a descriptor of the task. Pet. 51 (citing Ex. 1007 ¶ 94; Ex. 1003 ¶ 231.

Petitioner also argues this would apply for all TCWs. Pet. 53 (citing Ex. 1003 ¶ 237).

After reviewing Petitioner's arguments and evidence, including the Lowenthal Declaration (Ex. 1003), which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates, that the combination of Lurie and Ethernet Specification teaches limitations [3k] and [3m].

*h) Reason to Combine Lurie and Ethernet Specification*

Petitioner argues that a person having ordinary skill in the art would have combined Lurie and Ethernet Specification with a reasonable expectation of success. *See* Pet. 33–35; Ex. 1003 ¶¶ 173–180. Specifically, Petitioner argues that the LAN links in Lurie (Ex. 1007 ¶ 52) are a "reference to systems that use Ethernet, the Local Area Network ('LAN') standard that has been ubiquitous in computing since the 1980s." Pet. 33–34 (citing Ex. 1009). Petitioner further argues that a person having ordinary skill in the art "would have also known that an Ethernet LAN could be used to connect the same kinds of computing devices identified in Lurie for distributed computing." Pet. 34–35 (citing Ex. 1007 ¶ 51; Ex. 1003 ¶ 178). According to Petitioner, because "Ethernet Specification allows devices to be connected in a LAN, which Lurie explains is germane to its disclosed invention," a person having ordinary skill in the art "would have considered it obvious to utilize a well-known LAN protocol, such as Ethernet, to implement Lurie's system." Pet. 35 (citing Ex. 1003 ¶ 180).

After reviewing Petitioner's arguments and evidence, including the Lowenthal Declaration (Ex. 1003), which Patent Owner does not address separately (*see* PO Resp.), we are persuaded that Petitioner sufficiently demonstrates that a person having ordinary skill in the art would have sufficient reasons to combine the relevant teachings of Lurie and Ethernet Specification with a reasonable expectation of success.

*i) Conclusion Regarding Claim 3*

For the reasons set forth above, Petitioner has demonstrated by a preponderance of the evidence that the subject matter of claim 3 would have been obvious over Lurie and Ethernet Specification.

*3. Claim 2*

Claim 2 depends from claim 1 and recites several of the limitations found in claim 3. In substance, the parties rely on essentially the same arguments and evidence presented above for claim 3. *See* Pet. 53–54 (incorporating arguments for claim 3); PO Resp. 48–51 (repeating claim 3 arguments).

Accordingly, for the same reasons discussed above in Section II.E.2, we find that the combination of Lurie and Ethernet Specification teaches the additional limitations recited in claim 2. Petitioner, therefore, has shown by a preponderance of the evidence that the subject matter of claim 2 would have been obvious in light of Lurie and Ethernet Specification.

*4. Claim 6*

Claim 6 depends from claim 3 and further recites:

> a first device associated with the first co-processor; and
>
> a second device associated with the second co-processor;
>
> *wherein the first and second devices each comprise one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and security device*.

Ex. 1001, 16:4–11 (emphasis added). For the reasons discussed below, Lurie teaches the additional limitations recited in claim 6.

Lurie teaches that each TCW (first co-processor and second co-processor) is associated with a computing device (the claimed device) and runs on a workstation. Ex. 1007 Fig. 3B; Ex. 1003 ¶ 241; *see also* Pet. 54–56. Lurie further states that Lurie's workstations may be "any type of computing device" such as "a workstation, desktop computer, server, *laptop*, handheld computer or other form of computing or telecommunications device." Ex. 1007 ¶¶ 52 (first quote), 51 (second quote) (emphasis added);

*see also* Pet. 56–57; Ex. 1003 ¶ 248. A laptop is one of the types of devices recited in claim 6.

Patent Owner argues that Petitioner has not shown several items recited in claim 6 such "a 'sensor,' a 'light bulb,' a 'power switch,' an 'appliance,' a 'biometric device,' a 'medical device,' a 'diagnostic device,' a 'motor controller,' or a 'security device.'" PO Resp. 39. But Patent Owner's argument is inapposite. Claim 6 simply requires that the devices be "one of" the listed items, not that the devices can be each of the listed items. *See* Ex. 1001, 16:4–11. Therefore, Petitioner simply has to show that Lurie teaches one of the items recited, which it did in the form of a laptop.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 6 would have been obvious in light of Lurie and Ethernet Specification.

*5. Claim 7*

Claim 7 depends from claim 3 and further requires "wherein the first co-processor is configured to modify a task within the task pool." Ex. 1001, 16:12–14. For the reasons discussed below, Lurie teaches the additional limitation set forth in claim 7.

Lurie teaches that after a task is completed, "the [TCW] updates the task object to provide a result of the task," by writing to "a field representing the output arguments" or "an error field" in the task object. Ex. 1007 ¶ 103; *see also* Ex. 1003 ¶ 251; Pet. 57. As shown in Figure 6A, this writing/updating occurs while the task is in the task pool. Ex. 1007, Fig. 6A, ¶ 94 ("Then the technical computing worker 270 provides the result from the computation by performing a write operation to write a result object to the object exchange repository 662."); *see also* Ex. 1007, Fig. 3D; Ex. 1003

¶ 253; Pet. 57. Updating a task by writing the results is a modification of the task within the task pool. *See* Ex. 1003 ¶ 252; Ex. 1040 ¶¶ 62–63.

Patent Owner argues that Lurie describes writing a result object to the object exchange repository, not a modification of a task. PO Resp. 41 (citing Ex. 1007 ¶ 94; Ex. 2011 ¶ 124). Similarly, Patent Owner argues that Dr. Lowenthal's testimony discusses modifying an object in JavaSpaces, not a task pool. PO Resp. 41 (citing Ex. 2011 ¶ 125). However, Patent Owner's arguments are inapposite. The object exchange repository is within the ATD Mechanism, which Petitioner maps to the task pool. *See* Ex. 1007, Fig. 6A. Because the object exchange repository is in the ATD Mechanism, the tasks within the object exchange repository are also in the ATD Mechanism. *See* Ex. 1007, Fig. 6A; Ex. 1040 ¶¶ 63–64.

In its Sur-reply, Patent Owner also argues that, "to the extent Lurie's TCW modifies one or more fields within a *task object*, Lurie does not and would not modify the underlying *task* in so doing." PO Sur-reply 15–16. Instead, Patent Owner argues, Dr. Lowenthal agreed that the TCW simply modifies a field within the task object, not the task as required by the claim. PO Sur-reply 16 (citing Ex. 2015, 69:13–18, 71:14–25, 72:1–73:25, 74:24–75:7, 76:2–12, 77:2–16).

However, as Dr. Lowenthal testifies, a person having ordinary skill in the art would recognize that a task refers to a task object and one of the fields of the task object is the result. Ex. 2015, 71:14–73:11. He further testifies that a person having ordinary skill in the art would not believe that task refers solely to the function because you would never modify the function. Ex. 2015, 73:12–77:17. And, a person having ordinary skill in the art would not conflate the terms function and task. Ex. 2015, 76:21–77:7.

Dr. Lowenthal's cross-examination testimony that the result field is part of the task is consistent with Lurie. *See* PO Sur-reply 16 (discussing the testimony). For example, in the Figure 6C embodiment, which Petitioner discusses in the Petition (Pet. 57 (citing Ex. 1007 ¶ 94)), Lurie shows the TCW writing to the task itself. This is also illustrated in Figure 3D, cited in the Reply, which shows the results as part of the task. *See* Ex. 1007, Fig. 3D; Pet. Reply 15. A person having ordinary skill in the art "would have understood that this process of writing a result to the task pool by updating the task object is applicable to any embodiment that uses an automatic task distribution mechanism." Ex. 1040 ¶ 62. It is therefore of no moment that elsewhere Lurie describes other embodiments (such as that shown in Figure 6B) in which the result is shown separate from the task.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 7 would have been obvious in light of Lurie and Ethernet Specification.

*6. Claim 8*

Claim 8 depends from claim 3 and further recites "the first co-processor is further configured to process the first [task] and notify the task pool upon completion of the first task; and the second co-processor is further configured to process the second task and notify the task pool upon completion of the second task." Ex. 1001, 16:16–22. For the reasons discussed below, Lurie teaches the additional limitations set forth in claim 8.

As discussed above, in Section II.E.2, Lurie teaches first and second co-processors (TCWs) that perform first and second tasks, respectively. Lurie further teaches that the TCWs return the tasks to the ATD Mechanism after the task is completed. *See also* Ex. 1007 ¶ 72 (The TCW "provides the result to the automatic task distribution mechanism."); Ex. 1003 ¶ 255.

Providing the task is one way of notifying the ATD Mechanism that a task has been completed. *See* Ex. 1003 ¶¶ 256–257. This is confirmed by Lurie describing how after the ATD Mechanism receives the results, it notifies the TCC that the results are ready. Ex. 1007 ¶ 86 ("After obtaining the result from the technical computing worker 250 (step 550), the automatic task distribution mechanism 260 notifies (step 552) the technical computing client 250 that the result is available."), Fig. 5B; *see also* Ex. 2011 ¶ 146 ("As Fig. 5B clearly shows, the ATD then waits until the TCW has completed the task and provided its result in Step 518 to obtain the result and notify the client of the completed task.").

Patent Owner argues that, "[w]hile reporting a result may suggest that a task has been completed, the claimed element of notifying the task pool upon task completion is agnostic as to whether any particular result may also be reported." PO Resp. 43. However, Patent Owner's statement is attorney argument without any evidentiary support. It is well settled that mere attorney arguments and conclusory statements, which are unsupported by factual evidence, are entitled to little probative value. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989) ("Attorney's argument is no substitute for evidence."); *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) ("'[a]ttorney argument is not evidence' and cannot rebut other admitted evidence" (quoting *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017)). Moreover, although the claim does not require that the result is returned, the plain meaning of the claim does not preclude using the return of the results as a notification. In our view, because a result can only be provided once a task has been completed, providing a result is one way of notifying the task pool that the task has been completed. *See* Ex. 2011 ¶ 146 ("As Fig. 5B

clearly shows, the ATD then waits until the TCW has completed the task and provided its result in Step 518 to obtain the result and notify the client of the completed task."); Ex. 1002 ¶¶ 255–256; Ex. 1004 ¶ 86 ("After generating the result from computing the task (step 510), the technical computing worker 270 provides the result (step 512) to the automatic task distribution mechanism 260. After obtaining the result from the technical computing worker 250 (step 550), the automatic task distribution mechanism 260 notifies (step 552) the technical computing client 250 that the result is available."), Fig. 5B.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 8 would have been obvious in light of Lurie and Ethernet Specification.

*7. Claims 9 and 10*

Petitioner argues that Lurie teaches the additional limitations recited in dependent claims 9 and 10. *See* Pet. 59–62. Petitioner's arguments are supported by citations to the prior art and the testimony of Dr. Lowenthal. *See* Pet. 59–62. We, therefore, adopt Petitioner's arguments and evidence as our own.

Patent Owner does not address separately the additional limitations recited in claims 9 and 10. *See* PO Resp.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claims 9 and 10 would have been obvious in light of Lurie and Ethernet Specification.

*8. Claim 11*

Claim 11 depends from claim 3 and recites "wherein the first co-processor is configured to deposit a new task into the task pool." Ex. 1001,

16:32–34. For the reasons discussed below, Petitioner has shown that Lurie teaches the additional limitation set forth in claim 11.

Lurie teaches a "putTask" command which writes a task object to the JavaSpace space within the ATD Mechanism. Ex. 1007 ¶ 128; *see also* Ex. 1003 ¶ 275; Pet. 62. A person having ordinary skill in the art would have found it obvious to use the well-known bag-of-task architecture—such as that shown in Andrews (Ex. 1011, 132)[16]—for the TCW to deposit a task in the ATD Mechanism. *See* Ex. 1003 ¶¶ 276–278; Pet. 63. Such a feature would have improved—and replaced—Lurie's teaching of a TCW passing a task to a different TCW. *See* Ex. 1007 ¶ 293 (discussing passing tasks between TCWs); Ex. 1003 ¶¶ 279–282 (discussing reason for modification); Pet. 63.

Patent Owner argues "that Lurie discloses only that the putTask method has the stated result that the task is written to the JavaSpace space." PO Resp. 45 (citing Ex. 1003 ¶ 275; Ex. 1007 ¶ 128); *see also* PO Sur-reply 17–18. According to Patent Owner, "merely writing a task to a JavaSpace space in the context of Lurie, even if true, fails to disclose or suggest a co-processor configured to deposit a new task into the task pool as called for in Claim 11." PO Resp. 45; *see also* PO Sur-reply 18.

We do not agree with Patent Owner's argument as it does not address Petitioner's proposed modification to Lurie. Petitioner does not argue that Lurie teaches the additional limitation of claim 11 in paragraph 128. *See* Pet. 62–63. Instead, Petitioner argues that Lurie teaches that (1) tasks can be written to the ATD Mechanism and (2) TCWs can directly pass tasks to each

[16] Andrews, G. R. (2000). *Foundations of Multithreaded, Parallel, and Distributed Programming*. Addison-Wesley (Ex. 1011).

other; however, a person having ordinary skill in the art would have modified Lurie to allow the TCWs to *indirectly* pass tasks to another TCW by writing the task to the ATD Mechanism. *See* Pet. 62–63. Patent Owner's argument—which focuses on an unmodified Lurie—does not address that theory.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 11 would have been obvious in light of Lurie and Ethernet Specification.

### *F. Asserted Obviousness in View of Lurie, Ethernet Specification, and Sander*

Petitioner argues that claims 4 and 5 would have been obvious over Lurie, Ethernet Specification, and Sander. *See* Pet. 63–69. For the reasons set forth below, Petitioner has shown by a preponderance of the evidence that challenged claims 4 and 5 are unpatentable.

#### *1. Sander*

Sander is entitled "Dynamic Work Partitioning on Heterogeneous Processing Devices" and is directed to "an architecture for unifying the computational components within a computer system." Ex. 1010, code (54), ¶ 3.

Sander describes various elements of a computer system including a CPU and an APD (accelerated processing device). Ex. 1010 ¶¶ 5, 12–13. According to Sander, both the CPU and the APD can be "formed on a single silicon die or package, combining CPU 102 and APD 104 to provide a unified programming and execution environment." Ex. 1010 ¶ 28.

#### *2. Claim 4*

Claim 4 depends from claim 3 and recites "wherein the controller and the task pool reside on a monolithic integrated circuit (IC), and the first and

second co-processors do not reside on the IC." Ex. 1001, 15:36–39. For the reasons discussed below, Petitioner has shown that the combination of Lurie and Sander teaches the additional limitation set forth in claim 4.

As discussed above, Lurie teaches various elements including a TCC, an ATD Mechanism, and various TCWs. However, Lurie does not require any specific physical relationship between its TCC (controller), ATD Mechanism (task pool), and TCWs (co-processors). Ex. 1003 ¶ 291. For example, Lurie describes how it can be implemented either "in a stand-alone system configuration of a single computing device," or "distributed across multiple computing devices." Ex. 1007 ¶ 52; *see also* Ex. 1003 ¶ 291; Pet. 65–66.

Sander has a similar architecture that includes CPU 102 (controller), queue 202 (task pool), and APD 104 with shader cores 122 (co-processors). *See* Ex. 1010 ¶¶ 28–29, Fig. 2; Pet. 66. Although Sander states that in one embodiment "the system 100 is formed on a single silicon die or package . . . to provide a unified programming and execution environment," Sander further states that this is "not an absolute requirement of this invention" and "it is possible for them to be formed separately and mounted on the same or different substrates." Ex. 1010 ¶¶ 28–29; *see also* Pet. 66. A person having ordinary skill in the art would have recognized that "formed on a single silicon die" refers to being on the same monolithic IC. Ex. 1003 ¶ 295; *see also* Pet. 66.

A person having ordinary skill in the art would have recognized that Sander's teaching could apply to the elements of Lurie. *See* Ex. 1003 ¶¶ 295–296; Pet. 67. A person having ordinary skill in the art would have understood that placing Lurie's TCC and ATD Mechanism on the same monolithic IC would be advantageous in that it would decrease potential

latency and prevent the loss of data over a network connection. *See* Ex. 1003 ¶ 297; Pet. 67–68. A person having ordinary skill in the art would also have recognized that not having the TCWs on the same monolithic IC would allow easier scalability by adding additional TCWs remotely without requiring them to be manufactured and deposited on the same IC. *See* Ex. 1003 ¶ 298; Pet. 67–68.

Patent Owner argues that, even if the references teach the arrangement of claim 4 or the arrangement of claim 5 (which requires all of the elements on a monolithic IC), "it would be illogical for the references to disclose or suggest both arrangements in part because they are essentially mutually exclusive." PO Resp. 54. We disagree. As discussed above, Sander teaches both placing the element on a monolithic IC or placing only some of the elements on a monolithic IC. Ex. 1010 ¶ 28. Accordingly, so long as there is a sufficient reason to apply each teaching, the references can teach mutually exclusive combinations.

Patent Owner also argues that "the word 'monolithic' appears nowhere in Sander, and the words 'integrated' and 'circuit' appear only once." PO resp. 54 (citing Ex. 1010 ¶ 33). We find Patent Owner's argument inapposite. There is no requirement in an obviousness analysis for the prior art to "contain a description of the subject matter of the . . . claim in *ipsissimis verbis*." *In re May*, 574 F.2d 1082, 1090 (CCPA 1978). Rather, we find Dr. Lowenthal's testimony that "[a] [person having ordinary skill in the art] would have understood that components formed on the same single silicon die, as in Sander, are on the same monolithic integrated circuit" persuasive in light of the teachings of Sander. Ex. 1003 ¶ 295.

Patent Owner also argues that Sander "says nothing of the location or placement of a controller, task pool, and co-processor relative to a

monolithic integrated circuit as specifically recited" in the claims. PO Resp. 54 (emphasis omitted); *see also* PO Resp. 54–55 (expanding on the argument). We do not agree with Patent Owner's argument as Petitioner relies on the combination of Lurie and Sander, not Sander alone. *See* Pet. 65–68. "The question in an obviousness inquiry is whether it would have been obvious to a person of ordinary skill in the art to combine the relevant disclosures of the two references, not whether each individual reference discloses all of the necessary elements." *Game*, 942 F.3d at 1352 (citing *Cohesive*, 543 F.3d at 1364).

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 4 would have been obvious in light of Lurie, Ethernet Specification, and Sander.

*3. Claim 5*

Claim 5 depends from claim 3 and recites "wherein the controller, the task pool, and the first and second co-processors reside on a single monolithic integrated circuit (IC)." Ex. 1001, 16:1–3. For the reasons discussed below, Petitioner has shown that the combination of Lurie and Sander teaches the additional limitation set forth in claim 5.

As discussed above in Section II.F.2., Sander teaches placing either some or all of its elements on a "single silicon die" or monolithic IC. *See also* Ex. 1010 ¶ 28. Although, as discussed above for claim 4, there are some situations where a person having ordinary skill in the art would not have wanted all of the elements on a monolithic IC, that is not always true. For example, if the person having ordinary skill in the art wanted to eliminate potential latency and data loss between the ATD Mechanism and the TCWs, the person "would have considered it obvious to place the TCWs

onto the same chip as the other components [as well].” Ex. 1003 ¶ 305; *see also* Pet. 68–69.

Because Patent Owner relies on the same arguments discussed above for claim 4 to rebut Petitioner’s explanation and supporting evidence for claim 5, we disagree with them for the same reason. *See* PO Resp. 52–55.

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 5 would have been obvious in light of Lurie, Ethernet Specification, and Sander.

### *G. Asserted Obviousness in View of Lurie, Ethernet Specification, and Chow*

Petitioner argues that claim 12 would have been obvious over Lurie, Ethernet Specification, and Chow. *See* Pet. 69–75. For the reasons set forth below, Petitioner has shown by a preponderance of the evidence that challenged claim 12 is unpatentable.

#### *1. Chow*

Chow is entitled “Method for Hiding Latency in a Task-Based Library Framework for a Multiprocessor Environment” and is directed to “a task-based library framework for dynamic load balancing in a multiprocessor environment, and to a method of latency hiding in this framework.” Ex. 1008, code (54), ¶ 1.

Chow recites “[a] task-based library framework for load balancing using a system task queue in a tightly-coupled multiprocessor system. The system memory holds a queue of system tasks. The library processors fetch tasks from the queue for execution.” Ex. 1008, code (57). Chow further recites that “[t]he library processors fetch the tasks when they have a light load. A library processor can fetch a task while executing another task.” Ex. 1008, code (57).

Chow Figure 1 is reproduced below.

FIG. 1




Chow Figure 1 "schematically depicts a tightly-coupled multiprocessor system with a task-based library framework and library processors." Ex. 1008 ¶ 7.

> Referring to FIG. 1 of the drawings, the reference numeral 100 generally designates a tightly-coupled multiprocessor system with a task-based library framework. The system 100 comprises a system kernel 102, a system memory 104, and a number of library processors, 108, 110, 112, 114, and 116. The ellipsis indicates that the system 100 can comprise additional library processors. The system memory comprises a queue of tasks 106 to be assigned to the library processors (library task queue 106). Each library processor has access to the library task queue 106. When tasks arrive at the system kernel 102 for processing, they are subdivided into subtasks and placed into the library task queue 106. The library processors 108, 110, 112, 114, and 116 fetch the subtasks from the library task queue 106.

Ex. 1008 ¶ 13.

*2. Claim 12*

*a) Limitations [12a] and [12b]*

Claim 12 depends from claim 3 and recites "[12a] the first co-processor is configured to determine when it has available processing capacity, and [12b] to dispatch the first agent to the task pool in response to the determination." Ex. 1001, 16:35–38. For the reasons discussed below, Petitioner has shown that the combination of Lurie and Chow teaches the additional limitations set forth in claim 12.

Petitioner argues that the combination of Lurie, Ethernet Specification, and Chow teaches the additional limitations recited in claim 12. *See* Pet. 71–75. Specifically, Petitioner argues that Chow teaches that "each library processor 'checks the number of tasks residing in the buffer' and, if there are zero or one tasks, loads an additional 1 or 2 tasks up to the maximum buffer size of 2 tasks." Pet. 72 (quoting Ex. 1008 ¶ 18) (citing Ex. 1008, Fig. 4; Ex. 1003 ¶¶ 320–321). Petitioner further argues that "Chow's library processor can retrieve another task from the library task queue when the library processor has determined that there is available processing capacity, i.e., when there is either zero or only one task in the buffer." Pet. 72 (citing Ex. 1008 ¶¶ 18–21; Ex. 1003 ¶ 322). Petitioner further argues that a person having ordinary skill in the art would have combined Lurie with Chow "to check whether the co-processor has available processing capacity." Pet. 73 (citing Ex. 1003 ¶¶ 323–324).

Petitioner also argues a person having ordinary skill in the art "would have considered it obvious to combine Chow and Lurie such that not only . . . is each TCW provided with a buffer for storing tasks, but each TCW also checks the buffer and retrieves additional tasks only when it has available processing capabilities." Pet. 74–75 (citing Ex. 1003 ¶ 328). This would

result in dispatching "an agent to retrieve a task in response to the determination of available processing capabilities." Pet. 75 (citing Ex. 1003 ¶ 328).

After reviewing Petitioner's arguments and evidence, including the Lowenthal Declaration (Ex. 1003), which Patent Owner does not address separately (*see* PO Resp.),[17] we are persuaded that Petitioner sufficiently demonstrates that the combination of Lurie, Ethernet Specification, and Chow teaches the limitations of claim 12.

*b) Reason to Combine*

For the reasons set forth below, we find that a person having ordinary skill in the art would have combined the relevant teachings of Lurie, Ethernet Specification, and Chow.

Although Lurie discusses how the system assigns tasks to the various TCWs, it does not describe how a TCW determines that it has the ability to perform additional tasks. *See* Ex. 1003 ¶¶ 308–309; Pet. 69. A person having ordinary skill in the art would have recognized the need for such a system in order to prevent either TCWs sitting idle or TCWs obtaining so many tasks that they have a large backlog. *See* Ex. 1003 ¶¶ 309–311; Pet. 69–70.

In order to solve this problem, a person having ordinary skill in the art would have looked for a system such as Chow for a solution. *See* Ex. 1003 ¶¶ 313–316; Pet. 70–71. Specifically, both Lurie and Chow use a centralized task queue—as opposed to a central distributor. *Compare* Ex. 1008 ¶ 13, Fig. 1 (describing architecture), *with* Ex. 1007 ¶¶ 71–72,

---

[17] Patent Owner only disputes that a person having ordinary skill in the art would have combined Lurie and Chow. We address that argument below.

Fig. 3B (same); *see also* Ex. 1003 ¶ 314; Pet. 70. Because of this similarity, a person having ordinary skill in the art would have used Chow's "double buffer system that allows for even load balancing" "to expressly provide a mechanism for checking the available processing capacity of each TCW." Ex. 1003 ¶¶ 315–316 (citing Ex. 1008 ¶¶ 18–21, Fig. 4; Ex. 1007 ¶ 5, code (57)); *see also* Pet. 70–71.

Patent Owner argues that Lurie teaches using the ATD Mechanism to control the assignment and distribution of tasks. PO Resp. 56–58 (citing Ex. 2011 ¶¶ 142–148. Therefore, according to Patent Owner, a person having ordinary skill in the art would not need "to look elsewhere or to fabricate a new mechanism to add to Lurie for the purpose of understanding when TCW's are available for use." PO Resp. 58 (citing Ex. 2011 ¶ 149).

Patent Owner also argues that Lurie teaches away from the distributed approach of Chow. PO Resp. 59. According to Patent Owner, "[i]n every such embodiment, the ATD [Mechanism] performs the role of a central managing unit, deciding which tasks are to be assigned to which TCW's and notifying the chosen TCW that a task is available for it." PO Resp. 59. Patent Owner further argues that Chow teaches away from the centralized approach of Lurie. PO Resp. 59–60.

We do not agree with Patent Owner's arguments. First, we disagree with Patent Owner's description of Lurie as only teaching a centralized approach. As discussed above in Section II.E.2.d.(3), Lurie teaches that the TCWs select their tasks or suggests modifying the TCWs to dispatch an agent to select a task that the TCW can perform. Therefore, contrary to Patent Owner's argument, there is a need for the TCWs to determine when to dispatch an agent to retrieve a task.

Second, even if Patent Owner accurately described Lurie, that description does not show that it teaches away from a combination with Chow or that Chow teaches away from a combination with Lurie. A reference teaches away from a proposed combination when "a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). The descriptions of specific embodiments in Lurie and Chow "do[] not 'criticize, discredit, or otherwise discourage' investigation into the invention claimed." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (quoting *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004)). Merely stating a preference is insufficient to teach away from the claimed invention. *See DePuy*, 567 F.3d at 1327; *Fulton*, 391 F.3d at 1201.

Patent Owner also argues that, because "Lurie and Chow . . . teach specific (and mutually incompatible) ways of assigning tasks to processors," a person having ordinary skill in the art would not have an assurance of success. PO Resp. 60 (citing Ex. 2011 ¶¶ 154–155).

We disagree with Patent Owner's argument. First, as discussed above, the references are not mutually incompatible in terms of how tasks are assigned. Second, Dr. Lowenthal provides a detailed description of how the modified system would work. *See* Ex. 1003 ¶¶ 323–326, 328. That testimony supports a finding that there would be a reasonable expectation of success. Additionally, Dr. Lowenthal describes the combination as "obvious," which he understands to mean that the combination yields what the person having ordinary skill in the art would have expected. *Compare*

Ex. 1003 ¶ 316 (describing combination of Lurie and Chow as "obvious"), *with* Ex. 1003 ¶ 18 (providing Dr. Lowenthal's understanding of "obvious").

Patent Owner also argues that "Lurie lacks any disclosure in which 'a technical computing worker obtains a task without first being notified that the task is available.'" PO Sur-reply 22 (quoting Prelim. Guid. 17). Patent Owner further argues that we noted that "Lurie's [TCW] appears to be dependent upon notification from the automatic task distribution mechanism for obtaining and performing each task." PO Sur-reply 22 (quoting Prelim. Guid. 17). According to Patent Owner, "regardless of whether and/or how Lurie determines if a TCW has available processing capacity, in no event does Lurie disclose or suggest that a TCW obtains a task *in response to* such determination." PO Sur-reply 23.

However, because Patent Owner did not raise the argument in its Response, the argument was belated, and therefore, forfeited.[18] *See* Paper 7, 9 ("Patent Owner is cautioned that any arguments not raised in the response may be deemed forfeited.").

Moreover, Patent Owner mischaracterizes the finding in our Preliminary Guidance on the Motion to Amend. The issue in the Preliminary Guidance was whether the co-processor was "autonomous" and acting "proactively" as required by the proposed substitute claims. *See* Prelim. Guid. 16–17. Because Lurie provided a notification before the TCW obtained a task in some situations, we found, based on the record at that time, that Lurie did not teach an "autonomous co-processor" which was

[18] Although we issued our Preliminary Guidance after Patent Owner filed its Response, we relied on Lurie for our initial determination. *See* Prelim. Guid. 16–18. Patent Owner could have relied on the same teaching in Lurie in its Response, but declined to do so.

configured to "proactively interrogate the task pool." Prelim. Guid. 16–18 (emphasis omitted). Stated differently, acting upon a single notification was sufficient to show that the co-processor was not "autonomous" and acting "proactively."

However, we did not determine—as it was not an issue at that time—whether the TCW only obtained tasks when notified by the ATD Mechanism. Considering that issue for the first time, we are sufficiently persuaded, for the reasons discussed above, that it would have been obvious to a person having ordinary skill in the art to provide the TCW with a means to determine when it needed an additional task and send an agent to obtain it. Such a modification would allow the TCW to ensure that it does not have any periods where it is waiting for an assignment. *See* Ex. 1003 ¶ 325.

##### *c) Conclusion Regarding Claim 12*

Accordingly, Petitioner has shown by a preponderance of the evidence that the subject matter of claim 12 would have been obvious in light of Lurie, Ethernet Specification, and Chow.

## III. PATENT OWNER'S CONTINGENT MOTION TO AMEND

We have concluded that Petitioner has proven by a preponderance of the evidence that claims 1 and 2 of the '004 patent are unpatentable. Therefore, we address Patent Owner's Contingent Motion to Amend in which it seeks to replace claims 1 and 2 with proposed substitute claims 13 and 14, respectively. *See* MTA. For the reasons that follow, Patent Owner's motion is *denied*.

### *A. Legal Standard for a Motion to Amend*

In reviewing a motion to amend, we first consider whether the motion meets the statutory and regulatory requirements set forth in 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121. *Lectrosonics, Inc. v. Zaxcom, Inc.*,

IPR2018-01129, Paper 15 (PTAB Feb. 25, 2019) (designated precedential). Under those requirements, Patent Owner must demonstrate the following: (1) the amendment responds to a ground of unpatentability involved in the trial; (2) the amendment does not seek to enlarge the scope of the claims of the patent or introduce new subject matter; (3) the amendment proposes a reasonable number of substitute claims; and (4) the proposed claims are supported in the original disclosure of the patent. *See* 35 U.S.C. § 316(d); 37 C.F.R. § 42.121; *Lectrosonics*, Paper 15 at 4–8.

We also consider patentability. In that regard, "petitioner bears the burden of persuasion to show, by a preponderance of the evidence, that any proposed substitute claims are unpatentable." 37 C.F.R. § 42.121(d)(2).

For purposes of this Decision, we address only those issues that are case dispositive: whether Patent Owner meets the statutory and regulatory requirements of 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121 and whether the proposed substitute claims recite patent-eligible subject matter. *See Boston Scientific Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

*B. Proposed Substitute Claims*

Patent Owner identifies proposed substitute claim 13 as an independent claim. MTA A1–A2. Proposed substitute claim 14 depends from proposed substitute claim 13. MTA A-2–A-3. Proposed substitute claim 13, reproduced below, is illustrative of the subject matter of the proposed substitute claims (with underlining indicating language added and strikethrough indicating language removed).

> [[1.]]<u>13.</u> (Substitute for Claim 1) [13pre] A processing system, comprising:

> [13a] a task pool;
>
> [13b] a controller configured to populate the task pool with a plurality of first tasks having indicia of a first task type and a plurality of second tasks having indicia of a second task type;
>
> [13c] a first autonomous co-processor configured to perform tasks of the first type and configured to successively: proactively interrogate the task pool to retrieve a first task from the task pool without being instructed to do so by the task pool; deliver the first task to the first autonomous co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first autonomous co-processor and the controller; ~~and~~
>
> [13d] a second autonomous co-processor configured to perform tasks of the second type and configured to successively: proactively interrogate the task pool to retrieve a second task from the task pool without being instructed to do so by the task pool; deliver the second task to the second autonomous co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second autonomous co-processor and the controller;
>
> [13e] wherein after the first autonomous co-processor updates the task pool to reflect completion of the first task, the task pool is configured to send a notification to the controller indicating that the first task is completed;
>
> [13f] wherein after the second autonomous co-processor updates the task pool to reflect completion of the second task, the task pool is configured to send a notification to the controller indicating that the second task is completed; and, [13g] wherein the processing system is configured to dynamically accept the first autonomous co-processor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis without any communication with the controller.

MTA A-1–A-2.

*C. Procedural Requirements*

"Before considering the patentability of any substitute claims, . . . the Board first must determine whether the motion to amend meets the statutory and regulatory requirements set forth in 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121." *Lectrosonics*, Paper 15 at 4.

First, we consider whether the Motion to Amend proposes a reasonable number of substitute claims. 35 U.S.C. § 316(d)(1)(B); 37 C.F.R. § 42.121(a)(3). "There is a rebuttable presumption that a reasonable number of substitute claims per challenged claim is one (1) substitute claim." *Lectrosonics*, Paper 15 at 4–5 (citing 37 C.F.R. § 42.121(a)(3)). The Petition challenges 12 claims and the Motion to Amend proposes 2 substitute claims. MTA 1, 2. Petitioner does not argue that this requirement is not satisfied. *See* MTA Opp. Accordingly, the number of proposed claims is reasonable.

Second, we consider whether the proposed substitute claims respond to a ground of unpatentability involved in this trial. *Lectrosonics*, Paper 15 at 5–6. Patent Owner argues that the newly added language in the limitation of an "<u>autonomous</u> co-processor . . . configured to . . . <u>proactively interrogate the task pool to</u> retrieve a first task for the task pool <u>without being instructed to do so by the task pool</u>" distinguishes proposed substitute claim 13, and proposed substitute claim 14 depending therefrom, over the grounds asserted in the Petition. MTA 25–28 (boldface omitted; underlining added). Petitioner does not argue that this requirement is not satisfied. *See* MTA Opp. Accordingly, the proposed amendments respond to at least one ground of patentability.

Third, we consider the breadth of the substitute claims. "A motion to amend may not present substitute claims that enlarge the scope of the claims

of the challenged patent or introduce new subject matter." *Lectrosonics*, Paper 15 at 6–8 (citing 35 U.S.C. § 316(d)(3)); *see also* 37 C.F.R. § 42.121(a)(2)(ii).

Patent Owner asserts that proposed substitute claims 13 and 14 are supported by the original disclosure of the '332 and '696 applications.[19] *See* MTA 2–6; MTA Reply 1–4.

Petitioner argues that the proposed amended claims lack original description support for the limitations requiring (1) "a first autonomous co-processor . . . configured to . . . deliver the first task to the first autonomous co-processor," and (2) "dynamically accept[ing]" an "additional co-processor into the processing system on a plug-and-play basis *without any communication with the controller*." MTA Opp. 21–23; MTA Sur-reply 7–10. We address that argument in detail below and, for the reasons discussed in section H.4., we are persuaded that proposed substitute claims 13 and 14 are not supported by the original '332 application.

Finally, the Motion to Amend includes a claim listing, as required by 37 C.F.R. § 42.121(b). MTA A-1–A-3.

Accordingly, proposed substitute claims 13 and 14 do not meet the statutory and regulatory requirements of 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121.

---

[19] The '004 patent issued from U.S. Patent Application No. 14/340,332 (Ex. 2002, "the '332 application"). Ex. 1001, code (21). The '332 application is a continuation of U.S. Patent Application No. 13/750,696 (Ex. 2003, "the '696 application"). Ex. 1001, code (63).

*D. Support for the Proposed Substitute Claims in the Original Disclosure*

A motion to amend must set forth "support in the original disclosure of the patent for each claim that is added or amended." 37 C.F.R. § 42.121(b)(1). Stated differently, there must be written description support for the proposed substitute claims. The test for determining compliance with the written description requirement is whether the disclosure of the application as originally filed reasonably conveys to a person of ordinary skill in the art that the inventor had possession at that time of filing of the claimed subject matter, rather than the presence or absence of literal support in the specification for the claim language. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Although "[s]uch description need not recite the claimed invention *in haec verba*," the description "must do more than merely disclose that which would render the claimed invention obvious." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009); *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

"For negative claim limitations . . . there is adequate written description when, for example, 'the specification describes a reason to exclude the relevant [element].'" *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022) (quoting *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1351 (Fed. Cir. 2012)). Such reason "could be found in 'statements in the specification expressly listing the disadvantages of using' that element," or where "the specification 'distinguishes among' the element and alternatives to it." *Id.* (quoting *Santarus*, 694 F.3d at 1351 (first quote); *Inphi Corp. v. Netlist, Inc.*, 805 F.3d 1350, 1357 (Fed. Cir. 2015) (second quote)).

Proposed substitute claim limitation 13[g] recites "wherein the processing system is configured to dynamically accept the first autonomous co-processor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis *without any communication with the controller*." MTA A-2 (underlying in original omitted) (emphasis added). We focus our analysis on the italicized, negative limitation.

Patent Owner directs us to Figures 4 and 5 and paragraphs 13, 36, 52, 54, and 58–62 of the '332 application.[20] MTA 5. Specifically, Patent Owner argues that the '696 application[21] "describes disadvantages of traditional multiprocessor systems where 'a significant amount of the CPU's processing time is consumed in managing the co-processing tasks.'" MTA Reply 1 (quoting Ex. 2003 ¶ 3); *see also* MTA Reply 1–4 (describing the invention as using autonomous processors that do not communicate with the CPU (citing Ex. 2003 ¶¶ 4, 8, 14, 15, 18; Ex. 2013 ¶¶ 37–44; Ex. 2015, 92:21–93:5; Ex. 2002 ¶¶ 58–62)). According to Patent Owner, it is clear that the '696 application

> provides support for the integration of co-processors without communication with the controller by virtue of: i) the autonomy of the co-processors, ii) the co-processors seek out a task pool upon being connected to the system instead of communicating

[20] We focus on the '332 application which issued as the '004 patent. To the extent necessary, our findings and conclusions are equally applicable to the '696 application.

[21] Conversely, Patent Owner's written description arguments rely on disclosures in the '696 application. Patent Owner, however, states that "[t]he '332 [a]pplication contains language that is substantially equivalent to the citations provided above [in the '696 application] and supports Substitute Claim element [13g] for at least the same reasons." MTA 4.

> with the CPU, iii) various embodiments eliminate any direct communication connections between CPU and co-processors, and iv) the CPU does not require any reprogramming or reconfiguration to account for the newly added co-processors.

MTA Reply 4. Thus, according to Patent Owner, a person having ordinary skill in the art "would understand that the inventor . . . was in possession of Substitute Claim element [13g]." MTA Reply 4 (quoting Ex. 2013 ¶ 45) (alteration in original).

Based on the fully developed record, we are not persuaded by Patent Owner's arguments that the negative limitation of claim limitation [13g] is supported by the '332 application. Various sections of the specification relied on by Patent Owner in the Motion to Amend simply discuss adding processors or the plug-and-play feature. *See* Ex. 2002 ¶¶ 13, 36, 52, 54, 59, 62. But none of the paragraphs describe another processor added "on a plug-and-play basis without any communication with the controller" as recited in proposed substitute claim 13.

For example, the relevant portion of paragraph 13 of the '332 application simply acknowledges the use of plug and play without any reference to the negative limitation:

> Those skilled in the art will appreciate that interoperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. *As such, devices and their associated co-processors may be added to a network on a "plug and play" basis.* Another aspect of this invention provides interoperability within a heterogeneous array of CPUs with different instruction set architectures.

Ex. 2002 ¶ 13 (emphasis added). Similarly, paragraph 36 simply describes different types of processors and indicates that a new processor (sometimes referred to in the Specification as a "cell") can be "dynamically added to the system 10." Ex. 2002 ¶ 36; *see also* Ex. 2002 ¶ 52 ("For example, the CPU 11 may recruit cells from other cell systems, allowing for dynamic expansion and increased performance."). Likewise, none of the other sections of the '332 application cited by Patent Owner address whether the addition of another processor is done "without any communication with the controller." Accordingly, there is no discussion of any reason to exclude "communication with the controller."

To the contrary, one of the specific paragraphs cited by Patent Owner demonstrates that such communication exists. Specifically, paragraph 52 of the '332 application states that "the CPU 11 may recruit cells from other cell systems, allowing for dynamic expansion and increased performance." Ex. 2002 ¶ 52. This discloses at least some involvement of the CPU in adding cells to the system, contrary to the claimed accepting of co-processors "without any communication with the controller."

As Patent Owner points (MTA Reply 1–3) out, the '332 application discusses how the co-processors operate proactively and autonomously (*see, e.g.*, Ex. 2002 ¶¶ 2, 7, 9, 11, 43, 46, 56, 63, 64, 71, 75, 77, 81, 82), in contrast to a "typical multiprocessor system," which has the disadvantages of "a significant amount of CPU bandwidth [being] consumed by task distribution" and "co-processors often remain[ing] idle while waiting for a new task from the CPU." *See* Ex. 2002 ¶ 5. However, we do not see any description in those sections or any discussion of any disadvantages associated with communications with the CPU when adding an additional co-processor. The description of the co-processors as proactive and

autonomous relates to reducing management responsibility of a CPU in assigning tasks to co-processors, not to accepting co-processors into the system.

Nor are we persuaded by Patent Owner's citation (MTA Reply 3–4) to the portion of the '332 application that refers to adding new co-processors without reprograming the controller: "In either case, scalability of the system is greatly enhanced over conventional parallel processing schemes, as co-processors may be added and removed without reprogramming the CPU 11 to account for the changes to the system 10." Ex. 2002 ¶ 54. The absence of reprogramming does not mean there is no communication at all with the CPU. "For example, as described above, a controller 'recruit[ing]' an additional co-processor may not require 'reprogramming' it, yet still requires communication between the controller and the co-processor." Ex. 1040 ¶ 97.

Nor are we persuaded by Patent Owner's arguments regarding an embodiment in which there is no direct communication between the controller and the processors. *See* MTA Reply 2–3 (citing Ex. 2003 ¶¶ 8, 14, 18; Ex. 2012 ¶¶ 39–42).[22] Specifically, Patent Owner describes an embodiment in which "the co-processors 'connect directly to the task pool 13, such as by a wired configuration that does not require a switching fabric 14 to handle communications.' . . . 'A [person having ordinary skill in the art] would understand that in such a configuration, the co-processors are

[22] Once again, Patent Owner only cites to paragraphs in the '696 application. *See* MTA Reply 2–3. Patent Owner does not cite to a corresponding section of the '332 application, which is necessary to show written description support. Regardless, we do not find this argument meritorious.

inherently incapable of communicating with the CPU *directly*.'" MTA Reply 2 (emphasis in original omitted) (emphasis added) (quoting Ex. 2003 ¶ 18 (first quote); Ex. 2013 ¶ 40 (second quote)). However, limitation [13g] requires the addition to be done "*without any* communication." Any communication includes both direct and indirect communication. At most, Patent Owner argues that the '332 application adds processors without any *direct* communication; but that is not without any communication, such as indirect communication via the task pool. *See* Ex. 2002 ¶ 24 ("In some embodiments, the CPU 11 communicates with the cells 12 *only indirectly through the task pool*." (emphasis added)).

For the reasons set forth above, we determine the '332 application does not provide written description support for a system that "is configured to dynamically accept . . . an additional autonomous co-processor into the processing system on a plug-and-play basis without any communication with the controller" as recited in proposed substitute claim 13. Accordingly, Patent Owner has not satisfied all the statutory and regulatory requirements for proposed substitute claim 13 for this reason. Additionally, for the same reason, Patent Owner has not satisfied all the statutory and regulatory requirements for proposed substitute claim 14, which depends from claim 13.

*E. Subject Matter Eligibility under 35 U.S.C. § 101*

Having determined that Patent Owner has not satisfied the procedural requirements for a motion to amend, we need not address whether Petitioner has demonstrated by a preponderance of the evidence that claims 13 and 14 are unpatentable. However, we exercise our discretion and address one of the grounds of unpatentability asserted by Petitioner. Specifically, we

address Petitioner's argument that the proposed substitute claims are not patent eligible under 35 U.S.C. § 101.[23]

*1. Principles of Law*

An invention is patent-eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. However, the U.S. Supreme Court has long interpreted 35 U.S.C. § 101 to include implicit exceptions: "[l]aws of nature, natural phenomena, and abstract ideas" are not patentable. *E.g.*, *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

In determining whether a claim falls within an excluded category, we are guided by the Court's two-part framework, described in *Mayo* and *Alice*. *Alice*, 573 U.S. at 217–18 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 75–77 (2012)). In accordance with that framework, we first determine what concept the claim is "directed to." *See Alice*, 573 U.S. at 219 ("On their face, the claims before us are drawn to the concept of intermediated settlement, *i.e.,* the use of a third party to mitigate settlement

[23] The patent eligibility of the challenged claims and claims of related patents have been addressed in two district court proceedings. In the Arizona proceeding, the district court granted Petitioner's motion to dismiss the complaint, determining that the asserted claims of the '004 and Patent Owner's related U.S. Patent No. 10,592,275 ("the '275 patent") were not patent eligible. Ex. 1025. The district court later granted Patent Owner's motion for leave to file a first amendment complaint, determining that Patent Owner pled "sufficient factual allegations to survive dismissal under § 101 at the Rule 12(b)(6) stage." Ex. 2006, 2. In the California proceeding, the district court granted Petitioner's motion to dismiss the complaint, determining that the claims of the related '275 and '777 patents were not patent eligible. Ex. 2005. A motion for leave to amend the complaint is pending. *See* Ex. 2007. Both the Arizona proceeding and the California proceeding have been stayed pending this IPR.

risk."); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) ("Claims 1 and 4 in petitioners' application explain the basic concept of hedging, or protecting against risk.").

Concepts determined to be abstract ideas, and thus patent ineligible, include certain methods of organizing human activity, such as fundamental economic practices (*Alice*, 573 U.S. at 219–20; *Bilski*, 561 U.S. at 611); mathematical formulas (*Parker v. Flook*, 437 U.S. 584, 594–95 (1978)); and mental processes (*Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). Concepts determined to be patent eligible include physical and chemical processes, such as "molding rubber products" (*Diamond v. Diehr*, 450 U.S. 175, 191 (1981)); "tanning, dyeing, making water-proof cloth, vulcanizing India rubber, smelting ores" (*id.* at 182 n.7 (quoting *Corning v. Burden*, 56 U.S. 252, 267–68 (1853))); and manufacturing flour (*Benson*, 409 U.S. at 69 (citing *Cochrane v. Deener*, 94 U.S. 780, 785 (1876))).

In *Diehr*, the claim at issue recited a mathematical formula, but the Court held that "a claim drawn to subject matter otherwise statutory does not become nonstatutory simply because it uses a mathematical formula." *Diehr*, 450 U.S. at 187; *see also id.* at 191 ("We view respondents' claims as nothing more than a process for molding rubber products and not as an attempt to patent a mathematical formula."). Having said that, the Court also indicated that a claim "seeking patent protection for that formula in the abstract . . . is not accorded the protection of our patent laws, and this principle cannot be circumvented by attempting to limit the use of the formula to a particular technological environment." *Id.* (citation omitted) (citing *Benson* and *Flook*); *see, e.g.*, *id.* at 187 ("It is now commonplace that an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection.").

If the claim is "directed to" an abstract idea, we turn to the second part of the *Alice* and *Mayo* framework, where "we must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (quotation marks omitted). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* (alterations in original) (quoting *Mayo*, 566 U.S. at 77). "[M]erely requir[ing] generic computer implementation[] fail[s] to transform that abstract idea into a patent-eligible invention." *Id.*

In January 2019, the U.S. Patent and Trademark Office (USPTO) published revised guidance on the application of § 101.[24] The Manual of Patent Examining Procedure ("MPEP") now incorporates this revised guidance and subsequent updates at Section 2106.[25]

Under MPEP § 2106, we first look to whether the claim recites:

> (1) any judicial exceptions, including certain groupings of abstract ideas (i.e., mathematical concepts, certain methods of organizing human activity such as a fundamental economic practice, or mental processes) ("Step 2A, Prong One"); and

[24] 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019) ("2019 Revised Guidance"). In response to received public comments, the Office issued further guidance on October 17, 2019, clarifying the 2019 Revised Guidance. USPTO, *October 2019 Update: Subject Matter Eligibility* (the "October 2019 Update"). "All USPTO personnel are, as a matter of internal agency management, expected to follow the guidance." 84 Fed. Reg. at 51; *see also* October 2019 Update at 1.

[25] All references to the MPEP are to the Ninth Edition, Revision 07.2022 (Last Revised February 2023), unless otherwise indicated.

> (2) additional elements that integrate the judicial exception into a practical application ("Step 2A, Prong Two").[26]

MPEP § 2106.04(a)) and § 2106.04(d).

Only if a claim (1) recites a judicial exception and (2) does not integrate that exception into a practical application,[27] do we then look, under Step 2B, to whether the claim:

> (3) adds a specific limitation beyond the judicial exception that is not "well-understood, routine, conventional activity" in the field; or
>
> (4) simply appends well-understood, routine, conventional activities previously known to the industry, specified at a high level of generality, to the judicial exception.[28]

MPEP § 2106.05(d).

We evaluate the parties' arguments using the Guidance's framework. The Federal Circuit has warned that "the Office Guidance is not, itself, the law of patent eligibility" and "does not carry the force of law." *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020); *see also cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367, 1375 n.1 (Fed. Cir. 2021). Rather, "it is [the

---

[26] "Examiners evaluate integration into a practical application by (1) identifying whether there are any additional elements recited in the claim beyond the judicial exception(s); and (2) evaluating those additional elements individually and in combination to determine whether they integrate the exception into a practical application." MPEP § 2106.04(d)II.

[27] This corresponds to *Alice* part one where it is determined whether the claim is "directed to" an abstract idea. *See Alice*, 573 U.S. at 219. If a claim is "not directed to an abstract idea under step one of the *Alice* analysis, we do not need to proceed to step two." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).

[28] This corresponds to *Alice* part two where it is determined whether the claim "contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221.

Federal Circuit's] caselaw, and the Supreme Court precedent it is based upon, that must control." *Rudy*, 956 F.3d at 1383. Thus, although our analysis here is framed in terms of the Guidance, our decision is based upon governing precedent of the United States Supreme Court and our reviewing court's interpretation and application thereof.

*Alice* Step One asks whether the claims are directed to a judicial exception, such as an abstract idea. *See Alice*, 573 U.S. at 217. The Guidance frames this question as a two-prong inquiry under Step 2A: Prong 1, whether the claims recite any of the groupings of abstract ideas listed in the Guidance, and if so, Prong 2, whether the abstract idea is integrated into a practical application.

*2. Step 1*

Patent Owner argues that the proposed substitute claims are directed to a processing system with controllers and co-processors. MTA 9. According to Patent Owner, the proposed substitute claims are "within the statutory category of a 'machine' under 35 U.S.C. § 101." MTA 9 (citing MPEP § 2106.03(I)). Petitioner agrees with Patent Owner's analysis. MTA Opp. 3.

We agree with the parties. The proposed substitute claims relate to "[a] processing system, comprising" certain hardware such as "a controller," "a first autonomous co-processor," and "a second autonomous co-processor," and so at least nominally fits within one of the statutory categories of patent-eligible subject matter, namely, "[a] machine." *See* 35 U.S.C. § 101. Accordingly, the proposed substitute claims satisfy Step 1 of our analysis.

*3. Step 2A, Prong One*

Under Step 2A, Prong One, we determine whether the claims[29] recite any judicial exceptions, including certain groupings of abstract ideas (i.e., mathematical concepts, certain methods of organizing human activity such as a fundamental economic practice, or mental processes).

Petitioner argues that the claims recite a fundamental human activity long used for project management: the scrum board.[30] MTA Opp. 4. Therefore, according to Petitioner, "the claims fall into a recognized category of abstract ideas: a 'method of organizing human activity,' namely 'managing . . . interactions between people' including by 'following rules or instructions.'" MTA Opp. 4–5 (citing MPEP § 2106.04(a)(2); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016)). We agree.

Proposed substitute claim 13 recites:[31]

> 13. A processing system, comprising:
>
> a task pool;

[29] The parties argue proposed substitute claims 13 and 14 together. *See* MTA 7–25; MTA Opp. 2–19. Accordingly, we focus on proposed substitute claim 13.

[30] "A scrum board works by first having a project manager list tasks on sticky notes and post them on one side of a board. As the team members collect and perform each task, they individually move the notes from the 'incomplete' side of the board to the other side, the 'complete' side of the board." Ex. 1025, 4–5 (*Swarm Tech. LLC v. Amazon.com Inc.*, CV-21-00438 (D. Az. Sept. 20, 2021) (Order granting motion to dismiss)).

[31] For convenience, we have eliminated the markings indicating the new words added and the old words deleted.

> a controller configured to *populate the task pool with a plurality of first tasks having indicia of a first task type and a plurality of second tasks having indicia of a second task type*;
>
> a first autonomous co-processor configured to *perform tasks of the first type* and configured to successively: *proactively interrogate the task pool to retrieve a first task from the task pool without being instructed to do so by the task pool; deliver the first task* to the first autonomous co-processor; *process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first autonomous co-processor and the controller*;
>
> a second autonomous co-processor configured to *perform tasks of the second type* and configured to successively: *proactively interrogate the task pool to retrieve a second task from the task pool without being instructed to do so by the task pool; deliver the second task* to the second autonomous co-processor; *process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second autonomous co-processor and the controller*;
>
> wherein after the first autonomous co-processor *updates the task pool to reflect completion of the first task*, the task pool is configured to *send a notification* to the controller *indicating that the first task is completed*;
>
> wherein after the second autonomous co-processor *updates the task pool to reflect completion of the second tas*k, the task pool is configured *to send a notification* to the controller *indicating that the second task is completed*; and, wherein the processing system is configured to dynamically accept the first autonomous co-processor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis without any communication with the controller.

MTA A-1–A-2 (emphasis added).

We are persuaded the elements italicized above recite the concept of a scrum board, which can be completely performed by humans using pen and paper. Proposed substitute claim 13 does no more than apply the features of a scrum board to computer components. That is, the claim simply replaces the manager with a controller, the scrum board with a task pool, and the workers with autonomous co-processors in order to apply the well-known process to a specific computer environment. Accordingly, the limitations identified above with italics are directed to the abstract ideas category of "[c]ertain methods of organizing human activity," namely, "managing personal behavior or relationships or interactions between people (including . . . following rules or instructions)," as well as the category of "[m]ental processes." MPEP § 2106.04(a); *see also Broadcom Corp. v. Netflix Inc.*, 598 F. Supp. 3d 800, 808 (N.D. Cal. 2022) (determining claim ineligible where it "does not teach any specific improvement to computer functionality, but instead teaches using general, abstract resource allocation principles to pick the best computer device to perform a job"); *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (A process that can be performed "using a pencil and paper" is "a telltale sign of abstraction.").

Patent Owner argues that it is improper to base a decision under section 101 based on analogy. MTA 9–10; MTA Reply 5–7. But Patent Owner's argument is inapposite. Our conclusion is not based on whether the proposed substitute claims are analogous to a scrum board. Instead, our conclusion is based on the applicant taking the well-known concept of a scrum board and applying it to a computer environment. The "[a]utomation or digitization of a conventional method of organizing human activity . . . on a computer does not bring the claims out of the realm of abstractness."

*Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022); *see also Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017) ("[M]ere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology.").

Patent Owner also argues that the claims are not directed to a scrum board; instead, Patent Owner argues that the claims are directed to an unconventional multiprocessor architecture. MTA 11–14. In support of its argument, Patent Owner directs us to a color-coded version of proposed substitute claim 13 prepared by Dr. Nelson which purports to identify "structural/functional component[s]," "operation and behavior of those components," and "organization, arrangement, and interrelation of those components." MTA 13–14 (colors and emphasis omitted).

We do not agree with Patent Owner's argument. As discussed above, the proposed substitute claims do no more than apply the concept of a scrum board for use in a processing system. That is, the claims do no more than apply a "well-known idea using generic computers to the particular technological environment." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) (internal quotation marks omitted) (citation omitted).

Moreover, simply describing the claimed invention as an unconventional architecture is not sufficient to take the claims out of the realm of an abstract idea. In *Accenture*, although the specification described the claimed invention as a new architecture, because "the system claims themselves only contain[ed] generalized software components arranged to implement [the] abstract concept on a computer," the claims were found patent ineligible. *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *see also* MTA Opp. 9–10. In

this case, the claims—which refer to generic components such as a controller, a task pool, and autonomous co-processors—do no more than that. Indeed, this is confirmed by the ’004 patent, which describes the claimed invention as using “typical” components. *Compare* Ex. 1001, 1:56–61 (“A typical multiprocessor system includes a central processing unit (‘CPU’) and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed.”), *with* Ex. 1001, 2:11–14 (“Various embodiments of a parallel processing computing architecture include a CPU configured to populate a task pool, and one or more co-processors configured to proactively retrieve threads (tasks) from the task pool.”); *see also* MTA Opp. 10. Although a task pool is not listed as a typical component, the ’004 patent makes it clear that a task pool is just memory, which is conventional. *See* Ex. 1001, 6:56–58 (“Referring now to FIGS. 1 and 2, the task pool 13 may occupy a region of physical memory that is accessible by the CPU 11.”).

Patent Owner also argues that a district court order found that “[t]he claims in the ’004 Patent expressly focus on addressing existing problems in computer functionality . . . by *creating a new ‘multiprocessor architecture’* that ‘reduces CPU management overhead’ and ‘more effectively harnesses and exploits available co-processing resources.’” MTA 11–12 (quoting Ex. 2006 (*Swarm Tech. LLC v. Amazon.com Inc.*, CV-21-00438 (D. Az. Aug. 8, 2022) (Order granting motion for leave to amend)) (alteration in original))). But Patent Owner overstates the district court’s preliminary finding. As the district court explained, it found the issue a “close call” but that Patent Owner’s proposed first amended complaint set forth “sufficient

factual allegations to survive dismissal under § 101 at the Rule 12(b)(6) stage" where it presumes the factual statements to be accurate. Ex. 2006, 2; *see also* MTA Opp. 10–11. Here, there is no such presumption to Patent Owner's arguments. On a more complete record where we do not have to presume Patent Owner's factual assertions to be true, for the reasons discussed above, we find that the record does not support Patent Owner's argument.

Patent Owner also argues that this case is similar to *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017), in which the Federal Circuit reversed a district court's determination that the claims were not patent eligible. MTA Reply 7–8. According to Patent Owner, in that decision

> the Federal Circuit reversed the District Court's eligibility findings noting "[t]o be sure, the concept of categorical data storage *underlies* the '740 patent's claims . . . [b]ut this is not enough to doom a claim under § 101 because the claims are not so limited, and 'all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.' *Mayo*, 566 U.S. at 71, 132 S.Ct. 1289; *see also Alice Corp. v. CLS Bank Int'l*, 134 S.Ct. 2354 (2014) ('[A]n invention is not rendered ineligible for patent simply because it *involves* an abstract concept.'" (emphasis added)."

MTA Reply 8 (quoting *Visual Memory*, 867 F.3d at 1262).

However, we find *Visual Memory* inapposite. As the Federal Circuit emphasized in *Visual Memory*, "the key question is 'whether the focus of the claims is on the specific asserted improvement in computer capabilities (i.e., the self-referential table for a computer database) or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" 867 F.3d at 1258 (quoting *Enfish*, 822 F.3d at 1335–36). Unlike the claims in *Visual Memory*, the proposed substitute claims simply apply

the well-known concept of a scrum board to a computer processing environment. Any improvement in computer functionality comes from applying the concept of a scrum board, demonstrating that the computer is simply invoked as a tool for applying that abstract idea.

Similarly inapplicable is *Ancora Technologies, Inc. v. HTC America, Inc.*, 908 F.3d 1343, 1344 (Fed. Cir. 2018), also cited by Patent Owner. *See* MTA Reply 8. In *Ancora*, the claimed method "specifically identifie[d] how [a] functionality improvement is effectuated." 908 F.3d at 1348–49. But we see no such identification in the proposed substitute claims. Rather, the proposed substitute claims apply the features of a scrum board to computer components.

Accordingly, we find that the limitations of proposed substitute claim 13 and proposed substitute claim 14, which depends from proposed substitute claim 13, identify above recite the abstract ideas category of "[c]ertain methods of organizing human activity," namely, "managing personal behavior or relationships or interactions between people (including . . . following rules or instructions)," as well as the category of "[m]ental processes." MPEP § 2106.04(a).

*4. Step 2A, Prong Two*

Under Step 2A, Prong Two, if a claim recites a judicial exception, we determine whether the recited judicial exception is integrated into a practical application of that exception by (a) identifying whether there are any additional elements recited in the claim beyond the judicial exception(s); and (b) evaluating those additional elements individually and in combination to determine whether they integrate the exception into a practical application. MPEP § 2106.04(d). If the recited judicial exception is integrated into a

practical application, the claim is not directed to the judicial exception. MPEP § 2106.04(d).

We determine that the additional limitations in proposed substitute claims 13 and 14 fail to integrate the abstract idea into a practical application. The additional limitations in proposed substitute claim 13 include "a controller," "a first autonomous co-processor," "a second autonomous co-processor," "an additional autonomous co-processor," and the function of "dynamically accept[ing] the first autonomous co-processor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis without any communication with the controller." Proposed substitute claim 14 adds the additional features of "the [first/second]autonomous co-process includes a [first/second] agent configured to search the task pool or a task of the [first/second] type" and that "the task pool is configured to simultaneously contain the plurality of first tasks having indicia of the first task type and the plurality of second tasks having indicia of the second task type." Limiting proposed substitute claims 13 and 14 to the particular environment of a parallel processing computing architecture does not make the claims patent eligible, and nothing in proposed substitute claims 13 and 14 defines an improvement in how such computing architecture operates so as to lend eligibility to an otherwise patent-ineligible abstract idea. We see nothing in proposed substitute claims 13 and 14 "[a]pplying or using the [abstract idea] in some other meaningful way beyond generally linking the use of the [abstract idea] to a particular technological environment, such that the claim as a whole is more than a drafting effort designed to monopolize the [abstract idea]." MPEP § 2106.04(d). Instead, proposed substitute claims 13 and 14 do no more than "[g]enerally linking the use of [an abstract idea]

to a particular technological environment or field of use." MPEP § 2106.04(d).

Nor is there any improvement to computer functionality as the proposed substitute claims merely use conventional hardware and conventional architecture. Ex. 1001,5:61–6:17 (describing a co-processor in terms of currently existing technology); *see also* MTA Opp. 11. Any improvement is the result of the use of the concept of a scrum board, which reduces overall management of the system. Simply "linking the use of a judicial exception to a particular technological environment or field of use" is not sufficient to integrate the judicial exception into a practical application. MPEP § 2106.04(d)(I).

Patent Owner argues that the general-purpose components "are not used in their off-the-shelf condition." MTA 15. According to Patent Owner, the propose substitute claims "*require* that these devices be modified, configured, or programmed, as appropriate, to operate [in] a non-generic and unconventional manner." MTA 15 (citing Ex. 1001, 2:40–43, 5:45–49). We do not agree. The '004 patent makes it clear that conventional components and architecture can be used. *See* Ex. 1001, 4:24–25 ("Various features may be incorporated into any presently known or later-developed computer architecture."), 5:61–6:17 (describing a co-processor in terms of currently existing technology); *see also* MTA Opp. 11. Moreover, the proposed substitute claims—which are the focus of our analysis—do not recite such modifications that are unconventional; rather, these claims simply implement the concept of a scrum board to a technological environment and are simply "an instruction to apply [an] abstract idea using a generic computer." MPEP § 2106.05(f) (quoting *Alice*, 573 U.S. at 223). Accordingly, such modifications to conventional technology do not "add

meaningful limitations beyond generally linking the use of [a] judicial exception to a particular technological environment." MPEP § 2106.05(e).

Patent Owner further argues that the '004 patent sets forth various problems with conventional multiprocessor systems:

> a) a substantial amount of the CPU's bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks; responding to interrupts from co-processors when a task is completed; and, responding to other messages from co-processors (*see* [Ex. 1001], 1:61-2:1);
>
> b) dynamic changes to the system (by adding or removing co-processors) requires communication with the CPU which creates additional overhead burden on the CPU (*see* [Ex. 1001], 10:53-57);
>
> c) the system's co-processors are frequently idle while awaiting a new computational task assignment from the CPU; and (*see* [Ex. 1001], 2:1-3),
>
> d) if the CPU becomes overloaded with processing demands, or if the CPU becomes temporarily disconnected or unavailable, the processing activity of the co-processors may quickly come to a halt (impacting the system's reliability) (*see* [Ex. 1001], 1:61-2:7).

MTA 18–19. According to Patent Owner, those problems are solved by the claimed inventions of the proposed substitute claims. MTA 19–23. However, each of the advantages identified by Patent Owner flow from the use of a scrum board.

For example, Patent Owner points out that the CPU no longer has to assign tasks to specific co-processors. *See* MTA 19–20. However, that is no different than a manager who no longer has to assign specific tasks to workers.

Patent Owner also argues that the proposed substitute claims' use of autonomous co-processors that retrieve tasks may reduce the amount of time

that a co-processor is idle. MTA 20–21. But that is no different than a worker who picks up a new task from the scrum board after she completes the current task she is working on.

Patent Owner also argues that the proposed substitute claims allow for new tasks to continue to be taken even if the CPU is overloaded or disconnected from the system. MTA 21. But again, that is no different than a scrum board in which a worker can obtain a new task even if the manager is busy or out of the office.

Patent Owner also argues that the proposed substitute claims allow the addition of new co-processors that interact at the task level instead of the instruction level and that a heterogeneous mix of processors can be used. MTA 21–23. But again, this is a direct result of using a scrum board in which workers can be added (or subtracted) without consulting the manager.

Accordingly, the proposed substitute claims do not utilize the abstract idea in a "meaningful way beyond generally linking [it] to a particular technological environment." MPEP § 2106.04(d). Because the purported benefits of the claim "flow from performing [the] abstract idea in conjunction with a well-known [computer] structure," they are "not improvements to [computer] functionality," and therefore are directed to the abstract idea. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018).

Accordingly, we determine that proposed substitute claims 13 and 14, do not integrate the judicial exception into a practical application.

*5. Step 2B*

Under Step 2B, we look to whether the claim: (3) adds a specific limitation beyond the judicial exception that is not "well-understood, routine, [and] conventional" in the field; or (4) simply appends well-

understood, routine, conventional activities previously known to the industry, specified at a high level of generality, to the judicial exception. MPEP § 2106.05(d).

The Federal Circuit in *Berkheimer* made clear that "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry." *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). In fact, the Federal Circuit in *Berkheimer* did not require evidentiary support for independent claim 1 because "[t]he limitations [of claim 1] amount to no more than performing the abstract idea of parsing and comparing data with conventional computer components." *Id.* at 1370.

The '004 patent describes implementing the claimed system with generic computer components. For example, the '004 patent provides that "[t]he CPU 11 may be *any* single or multi-core processor, applications processor or microcontroller, used to execute a software program," that "[a] cell 12 may be a *general* or special purpose co-processor," and that the task pool is "a region of physical memory." Ex. 1001, 5:17–19, 5:66–67, 6:56–58 (emphases added). Therefore, we determine that the additional limitations beyond the abstract idea cover merely conventional activity and do not provide an inventive concept. *See* MPEP § 2106.05(d); *see also Alice*, 573 U.S. at 225–26 ("data processing system" and "data storage unit" are non-inventive); *Accenture*, 728 F.3d at 1338–39 (storing task rules in database, determining tasks using "task engine," populating tasks on "task assistant," and transmitting tasks for completion are not inventive concepts).

Patent Owner argues that the proposed substitute claims require the components to operate in an unconventional manner. MTA 24–25; MTA Reply 9–12. Specifically, Patent Owner argues that, in the conventional paradigm, "the CPU was configured to directly manage and control the

computational activity of the co-processors." MTA 24 (citing Ex. 1001, 1:56–59; Ex. 2004 ¶¶ 25–29); *see also* MTA Reply 9–10. In contrast, Patent Owner argues that the co-processors in the proposed substitute claims "are configured to act in an unconventional manner by autonomously and proactively retrieving tasks from the task pool without waiting for an instruction from the CPU or Task Pool." MTA 25 (citing Ex. 1001, 2:20–46, 8:24–28, 8:59–9:5, 11:9–34).

We do not agree with Patent Owner's argument. At its heart, Patent Owner's argument is that the use of the abstract idea is unconventional. However, "the abstract idea . . . 'cannot supply the inventive concept that renders the invention "significantly more" than that [abstract idea]' at step [2B]." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1363–64 (Fed. Cir. 2020) (quoting *BSG Tech*, 899 F.3d at 1290) (last alteration added).

We also do not agree with Patent Owner's argument that Lurie teaches the so-called "conventional controller/responder paradigm." MTA 24. First, as discussed above in Sections II.D.3 and II.E.2., contrary to Patent Owner's argument, Lurie teaches a decentralized system in which the TCWs search the ATD Mechanism for tasks, or it would have been obvious to modify Lurie to do so. Because what Patent Owner claims is unconventional is taught or rendered obvious in light of Lurie, Lurie refutes Patent Owner's argument.

Moreover, even if what Patent Owner says about Lurie is accurate, it would not matter. "The search for a § 101 inventive concept is . . . distinct from demonstrating § 102 novelty" or § 103 obviousness. *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016). Even if the proposed substitute claims were "new," "innovative, or even brilliant . . .

that is not enough for eligibility" where, as here, the purported innovation is an abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).[32]

Accordingly, we determine that the proposed substitute claims simply append well-understood, routine, conventional activities previously known to the industry.

#### *6. Conclusion Regarding Section 101*

Accordingly, Petitioner has shown by a preponderance of the evidence that proposed substitute claims 13 and 14 are patent ineligible under 35 U.S.C. § 101.

## IV. CONCLUSION[33]

For the foregoing reasons, we conclude that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of claims 1–12 of the '004 patent. Specifically, Petitioner has demonstrated by a preponderance of the evidence that (1) claim 1 would have been obvious under 35 U.S.C. § 103(a) in light of Lurie; (2) claims 2, 3, and 6–11 would

[32] Patent Owner also addresses Petitioner's argument based on the "[b]ag-of-[t]asks." MTA Reply 11–12. Because we do not rely on Petitioner's arguments relating to the bag of tasks, Patent Owner's counter-arguments are moot.

[33] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

have been obvious under 35 U.S.C. § 103(a) in light of Lurie and Ethernet Specification; (3) claims 4 and 5 would have been obvious under 35 U.S.C. § 103(a) in light of Lurie, Ethernet Specification, and Sander; and (4) claim 12 would have been obvious under 35 U.S.C. § 103(a) in light of Lurie, Ethernet Specification, and Chow. Additionally, we deny Patent Owner's Contingent Motion to Amend because proposed substitute claims 13 and 14 recite new matter and are not patent eligible under 35 U.S.C. § 101.

In summary,

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claim(s) Shown Unpatentable** | **Claim(s) Not Shown Unpatentable** |
|---|---|---|---|---|
| 1 | 103(a) | Lurie | 1 | |
| 2, 3, 6–11 | 103(a) | Lurie, Ethernet Specification | 2, 3, 6–11 | |
| 4, 5 | 103(a) | Lurie, Ethernet Specification, Sander | 4, 5 | |
| 12 | 103(a) | Lurie, Ethernet Specification, Chow | 12 | |
| **Overall Outcome** | | | 1–12 | |

| **Motion to Amend Outcome** | **Claim(s)** |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 13, 14 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | 13, 14 |
| Substitute Claims: Not Reached | |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, Petitioner has shown by a preponderance of the evidence that claims 1–12 of the ’004 patent are unpatentable;

FURTHER ORDERED that Patent Owner’s Contingent Motion to Amend is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Jonathan M. Strang
Adam M. Greenfield
David Zucker
Kimberly Q. Li
LATHAM & WATKINS LLP
jonathan.strang@lw.com
adam.greenfield@lw.com
david.zucker@lw.com
kimberly.li@lw.com

FOR PATENT OWNER:

Daniel R. Pote
JENNINGS STROUSS & SALMON PLC
dpote@jsslaw.com

Michael K. Kelly
BEUS GILBERT MCGRODER PLLC
mkelly@beusgilbert.com

Daniel J. Anderson
ERNST, BROWN & DRAPER, PLLC
daniel.anderson@andersonpatents.com

Trials@uspto.gov
571.272.7822

Paper 36
Date: August 28, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

AMAZON.COM, INC. and
AMAZON WEB SERVICES, INC.,
Petitioner,

v.

SWARM TECHNOLOGY LLC,
Patent Owner.

---

IPR2022-00633
Patent 10,592,275 B2

---

Before MICHAEL R. ZECHER, GREGG I. ANDERSON, and SCOTT B. HOWARD, *Administrative Patent Judges*.

ZECHER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
Dismissing Patent Owner's Contingent Motion to Amend
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Petitioner, Amazon.com, Inc. and Amazon Web Services, Inc. (collectively "Amazon"), filed a Petition requesting an *inter partes* review ("IPR") of claims 1–17 of U.S. Patent No. 10,592,275 B2 (Ex. 1001, "the '275 patent"). Paper 2 ("Pet."). Patent Owner, Swarm Technology LLC ("Swarm"), filed a Preliminary Response. Paper 5. Taking into account the arguments presented in Swarm's Preliminary Response, we determined that the information presented in the Petition established that there was a reasonable likelihood that Amazon would prevail with respect to challenging at least one of claims 1–17 of the '275 patent as unpatentable. Pursuant to 35 U.S.C. § 314, we instituted this IPR on September 6, 2022, as to all challenged claims and all grounds raised in the Petition. Paper 8 ("Institution Decision" or "Dec. on Inst.").

During trial, Swarm filed a Patent Owner Response (Paper 12, "PO Resp."), Amazon filed a Reply to the Patent Owner Response (Paper 16, "Pet. Reply"), and Swarm filed a Sur-reply to the Reply (Paper 25, "PO Sur-reply"). Swarm also filed a Contingent Motion to Amend (Paper 11, "Mot.") and Amazon filed an Opposition to the Contingent Motion to Amend (Paper 15). After receiving Preliminary Guidance (Paper 19) regarding Swarm's Contingent Motion to Amend, Swarm filed a Reply to the Opposition to the Contingent Motion to Amend (Paper 24) and Amazon filed a Sur-reply to the Reply to the Opposition to the Contingent Motion to Amend (Paper 31). In addition, an oral argument was held on June 6, 2023, and a transcript of the hearing is included in the record. Paper 35 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 1–17 of the ’275 patent. For the reasons we identify below, we hold that Amazon has not demonstrated by a preponderance of the evidence that any of the challenged claims are unpatentable. As a result, we *dismiss* Swarm’s Contingent Motion to Amend as moot.

### *A. Real Parties in Interest*

According to the Petition, Amazon.com, Inc. and Amazon Web Services, Inc. are the real-parties in interest (“RPIs). Pet. 75. Swarm identifies itself as the only RPI. Paper 3, 1 (Swarm’s Mandatory Notices Under 37 C.F.R. § 42.8).

### *B. Related Matters*

The parties identify the following district court cases involving the ’275 patent: (1) *Juniper Networks, Inc. v. Swarm Technology LLC*, No. 3:20-cv-03137 (N.D. Cal.) and (2) *Swarm Technology, LLC v Amazon.com, Inc.*, No. 2:21-cv-00438 (D. Az.). Pet. 75–76; Paper 3, 1–2. The parties also identify the following related IPR proceedings: (1) *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2021-01317 (involving U.S. Patent No. 9,146,777 B2 (“the ’777 patent”)), (2) *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2021-01445 (involving U.S. Patent No. 9,852,004 B2 (“the ’004 patent”)), (3) *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2022-00141 (involving the ’275 patent), and (4) *Amazon.com, Inc. and Amazon Web Services, Inc. v. Swarm Technology, LLC*, IPR2022-00283 (involving the ’004 patent). Pet. 75–76; Paper 3, 1–2. In addition, the parties identify U.S. Patent Application No. 16/788,122 as related to the ’275 patent. Pet. 75; Paper 3, 3.

*C. The ’275 Patent*

The ’275 patent is titled “System and Method for Swarm Collaborative Intelligence Using Dynamically Configurable Proactive Autonomous Agents.” Ex. 1001, code (54). The ’275 patent generally is directed to “parallel-process computing, and collaborative intelligence, and particularly relates to a processing architecture which involves autonomous co-processors (such as robotic vehicles, Internet of Things (IoT) components, and networked devices) configured to proactively retrieve tasks from a task pool populated by a central processing unit.” *Id.* at 1:17–23.

According to the ’275 patent, “[c]omputer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user’s perspective the applications appear to be processed in parallel.” Ex. 1001, 1:49–54. The ’275 patent further states that “[t]rue parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors.” *Id.* at 1:54–57. “A typical multiprocessor system includes a central processing unit (‘CPU’) and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed.” *Id.* at 1:63–2:1.

The ’275 patent identifies a problem with using the CPU to control the distribution of tasks:

> Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

Ex. 1001, 2:1–10. The ’275 patent purportedly addresses this problem using a system that reduces CPU management overhead and “more effectively harnesses and exploits available co-processing resources.” *Id.* at 2:11–15.

Figure 1 of the ’275 patent is reproduced below.




FIG. 1

Ex. 1001, Fig. 1. Figure 1 “is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric.” *Id.* at 3:64–67. More specifically, Figure 1 illustrates the following:

> a single or multi-core CPU 11 and one or more solidarity or co-processing cells 12A-12[n] configured to communicate with a task pool 13 through a cross-bar switching fabric 14. The solidarity cells 12 may also communicate with each other through the switching fabric 14 or through a separate cell bus (not shown). CPU 11 may communicate with the task pool 13 directly or through the switching fabric 14. One or more memory units 15 each contain data and/or instructions.

*Id.* at 4:43–52.

### *C. Challenged Claims*

Of the challenged claims, claims 1, 6, and 11 are independent. Independent claims 1 and 6 are each directed to "[a] collaborative intelligence system," whereas independent claim 11 is directed to "[a] method of using collaborative intelligence to achieve an objective." Ex. 1001, 14:24, 15:8, 16:25–26. Claims 2–5 directly depend from independent claim 1; claims 7–10 directly or indirectly depend from independent claim 6; and claims 12–17 directly depend from independent claim 11. *Id.* at 14:50–15:7, 16:8–11, 16:17–24, 16:42–64. Independent claim 1, reproduced below, is illustrative of the challenged claims.

> 1. A collaborative intelligence system, comprising:
>
> a task pool;
>
> a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;
>
> a first co-processor configured to successively: proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and
>
> a second co-processor configured to successively:

> second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;
>
> wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;
>
> the plurality of first tasks and the plurality of second tasks are associated with a common objective;
>
> the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

*Id.* at 14:24–49.

*D. Asserted Prior Art References*

Amazon relies on the prior art references set forth in the tables below.

| **Name**[1] | **Reference** | **Dates** | **Exhibit No.** |
|---|---|---|---|
| Lurie | US 2007/0124363 Al | published May 31, 2007 | 1007 |
| Chow | US 2005/0132380 A1 | published June 16, 2005 | 1008 |
| Sander | US 2012/0192201 A1 | published July 26, 2012 | 1010 |

[1] For clarity and ease of reference, we only list the first named inventor.

| Printed Publication | Exhibit No. |
|---|---|
| The Ethernet: A Local Area Network, Data Link Layer and Physical Layer Specifications (Sept. 30, 1980) ("Ethernet Specification"). All citations are to the native pagination. | 1009 |
| Gregory R. Andrews, Foundations of Multithreaded, Parallel, and Distributed Programming (2000) ("Andrews"). All citations are to the native pagination. | 1011 |
| Ali Marjovi et al., *Robotic Clusters: Multi-robot systems as computer clusters: A topological map merging demonstration*, 60 Robotics & Autonomous Sys. 1191 (2012) ("Marjovi"). All citations are to the native pagination. | 1026 |

*E. Asserted Grounds of Unpatentability*

Amazon asserts that claims 1–17 of the '275 patent would have been unpatentable based on the grounds set forth in the table below. Pet. 1–2, 14–71.

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1, 3, 6, 11, 12, 14, 16, 17 | 103(a) | Lurie, Ethernet Specification |
| 2, 7, 10, 13 | 103(a) | Lurie, Ethernet Specification, Andrews |

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. §§ 102, 103 that became effective on March 16, 2013. Because the '275 patent claims the benefit of the priority date of U.S. Patent Application No. 13/750,696—now the '777 patent, which was filed before March 16, 2013, and neither party has argued that the provisions of the AIA apply, we apply the pre-AIA versions of the statutory bases for unpatentability. *See* Ex. 1001, code (63).

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 4, 9, 15 | 103(a) | Lurie, Ethernet Specification, Andrews,[3] Chow |
| 5 | 103(a) | Lurie, Ethernet Specification, Sander |
| 8 | 103(a) | Lurie, Ethernet Specification, Andrews, Marjovi |

Amazon supports its arguments in the Petition with the testimony of David Lowenthal (Ex. 1003 (Declaration of Dr. Lowenthal in support of Petition)) and Ingrid Hsieh-Yee, Ph.D. (Ex. 1005 (Declaration of Dr. Hsieh-Yee)). Amazon supports its arguments in the Reply with the testimony of Dr. Lowenthal. Ex. 1040 (Supplemental Declaration of Dr. Lowenthal in support of the Reply). Swarm supports its arguments in the Patent Owner Response with the testimony of Dr. Brent Nelson. Ex. 2014 (Declaration of Dr. Nelson in support of Patent Owner's Response).

Swarm supports its argument in the Contingent Motion to Amend with the testimony of Dr. Nelson. Ex. 2006 (Declaration of Dr. Nelson in support of Contingent Motion to Amend). Swarm supports its arguments in the Reply to the Opposition to the Contingent Motion to Amend with the testimony of Dr. Nelson. Ex. 2019 (Supplemental Declaration of Dr. Nelson in support of Reply to the Opposition to the Contingent Motion to Amend).

---

[3] Although Amazon contends that "[c]laims 4 and 15 are unpatentable under 35 U.S.C. § 103[(a)] over Lurie in view of Ethernet Specification and Chow," whereas "[c]laim 9 is unpatentable under 35 U.S.C. § 103[(a)] over Lurie in view of Ethernet Specification, Andrews, and Chow," Amazon relies on Lurie, Ethernet Specification, Andrews and Chow in its substantive analysis of dependent claims 4, 9, and 15. *See* Pet. 2, 58–63. Accordingly, we consider Amazon's reliance on Andrews for each of these dependent claims.

## II. ANALYSIS

### *A. Claim Construction*

In an IPR based on a petition filed on or after November 13, 2018, such as here, claim terms are construed using the same claim construction standard as in a civil action under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b) (2021). That is, claim terms generally are construed in accordance with their ordinary and customary meaning, as would have been understood by a person of ordinary skill in the art, in view of the specification and the prosecution history pertaining to the patent at issue. *See id.* The ordinary and customary meaning of a claim term "is its meaning to the ordinary artisan after reading the entire patent," and "as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1321 (Fed. Cir. 2005) (en banc).

In its Petition, Amazon states that "[t]he prior art relied on in [the] Petition discloses the subject matter of the challenged claims under any reasonable construction, including their plain meaning." Pet. 5 (citing Ex. 1003 ¶ 45). In its Patent Owner Response, Swarm identifies certain claim terms where there apparently is a dispute between the parties regarding their scope and meaning. PO Resp. 6–8. After reviewing the arguments and evidence presented by the parties during trial, we determine that the claim term "proactively" is the only term in controversy that requires us to determine its scope and meaning for purposes of determining whether Amazon has met its burden of demonstrating by a preponderance of the evidence that the challenged claims are unpatentable. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in

controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

In its Patent Owner Response, Swarm contends that the claim term "proactively" is "properly understood to describe a co-processor configured to seek/obtain a new task as the co-processor becomes available to perform further processing." PO Resp. 8. To support its proposed construction, we understand Swarm to rely on the disclosure in the specification of the '527 patent at column 8, lines 35–38. *See, e.g.*, *id.* at 27 (arguing that "the term 'proactively retrieve' is properly understood to mean that the co[-]processor retrieves a new task as soon as it is determined that the co-processor has available processing capacity" (citing Ex. 1001, 8:35–38)).

In its Reply, despite being put on notice that Swarm argues the claim term "proactively" has a particular meaning, Amazon does not provide an explicit construction for this claim term. *See* Pet. Reply 9–17. Instead, we understand Amazon to argue that one example of acting "proactively" in the context of the '275 patent includes that "each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor." *Id.* at 9 (quoting Ex. 1001, 2:48–51). Relying on the cross-examination testimony of Dr. Nelson, Amazon asserts that "periodically" in the above quoted disclosure of the '275 patent "does not require acting on a fixed interval, but merely means the TCW 'makes the determination to send it, and that happens on a possibly regular basis.'" *Id.* (quoting Ex. 1063, 128:17–129:7) (citing Ex. 1063, 129:15–130:5).

"In determining the meaning of [a] disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). There is a "heavy presumption" that a claim term carries its ordinary and customary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). A claim term, however, "will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." *Id.* Although the patentee is free to define a specific claim term used to describe his or her invention, "this must be done with reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Based on the fully developed trial record, we apply the ordinary and customary meaning of the claim term "proactively" and, therefore, we construe this claim term as initiating change rather than reacting to events (i.e., not being told to act or not reactionary). Beginning with the intrinsic evidence, both parties appear to agree that the '275 patent does not define the claim term "proactively" with reasonable clarity, deliberateness, and precision. For example, during the oral hearing, counsel for Amazon indicated that the specification of the '275 patent provides "some examples" of what it means to act "proactively," but it does not provide a lexicographic definition. *See* Tr. 7:8–11:21. In the same vein, during oral argument, counsel for Swarm stated that "[w]e haven't advocated for anything other than the plain and ordinary meaning of proactively." *Id.* at 34:23–24. We

also take this opportunity to note that neither party takes the position that the claim term "proactively" was defined during prosecution of the application that issued as the '275 patent.

With this in mind, we understand the parties to argue that the claim term "proactively" was not defined in the specification of the '275 patent nor during prosecution and, as a result, both parties rely on its ordinary and customary meaning. The problem we face here is that neither party takes a definitive position as to what exactly constitutes the ordinary and customary meaning of the claim term "proactively." At best, both parties direct us to examples of acting "proactively" in the specification of the '275 patent. Based on these examples, we are left to speculate what the parties believe is the ordinary and customary meaning of the claim term "proactively" in the context of the '275 patent.

For instance, on the one hand, Amazon directs us to the following disclosure in the specification of the '275 patent: "[t]he term proactive *suggests* that each co-processor *may be* configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor." Ex. 1001, 2:48–51 (emphases added). But given the use of the language "suggests" and "may be," together with the admission of counsel for Amazon during oral argument, this is just an example of acting "proactively" in the context of the '275 patent. *See* Tr. 7:8–11:21. This example, however, falls squarely within our ordinary and customary meaning of initiating change rather than reacting to events (i.e., not being told to act or not reactionary) because the co-processor sends an agent to monitor the task pool for available tasks that it is capable of performing, without being notified to do so.

On the other hand, Swarm directs us to the following disclosure in the specification of the ’275 patent: “[e]ach cell acts proactively in that it seeks a task 22 from the task pool 13 as soon as the cell becomes available for further processing.” Ex. 1001, 8:35–38. Once again, this is merely an example of acting “proactively” in the context of the ’275 patent. This example, however, also falls squarely within our ordinary and customary meaning of initiating change rather than reacting to events (i.e., not being told to act or not reactionary) because the cell 12 seeks task 22 from task pool 13 as soon as it determines that it has available processing capacity. There is no indication that the task pool 13 first notifies cell 12 that it may seek or obtain task 22.

Swarm’s reliance on this cited example in the ’275 patent is misplaced for an additional reason. Where possible, we presume that “an interpretation of a claim should be avoided if it would make the claim read like another one.” *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). Such a presumption is applicable where one party is urging that an independent claim should be interpreted to be read as its dependent claim. *See SunRace Roots Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003). Dependent claim 4 further limits independent claim 1 by reciting “wherein *the first co-processor is configured to determine when it has available processing capacity*, and to dispatch the first agent to the task pool in response to the determination.” Ex. 1001, 14:66–15:3 (emphasis added); *see also id.* at 16:17–21 (dependent claim 9 reciting a similar limitation, which further limits independent claim 6), 16:53–56 (dependent claim 15 reciting a similar limitation, which further limits independent claim 11). Stated differently, dependent claim 4 recites “the

first co-processor is configured to determine when it has available processing capacity," whereas independent claim 1 only requires the "first co-processor configured to . . . proactively retrieve." Here, the claim phrase "proactively retrieve" has a broader meaning than the claim phrase "determin[ing] when it has available processing capacity." Consequently, the proactive retrieval required by the first co-processor of independent claim 1 need not determine whether the first co-processor has available processing capacity, as asserted by Swarm.

Turning to the extrinsic evidence, Amazon submitted two general-purpose dictionary definitions (albeit in conjunction with its Opposition to Swarm's Contingent Motion to Amend) that further support according the claim term "proactively" an ordinary and customary meaning of initiating change rather than reacting to events (i.e., not being told to act or not reactionary). The American Heritage Dictionary of the English Language, 5th ed. (2011) defines "proactive" as "[a]cting in advance to deal with an expected difficulty; anticipatory." Ex. 1065, 4.[4] Similarly, Dictionary.com indicates that "proactive" is "the opposite of *reactive*" and then proceeds to define this term as "tending to initiate change rather than reacting to events." Ex. 1066, 3–4. Although these two general-purpose dictionary definitions may be of less significant than the two examples of acting "proactively" in the specification of the '275 patent that the parties identify above, they nonetheless appear to support applying the ordinary and customary meaning of "proactively" that we propose.

---

[4] All references to the page number in Exhibit 1065 refer to the page numbers inserted by Amazon in the bottom, right-hand corner of each page.

Amazon also submitted a supplemental declaration of Dr. Lowenthal in support of its Reply, in which he provides testimony regarding the ordinary and customary meaning of the claim term "proactively." Relying on testimony from his declaration in support of the Petition, Dr. Lowenthal testifies that "'proactive' by its plain and ordinary meaning refers to a co-processor that does not need to be told to act (e.g., Lurie's TCWs retrieve tasks without needing to be told by the TCC)." Ex. 1040 ¶ 56 (citing Ex. 1003 ¶¶ 164–68, 173). Once again, although Dr. Lowenthal's testimony may be of less significant than the two examples of acting "proactively" in the specification of the '275 patent that the parties identify above, it nonetheless appears to support applying the ordinary and customary meaning of "proactively" that we propose.

Accordingly, upon weighing all the evidence bearing on the construction of the claim term "proactively," we accord this claim term an ordinary and customary meaning of initiating change rather than reacting to events (i.e., not being told to act or not reactionary). Our construction finds support in the two examples of acting "proactively" in the specification of the '275 patent that the parties identify above. Although less significant, the two general-purpose dictionary definitions and the supporting testimony of Dr. Lowenthal only serve to bolster our understanding of the ordinary and customary meaning of the claim term "proactively" as used in the challenged claims.

### *B. Obviousness Over the Combined Teachings of Lurie and Ethernet Specification*

Amazon contends that claims 1, 3, 6, 11, 12, 14, 16, and 17 of the '275 patent are unpatentable under § 103(a) as obvious over the combined

teachings of Lurie and Ethernet Specification. Pet. 14–55. Amazon contends that the teachings of Lurie and Ethernet Specification account for the subject matter of each challenged claim, and provides reasoning as to why a person of ordinary skill in the art would have been prompted to combine the teachings of these references. *Id.* During trial, Swarm contends that Lurie alone or in combination with Ethernet Specification does not teach or suggest "a first co-processor configured to successively: proactively retrieve a first task from the task pool," as recited in each of independent claims 1 and 6, and similarly recited in independent claim 11. PO Resp. 27–40; PO Sur-reply 4–5, 10–12.

Based on the fully developed trial record, we determine that Amazon has not shown by a preponderance of the evidence that claims 1, 3, 6, 11, 12, 14, 16, and 17 of the '275 patent are unpatentable as obvious over the combined teachings of Lurie and Ethernet Specification. We begin our analysis with the principles of law that generally apply to an obviousness ground, an assessment of the level of skill in the art, followed by brief overviews of Lurie and Ethernet Specification, and then we address the dispositive issue with respect to independent claims 1, 6, and 11.

*1. Principles of Law*

A claim is unpatentable under § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences

between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective indicia of non-obviousness (i.e., secondary considerations, such as commercial success, long-felt but unsolved needs, failure of others, etc.). *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). We analyze the asserted grounds based on obviousness with the principles identified above in mind.

*2. Level of Skill in the Art*

In determining whether an invention would have been obvious at the time it was made, we consider the level of ordinary skill in the pertinent art at the time of the invention. *Graham*, 383 U.S. at 17. "The importance of resolving the level of ordinary skill in the art lies in the necessity of maintaining objectivity in the obviousness inquiry." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). The "person having ordinary skill in the art" is a hypothetical construct, from whose vantage point obviousness is assessed. *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

In its Petition, Amazon argues that a person of ordinary skill in the art "would have had a bachelor's degree in computer science, computer engineering, or a related field, and about five years of industry or academic research experience in parallel or distributed computing, system architecture, or an equivalent." Pet. 4–5 (citing Ex. 1003 ¶¶ 42–44). Amazon further argues that "[a] post-graduate degree or additional formal education can compensate for less experience, and vice-versa." *Id.* In its Patent Owner Response, Swarm does not address the level of skill in the art. *See* PO Resp.

Accordingly, based on the fully developed trial record, we maintain our preliminary determination regarding the level of ordinary skill in the art. Dec. on Inst. 10–11. That is, we adopt Amazon's proposed assessment of the level of ordinary skill in the art because it is consistent with the '275 patent and the asserted prior art. We apply this assessment of the level of ordinary skill in the art in our obviousness evaluations below.

*3. Overview of Lurie*

Lurie is titled "Instrument-Based Distributed Computing Systems." Ex. 1007, code (54). Lurie is directed to "providing an instrument-based distributed computing system that accelerates the measurement, analysis, verification and validation of data in the distributed computing environment." *Id.* ¶ 2.

Lurie describes an "automatic [task] distribution mode" of a distributed computing environment. Ex. 1007 ¶ 19. Lurie includes technical computing client 250 ("TCC"), which "can be a technical computing software application that provides a technical computing and graphical modeling environment for generating block diagram models and to define mathematical algorithms for simulating models." *Id.* ¶ 55. Lurie further

includes a number of technical computing workers 270A–N ("TCWs"), which "can be a technical computing software application that provides a technical computing environment for performing technical computing of tasks, such as those tasks defined or created by the [TCC] 250." *Id.* ¶ 58.

In one embodiment, Lurie further describes Automatic Task Distribution Mechanism 260 ("ATD Mechanism"), which can be "one or more application software components to provide for the automatic [task] distribution of tasks from the [TCC] 250 to the [TCWs 270A–N]." Ex. 1007 ¶ 61. This embodiment is shown in Figure 3B, which is reproduced below.




*Fig. 3B*

Figure 3B "is a block diagram of [Lurie's] automatic [task] distribution mode" embodiment, which depicts (1) tasks and results flowing between TCC 250 and ATD Mechanism 260 and (2) tasks and results flowing between ATD Mechanism 260 and TCWs 270A–N. *Id.* ¶ 19, Fig. 3B. More specifically, ATD Mechanism 260 of the system "is intended to provide a

configuration where the user does not want to control which [TCW 270A–N] executes a particular task." *Id.* ¶ 71. Instead, TCC 250 is in communication with ATD Mechanism 260, which, in turn, is in communication with TCWs 270A–N. *Id.* "Under this mode of operation, the [TCC] 250 is not required to have any specific knowledge of the [TCWs 270A–N], e.g., the name of the workstation running a [TCW 270A–N], or the availability of the [TCW 270A–N] to perform technical computing of a task." *Id.* TCC 250 submits tasks to ATD Mechanism 260, which, in turn, makes them available to TCWs 270A–N. *Id.* ¶ 72. "A [TCW 270A–N] takes a task from the [ATD Mechanism] 260 for technical computing of the task, computes a result for the task and provides the result to the [ATD Mechanism] 260." *Id.* TCC 250 is then able to obtain the results from ATD Mechanism 260. *Id.*

An alternative "batch mode" embodiment is illustrated in Figure 3C, which is reproduced below. Ex. 1007 ¶ 20.




*Fig. 3C*

Figure 3C "is a block diagram of the batch automatic distribution mode of operation." *Id.* The "batch mode . . . is intended to provide a configuration where the user can specify a group of related tasks as a job and provide the batch of tasks, or the job, to the [ATD Mechanism] 260." *Id.* ¶ 73. In this embodiment, TCC 250 "is in communication with the job manager 265 on the server 160" and "[t]he job manager 265 interfaces and communicates with the [ATD Mechanism] 260 running on the same server 160." *Id.* As with the Figure 3B embodiment, "[e]ach of the [TCWs 270A–N] is in communication with the [ATD Mechanism] 260." *Id.*

In batch mode, "[i]nstead of submitting each task separately as depicted in FIG. 3B, the [TCC] 250 submits the job containing all the associated tasks to the job manager 265." Ex. 1007 ¶ 74. "The job manager 265 obtains the tasks from the job and provides the tasks to the [ATD

Mechanism] 260 for [TCWs 270A–N] to take and compute results." *Id.*

Lurie describes the operation of the components as follows:

> For example, [TCC] 250 defines a job, Job1, with a set of three tasks: Task1, Task2 and TaskN-M. The [TCC] 250 then submits Job1 to the job manager 265. The job manager 265 obtains Job1 and obtains each of the tasks, Task1-TaskN-M from Job 1. Then, . . . the job manager 265 submits each of the tasks to the [ATD Mechanism] 260 for technical computing by a [TCW 270A–N]. [TCW] 270A may take Task1 from the [ATD Mechanism] 260, compute a Result1 for Task1 and provide the Result1 to the [ATD Mechanism] 260. [TCW] 270B and [TCW] 270N, in a similar fashion, compute and provide results for Task2 and TaskN-M respectively. The job manager 265 then obtains the set of results for the completed job of Job1 and provides the results of each of the tasks to the [TCC] 250.

*Id.* When there are multiple jobs, "the job manager 265 may handle jobs in a first-in first-out manner. In this case, the job manager 265 does not process the next job until all the tasks from the current job have been processed by the [ATD Mechanism] 260." *Id.* ¶ 75.

### *4. Overview of Ethernet Specification*

Ethernet Specification "contains the specification of the Ethernet, a local area network." Ex. 1009, i. Ethernet Specification "is intended as a design reference document, rather than an introduction or tutorial." *Id.* Chapter 6 provides the "Ethernet Data Link Layer Specification." *Id.* at 19–44. Figure 6-1 is reproduced below.




Figure 6-1: Data Link Layer Frame Format

*Id.* at 20. Figure 6-1 depicts a "Data Link Layer Frame Format," which includes a destination, source, type, data, and frame check sequence. *Id.*

### 5. *Claims 1, 6, and 11*

Independent claims 1 and 6 each recite, in relevant part, "a first co-processor configured to successively: *proactively retrieve a first task from the task pool*." Ex. 1001, 14:28–29, 15:12–13 (emphasis added). Independent 11 recites a similar limitation. *Id.* at 16:40–41 ("proactively retrieving a task having a compatible task type from the task pool"). Our analysis below only focuses on the parties' arguments directed to the italicized language regarding "proactively retriev[ing] a first task from the task pool" recited in each of independent claim 1 and 6, but our analysis equally applies to independent claim 11.

*a. "proactively retriev[ing] a first task from the task pool"*

In its Petition, Amazon argues that Lurie alone or in combination with the Ethernet Specification teaches this limitation. Pet. 23–29. More specifically, Amazon argues that one of Lurie's TCWs 270A–N is a first co-processor which "'takes,' without being instructed by the TCC [250], 'a task from the [ATD Mechanism 260]' (i.e., task pool), to execute." *Id.* at 23 (quoting Ex. 1007 ¶ 72) (citing Ex. 1003 ¶ 165). Amazon argues that "TCW (co-processor) then processes its task and generates the resulting data." *Id.* (citing Ex. 1007 ¶ 72). Amazon further argues that the "TCW then 'provides the result [back] to the [ATD Mechanism],' thereby updating the ATD Mechanism (task pool) to reflect completion." *Id.* (quoting Ex. 1007 ¶ 72) (citing Ex. 1003 ¶¶ 168–73) (alterations in original). According to Amazon, because the ATD Mechanism 260 "makes the results . . . available to the [TCC]," "the TCC (controller) and the TCWs (co-processors) do not communicate (as required by the claim), but instead rely on the ATD Mechanism as an intermediary." *Id.* at 24 (quoting Ex. 1007 ¶ 61) (citing Ex. 1007 ¶¶ 61, 72, Figs. 3C, 6A; Ex. 1003 ¶¶ 167–74) (alteration in original).

In addition, when discussing ATD Mechanism 260, Amazon directs us to Lurie's Figure 6A, which shows Object Exchange Repository 662. Pet. 24. Amazon then argues the following:

> Lurie's TCWs (co-processors) "register" with an object exchange repository, or space, in the ATD mechanism—not the TCC (controller)—to retrieve tasks. *As Lurie explains, "[a TCW] registers with the object exchange repository 662 to be notified when a task object appears."* After the TCC "write[s] [a] task object" to the [object exchange] repository, a TCW "performs a take operation . . . to retrieve the submitted task."

> The TCW then processes the task, and "provides the results from the computation back to the object exchange repository. The TCC "is not required to have any specific knowledge of the [TCWs]," such as "the name of the workstation . . . or the availability of the [TCW]."

*Id.* at 24–25 (emphasis added) (quoting Ex. 1007 ¶¶ 71, 93, 94) (citing Ex. 1007 ¶¶ 91, 92; Ex. 1003 ¶ 176).

To the extent "[t]he term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor," Amazon argues that Lurie in combination with Ethernet Specification teaches that the "TCWs 'proactively retrieve' tasks because Lurie is implemented over a network where each TCW has an agent that identifies available tasks appropriate to that TCW from the task pool . . . and retrieves an available, appropriate task to deliver to the TCW." Pet. 26–27 (quoting Ex. 1001, 2:48–51) (citing Ex. 1007 ¶¶ 43, 81, 91; Ex. 1003 ¶ 183) (alteration in original). More specifically, Amazon argues that "[a] [person of ordinary skill in the art] would have understood that[,] when Lurie is implemented over Ethernet (or similar networking protocol), data frames act as agents of a TCW to retrieve tasks as described in the '275 patent." *Id.* at 28 (footnote omitted) (citing Ex. 1007 ¶ 93; Ex. 1003 ¶¶ 128, 184, 188–90).

In its Patent Owner Response, Swarm contends that, although Lurie's Object Exchange Repository 662 illustrated in Figure 6A appears to describe one of TCWs [270A–N] "taking" a task from ATD mechanism 260 in a manner similar to how a co-processor in the '275 patent retrieves a task from the task pool, "the similarity is only superficial." PO Resp. 28–29 (citing

Ex. 2014 ¶¶ 54–56). Instead, Swarm argues that Lurie discloses the following:

> "[a] [TCW] 270 registers with the object exchange repository 662 to be notified when a task object appears in the object exchange repository 662. After the [TCC] 250 writes the task object, the object exchange repository 662 sends a notification to [TCW] 270 informing of the task object being available in the object exchange repository 662. The [TCW] 270, in response to the notification, performs a take operation on the object exchange repository 662 to retrieve the submitted task object."

*Id.* at 29 (quoting Ex. 1007 ¶ 93) (first alteration in original). Based on these cited disclosures, Swarm asserts that Lurie's TCWs 270A–N do not retrieve tasks proactively because each "TCW [270A–N] must register with the Object Exchange Repository [662] and only retrieves a task in response to a notification from the Object Exchange Repository [662], and not when it becomes available for further processing." *Id.* (citing Ex. 1001, 8:37–38). Stated differently, Swarm assert that "Lurie does not describe any embodiment where a TCW [(e.g., 270A)] proactively retrieves a task from the Object Exchange Repository [662] without a predicate instruction or notification to do so." *Id.* at 30 (citing Ex. 2014 ¶¶ 54–56).

In its Reply, Amazon disagrees with Swarm's argument that Lurie's system "only retrieves a task in response to a notification." Pet. Reply 11 (citing PO Resp. 29). According to Amazon, Lurie's TCWs 270A–N register only once and ATD mechanism 260 provides only one kickoff notification that initially starts the processing. *Id.*; *see also* Tr. 16:18–17:13 (during oral argument, counsel for Amazon appears to refer to this notification as a "kickoff notification"). Amazon argues that Lurie's kickoff notification does not describe repeatedly sending notifications each time any

one of the TCWs 270A–N completes a task. Pet. Reply 11–12 (citing Ex. 1007 ¶¶ 86, 87, 99). Rather, Amazon argues that, after the TCWs 270A–N receive a kickoff notification indicating that tasks first become available or otherwise appear in ATD mechanism 260, each TCW repeatedly retrieves and processes tasks until all the tasks have been completed. *Id.* at 12 (citing Ex. 1007 ¶¶ 86–88, 95–97, 128, Figs. 5B–5D; Ex. 1040 ¶¶ 56–76). Amazon then argues that, upon reading Lurie, a person of ordinary skill in the art would have understood that it discloses a textbook bag-of-tasks technique with a kickoff notification to start the process, after which each TCW "repeatedly takes a task from the bag and executes it." *Id.* at 12–13 (citing Ex. 1011, 135; Ex. 1053, 338–40, 427, 429, 561–63, Pet. 18; Ex. 1003 ¶¶ 168, 225; Ex. 1040 ¶¶ 14, 59–70). Amazon also argues that a person of ordinary skill in the art would have understood that Lurie's kickoff notification initiates its bag-of-tasks process that reduces redundant message traffic by making repeated task availability notifications unnecessary. *Id.* at 13 (citing Ex. 1040 ¶¶ 71–76).

In its Sur-reply, Swarm maintains its position that Lurie's TCWs 270A–N do not "proactively" retrieve tasks because each TCW requires a predicate instruction prior to obtaining a task. *See* PO Sur-reply 3. As further support for its argument, Swarm directs us to our Preliminary Guidance, in which we preliminarily determined that each of Lurie's TCWs 270A–N does not proactively interrogate ATD mechanism 260 without first receiving a notification to do so. *Id.* at 4–5 (citing Paper 19, 16–17).

Based on the fully developed trial record, we agree with Swarm that Amazon has not demonstrated that Lurie alone or in combination with Ethernet Specification teaches or suggests "proactively retriev[ing] a first

task from the task pool." Amazon's position regarding "proactively" retrieving is based primarily on Figure 6A of Lurie, reproduced below. *See* Pet. 24–25.




*Fig. 6A*

Figure 6A illustrates a block diagram of the ATD mechanism 260, including object exchange repository 662 that handles task distribution to TCW 270 registered with ATD mechanism 260. Ex. 1007 ¶¶ 26, 92. Lurie discloses that TCW 270 registers with object exchange repository 662 to be notified when a task becomes available or otherwise appears in object exchange repository 662. *Id.* ¶ 93. In response to receiving the notification, TCW 270 retrieves the task by performing either a take operation on, or read operation from, object exchange repository 662. *Id.* Based on these disclosures, we find that Lurie's object exchange repository 662 located within ATD mechanism 260 sends a kickoff notification to TCW 270 when a task

becomes available or otherwise appears. In response to this kickoff notification, TCW 270 takes the task from object exchange repository 662.[5]

Amazon's declarant, Dr. Lowenthal, provides testimony that supports our finding above. In his supplemental declaration in support of the Reply, Dr. Lowenthal testifies that, "[c]ertainly, Lurie initially sends an initial notification of 'one or more tasks . . . becoming available.' After that, . . . TCW [270] will obtain and process a first task." Ex. 1040 ¶ 58 (quoting Ex. 1007 ¶ 86) (citing Ex. 1007 ¶¶ 87, 88) (second two alterations in original). He also testifies that the "one initial notification . . . kick[s] off the procedure" because it "informs all registered TCWs [270] that one or more tasks are available." *Id.* ¶ 59. We credit the aforementioned testimony of Dr. Lowenthal's because it is consistent with the disclosures in Lurie that we highlight above, most notably the kickoff notification.

As we explain in the claim construction section above, we accord the claim term "proactively" an ordinary and customary meaning of initiating change rather than reacting to events (i.e., not being told to act or not reactionary). *See supra* Section II.A. Contrary to our construction, Lurie's TCW 270 only takes a task after receiving a kickoff notification and, therefore, it is not acting proactively. That is, Lurie's TCW 270 reacts to the kickoff notification that a task is available or otherwise appears in object exchange repository 662 rather than initiates change by seeking a task from object exchange repository 662 without being notified to do so.

---

[5] Indeed, regardless if Lurie's system is operating in automated task distribution mode or batch mode, Lurie's TCWs 270A–N only take a task after receiving a kickoff notification. *Compare* Ex. 1007 ¶ 86, Fig. 5B (steps 538, 540, 542 544), *with id.* ¶ 87, Fig. 5C (steps 538, 540, 542, 544).

We do not agree with Amazon's argument that Lurie's TCWs 270A–N are capable of retrieving tasks, without notification, because Lurie's system executes a textbook bag-of-tasks technique with an initial kickoff notification to start the process, after which each TCW repeatedly retrieves a task from the bag and completes it until all tasks have been completed. *See* Pet. Reply 11–13. Even assuming that Amazon is correct in that Lurie's system executes a textbook bag-of-tasks technique, Amazon fails to appreciate that each TCW 270A–N still requires a kickoff notification before it begins retrieving and completing tasks. As we explain above, because Lurie's TCWs 270A–N require a kickoff notification to retrieve a first task, it does not matter that they can retrieve and complete additional tasks without further notifications. In our view, Lurie's TCWs 270A–N are reactive—not proactive—because they require receipt of a kickoff notification to retrieve a first task.

In summary, based on the fully developed record, Amazon's proposed combination of Lurie and Ethernet Specification does not teach or suggest "a first co-processor configured to successively: proactively retrieve a first task from the task pool," as recited in each of independent claims 1 and 6, and similarly recited in independent claim 11. Accordingly, Amazon has not demonstrated by a preponderance of the evidence that the subject matter of independent claims 1, 6, and 11 would have been obvious over the combined teachings of Lurie and Ethernet Specification.

*6. Claims 3, 12, 14, 16, and 17*

By virtue of their dependency, claims 3, 12, 14, 16, and 17 include the same limitations as at least one of independent claims 1 and 11. Amazon does not present additional arguments and evidence with respect to these

dependent claims that remedy the deficiency in its analysis of the combined teachings of Lurie and Ethernet Specification. *See* Pet. 50–55. Accordingly, for the same reasons we identify above, Amazon has not demonstrated by a preponderance of the evidence that the subject matter of dependent claims 3, 12, 14, 16, and 17 would have been obvious over the combined teachings of Lurie and Ethernet Specification.

### *C. Remaining Obviousness Grounds*

Amazon also contends that (1) claims 2, 7, 10, and 13 of the '275 patent are unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, and Andrews; (2) claim 4, 9, and 15 of the '275 patent are unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, Andrews, and Chow; (3) claim 5 of the '275 patent is unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, and Sander; and (4) claim 8 of the '275 patent is unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, Andrews, and Marjovi. Pet. 56–71. Amazon does not present additional arguments and evidence with respect to these remaining grounds that remedy the deficiency in its analysis of the combined teachings of Lurie and Ethernet Specification. *See id.* Accordingly, for the same reasons we identify above, Amazon has not demonstrated by a preponderance of the evidence that (1) claims 2, 7, 10, and 13 of the '275 patent are unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, and Andrews; (2) claim 4, 9, and 15 of the '275 patent are unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, Andrews, and Chow; (3) claim 5 of the '275 patent is unpatentable under

§ 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, and Sander; and (4) claim 8 of the ’275 patent is unpatentable under § 103(a) as obvious over the combined teachings of Lurie, Ethernet Specification, Andrews, and Marjovi.

### *D. Swarm’s Contingent Motion to Amend*

Swarm’s Contingent Motion to Amend is contingent on us determining that originally challenged claims 1 and 3 of the ’275 patent are unpatentable. Mot. 1. As we discuss above, because Amazon has not demonstrated by a preponderance of the evidence that claims 1 and 3 of the ’275 patent are unpatentable under § 103(a) as obvious, Swarm’s request to amend originally challenged claims 1 and 3 and replace them with proposed substitute claims 18 and 19 is *dismissed* as moot.

## III. CONCLUSIONS

Based on the fully developed record, Amazon has not demonstrated by a preponderance of the evidence that claims 1–17 of the ’275 patent are unpatentable under § 103(a) as obvious. A summary of our conclusions is set forth in the table below.

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 3, 6, 11, 12, 14, 16, 17 | 103(a) | Lurie, Ethernet Specification | | 1, 3, 6, 11, 12, 14, 16, 17 |
| 2, 7, 10, 13 | 103(a) | Lurie, Ethernet Specification, Andrews | | 2, 7, 10, 13 |
| 4, 9, 15 | 103(a) | Lurie, Ethernet Specification, Andrews, Chow | | 4, 9, 15 |
| 5 | 103(a) | Lurie, Ethernet Specification, Sander | | 5 |
| 8 | 103(a) | Lurie, Ethernet Specification, Andrews, Marjovi | | 8 |
| **Overall Outcome** | | | | 1–17 |

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 18, 19 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | |
| Substitute Claims: Not Reached | 18, 19 |

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–17 of the ’275 patent have not been shown to be unpatentable;

FURTHER ORDERED that Swarm’s Contingent Motion to Amend is *dismissed* as moot; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Jonathan M. Strang
Adam M. Greenfield
David Zucker
Kimberly Q. Li
Ashley Finger
Latham & Watkins LLP
jonathan.strang@lw.com
adam.greenfield@lw.com
david.zucker@lw.com
kimberly.li@lw.com
ashley.finger@lw.com

FOR PATENT OWNER:

Michael K. Kelly
Christine N. Jones (admitted *pro hac vice*)
Beus Gilbert McGroder PLLC
mkelly@beusgilbert.com
cjones@beusgilbert.com

Daniel R. Pote
Jennings Strouss & Salmon PLC
p@jsslaw.com
dpote@jsslaw.com

Daniel J. Anderson
Ernst, Brown & Draper, PLLC
daniel.anderson@andersonpatents.com

US009852004B2

(12) **United States Patent**
**Iniguez**

(10) **Patent No.: US 9,852,004 B2**
(45) **Date of Patent: *Dec. 26, 2017**

(54) **SYSTEM AND METHOD FOR PARALLEL PROCESSING USING DYNAMICALLY CONFIGURABLE PROACTIVE CO-PROCESSING CELLS**

(71) Applicant: **Swarm Technology LLC**, Mesa, AZ (US)

(72) Inventor: **Alfonso Iniguez**, Mesa, AZ (US)

(73) Assignee: **Swarm Technology LLC**, Mesa, AZ (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 453 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/340,332**

(22) Filed: **Jul. 24, 2014**

(65) **Prior Publication Data**

US 2014/0337850 A1 Nov. 13, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/750,696, filed on Jan. 25, 2013, now Pat. No. 9,146,777.

(51) **Int. Cl.**

***G06F 9/46*** (2006.01)
***G06F 9/48*** (2006.01)
***G06F 9/54*** (2006.01)
***G06F 9/50*** (2006.01)

(52) **U.S. Cl.**

CPC .......... ***G06F 9/4843*** (2013.01); ***G06F 9/5044*** (2013.01); ***G06F 9/54*** (2013.01); ***G06F 9/544*** (2013.01); *G06F 2209/5017* (2013.01)

(58) **Field of Classification Search**

None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,330,583 | B1 | 12/2001 | Reiffin |
| 7,082,604 | B2 | 7/2006 | Schneiderman |
| 7,159,215 | B2 | 1/2007 | Shavit et al. |
| 7,174,381 | B2 | 2/2007 | Guiko et al. |
| 7,665,117 | B2 | 2/2010 | Sequeria |
| 8,037,474 | B2 | 10/2011 | Bates et al. |
| 8,108,867 | B2 | 1/2012 | Robison |
| 8,209,702 | B1 | 6/2012 | Roytman et al. |
| 8,284,206 | B2 | 10/2012 | State |
| 8,533,729 | B2 | 9/2013 | Yao |

(Continued)

OTHER PUBLICATIONS

Tozlu et al. ("Wi-Fi Enabled Sensors for Internet of Things: A Practical Approach", IEEE Communications Magazine, Jun. 2012).*

*Primary Examiner* — Wissam Rashid
(74) *Attorney, Agent, or Firm* — Jennings, Strouss & Salmon, PLC; Michael K. Kelly

(57) **ABSTRACT**

A parallel processing architecture includes a CPU, a task pool populated by the CPU, and a plurality of autonomous co-processing cells each having an agent configured to proactively interrogate the task pool to retrieve tasks appropriate for a particular so-processor. Each co-processor communicates with the task pool through a switching fabric, which facilitates connections for data transfer and arbitration between all system resources. Each so-processor notifies the task pool when a task or task thread is completed, whereupon the task pool notifies the CPU.

**12 Claims, 6 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 8,732,713 | B2 | 5/2014 | Coon et al. | |
| 8,949,853 | B2 | 2/2015 | Zimmermann | |
| 8,990,833 | B2 | 3/2015 | Kuesel et al. | |
| 2005/0188372 | A1 | 8/2005 | Inoue et al. | |
| 2006/0026377 | A1 | 2/2006 | Sikdar et al. | |
| 2007/0074207 | A1 * | 3/2007 | Bates | G06F 9/4881 718/1 |
| 2008/0168318 | A1 * | 7/2008 | DeMent | G01R 31/3004 714/745 |

* cited by examiner




FIG. 1


13
Thread Complete
30C
21A
21B
21
22D
22B
22A
22C
22
Descriptor
First Type
Second Type
Third Type
Completed
Ready
Not Ready
OR
AND

FIG. 2


312
A
314
B
316
C
318
A,B
A
B
C
A,B
320
322
324
322
340
C
C
342
334
B
B
336
330
A
A
332
308
310
306
302
304
300

FIG. 3




FIG. 4




FIG. 5


600
602
Populate task pool
604
Proactively dispatch agent from cell to task pool
606
Retrieve and process task
608
Notify task pool and CPU when task complete
610
Incorporate additional co-processor

FIG. 6

# SYSTEM AND METHOD FOR PARALLEL PROCESSING USING DYNAMICALLY CONFIGURABLE PROACTIVE CO-PROCESSING CELLS

## PRIORITY DATA

This application is a continuation of U.S. application Ser. No. 13/750,696, filed Jan. 25, 2013, which is incorporated herein by reference.

## FIELD OF INVENTION

The present invention generally relates to parallel-process computing, and particularly to a processing architecture which involves autonomous co-processors configured to proactively retrieve tasks from a task pool populated by a central processing unit.

## BACKGROUND

The Internet of Things (also referred to as the Cloud of Things) refers to an ad hoc network of uniquely identifiable embedded computing devices within the existing Internet infrastructure. The internet of things (IoT) portends advanced connectivity of devices, systems, and services that goes beyond machine-to-machine communications (M2M). The scope of things contemplated by the IoT is unlimited, and may include devices such as heart monitoring implants, biochip transponders, automobile sensors, aerospace and defense field operation devices, and public safety applications that assist fire-fighters in search and rescue operations, for example. Current market examples include home based networks that involve smart thermostats, light bulbs, and washer/dryers that utilize wifi for remote monitoring. Due to the ubiquitous nature of connected objects in the IoT, it is estimated that more than 30 billion devices will be wirelessly connected to the Internet of Things by 2020. Harnessing the processing capacity of the controllers and processors associated with these devices is one of the objectives of the present invention.

Computer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user's perspective the applications appear to be processed in parallel. True parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors. A computing architecture that uses task parallelism (parallel processing) divides a large computational requirement into discrete modules of executable code. The modules are then executed concurrently or sequentially, based on their respective priorities.

A typical multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed. Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.



A multiprocessor architecture in thus needed which reduces CPU management overhead, and which also more effectively harnesses and exploits available co-processing resources.

## SUMMARY OF THE INVENTION

Various embodiments of a parallel processing computing architecture include a CPU configured to populate a task pool, and one or more co-processors configured to proactively retrieve threads (tasks) from the task pool. Each co-processor notifies the task pool upon completion of a task, and pings the task pool until another task becomes available for processing. In this way, the CPU communicates directly with the task pool, and communicates indirectly with the co-processors through the task pool.

The co-processors may also be capable of acting autonomously; that is, they may interact with the task pool independently of the CPU. In a preferred embodiment, each co-processor includes an agent that interrogates the task pool to seek a task to perform. As a result, the co-processors work together "in solidarity" with one another and with the task pool to complete aggregate computational requirements by autonomously retrieving and completing individual tasks which may or may not be inter-related. By way of non-limiting example, suppose a task B involves computing an average temperature over time. By defining a task A to include capturing temperature readings over time, and further by defining task B to including obtaining the captured readings, the CPU and the various co-processors may thereby inferentially communicate with each other via the task pool.

In various embodiments the co-processors are referred to as autonomous, proactive solidarity cells. In this context, the term autonomous implies that a co-processor may interact with the task pool without being instructed to do so by the CPU or by the task pool. The term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor. The term solidarity implies that co-processing cells share a common objective in monitoring and executing all available tasks within the task pool.

A solidarity cell (co-processor) may be a general purpose or special purpose processor, and therefore may have the same or different instruction set, architecture, and microarchitecture as compared to the CPU and other solidarity cells in the system. Moreover, the software programs to be executed and data to be processed may be contained within one or more memory units. In a typical computer system, for example, a software program consists of a series of instructions that may require data to be used by the program. For example, if the program corresponds to a media player, then the data contained in memory may be compressed audio data which is read by a co-processor and eventually played on a speaker.

Each solidarity cell in the system may be configured to communicate, ohmically or wirelessly, with the task pool through a crossbar switch, also known as fabric. In a purely wireless mesh topology, the radio signals themselves may constitute the fabric. In various embodiments, the co-processors may also communicate directly with the CPU. The switching fabric facilitates communication among system resources. Each solidarity cell is proactive, in that it obtains

a task to perform by sending its agent to the task pool when the solidarity cell has no processing to perform or, alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation. By way of non-limiting example, in the context of the Internet-of-Things (discussed in greater detail below), a co-processor associated with a device such as a light bulb may be programmed to listen for "on" and "off" commands from a master device (such as a smartphone) as its normal operation, but its processing resources may also be harnessed through a task pool.

In the context of various embodiments described herein, the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to thereby obtain available tasks which are appropriate for that co-processor cell. The solidarity cells may execute the tasks sequentially, when the tasks are contingent on the execution of a previous task, or in parallel, when more than one solidarity cell is available and more than one matching tasks are available for execution. The tasks may be executed independently or collaboratively, depending on the task thread restrictions (if any) provided by the CPU. Interdependent tasks within the task pool may be logically combined. The task pool notifies the CPU when a task thread is completed. If a task thread is composed of a single task, then the task pool may notify the CPU at completion of such task. If a task thread is composed of multiple tasks, the task pool may notify the CPU at completion of such chain of tasks. Since task threads may be logically combined, it is conceivable to have a case in which the task pool notifies the CPU after completion of logically combined task threads.

Those skilled in the art will appreciate that interoperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices and their associated co-processors may be added to a network on a "plug and play" basis. Another aspect of this invention provides interoperability within a heterogeneous array of CPUs with different instruction set architectures.

Various features of the invention are applicable to, inter alia, a network of Internet-of-Things devices and sensors; heterogeneous computing environments; high performance computing, two dimensional and three dimensional monolithic integrated circuits; and motion control and robotics.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will hereinafter be described in conjunction with the appended drawing figures, wherein like numerals denote like elements, and:

FIG. **1** is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric in accordance with an embodiment;

FIG. **2** is a schematic block diagram illustrating details of an exemplary task pool in accordance with an embodiment;

FIG. **3** is a schematic block diagram of a network including co-processing cells and their corresponding agents interacting with a task pool in accordance with an embodiment;

FIG. **4** is a schematic layout of an internet of things network including available plug and play devices in accordance with an embodiment; and

FIG. **5** is a schematic layout diagram of an exemplary internet of things use case illustrating dynamic harnessing of nearby devices in accordance with an embodiment; and

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment in accordance with an embodiment.

## DETAILED DESCRIPTION

Various embodiments relate to parallel processing computing systems and environments, from simple switching and control functions to complex programs and algorithms including, without limitation: data encryption; graphics, video, and audio processing; direct memory access; mathematical computations; data mining; game algorithms; ethernet packet and other network protocol processing including construction, reception and transmission of data the outside network; financial services and business methods; search engines; internet data streaming and other web-based applications; execution of internal or external software programs; switching on and off and/or otherwise controlling or manipulating appliances, light bulbs, consumer electronics, and the like, e.g., in the context of the Internet-of-Things.

Various features may be incorporated into any presently known or later-developed computer architecture. For example, parallel processing concerns relating to synchronization, data security, out-of-order execution, and main processor interrupts may be addressed using the inventive concepts described herein.

Referring now to FIG. **1**, a distributed processing system **10** includes a single or multi-core CPU **11** and one or more solidarity or co-processing cells **12**A-**12** configured to communicate with a task pool **13** through a cross-bar switching fabric **14**. The solidarity cells **12** may also communicate with each other through the switching fabric **14** or through a separate cell bus (not shown). The CPU **11** may communicate with the task pool **13** directly or through the switching fabric **14**. One or more memory units **15** each contain data and/or instructions. In this context, the term "instructions" include a software program that may be compiled for execution by the CPU **11**. The memory units **15**, cells **12**, and the task pool **13** may be ohmically or wirelessly interconnected to communicate with the CPU and/or with each other via the switching fabric **14**. In some embodiments, the CPU **11** communicates with the cells **12** only indirectly through the task pool. In other embodiments, the CPU **11** may also communicate directly with the cells **12** without using the task pool as an intermediary.

In some embodiments the system **10** may include more than one CPU **11** and more than one task pools **13**, in which case a particular CPU **11** may interact exclusively with a particular task pool **13**, or multiple CPUs **11** may share one or more task pools **13**. Moreover, each solidarity cell may be configured to interact with more than one task pool **13**. Alternatively, a particular cell may be configured to interact with a single designated task pool, for example, in a high performance or high security context.

In various embodiments cells may be dynamically paired, ohmically (plug and play) or wirelessly (on the fly), with a task pool when the following three conditions are meet:

1) The cell is able to communicate, ohmically or wirelessly, with the task pool. The connection to the task pool can be through a port in the task pool itself, or through a switching fabric that is connected to the task pool;
2) The task pool recognizes the agent sent by the cell as trustworthy, for example, using input from the user,

with or without password, through traditional Wi-Fi, Blootooth or similar pairing, manually through a graphical software program running on a smartphone or tablet, or by any other secure or unsecure method; and

3) At least one of the available tasks within the task pool is compatible with the capabilities of the solidarity cell.

In the case of a multi-processor environment with multiple task pools, the foregoing dynamic pairing conditions apply, except that a given cell may be locked or restricted to work with only one of the task pools; otherwise, the cells may connect with one or more task pools, using a first found basis, round robin basis or any other selection scheme. It is also possible to assign priorities to the tasks within the task pools, whereby the cells give preference to the high priority tasks and serve the lower priority tasks when not otherwise engaged by the higher priority tasks.

The CPU **11** may be any single or multi-core processor, applications processor or microcontroller, used to execute a software program. The system **10** may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device, in which case the CPU **11** may be any personal computer, central processor, or processor cluster, such as an Intel® Pentium® or multi-core processor local to or remote from the immediate computing environment. Alternatively, the system **10** may be implemented on a supercomputer and the CPU **11** may be a reduced instruction set computer ("RISC") processor, applications processor, a microcontroller, or the like.

In other embodiments, the system **10** may be implemented on a locally connected series of personal computers, such as a Beowulf cluster, in which case the CPU **11** may include the central processors of all, a subset, or one of the networked computers. Alternatively, the system **10** may be implemented on a network of remotely connected computers, in which case the CPU **11** may be a presently known or later developed central processor for a server or mainframe. The particular manner in which the CPU **11** performs the subject parallel processing methods within the presently described system **10** may be influenced by the CPU's operating system. For example, the CPU **11** may be configured for use within the system **10** by programing it to recognize and communicate with the task pool **13** and divide the computing requirements into threads, as described below.

It is further contemplated that the system **10** may be implemented retroactively on any computer or computer network having an operating system that may be modified or otherwise configured to implement the functionality described herein. As is known in the art, the data to be processed is contained within the memory units **15**, for example in the context of addressable regions or sectors of random access or read-only memory, cache memory for the CPU **11**, or other forms of data storage such as flash memory and magnetic storage. The memory units **15** contain the data to be processed as well as the location to place the results of the processed data. Not every task is required to access the memory units **15**, as in the case of, for example, smart meters and automotive instrumentation, which may return data to the system **10**, or as in the case of a robot and motor controllers which may actuate a mechanism.

Each cell **12** is a conceptually or logically independent computational unit capable of executing one or more tasks/threads. A cell **12** may be a microcontroller, a microprocessor, application processor, a "dumb" switch, or a standalone computer such as a machine in a Beowulf cluster.

A cell **12** may be a general or special purpose coprocessor configured to supplement, perform all of, or perform a limited range of functions of the CPU, or functions that are foreign to the CPU **11** such as ambient monitoring and robotic actuators, for example. A special-purpose processor may be a dedicated hardware module designed, programmed, or otherwise configured to perform a specialized task, or it may be a general-purpose processor configured to perform specialized tasks such as graphics processing, floating-point arithmetic, or data encryption.



In an embodiment, any cell **12** that is a special-purpose processor may also be configured to access and write to memory and execute descriptors, as described below, as well as other software programs.

Moreover, any number of cells **12** may comprise a heterogeneous computing environment; that is, a system that uses more than one kind of processor such as an AMD-based and/or an Intel-based processor, or a mixture of 32-bit and 64-bit processors.

Each cell **12** configured to perform one or a plurality of specialized tasks, as illustrated in the following sequence of events. During a poll phase each cell periodically sends an agent to the task pool until a matching task is found. To facilitate this matching, both the cell and the task pool may be equipped with a transceiver. In the case of the task pool, the transceiver maybe located in the task pool itself or in the switching fabric to which the task pool is connected. When a task match is found within a task pool, the task pool transmits an acknowledgement to the cell. The next step is the "communication channel" phase. During the communication channel phase, the cell receives the task and begins to execute the task. In one implementation, once the first task is completed, the communication channel is maintained so that the solidary cell can fetch another task without having to repeat the "poll" and "acknowledge" phases.

The system **10** may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system **10**. The set of task types performed by a given cell **12** may be a subset of the set of task types performed by another cell. For example, in FIG. **1**, the system **10** may divides an aggregate computational problem into a group of tasks, and populate the task pool **13** with a first type, a second type, and a third type of tasks. A first cell **12**A may capable of performing only tasks of the first type; a second cell **12**B may be capable of perform tasks of the second type; a third cell **12**C may be capable of performing tasks of the third type; a fourth cell **12**D may be capable of performing tasks of the second or third types; and a fifth cell **12**N may be capable of performing all three task types. The system **10** may be configured with this redundancy so that if a given cell is removed from the system **10** (or currently busy or otherwise unavailable), the system **10** may continue to function seamlessly. Furthermore, if a cell is dynamically added to the system **10**, the system **10** may continue to function seamlessly with the benefit of increased performance.

Referring now to FIGS. **1** and **2**, the task pool **13** may occupy a region of physical memory that is accessible by the CPU **11**. Alternatively, the task pool **13** may be accessible by MAC address or IP address. Multiple embodiments are envisioned for the task pool **13**; it may be physically located with the CPU in the same 2D or 3D monolithic IC, or it may be implemented as a stand-alone IC and be physically interconnected to a computer board, smart phone, tablet, router or Internet-of-Things device. In a further alternative embodiment, the task pool may be a stand-alone multi-port, wired and/or wireless connected device which may be shared among multiple CPU **11** systems, or dedicated to a

given CPU **11**. The task pool **13** may also be addressable by the cells **12**. The task pool **13** may be disposed in a dedicated hardware block to provide maximum access speed by the CPU **11** and cells **12**. Alternatively, the task pool **13** may be software based, wherein the contents of the task pool **13** are stored in memory, analogous to the hardware-based embodiment, but represented by data structures.

Upon being populated by the CPU **11**, the task pool **13** contains one or more task threads **21**. Each task thread **21** represents a computational task that may be a component or subset of the larger aggregate computational requirement imposed on the CPU **11**. In one embodiment, the CPU **11** may initialize and then populate the task pool **13** with concurrently executable threads **21**. Each thread **21**may include one or more discrete tasks **22**. A task **22** may have a task type and a descriptor. The task type indicates which cells **12** are capable of performing the task **22**. The task pool **13** may also use the task type to prioritize tasks **22** having the same type. In one embodiment, the task pool **13** may maintain a prioritization table (not shown) that documents the solidarity cells **12** present in the system **10**, the types of tasks **22** each cell is capable of performing, and whether or not each cell is presently processing a task **22**. The task pool **13** may use the prioritization table to determine which of the eligible tasks **22** to assign to a requesting cell, as described below.

In some embodiments, the CPU **11** may retrieve and execute a task or thread from the task pool. Moreover, the CPU **11** may abort any task that is determined to be stale, broken, stuck, or erroneous. In such case, the CPU **11** may refresh the task, making available for subsequent processing. Nothing precludes the CPU **11** from implementing adaptive task management, for example, as may be required by Artificial Intelligence, whereupon the CPU **11** may add, remove, or change tasks within an unfinished existing thread **21**.

The descriptor may contain one or more of a specific instruction to be executed, a mode of execution, the location (e.g., address) of the data to be processed, and the location for placement of the task results, if any. The location for placement of results is optional, such as in the case of animation and multimedia tasks that often present results to a display rather than storing them in memory. Moreover, task descriptors may be chained together, as in a linked list, so that the data to be processed may be accessed with fewer memory calls than if the descriptors were not chained together. In an embodiment, the descriptor is a data structure containing a header and a plurality of reference pointers to memory locations, and the task **22** includes the memory address of the data structure. The header defines the function or instruction to be executed. A first pointer references the location of the data to be processed. A second, optional pointer, references the location for placement of processed data. If the descriptor is linked to another descriptor to be sequentially executed, the descriptor may include a third pointer that references the next descriptor. In an alternative embodiment where the descriptor is a data structure, the task **22** may include the full data structure.

A thread **21** may further comprise a “recipe” describing the order in which the tasks **22** may be performed and any conditions that affect the order of performance. According to the recipe, the tasks **22** may be executed sequentially, concurrently, out-of order, interdependently, or conditionally according to Boolean operations. For example, in FIG. **2**, thread **21**A comprises four tasks: **22**A, **22**B, **22**C, and **22**D. In the illustrated embodiment, the first task **22**A must be completed before either the second task **22**B or the third task **22**C can begin. According to the recipe, once either the second task **22**B or third task **22**C is complete, the fourth task **22**D may begin.



Threads **21** may also be interdependent. For example, as shown in FIG. **2**, due to the Boolean operation in thread **21**B, a completed task **22**C may allow processing of tasks in thread **21**B to continue. The task pool **13** may lock a task **22** while the task **22** is waiting for completion of another task **22** upon which it depends. When a task **22** is locked, it cannot be acquired by a cell. When the tasks **22** of a thread **21** are completed, the task pool **13** may notify the CPU **11** of the completion. The CPU may then advance processing beyond the completed thread **21**.

The cells advantageously maintain solidarity with each other and with the CPU **11**, thereby helping the system **10** to perform complex computations by autonomously and proactively retrieving tasks from the task pool **13**. The cells **12** act autonomously in that they may act independently of the CPU **11** or any other coprocessor. Alternatively, a cell may be acted upon or instructed directly by the CPU. Each cell acts proactively in that it seeks a task **22** from the task pool **13** as soon as the cell becomes available for further processing.

More particularly, in an embodiment, a cell **12** acquires a task from the task pool by sending an agent **30** to interrogate (search for) the task pool and retrieve an available task **22** that requires completion, is not locked, and that has a task type that can be performed by the cell. Typically, the system **10** has the same number of agents as solidarity co-processing cells. In this context, an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload. In an embodiment, the destination address is the address of the task pool **13** when the agent **30** is seeking a task **22**, and the destination address is the address of the corresponding cell **12** when the agent **30** is returning to its cell with a task **22**. Correspondingly, the source address is the address of the cell **12** when the agent **30** is seeking a task **22**, and the source address is the address of the task pool **13** when the agent **30** is returning to its cell with a task **22**.

In addition, the source and destination addresses may facilitate frame synchronization. That is, the system **10** may be configured to unequivocally differentiate addresses from payload data, so that when the contents of an agent **30** are read, the destination address indicates the beginning of the frame and the source address indicates the end of the frame, or vice versa. This allows the payload to vary in size when it is placed between the addresses. In another embodiment of a variable-size payload, an agent **30** may include a header that indicates the payload size. The header information may be compared to the payload to verify the data integrity. In still another embodiment, the payload may be a fixed length. When an agent **30** is dispatched to the task pool **13** by its co-processor cell, the payload contains identifying information of the types of tasks the cell **12** can perform. When the agent **30** returns from the task pool **13**, the payload contains the descriptor of the task **22**, either in the form of a memory location or the full descriptor data structure.

In other embodiments, some or all of the agents **30** are autonomous representatives of their respective corresponding cells **12**. That is, each agent **30** may be dispatched by its corresponding cell **12** to retrieve a task **22** any time the cell is idle or capable of performing additional processing. In this way, the processing capacity of the solidarity cells **12** may be more fully exploited, inasmuch as the cells need not wait idly for an instruction from the CPU **11**. This approach has the additional benefit of reducing CPU overhead by reliev-

ing the CPU of the need to send a request to a cell to retrieve a task from the task pool. These advantages render the system **10** more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU.

Further, the solidarity cells **12**A-**12***n* are ambivalent as to the particular composition of the thread itself Rather, an agent is only concerned about finding a match between the capabilities of its corresponding cell and an available task **22** to be completed in the task pool **13**. That is, as long as there are available tasks **22** in the task pool **13**, and an available task **22** matches the capability of the cell, then the system may effectively harness the processing capacity of the cell.

Some or all of the solidarity cells **12**A-**12***n* may work independently of each other, or may communicate with each other directly, through the switching fabric **14**, through the task pool **13**, or pursuant to a command or request from the CPU to invoke another solidarity cell to assist in processing, moving, or transmitting data. In one embodiment, the agent **30**A may search for a match between the task type of the ready tasks **22** and the types of tasks that the cell **12**A is able to perform. This architecture may involve hard-coding of the types of tasks that the CPU **11** is configured to create. Thus, if the task pool **13** contains three types of tasks **22**, and the large computational requirement includes a task of a fourth type, this fourth type of task may not be placed in the task pool **13** even if a cell capable of performing tasks of the fourth type is included in or added to the system **10**. Consequently, the CPU **11** may be configured to "learn" or be taught how to create tasks of the fourth type in order to more fully exploit the available processing resources.

In another embodiment, the agent **30**A searches the task **22** descriptors for an executable instruction that matches one of the instructions that that cell **12**A is capable of executing. When a matching task **22** is found, the agent **30**A delivers the descriptor of the matching task **22** to the cell **12**A, whereupon the cell **12**A begins to process the task **22**. In particular, the agent **30**A may deliver the memory address of the descriptor to the cell **12**A, and the cell **12**A retrieves the data structure from memory. Alternatively, where the descriptor's entire data structure is contained in the task **22**, the agent **30**A may deliver the complete data structure to the cell **12**A for processing. The descriptor informs the cell **12**A which instruction to execute, the location in memory units **15** where the data to be processed may be found, and the location in memory **15** where the results are to be placed. Upon completion of the task **22**, the cell **12**A notifies the task pool **13** to change the status of the selected task **22** from 'to be completed' to 'completed.' Further, once the cell **12**A finishes a task **22**, the cell may dispatch its agent **30**A to the task pool **13** to seek another task **22**.

Some or all of the agents **30**A-**30***n* may travel through the system **10** by wire or wirelessly, for example, using a Wi-Fi network, wireless Ethernet, wireless USB, wireless bridge, wireless repeater, wireless router, Zigbee®, ANT+® or Bluetooth® pairing, according to the particular architecture and/or implementation of the system **10**. In an embodiment, an agent **30** may be guided to the task pool **13** wirelessly by including a receptor feature at the task pool **13** and further by including a transmitter feature with the cell **12**. Similarly, the task pool may answer wirelessly to the cells by equipping the task pool with a transmitter and the solidarity cells with a receiver. In this manner, the cells may communicate wirelessly with the task pool with or without use of the switching fabric.

In a preferred embodiment, however, some form of switching fabric **14** is used. The switching fabric **14** facilitates connections for data transfer and arbitration between system resources. The switching fabric **14** may be a router or crossbar switch that provides connectivity between the various cells and the task pool. The switching fabric **14** may further provide connectivity between each solidarity cell **12**A-**12***n* and system resources such as the CPU **11**, memory units **15**, and traditional system components including, without limitation: direct memory access units, transmitters, hard disks and their controllers, display and other input/output devices, and other coprocessors. The cells **12**A-**12***n* may be connected physically to the switching fabric **14**, or the cells may be connected wirelessly.

The wireless connection of cells into the system **10** facilitates the dynamic addition and/or removal of cells for use in the system **10**. For example, the CPU **11** may recruit cells from other cell systems, allowing for dynamic expansion and increased performance. In this manner, two or more cell systems (e.g., networks) may share solidarity cells. In one embodiment, a cell that becomes idle may look for and/or be recruited by another system that has a need for additional processing resources, i.e., it has available processing tasks that need to be completed. Similarly, the system **10** may expand performance by incorporating clusters of additional cells for a particular task. For example, the system **10** may enhance performance of an encryption/decryption function, or the processing of audio and/or video data, by incorporating nearby cells capable of performing these tasks.

To guard against undesirable connections, the CPU **11** may provide the task pool **13** with a list of or, alternatively, criteria for identifying trusted and/or untrusted cells as well as authentication requirements or protocols. Moreover, the task pool itself may exclude particular cells on the basis of low performance, unreliable connection, poor data throughput, or suspicion of malicious or otherwise inappropriate activity. In various embodiments, cells **12** may be added to a task pool **13**, or excluded from a task pool **13**, by a user through the use of a smartphone, tablet or other device or application. In one embodiment, a graphical application interface may provide the user with useful statistical and/or iconic information such as location of available cells and other devices, performance gain, or performance penalty, as a result of adding or removing particular cells from a network.

In an alternative embodiment, some or all of the co-processing cells may connect directly to the task pool **13**, such as by a wired configuration that does not require a switching fabric **14** for communication. The wired connection of cells may further facilitate dynamic expansion and contraction of the system **10** analogous to the wireless configuration discussed above, although wired connections may physical (e.g., manual) integration and extraction of peripheral devices. In either case, scalability of the system is greatly enhanced over conventional parallel processing schemes, as co-processors may be added and removed without reprogramming the CPU **11** to account for the changes to the system **10**.

Referring now to FIG. **3**, a network **300** includes a CPU **302**, a first memory **304**, a second memory **306**, a task pool **308**, a switching fabric **310**, a first co-processing cell **312** configured to perform (execute) type A tasks, a second cell **314** configured to perform type B tasks, a third cell **316** configured to perform type C tasks, and a fourth cell **318** configured to perform both type A and type B tasks. As shown, the task pool **308** is populated (e.g., by the CPU **302**) with tasks (or task threads) **330** and **332** of task type A; tasks **334** and **336** of task type B; and tasks **340** and **342** of task

type C. In an embodiment, each cell preferably has a unique, dedicated agent. In particular, cell **312** includes an agent **320**; cell **314** includes an agent **322**; cell **316** includes an agent **324**; and cell **318** includes an agent **326**. Each agent preferably includes an information field or header which identifies the type of tasks its associated cell is configured to perform, for example, a single task or combination of tasks A, B, C.

During operation, when a cell is either idle or otherwise has available processing capacity, its agent proactively interrogates the task pool to determine whether any tasks are in the task queue which are appropriate for that particular cell. For example, cell **312** may dispatch its agent **320** to retrieve one or both of tasks **330** and **332** corresponding to task type A. Similarly, cell **314** may dispatch its agent **322** to retrieve either task **334** or **336** (depending on their relative priorities) corresponding to task type B, and so on. For cells which are capable of performing more than one task type, such as cell **318** configured to perform task types A and B, agent **326** may retrieve any one of tasks **330**, **332**, **334**, and/or **336**.

Upon retrieving a task from the task pool, a cell may then process that task, typically by retrieving data from a particular location in first memory **304**, processing that data, and storing the processed data at a particular location within second memory **306**. When a task is completed, the cell notifies the task pool, the task pool marks the task as completed, and the task pool notifies the CPU that the task is completed. Alternatively, the task pool may notify the CPU when a task thread is completed, inasmuch as a task thread may comprise a single task, a series of tasks, or Boolean combination of tasks. Significantly, the retrieval of tasks and the processing of data by the cells may occur without direct communication between the CPU and the various cells.

Referring now to FIG. **4**, an internet of things network **400** includes a controller (CPU) **402**, a task pool **408**, and various devices **410**-**422**, some or all of which include an associated or embedded microcontroller, such as an integrated circuit (IC) chip or other component which embodies processing capacity. By way of non-limiting example, the devices may include a light bulb **410**, a thermostat **412**, an electrical receptacle **414**, a power switch **416**, an appliance (e.g., toaster) **418**, a vehicle **420**, a keyboard **422**, and virtually any other plug and play device or application capable of interfacing with a network.

In the illustrated embodiment, the controller **402** may be a smartphone, tablet, laptop, or other device which may include a display **404** and a user interface (e.g., keypad) **406** for facilitating user interaction with the various devices on the network. To the extent the processing capacity (e.g., bandwidth) of the controller **402** may be insufficient to adequately support the network, the controller may effectively harvest or recruit processing resources from the peripheral devices via the task pool, for example as explained below in conjunction with FIG. **5**.

Referring now to FIG. **5**, an internet of things network **500** use case illustrates the dynamic harnessing of nearby (or otherwise available) devices. Network **500** includes a primary control unit **502** (e.g., a laptop, tablet, or gaming device), a task pool **504**, a first co-processor device **506**, and a second co-processor device **508**. An exemplary use case in the context of network **500** will now be described.

Suppose a user is playing a video game on her laptop computer **502**. The video game requires detailed computer-generated imagery, and perhaps the processing power in laptop **502** is sufficient to render a single realistic-looking character, but when a second character is introduced onto the



screen, the image quality degrades, and the movement of the characters is no longer continuous. The present invention proposes a method to harness the processing power of underutilized computer resources located within the vicinity of, or otherwise available to, the user.

To address the need for additional processing power, the laptop **502** connects to the task pool **504**. In this regard, the laptop itself may be equipped with a task pool, or the task pool may be in the form an external device or application located within wireless reach from the laptop **502**. In the case of an external task pool, the task pool itself could perform the duties of a switching fabric with ports to allow connection to multiple co-processing cells. The laptop **502** populates the task pool **504** with computationally intensive tasks. A nearby underutilized device, such as a smartphone **508**, subsequently connects to the task pool **504** and sends its agent to fetch a matching task type. Consequently, the smart phone **508** becomes a co-processor seamlessly assisting the laptop **502**, thereby enhancing the video game experience. The same method may be repeated in the event other underutilized processing resources exist and are needed. Indeed, even the processing power of an available light-bulb **506** may become a co-processor to the laptop.

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment. In particular, a method **600** includes populating a task pool with tasks (Step **602**), proactively dispatching one or more agents from one or more corresponding cells to the task pool (Step **604**), retrieving and processing a task (Step **606**), and notifying the task pool and the CPU that the task thread has been performed (Step **608**). The method **600** further includes dynamically incorporating (Step **610**) an additional device into the network, as needed.

A processing system is thus provided which includes a task pool, a controller configured to populate the task pool with a first task, and a first co-processor configured to proactively retrieve the first task from the task pool.

In an embodiment, the first co-processor comprises a first agent configured to retrieve the first task from the task pool without communicating with the controller.

In an embodiment, the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type.

In an embodiment, the first co-processor is further configured to process the first and notify the task pool upon completion of the first task, and the task pool is configured to notify the controller upon completion of the first task.

In an embodiment, the controller and the first co-processor are configured communicate with each other only through the task pool.

In an embodiment, the controller and the first co-processor are configured communicate with each other directly and through the task pool.

In an embodiment, the first co-processor is configured to determine that it has available processing capacity, and to dispatch the agent to the task pool in response to the determination.

In an embodiment, the controller is further configured to populate the task pool with a second task, and wherein the system further comprises a second co-processor having a second agent configured to proactively retrieve the second task from the task pool.

In an embodiment, the second task includes indicia of a second task type, the second co-processor is configured to

perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

In an embodiment, the controller and the task pool reside on a monolithic integrated circuit (IC), and the first co-processor does not reside on the IC.

In another embodiment, the controller, the task pool, and the first and second co-processors reside on a monolithic integrated circuit (IC).

A method is also provided for dynamically controlling processing resources in a network of the type including a central processing unit (CPU) configured to populate a task pool with a first task having a first task type. The method includes the steps of: programming a first cell to perform the first task type; adding the programmed first cell to the network; proactively sending a first agent from the first cell to the task pool; searching the task pool, by the first agent, for a task of the first type; retrieving, by the first agent, the first task from the task pool; transporting, by the first agent, the first task to the first cell; processing, by the first cell, the first task; and sending a notification from the first cell to the task pool that the first task is completed.

In an embodiment, the method also includes: marking, by the task pool, the first task as being completed; and sending a notification from the task pool to the CPU that the first task is completed.

In an embodiment, the method also includes configuring the first cell to determine that the first cell has available processing capacity as a predicate to proactively sending the first agent to the task pool.

In an embodiment, the method also includes integrating the first cell into a first device prior to adding the programmed first cell to the network.

In an embodiment, the first device comprises one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and a security device.

In an embodiment, adding the programmed first cell to the network comprises establishing a communication link between the first cell and the task pool.

In an embodiment, the (CPU) is further configured to populate the task pool with a second task having a second task type, the method further comprising the steps of: programming the second cell to perform the second task type; establishing a communication link between the second cell and the task pool; proactively sending a second agent from the second cell to the task pool; searching the task pool, by the second agent, for a task of the second type; retrieving, by the second agent, the second task from the task pool; transporting, by the second agent, the second task to the second cell; processing, by the second cell, the second task; sending a notification from the second cell to the task pool that the second task is completed; marking, by the task pool, the second task as being completed; and sending a notification from the task pool to the CPU that the second task is completed.

A system is also provided for controlling distributed processing resources in an internet of things (IoT) computing environment, including: a CPU configured to partition an aggregate computing requirement into a plurality of tasks and place the tasks in a pool; and a plurality of devices each having a unique dedicated agent configured to proactively retrieve a task from the pool without direct communication with the CPU.

While there has been illustrated an enabling description of various embodiments including the best mode known to the inventors, it will be understood by those skilled in the art that various changes and modifications may be made and equivalents may be substituted for various elements without departing from the scope of the invention. Therefore, it is intended that the inventions disclosed herein not be limited to the particular embodiments disclosed, but that the invention will include all embodiments falling within the literal and equivalent scope of the appended claims.

I claim:

**1**. A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller.

**2**. The processing system of claim **1**, wherein:

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type; and

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

**3**. A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein:

the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first

type, and the first agent is configured to search the task pool for a task of the first type;

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type;

the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload; and

the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

and further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;

when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload includes a second function which the second co-processor is configured to perform; and

when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.

**4**. The processing system of claim **3**, wherein the controller and the task pool reside on a monolithic integrated circuit (IC), and the first and second co-processors do not reside on the IC.



**5**. The processing system of claim **3**, wherein the controller, the task pool, and the first and second co-processors reside on a single monolithic integrated circuit (IC).

**6**. The processing system of claim **3**, further comprising:

a first device associated with the first co-processor; and

a second device associated with the second co-processor;

wherein the first and second devices each comprise one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and security device.

**7**. The processing system of claim **3**, wherein the first co-processor is configured to modify a task within the task pool.

**8**. The processing system of claim **3**, wherein:

the first co-processor is further configured to process the first and notify the task pool upon completion of the first task; and

the second co-processor is further configured to process the second task and notify the task pool upon completion of the second task.

**9**. The processing system of claim **8**, wherein:

the task pool is configured to notify the controller upon completion of the first task; and

the task pool is further configured to notify the controller upon completion of the second task.

**10**. The processing system of claim **3**, wherein the controller is configured to communicate with the first co-processor and the second co-processor only indirectly through the task pool.

**11**. The processing system of claim **3**, wherein the first co-processor is configured to deposit a new task into the task pool.

**12**. The processing system of claim **3**, wherein the first co-processor is configured to determine when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination.

* * * * *

US010592275B2

(12) **United States Patent**
**Iniguez**

(10) **Patent No.: US 10,592,275 B2**
(45) **Date of Patent: *Mar. 17, 2020**

(54) **SYSTEM AND METHOD FOR SWARM COLLABORATIVE INTELLIGENCE USING DYNAMICALLY CONFIGURABLE PROACTIVE AUTONOMOUS AGENTS**

(71) Applicant: **Swarm Technology LLC**, Mesa, AZ (US)

(72) Inventor: **Alfonso Iniguez**, Mesa, AZ (US)

(73) Assignee: **Swarm Technology LLC**, Mesa, AZ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/852,480**

(22) Filed: **Dec. 22, 2017**

(65) **Prior Publication Data**

US 2018/0121238 A1 May 3, 2018
US 2018/0293096 A2 Oct. 11, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/340,332, filed on Jul. 24, 2014, now Pat. No. 9,852,004, which is a

(Continued)

(51) **Int. Cl.**
***G06F 9/46*** (2006.01)
***G06F 9/48*** (2006.01)

(Continued)

(52) **U.S. Cl.**
CPC .......... ***G06F 9/4843*** (2013.01); ***G06F 9/5044*** (2013.01); ***G06F 9/54*** (2013.01); ***G06F 9/544*** (2013.01); *G06F 2209/5017* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,330,583 B1 12/2001 Reiffin
7,082,604 B2 7/2006 Schneiderman

(Continued)

FOREIGN PATENT DOCUMENTS

WO WO 00/11561 3/2000

OTHER PUBLICATIONS

Tozlu et al. ("Wi-Fi Enabled Sensors for Internet of Things: A Practical Approach", IEEE Communications Magazine, Jun. 2012).*

(Continued)

*Primary Examiner* — Wissam Rashid
(74) *Attorney, Agent, or Firm* — Jennings, Strouss & Salmon PLC; Michael K. Kelly; Daniel R. Pote

(57) **ABSTRACT**

A parallel processing architecture includes a CPU, a task pool populated by the CPU, and a plurality of autonomous co-processing cells each having an agent configured to proactively interrogate the task pool to retrieve tasks appropriate for a particular co-processor. Each co-processor communicates with the task pool through a switching fabric, which facilitates connections for data transfer and arbitration between all system resources. Each co-processor notifies the task pool when a task or task thread is completed, whereupon the task pool notifies the CPU.

**17 Claims, 6 Drawing Sheets**






Amazon
Exhibit 1001
Page 001

**Related U.S. Application Data**

continuation of application No. 13/750,696, filed on Jan. 25, 2013, now Pat. No. 9,146,777.

(51) **Int. Cl.**
***G06F 9/54*** (2006.01)
***G06F 9/50*** (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 7,159,215 | B2 | 1/2007 | Shavit et al. |
| 7,174,381 | B2 | 2/2007 | Gulko et al. |
| 7,665,117 | B2 | 2/2010 | Sequeria |
| 7,908,313 | B2 | 3/2011 | Lurie |
| 8,037,474 | B2 | 10/2011 | Bates et al. |
| 8,108,867 | B2 | 1/2012 | Robison |
| 8,209,702 | B1 | 6/2012 | Roytman et al. |
| 8,284,206 | B2 | 10/2012 | State |
| 8,533,729 | B2 | 9/2013 | Yao |
| 8,732,713 | B2 | 5/2014 | Coon et al. |
| 8,949,853 | B2 | 2/2015 | Zimmermann |
| 8,990,833 | B2 | 3/2015 | Kuesel et al. |
| 9,325,575 | B2 | 4/2016 | Gray |
| 2005/0188372 | A1 | 8/2005 | Inoue et al. |
| 2006/0026377 | A1 | 2/2006 | Sikdar et al. |
| 2007/0074207 | A1* | 3/2007 | Bates .................... G06F 9/4881 718/1 |
| 2011/0310977 | A1 | 12/2011 | Nishihara et al. |

OTHER PUBLICATIONS

Beni G., Wang J. (1993) Swarm Intelligence in Cellular Robotic Systems. In: Dario P., Sandini G., Aebischer P. (eds) Robots and Biological Systems: Towards a New Bionics?. NATO ASI Series (Series F: Computer and Systems Sciences), vol. 102. Springer, Berlin, Heidelberg.*

US-2008/0168318 A1 Jul. 2008 Dement, Jonathan J.; Wi-Fi Enabled Sensors for the Internet of Things: A Practical Approach; IEEE Communications Magazine—Jun. 2012, pp. 134-143.

Extended European Search Report, dated Feb. 13, 2018; 11pgs.

Kennedy, J.; "Swarm Intelligence", Zomaya, Handbook of Nature—Inspired and Innovative Computing. Springer, Boston, MA (2006), Chap. 6, 35pgs.

Ron Hipschman, "SETI@Home The Search for Extraterrestrial Intelligence", UC Berkeley SETI Project (online), 1997, Available at http://seticlassic.ssl.berkeley.edu/about_seti/about_seti_at_home_1.html.

Julia Evangelou Strait, "Computational biology project aims to better understand protein folding Crowd-sourced computer network delves into protein structure, seeks new disease therapies", The Source (online), Feb. 26, 2019, Washington University in St. Louis, Available at https://source.wustl.edu/2019/02/computational-biology-project-aims-to-better-understand-protein-folding/.


* cited by examiner




FIG. 1

Case: 23-2323 Document: 32 Page: 246 Filed: 04/08/2024




FIG. 2


300
302
304
306
308
310
312
A
314
B
316
C
318
A,B
320
A
322
B
324
C
322
A,B
330
A
332
A
334
B
336
B
340
C
342
C

FIG. 3




FIG. 4




FIG. 5


600
602
Populate task pool
604
Proactively dispatch agent from cell to task pool
606
Retrieve and process task
608
Notify task pool and CPU when task complete
610
Incorporate additional co-processor

FIG. 6

# SYSTEM AND METHOD FOR SWARM COLLABORATIVE INTELLIGENCE USING DYNAMICALLY CONFIGURABLE PROACTIVE AUTONOMOUS AGENTS

## PRIORITY DATA

This application is a continuation of U.S. application Ser. No. 14/340,332, filed Jul. 24, 2014, now U.S. Pat. No. 9,852,004, issued on Dec. 26, 2017, which is a continuation of U.S. application Ser. No. 13/750,696, filed Jan. 25, 2013, now U.S. Pat. No. 9,146,777, issued on Sep. 29, 2015, which are incorporated herein by reference.

## FIELD OF INVENTION

The present invention generally relates to parallel-process computing, and collaborative intelligence, and particularly relates to a processing architecture which involves autonomous co-processors (such as robotic vehicles, Internet of Things (IoT) components, and networked devices) configured to proactively retrieve tasks from a task pool populated by a central processing unit.

## BACKGROUND

The Internet of Things (also referred to as the Cloud of Things) refers to an ad hoc network of uniquely identifiable embedded computing devices within the existing Internet infrastructure. In addition to or in conjunction with IoT, collaborative intelligence portends advanced connectivity of devices, systems, and robotic vehicles. The scope of things contemplated by collaborative intelligence and the IoT is unlimited, and may include devices such as heart monitoring implants, biochip transponders, automobile sensors, aerospace and defense field operation devices, unmanned ground vehicle (UGVs), unmanned aerial vehicles (UAVs), and public safety applications that assist fire-fighters in search and rescue operations, for example. Current market examples include home based networks that involve smart thermostats, light bulbs, and washer/dryers that utilize wifi for remote monitoring. Due to the ubiquitous nature of connected objects in the IoT, it is estimated that more than 30 billion devices will be wirelessly connected to the Internet of Things by 2020. Harnessing the processing capacity of the controllers and processors associated with these devices is one of the objectives of the present invention.

Computer processors traditionally execute machine coded instructions serially. To run a plurality of applications concurrently, a single processor interleaves instructions from various programs and executes them serially, although from the user's perspective the applications appear to be processed in parallel. True parallel or multi-core processing, on the other hand, is a computational approach that breaks large computational tasks into individual blocks of computations and distributes them among two or more processors. A computing architecture that uses task parallelism (parallel processing) divides a large computational requirement into discrete modules of executable code. The modules are then executed concurrently or sequentially, based on their respective priorities.

A typical multiprocessor system includes a central processing unit ("CPU") and one or more co-processors. The CPU partitions the computational requirements into tasks and distributes the tasks to co-processors. Completed threads are reported to the CPU, which continues to distribute additional threads to the co-processors as needed. Presently known multiprocessing approaches are disadvantageous in that a significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.



A multiprocessor architecture in thus needed which reduces CPU management overhead, and which also more effectively harnesses and exploits available co-processing resources.

## SUMMARY OF THE INVENTION

Various embodiments of a parallel processing computing architecture include a CPU configured to populate a task pool, and one or more co-processors configured to proactively retrieve threads (tasks) from the task pool. Each co-processor notifies the task pool upon completion of a task, and pings the task pool until another task becomes available for processing. In this way, the CPU communicates directly with the task pool, and communicates indirectly with the co-processors through the task pool.

The co-processors may also be capable of acting autonomously; that is, they may interact with the task pool independently of the CPU. In a preferred embodiment, each co-processor includes an agent that interrogates the task pool to seek a task to perform. As a result, the co-processors work together "in solidarity" with one another and with the task pool to complete aggregate computational requirements by autonomously retrieving and completing individual tasks which may or may not be inter-related. By way of non-limiting example, suppose a task B involves computing an average temperature over time. By defining a task A to include capturing temperature readings over time, and further by defining task B to including obtaining the captured readings, the CPU and the various co-processors may thereby inferentially communicate with each other via the task pool.

In various embodiments the co-processors are referred to as autonomous, proactive solidarity cells. In this context, the term autonomous implies that a co-processor may interact with the task pool without being instructed to do so by the CPU or by the task pool. The term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor. The term solidarity implies that co-processing cells share a common objective in monitoring and executing all available tasks within the task pool.

A solidarity cell (co-processor) may be a general purpose or special purpose processor, and therefore may have the same or different instruction set, architecture, and microarchitecture as compared to the CPU and other solidarity cells in the system. Moreover, the software programs to be executed and data to be processed may be contained within one or more memory units. In a typical computer system, for example, a software program consists of a series of instructions that may require data to be used by the program. For example, if the program corresponds to a media player, then the data contained in memory may be compressed audio data which is read by a co-processor and eventually played on a speaker.

Each solidarity cell in the system may be configured to communicate, ohmically or wirelessly, with the task pool through a crossbar switch, also known as fabric. In a purely wireless mesh topology, the radio signals themselves may constitute the fabric. In various embodiments, the co-processors may also communicate directly with the CPU. The switching fabric facilitates communication among system resources. Each solidarity cell is proactive, in that it obtains a task to perform by sending its agent to the task pool when the solidarity cell has no processing to perform or, alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation. By way of non-limiting example, in the context of the Internet-of-Things (discussed in greater detail below), a co-processor associated with a device such as a light bulb may be programmed to listen for "on" and "off" commands from a master device (such as a smartphone) as its normal operation, but its processing resources may also be harnessed through a task pool.

In the context of various embodiments described herein, the term agent refers to a software module, analogous to a network packet, associated with a co-processor that interacts with the task pool to thereby obtain available tasks which are appropriate for that co-processor cell. The solidarity cells may execute the tasks sequentially, when the tasks are contingent on the execution of a previous task, or in parallel, when more than one solidarity cell is available and more than one matching tasks are available for execution. The tasks may be executed independently or collaboratively, depending on the task thread restrictions (if any) provided by the CPU. Interdependent tasks within the task pool may be logically combined. The task pool notifies the CPU when a task thread is completed. If a task thread is composed of a single task, then the task pool may notify the CPU at completion of such task. If a task thread is composed of multiple tasks, the task pool may notify the CPU at completion of such chain of tasks. Since task threads may be logically combined, it is conceivable to have a case in which the task pool notifies the CPU after completion of logically combined task threads.

Those skilled in the art will appreciate that interoperability among the CPU and co-processors may be facilitated by configuring the CPU to compose and/or structure tasks at a level of abstraction which is independent of the instruction set architecture associated with the various co-processors, thereby allowing the components to communicate at a task level rather than at an instruction level. As such, devices and their associated co-processors may be added to a network on a "plug and play" basis. Another aspect of this invention provides interoperability within a heterogeneous array of CPUs with different instruction set architectures.

Various features of the invention are applicable to, inter alia, a network of Internet-of-Things devices and sensors; heterogeneous computing environments; high performance computing, two dimensional and three dimensional monolithic integrated circuits; and motion control and robotics.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will hereinafter be described in conjunction with the appended drawing figures, wherein like numerals denote like elements, and:

FIG. **1** is a schematic block diagram of a parallel processing architecture including a CPU, memory, task pool, and a plurality of co-processors configured to communicate through a fabric in accordance with an embodiment;

FIG. **2** is a schematic block diagram illustrating details of an exemplary task pool in accordance with an embodiment;

FIG. **3** is a schematic block diagram of a network including co-processing cells and their corresponding agents interacting with a task pool in accordance with an embodiment;

FIG. **4** is a schematic layout of an internet of things network including available plug and play devices in accordance with an embodiment; and

FIG. **5** is a schematic layout diagram of an exemplary internet of things use case illustrating dynamic harnessing of nearby devices in accordance with an embodiment; and

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment in accordance with an embodiment.

## DETAILED DESCRIPTION

Various embodiments relate to parallel processing computing systems and environments (such as IoT and collaborative intelligence environments), ranging from simple switching and control functions to complex programs and algorithms including, without limitation: robot control, data encryption; graphics, video, and audio processing; direct memory access; mathematical computations; data mining; game algorithms; ethernet packet and other network protocol processing including construction, reception and transmission of data the outside network; financial services and business methods; search engines; internet data streaming and other web-based applications; execution of internal or external software programs; switching on and off and/or otherwise controlling or manipulating appliances, light bulbs, consumer electronics, robotic vehicles, and the like, e.g., in the context of the Internet-of-Things and/or collaborative intelligence systems.

Various features may be incorporated into any presently known or later-developed computer architecture. For example, parallel processing concerns relating to synchronization, data security, out-of-order execution, and main processor interrupts may be addressed using the inventive concepts described herein.

Referring now to FIG. **1**, a distributed processing system **10** for use in connection with, for example, an IoT network or collaborative intelligence system includes a single or multi-core CPU **11** and one or more solidarity or co-processing cells **12**A-**12** configured to communicate with a task pool **13** through a cross-bar switching fabric **14**. The solidarity cells **12** may also communicate with each other through the switching fabric **14** or through a separate cell bus (not shown). The CPU **11** may communicate with the task pool **13** directly or through the switching fabric **14**. One or more memory units **15** each contain data and/or instructions. In this context, the term "instructions" include a software program that may be compiled for execution by the CPU **11**. The memory units **15**, cells **12**, and the task pool **13** may be ohmically or wirelessly interconnected to communicate with the CPU and/or with each other via the switching fabric **14**. In some embodiments, the CPU **11** communicates with the cells **12** only indirectly through the task pool. In other embodiments, the CPU **11** may also communicate directly with the cells **12** without using the task pool as an intermediary.

In some embodiments the system **10** may include more than one CPU **11** and more than one task pools **13**, in which case a particular CPU **11** may interact exclusively with a particular task pool **13**, or multiple CPUs **11** may share one or more task pools **13**. Moreover, each solidarity cell may be configured to interact with more than one task pool **13**.

Alternatively, a particular cell may be configured to interact with a single designated task pool, for example, in a high performance or high security context.

In various embodiments cells may be dynamically paired, ohmically (plug and play) or wirelessly (on the fly), with a task pool when the following three conditions are meet:

1) The cell is able to communicate, ohmically or wirelessly, with the task pool. The connection to the task pool can be through a port in the task pool itself, or through a switching fabric that is connected to the task pool;
2) The task pool recognizes the agent sent by the cell as trustworthy, for example, using input from the user, with or without password, through traditional Wi-Fi, Bluetooth or similar pairing, manually through a graphical software program running on a smartphone or tablet, or by any other secure or unsecure method; and
3) At least one of the available tasks within the task pool is compatible with the capabilities of the solidarity cell.

In the case of a multi-processor environment with multiple task pools, the foregoing dynamic pairing conditions apply, except that a given cell may be locked or restricted to work with only one of the task pools; otherwise, the cells may connect with one or more task pools, using a first found basis, round robin basis or any other selection scheme. It is also possible to assign priorities to the tasks within the task pools, whereby the cells give preference to the high priority tasks and serve the lower priority tasks when not otherwise engaged by the higher priority tasks.

The CPU **11** may be any single or multi-core processor, applications processor or microcontroller, used to execute a software program. The system **10** may be implemented on a personal computer, smart phone, tablet, or Internet-of-Things device, in which case the CPU **11** may be any personal computer, central processor, or processor cluster, such as an Intel® Pentium® or multi-core processor local to or remote from the immediate computing environment. Alternatively, the system **10** may be implemented on a supercomputer and the CPU **11** may be a reduced instruction set computer ("RISC") processor, applications processor, a microcontroller, or the like.

In other embodiments, the system **10** may be implemented on a locally connected series of personal computers, such as a Beowulf cluster, in which case the CPU **11** may include the central processors of all, a subset, or one of the networked computers. Alternatively, the system **10** may be implemented on a network of remotely connected computers, in which case the CPU **11** may be a presently known or later developed central processor for a server or mainframe. The particular manner in which the CPU **11** performs the subject parallel processing methods within the presently described system **10** may be influenced by the CPU's operating system. For example, the CPU **11** may be configured for use within the system **10** by programming it to recognize and communicate with the task pool **13** and divide the computing requirements into threads, as described below.

It is further contemplated that the system **10** may be implemented retroactively on any computer or computer network having an operating system that may be modified or otherwise configured to implement the functionality described herein. As is known in the art, the data to be processed is contained within the memory units **15**, for example in the context of addressable regions or sectors of random access or read-only memory, cache memory for the CPU **11**, or other forms of data storage such as flash memory and magnetic storage. The memory units **15** contain the data to be processed as well as the location to place the results of the processed data. Not every task is required to access the memory units **15**, as in the case of, for example, smart meters and automotive instrumentation, which may return data to the system **10**, or as in the case of a robot and motor controllers which may actuate a mechanism.



Each cell **12** is a conceptually or logically independent computational unit capable of executing one or more tasks/threads. A cell **12** may be a microcontroller, a microprocessor, application processor, a "dumb" switch, or a standalone computer such as a machine in a Beowulf cluster.

A cell **12** may be a general or special purpose coprocessor configured to supplement, perform all of, or perform a limited range of functions of the CPU, or functions that are foreign to the CPU **11** such as ambient monitoring and robotic actuators, for example. A special-purpose processor may be a dedicated hardware module designed, programmed, or otherwise configured to perform a specialized task, or it may be a general-purpose processor configured to perform specialized tasks such as graphics processing, floating-point arithmetic, or data encryption.

In an embodiment, any cell **12** that is a special-purpose processor may also be configured to access and write to memory and execute descriptors, as described below, as well as other software programs.

Moreover, any number of cells **12** may comprise a heterogeneous computing environment; that is, a system that uses more than one kind of processor such as an AMD-based and/or an Intel-based processor, or a mixture of 32-bit and 64-bit processors.

Each cell **12** configured to perform one or a plurality of specialized tasks, as illustrated in the following sequence of events. During a poll phase each cell periodically sends an agent to the task pool until a matching task is found. To facilitate this matching, both the cell and the task pool may be equipped with a transceiver. In the case of the task pool, the transceiver maybe located in the task pool itself or in the switching fabric to which the task pool is connected. When a task match is found within a task pool, the task pool transmits an acknowledgement to the cell. The next step is the "communication channel" phase. During the communication channel phase, the cell receives the task and begins to execute the task. In one implementation, once the first task is completed, the communication channel is maintained so that the solidary cell can fetch another task without having to repeat the "poll" and "acknowledge" phases.

The system **10** may include a plurality of cells, wherein some of the cells are capable of performing the same task types as other cells, to thereby create redundancy in the system **10**. The set of task types performed by a given cell **12** may be a subset of the set of task types performed by another cell. For example, in FIG. **1**, the system **10** may divides an aggregate computational problem into a group of tasks, and populate the task pool **13** with a first type, a second type, and a third type of tasks. A first cell **12**A may capable of performing only tasks of the first type; a second cell **12**B may be capable of perform tasks of the second type; a third cell **12**C may be capable of performing tasks of the third type; a fourth cell **12**D may be capable of performing tasks of the second or third types; and a fifth cell **12**N may be capable of performing all three task types. The system **10** may be configured with this redundancy so that if a given cell is removed from the system **10** (or currently busy or otherwise unavailable), the system **10** may continue to function seamlessly. Furthermore, if a cell is dynamically

added to the system **10**, the system **10** may continue to function seamlessly with the benefit of increased performance.

Referring now to FIGS. **1** and **2**, the task pool **13** may occupy a region of physical memory that is accessible by the CPU **11**. Alternatively, the task pool **13** may be accessible by MAC address or IP address. Multiple embodiments are envisioned for the task pool **13**; it may be physically located with the CPU in the same 2D or 3D monolithic IC, or it may be implemented as a stand-alone IC and be physically interconnected to a computer board, smart phone, tablet, router or Internet-of-Things device. In a further alternative embodiment, the task pool may be a stand-alone multi-port, wired and/or wireless connected device which may be shared among multiple CPU **11** systems, or dedicated to a given CPU **11**. The task pool **13** may also be addressable by the cells **12**. The task pool **13** may be disposed in a dedicated hardware block to provide maximum access speed by the CPU **11** and cells **12**. Alternatively, the task pool **13** may be software based, wherein the contents of the task pool **13** are stored in memory, analogous to the hardware-based embodiment, but represented by data structures.

Upon being populated by the CPU **11**, the task pool **13** contains one or more task threads **21**. Each task thread **21** represents a computational task that may be a component or subset of the larger aggregate computational requirement imposed on the CPU **11**. In one embodiment, the CPU **11** may initialize and then populate the task pool **13** with concurrently executable threads **21**. Each thread **21** may include one or more discrete tasks **22**. A task **22** may have a task type and a descriptor. The task type indicates which cells **12** are capable of performing the task **22**. The task pool **13** may also use the task type to prioritize tasks **22** having the same type. In one embodiment, the task pool **13** may maintain a prioritization table (not shown) that documents the solidarity cells **12** present in the system **10**, the types of tasks **22** each cell is capable of performing, and whether or not each cell is presently processing a task **22**. The task pool **13** may use the prioritization table to determine which of the eligible tasks **22** to assign to a requesting cell, as described below.

In some embodiments, the CPU **11** may retrieve and execute a task or thread from the task pool. Moreover, the CPU **11** may abort any task that is determined to be stale, broken, stuck, or erroneous. In such case, the CPU **11** may refresh the task, making available for subsequent processing. Nothing precludes the CPU **11** from implementing adaptive task management, for example, as may be required by Artificial Intelligence, whereupon the CPU **11** may add, remove, or change tasks within an unfinished existing thread **21**.

The descriptor may contain one or more of a specific instruction to be executed, a mode of execution, the location (e.g., address) of the data to be processed, and the location for placement of the task results, if any. The location for placement of results is optional, such as in the case of animation and multimedia tasks that often present results to a display rather than storing them in memory. Moreover, task descriptors may be chained together, as in a linked list, so that the data to be processed may be accessed with fewer memory calls than if the descriptors were not chained together. In an embodiment, the descriptor is a data structure containing a header and a plurality of reference pointers to memory locations, and the task **22** includes the memory address of the data structure. The header defines the function or instruction to be executed. A first pointer references the location of the data to be processed. A second, optional



pointer, references the location for placement of processed data. If the descriptor is linked to another descriptor to be sequentially executed, the descriptor may include a third pointer that references the next descriptor. In an alternative embodiment where the descriptor is a data structure, the task **22** may include the full data structure.

A thread **21** may further comprise a "recipe" describing the order in which the tasks **22** may be performed and any conditions that affect the order of performance. According to the recipe, the tasks **22** may be executed sequentially, concurrently, out-of order, interdependently, or conditionally according to Boolean operations. For example, in FIG. **2**, thread **21**A comprises four tasks: **22**A, **22**B, **22**C, and **22**D. In the illustrated embodiment, the first task **22**A must be completed before either the second task **22**B or the third task **22**C can begin. According to the recipe, once either the second task **22**B or third task **22**C is complete, the fourth task **22**D may begin.

Threads **21** may also be interdependent. For example, as shown in FIG. **2**, due to the Boolean operation in thread **21**B, a completed task **22**C may allow processing of tasks in thread **21**B to continue. The task pool **13** may lock a task **22** while the task **22** is waiting for completion of another task **22** upon which it depends. When a task **22** is locked, it cannot be acquired by a cell. When the tasks **22** of a thread **21** are completed, the task pool **13** may notify the CPU **11** of the completion. The CPU may then advance processing beyond the completed thread **21**.

The cells advantageously maintain solidarity with each other and with the CPU **11**, thereby helping the system **10** to perform complex computations by autonomously and proactively retrieving tasks from the task pool **13**. The cells **12** act autonomously in that they may act independently of the CPU **11** or any other coprocessor. Alternatively, a cell may be acted upon or instructed directly by the CPU. Each cell acts proactively in that it seeks a task **22** from the task pool **13** as soon as the cell becomes available for further processing.

More particularly, in an embodiment, a cell **12** acquires a task from the task pool by sending an agent **30** to interrogate (search for) the task pool and retrieve an available task **22** that requires completion, is not locked, and that has a task type that can be performed by the cell. Typically, the system **10** has the same number of agents as solidarity co-processing cells. In this context, an agent is generally analogous to a data frame in the networking sense, in that an agent may be equipped with a source address, a destination address, and a payload. In an embodiment, the destination address is the address of the task pool **13** when the agent **30** is seeking a task **22**, and the destination address is the address of the corresponding cell **12** when the agent **30** is returning to its cell with a task **22**. Correspondingly, the source address is the address of the cell **12** when the agent **30** is seeking a task **22**, and the source address is the address of the task pool **13** when the agent **30** is returning to its cell with a task **22**.

In addition, the source and destination addresses may facilitate frame synchronization. That is, the system **10** may be configured to unequivocally differentiate addresses from payload data, so that when the contents of an agent **30** are read, the destination address indicates the beginning of the frame and the source address indicates the end of the frame, or vice versa. This allows the payload to vary in size when it is placed between the addresses. In another embodiment of a variable-size payload, an agent **30** may include a header that indicates the payload size. The header information may be compared to the payload to verify the data integrity. In still another embodiment, the payload may be a fixed length.

When an agent **30** is dispatched to the task pool **13** by its co-processor cell, the payload contains identifying information of the types of tasks the cell **12** can perform. When the agent **30** returns from the task pool **13**, the payload contains the descriptor of the task **22**, either in the form of a memory location or the full descriptor data structure.

In other embodiments, some or all of the agents **30** are autonomous representatives of their respective corresponding cells **12**. That is, each agent **30** may be dispatched by its corresponding cell **12** to retrieve a task **22** any time the cell is idle or capable of performing additional processing. In this way, the processing capacity of the solidarity cells **12** may be more fully exploited, inasmuch as the cells need not wait idly for an instruction from the CPU **11**. This approach has the additional benefit of reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool. These advantages render the system **10** more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU.

Further, the solidarity cells **12**A-**12***n* are ambivalent as to the particular composition of the thread itself. Rather, an agent is only concerned about finding a match between the capabilities of its corresponding cell and an available task **22** to be completed in the task pool **13**. That is, as long as there are available tasks **22** in the task pool **13**, and an available task **22** matches the capability of the cell, then the system may effectively harness the processing capacity of the cell.

Some or all of the solidarity cells **12**A-**12***n* may work independently of each other, or may communicate with each other directly, through the switching fabric **14**, through the task pool **13**, or pursuant to a command or request from the CPU to invoke another solidarity cell to assist in processing, moving, or transmitting data. In one embodiment, the agent **30**A may search for a match between the task type of the ready tasks **22** and the types of tasks that the cell **12**A is able to perform. This architecture may involve hard-coding of the types of tasks that the CPU **11** is configured to create. Thus, if the task pool **13** contains three types of tasks **22**, and the large computational requirement includes a task of a fourth type, this fourth type of task may not be placed in the task pool **13** even if a cell capable of performing tasks of the fourth type is included in or added to the system **10**. Consequently, the CPU **11** may be configured to “learn” or be taught how to create tasks of the fourth type in order to more fully exploit the available processing resources.

In another embodiment, the agent **30**A searches the task **22** descriptors for an executable instruction that matches one of the instructions that that cell **12**A is capable of executing. When a matching task **22** is found, the agent **30**A delivers the descriptor of the matching task **22** to the cell **12**A, whereupon the cell **12**A begins to process the task **22**. In particular, the agent **30**A may deliver the memory address of the descriptor to the cell **12**A, and the cell **12**A retrieves the data structure from memory. Alternatively, where the descriptor’s entire data structure is contained in the task **22**, the agent **30**A may deliver the complete data structure to the cell **12**A for processing. The descriptor informs the cell **12**A which instruction to execute, the location in memory units **15** where the data to be processed may be found, and the location in memory **15** where the results are to be placed. Upon completion of the task **22**, the cell **12**A notifies the task pool **13** to change the status of the selected task **22** from ‘to be completed’ to ‘completed.’ Further, once the cell **12**A finishes a task **22**, the cell may dispatch its agent **30**A to the task pool **13** to seek another task **22**.

Some or all of the agents **30**A-**30***n* may travel through the system **10** by wire or wirelessly, for example, using a Wi-Fi network, wireless Ethernet, wireless USB, wireless bridge, wireless repeater, wireless router, Zigbee®, ANT+® or Bluetooth® pairing, according to the particular architecture and/or implementation of the system **10**. In an embodiment, an agent **30** may be guided to the task pool **13** wirelessly by including a receptor feature at the task pool **13** and further by including a transmitter feature with the cell **12**. Similarly, the task pool may answer wirelessly to the cells by equipping the task pool with a transmitter and the solidarity cells with a receiver. In this manner, the cells may communicate wirelessly with the task pool with or without use of the switching fabric.

In a preferred embodiment, however, some form of switching fabric **14** is used. The switching fabric **14** facilitates connections for data transfer and arbitration between system resources. The switching fabric **14** may be a router or crossbar switch that provides connectivity between the various cells and the task pool. The switching fabric **14** may further provide connectivity between each solidarity cell **12**A-**12***n* and system resources such as the CPU **11**, memory units **15**, and traditional system components including, without limitation: direct memory access units, transmitters, hard disks and their controllers, display and other input/output devices, and other coprocessors. The cells **12**A-**12***n* may be connected physically to the switching fabric **14**, or the cells may be connected wirelessly.

The wireless connection of cells into the system **10** facilitates the dynamic addition and/or removal of cells for use in the system **10**. For example, the CPU **11** may recruit cells from other cell systems, allowing for dynamic expansion and increased performance. In this manner, two or more cell systems (e.g., networks) may share solidarity cells. In one embodiment, a cell that becomes idle may look for and/or be recruited by another system that has a need for additional processing resources, i.e., it has available processing tasks that need to be completed. Similarly, the system **10** may expand performance by incorporating clusters of additional cells for a particular task. For example, the system **10** may enhance performance of an encryption/decryption function, or the processing of audio and/or video data, by incorporating nearby cells capable of performing these tasks.

To guard against undesirable connections, the CPU **11** may provide the task pool **13** with a list of or, alternatively, criteria for identifying trusted and/or untrusted cells as well as authentication requirements or protocols. Moreover, the task pool itself may exclude particular cells on the basis of low performance, unreliable connection, poor data throughput, or suspicion of malicious or otherwise inappropriate activity. In various embodiments, cells **12** may be added to a task pool **13**, or excluded from a task pool **13**, by a user through the use of a smartphone, tablet or other device or application. In one embodiment, a graphical application interface may provide the user with useful statistical and/or iconic information such as location of available cells and other devices, performance gain, or performance penalty, as a result of adding or removing particular cells from a network.

In an alternative embodiment, some or all of the co-processing cells may connect directly to the task pool **13**, such as by a wired configuration that does not require a switching fabric **14** for communication. The wired connection of cells may further facilitate dynamic expansion and contraction of the system **10** analogous to the wireless configuration discussed above, although wired connections

may physical (e.g., manual) integration and extraction of peripheral devices. In either case, scalability of the system is greatly enhanced over conventional parallel processing schemes, as co-processors may be added and removed without reprogramming the CPU **11** to account for the changes to the system **10**.

Referring now to FIG. **3**, a network **300** includes a CPU **302**, a first memory **304**, a second memory **306**, a task pool **308**, a switching fabric **310**, a first co-processing cell **312** configured to perform (execute) type A tasks, a second cell **314** configured to perform type B tasks, a third cell **316** configured to perform type C tasks, and a fourth cell **318** configured to perform both type A and type B tasks. As shown, the task pool **308** is populated (e.g., by the CPU **302**) with tasks (or task threads) **330** and **332** of task type A; tasks **334** and **336** of task type B; and tasks **340** and **342** of task type C. In an embodiment, each cell preferably has a unique, dedicated agent. In particular, cell **312** includes an agent **320**; cell **314** includes an agent **322**; cell **316** includes an agent **324**; and cell **318** includes an agent **326**. Each agent preferably includes an information field or header which identifies the type of tasks its associated cell is configured to perform, for example, a single task or combination of tasks A, B, C.

During operation, when a cell is either idle or otherwise has available processing capacity, its agent proactively interrogates the task pool to determine whether any tasks are in the task queue which are appropriate for that particular cell. For example, cell **312** may dispatch its agent **320** to retrieve one or both of tasks **330** and **332** corresponding to task type A. Similarly, cell **314** may dispatch its agent **322** to retrieve either task **334** or **336** (depending on their relative priorities) corresponding to task type B, and so on. For cells which are capable of performing more than one task type, such as cell **318** configured to perform task types A and B, agent **326** may retrieve any one of tasks **330**, **332**, **334**, and/or **336**.

Upon retrieving a task from the task pool, a cell may then process that task, typically by retrieving data from a particular location in first memory **304**, processing that data, and storing the processed data at a particular location within second memory **306**. When a task is completed, the cell notifies the task pool, the task pool marks the task as completed, and the task pool notifies the CPU that the task is completed. Alternatively, the task pool may notify the CPU when a task thread is completed, inasmuch as a task thread may comprise a single task, a series of tasks, or Boolean combination of tasks. Significantly, the retrieval of tasks and the processing of data by the cells may occur without direct communication between the CPU and the various cells.

Referring now to FIG. **4**, an internet of things network **400** includes a controller (CPU) **402**, a task pool **408**, and various devices **410**-**422**, some or all of which include an associated or embedded microcontroller, such as an integrated circuit (IC) chip or other component which embodies processing capacity. By way of non-limiting example, the devices may include a light bulb **410**, a thermostat **412**, an electrical receptacle **414**, a power switch **416**, an appliance (e.g., toaster) **418**, a vehicle **420**, a keyboard **422**, and virtually any other plug and play device or application capable of interfacing with a network.

In the illustrated embodiment, the controller **402** may be a smartphone, tablet, laptop, or other device which may include a display **404** and a user interface (e.g., keypad) **406** for facilitating user interaction with the various devices on the network. To the extent the processing capacity (e.g., bandwidth) of the controller **402** may be insufficient to adequately support the network, the controller may effectively harvest or recruit processing resources from the peripheral devices via the task pool, for example as explained below in conjunction with FIG. **5**.

Referring now to FIG. **5**, an internet of things network **500** use case illustrates the dynamic harnessing of nearby (or otherwise available) devices. Network **500** includes a primary control unit **502** (e.g., a laptop, tablet, or gaming device), a task pool **504**, a first co-processor device **506**, and a second co-processor device **508**. An exemplary use case in the context of network **500** will now be described.

Suppose a user is playing a video game on her laptop computer **502**. The video game requires detailed computer-generated imagery, and perhaps the processing power in laptop **502** is sufficient to render a single realistic-looking character, but when a second character is introduced onto the screen, the image quality degrades, and the movement of the characters is no longer continuous. The present invention proposes a method to harness the processing power of underutilized computer resources located within the vicinity of, or otherwise available to, the user.

To address the need for additional processing power, the laptop **502** connects to the task pool **504**. In this regard, the laptop itself may be equipped with a task pool, or the task pool may be in the form an external device or application located within wireless reach from the laptop **502**. In the case of an external task pool, the task pool itself could perform the duties of a switching fabric with ports to allow connection to multiple co-processing cells. The laptop **502** populates the task pool **504** with computationally intensive tasks. A nearby underutilized device, such as a smartphone **508**, subsequently connects to the task pool **504** and sends its agent to fetch a matching task type. Consequently, the smart phone **508** becomes a co-processor seamlessly assisting the laptop **502**, thereby enhancing the video game experience. The same method may be repeated in the event other underutilized processing resources exist and are needed. Indeed, even the processing power of an available light-bulb **506** may become a co-processor to the laptop.

FIG. **6** is a flow chart illustrating the operation of an exemplary parallel computing environment. In particular, a method **600** includes populating a task pool with tasks (Step **602**), proactively dispatching one or more agents from one or more corresponding cells to the task pool (Step **604**), retrieving and processing a task (Step **606**), and notifying the task pool and the CPU that the task thread has been performed (Step **608**). The method **600** further includes dynamically incorporating (Step **610**) an additional device into the network, as needed.

A processing system is thus provided which includes a task pool, a controller configured to populate the task pool with a first task, and a first co-processor configured to proactively retrieve the first task from the task pool.

In an embodiment, the first co-processor comprises a first agent configured to retrieve the first task from the task pool without communicating with the controller.

In an embodiment, the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type.

In an embodiment, the first co-processor is further configured to process the first and notify the task pool upon completion of the first task, and the task pool is configured to notify the controller upon completion of the first task.

In an embodiment, the controller and the first co-processor are configured communicate with each other only through the task pool.

In an embodiment, the controller and the first co-processor are configured communicate with each other directly and through the task pool.

In an embodiment, the first co-processor is configured to determine that it has available processing capacity, and to dispatch the agent to the task pool in response to the determination.

In an embodiment, the controller is further configured to populate the task pool with a second task, and wherein the system further comprises a second co-processor having a second agent configured to proactively retrieve the second task from the task pool.

In an embodiment, the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

In an embodiment, the controller and the task pool reside on a monolithic integrated circuit (IC), and the first co-processor does not reside on the IC.

In another embodiment, the controller, the task pool, and the first and second co-processors reside on a monolithic integrated circuit (IC).

A method is also provided for dynamically controlling processing resources in a network of the type including a central processing unit (CPU) configured to populate a task pool with a first task having a first task type. The method includes the steps of: programming a first cell to perform the first task type; adding the programmed first cell to the network; proactively sending a first agent from the first cell to the task pool; searching the task pool, by the first agent, for a task of the first type; retrieving, by the first agent, the first task from the task pool; transporting, by the first agent, the first task to the first cell; processing, by the first cell, the first task; and sending a notification from the first cell to the task pool that the first task is completed.

In an embodiment, the method also includes: marking, by the task pool, the first task as being completed; and sending a notification from the task pool to the CPU that the first task is completed.

In an embodiment, the method also includes configuring the first cell to determine that the first cell has available processing capacity as a predicate to proactively sending the first agent to the task pool.

In an embodiment, the method also includes integrating the first cell into a first device prior to adding the programmed first cell to the network.

In an embodiment, the first device comprises one of a sensor, light bulb, power switch, appliance, biometric device, medical device, diagnostic device, lap top, tablet, smartphone, motor controller, and a security device.

In an embodiment, adding the programmed first cell to the network comprises establishing a communication link between the first cell and the task pool.

In an embodiment, the (CPU) is further configured to populate the task pool with a second task having a second task type, the method further comprising the steps of: programming the second cell to perform the second task type; establishing a communication link between the second cell and the task pool; proactively sending a second agent from the second cell to the task pool; searching the task pool, by the second agent, for a task of the second type; retrieving, by the second agent, the second task from the task pool; transporting, by the second agent, the second task to the second cell; processing, by the second cell, the second task; sending a notification from the second cell to the task pool that the second task is completed; marking, by the task pool, the second task as being completed; and sending a notification from the task pool to the CPU that the second task is completed.



A system is also provided for controlling distributed processing resources in an internet of things (IoT) computing environment, including: a CPU configured to partition an aggregate computing requirement into a plurality of tasks and place the tasks in a pool; and a plurality of devices each having a unique dedicated agent configured to proactively retrieve a task from the pool without direct communication with the CPU.

While there has been illustrated an enabling description of various embodiments including the best mode known to the inventors, it will be understood by those skilled in the art that various changes and modifications may be made and equivalents may be substituted for various elements without departing from the scope of the invention. Therefore, it is intended that the inventions disclosed herein not be limited to the particular embodiments disclosed, but that the invention will include all embodiments falling within the literal and equivalent scope of the appended claims.

I claim:

**1**. A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the plurality of first tasks and the plurality of second tasks are associated with a common objective;

the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

**2**. The collaborative intelligence system of claim **1**, wherein the first co-processor is configured to perform at least one of depositing a new task into the task pool and modifying an existing task within the task pool.

**3**. The collaborative intelligence system of claim **1**, wherein:

the first co-processor includes a first agent;

the second co-processor includes a second agent;

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type; and

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

**4**. The collaborative intelligence system of claim **1**, wherein the first co-processor is configured to determine

when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination.

**5**. The collaborative intelligence system of claim **1**, wherein the controller and the task pool reside on a monolithic integrated circuit (IC) that is not a component of either the first or second co-processors.

**6**. A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: proactively retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor including a second agent comprising a second source address, a second destination address, and a second payload, the second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein:

the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the collaborative intelligence system on a plug-and-play basis without any communication with the controller;

the first co-processor includes a first agent comprising a first source address, a first destination address, and a first payload;

the second co-processor includes a second agent comprising a second source address, a second destination address, and a second payload;

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type;

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type;

further wherein:

when the first agent is retrieving the first task from the task pool, the first source address corresponds to an address associated with the first co-processor, the first destination address corresponds to an address associated with the task pool, and the first payload includes a first function which the first co-processor is configured to perform;

when the first agent is returning from the task pool, the first source address is the task pool's address, the first destination address is the first co-processor's address, and the first payload includes a descriptor of the first task;

when the second agent is retrieving the second task from the task pool, the second source address corresponds to an address associated with the second co-processor, the second destination address corresponds to an address associated with the task pool, and the second payload



includes a second function which the second co-processor is configured to perform; and

when the second agent is returning from the task pool, the second source address is the task pool's address, the second destination address is the second co-processor's address, and the second payload includes a descriptor of the second task.

**7**. The collaborative intelligence system of claim **6**, wherein the first co-processor is configured to perform at least one of depositing a new task into the task pool and modifying a task within the task pool.

**8**. The collaborative intelligence system of claim **7**, wherein the first co-processor is an unmanned autonomous vehicle configured to operate as at least one of a ground vehicle and an aerial vehicle in connection with defense field operations.

**9**. The collaborative intelligence system of claim **7**, wherein the first co-processor is configured to determine when it has available processing capacity, and to dispatch the first agent to the task pool in response to the determination.

**10**. The collaborative intelligence system of claim **7**, wherein neither the controller nor the task pool are incorporated into either the first or second co-processor.

**11**. A method of using collaborative intelligence to achieve an objective, comprising:

populating a task pool, with a controller, such that the task pool includes a plurality of tasks associated with the objective, wherein each of the tasks has a respective task type; and

dynamically introducing into an environment, on a plug-and-play basis without any communication with the controller, a plurality of autonomous co-processors, each of which is compatible with one or more of the task types,

wherein, upon introduction into the environment, the plurality of autonomous co-processors operate in solidarity with each other and the task pool to complete the objective, without communication with the controller, by: proactively retrieving a task having a compatible task type from the task pool; completing the task; and updating the task pool to reflect completion of the task.

**12**. The method of claim **11**, wherein at least one of the plurality of autonomous co-processors are configured to modify an existing task in the task pool.

**13**. The method of claim **11**, wherein at least one of the plurality of autonomous co-processors are configured to add a task to the task pool.

**14**. The method of claim **11**, wherein:

at least one of the plurality of co-processors includes an agent configured to select from the task pool a task of a compatible type and deliver the selected task to the at least co-processors.

**15**. The method of claim **11**, wherein the at least one co-processor is configured to determine whether it has available processing capacity, and to dispatch the agent to the task pool in response to the determination.

**16**. The method of claim **11**, wherein the plurality of autonomous co-processors retrieve the tasks from the task pool via a wireless data connection.

**17**. The method of claim **11**, wherein:

at least one of the plurality of co-processors includes an agent configured to instruct the task pool to select a task of a compatible type and deliver the selected task to the at least co-processors.

* * * * *