Nos. 23-2323, 24-1095

# United States Court of Appeals for the Federal Circuit

SWARM TECHNOLOGY LLC,

*Appellant*,

v.

AMAZON.COM INC., AMAZON WEB SERVICES, INC.,

*Cross-Appellants*.

On Appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board in Nos. IPR2022-00283, IPR2022-00633 Administrative Patent Judges Gregg I. Anderson, Scott B. Howard, and Michael R. Zecher

**PRINCIPAL AND RESPONSIVE BRIEF OF CROSS-APPELLANTS**

Kimberly Q. Li
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Adam M. Greenfield
Gabriel K. Bell
David A. Zucker
Ashley N. Finger
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Cross-Appellants Amazon.com, Inc. and Amazon Web Services, Inc.*

July 19, 2024

Claims 1-2 of U.S. Patent No. 9,852,004 (Appx157) provide:

**1.** A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: retrieve a first task from the task pool; deliver the first task to the first co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: retrieve a second task from the task pool; deliver the second task to the second co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the processing system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller.

**2.** The processing system of claim 1, wherein:

the first task includes indicia of a first task type, the first co-processor is configured to perform tasks of the first type, and the first agent is configured to search the task pool for a task of the first type; and

the second task includes indicia of a second task type, the second co-processor is configured to perform tasks of the second type, and the second agent is configured to search the task pool for a task of the second type.

Proposed substitute claim 13 of the ’004 patent (Appx75-76) provides:

**13.** (Substitute for Claim 1) A processing system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks having indicia of a first task type and a plurality of second tasks having indicia of a second task type;

a first autonomous co-processor configured to perform tasks of the first type and configured to successively: proactively interrogate the task pool to retrieve a first task from the task pool without being instructed to do so by the task pool; deliver the first task to the first autonomous co-processor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first autonomous co-processor and the controller; and

a second autonomous co-processor configured to perform tasks of the second type and configured to successively: proactively interrogate the task pool to retrieve a second task from the task pool without being instructed to do so by the task pool; deliver the second task to the second autonomous co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second autonomous co-processor and the controller;

wherein after the first autonomous co-processor updates the task pool to reflect completion of the first task, the task pool is configured to send a notification to the controller indicating that the first task is completed;

wherein after the second autonomous co-processor updates the task pool to reflect completion of the second task, the task pool is configured to send a notification to the controller indicating that the second task is completed; and wherein the processing system is configured to dynamically accept the first autonomous co-processor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis without any communication with the controller.

Claim 1 of U.S. Patent No. 10,592,275 (Appx173) provides:

**1.** A collaborative intelligence system, comprising:

a task pool;

a controller configured to populate the task pool with a plurality of first tasks and a plurality of second tasks;

a first co-processor configured to successively: proactively retrieve a first task from the task pool; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first co-processor and the controller; and

a second co-processor configured to successively: proactively retrieve a second task from the task pool; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second co-processor and the controller;

wherein the collaborative intelligence system is configured to dynamically accept the first co-processor, the second co-processor, and an additional co-processor into the processing system on a plug-and-play basis without any communication with the controller;

the plurality of first tasks and the plurality of second tasks are associated with a common objective;

the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

# CERTIFICATE OF INTEREST

**Case Number**: 23-2323, 24-1095

**Short Case Caption**: *Swarm Technology LLC v. Amazon.com, Inc.*

**Filing Party/Entity**: Amazon.com, Inc. and Amazon Web Services, Inc., Cross-Appellants

I certify the following information and any attached sheets is accurate and complete to the best of my knowledge.

Date: July 19, 2024 Signature: */s/ Adam M. Greenfield*
Name: Adam M. Greenfield

**1.** **Represented Entities**. Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

Amazon.com, Inc. and Amazon Web Services, Inc.

**2.** **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

None.

**3.** **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. Fed. Cir. R. 47.4(a)(3).

Amazon Web Services, Inc. is a wholly-owned subsidiary of Amazon.com, Inc.

Amazon.com, Inc. is a publicly held corporation and has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   None/Not Applicable

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   Yes.

   If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   None/Not Applicable.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..... iv

TABLE OF AUTHORITIES ..... ix

STATEMENT OF RELATED CASES ..... xiv

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUES ..... 2

A. Swarm's Appeal Issues – '004 Patent ..... 2

B. Amazon's Cross-Appeal Issue – '275 Patent ..... 3

INTRODUCTION ..... 4

STATEMENT OF THE CASE ..... 6

A. The Asserted Patents ..... 6

1. The '004 Patent ..... 6

2. The '275 Patent ..... 7

B. The Prior Art ..... 8

1. Lurie ..... 8

2. Ethernet Specification ..... 10

3. The Combination Of Lurie And Ethernet Specification ..... 12

C. Board Proceedings ..... 12

1. The '004 IPR ..... 12

2. The '275 IPR ..... 19

SUMMARY OF THE ARGUMENT ..... 22

STANDARD OF REVIEW ..... 26

**Page**

ARGUMENT ........................................................................................................27

I. The Board's Determinations That All Issued And Substitute Claims Of The '004 Patent Are Unpatentable Are Proper And Supported By Substantial Evidence........................................................................................27

A. Substantial Evidence Supports The Board's Finding That All Issued Claims Would Have Been Obvious ........................................28

1. Substantial Evidence Supports The Board's Finding That Lurie And Ethernet Specification Render Obvious The "Agent … Configured To Search The Task Pool" ...................28

2. Swarm's Claim Construction Challenge Is Forfeited, And In Any Event Irrelevant ..........................................................35

3. Swarm's Remaining Scattershot Challenges Re-Litigate The Board's Fact Findings And Misapprehend Its Decision ...........................................................................36

B. Substantial Evidence Supports The Board's Finding That The Substitute Claims Add New Matter ..................................................45

1. Substantial Evidence Supports The Board's Finding That The '332 Application Lacks Support For Adding Co-Processors "without any communication with the controller" ..........................................................................46

2. Swarm's Claim Construction Challenge Is Forfeited And Meritless...........................................................................48

C. The Board Correctly Held That The Substitute Claims Lack Patent-Eligible Subject Matter ..........................................................51

1. The Substitute Claims Are Directed To The Abstract Idea Of A Scrum Board ..................................................................52

2. The Substitute Claims Lack An Inventive Concept .................61

II. The Board's Determination That The '275 Patent Claims Are Not Unpatentable Should Be Vacated..................................................................67

**Page**

A. The Board Incorrectly Construed "Proactively" .................................68

B. The Board Violated The Law Of Obviousness In Evaluating Lurie .........................................................................................74

CONCLUSION .........................................................................................78

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3M Innovative Properties Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) ....................71

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) ....................58

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
573 U.S. 208 (2014)....................5, 62

*Apple Inc. v. MPH Technologies Oy*,
28 F.4th 254 (Fed. Cir. 2022) ....................69

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................44

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ....................26

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
616 F.3d 1249 (Fed. Cir. 2010) ....................50

*Beteiro, LLC v. DraftKings Inc.*,
104 F.4th 1350 (Fed. Cir. 2024) ....................62

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ....................64

*Chef America, Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ....................50, 51

*Credit Acceptance Corp. v. Westlake Services*,
859 F.3d 1044 (Fed. Cir. 2017) ....................60

*DDR Holdings*, *LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ....................56, 62

**Page(s)**

*Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ....................43

*Elbit Systems of America, LLC v. Thales Visionix, Inc.*,
881 F.3d 1354 (Fed. Cir. 2018) ....................23, 35, 39, 41

*Eolas Technologies Inc. v. Amazon.com, Inc.*,
Nos. 2022-1932, et al., 2024 WL 371959 (Fed. Cir. Feb. 1, 2024) ....................62

*Ericsson, Inc. v. TCL Communication Technology Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020) ....................24, 58

*FairWarning IP, LLC v. Iatric System, Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................57

*Fleming v. Cirrus Design Corp.*,
28 F.4th 1214 (Fed. Cir. 2022) ....................41, 42, 46

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
607 F.3d 776 (Fed. Cir. 2010) ....................51

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ....................53, 61

*IOENGINE, LLC v. Ingenico Inc.*,
100 F.4th 1395 (Fed. Cir. 2024) ....................48

*Juniper Networks Inc. v. Swarm Technology LLC*,
No. 3:2-cv-03137, 2022 WL 3031211 (N.D. Cal. Aug. 1, 2022)....................52

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022) ....................70, 71, 74

*In re Killian*,
45 F.4th 1373 (Fed. Cir. 2022) ....................26

*Medytox, Inc. v. Galderma S.A.*,
71 F.4th 990 (Fed. Cir. 2023) ....................26, 44

**Page(s)**

*Novartis AG v. Torrent Pharmaceuticals Ltd.*,
853 F.3d 1316 (Fed. Cir. 2017) ....................................................................66

*Novartis Pharmaceuticals Corp. v. Accord Healthcare, Inc.*,
38 F.4th 1013 (Fed. Cir. 2022) ....................................................................46

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) ....................................................................39

*PersonalWeb Technologies LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ..............................................................56, 57

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ......................................................35, 49, 69

*Regeneron Pharmaceuticals, Inc. v. Merus N.V.*,
864 F.3d 1343 (Fed. Cir. 2017) ..............................................................77, 78

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
76 F.4th 1376 (Fed. Cir. 2023) ....................................................................35

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001) ....................................................................72

*SAP America, Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ....................................................................62

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................................................................69

*Shoes by Firebug LLC v. Stride Rite Children's Group, LLC*,
962 F.3d 1362 (Fed. Cir. 2020) ....................................................................38

*Simio, LLC v. FlexSim Software Products, Inc.*,
983 F.3d 1353 (Fed. Cir. 2020) ....................................................................63

*Sisvel International SA v. Sierra Wireless, Inc.*,
81 F.4th 1231 (Fed. Cir. 2023) ....................................................................44

*Swarm Technology LLC v. Amazon.com Inc.*,
561 F. Supp. 3d 861 (D. Ariz. 2021) ............................................................51

**Page(s)**

*Teva Pharmceuticals International GmbH v. Eli Lilly & Co.*,
8 F.4th 1349 (Fed. Cir. 2021) ....................26, 39

*TQ Delta, LLC v. CISCO Systems, Inc.*,
942 F.3d 1352 (Fed. Cir. 2019) ....................40

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ....................58, 66

*Unwired Planet, LLC v. Google Inc.*,
841 F.3d 995 (Fed. Cir. 2016) ....................25, 76

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ....................59

*In re Warsaw Orthopedic, Inc.*,
832 F.3d 1327 (Fed. Cir. 2016) ....................36

*Wasica Finance GmbH v. Continental Automotive Systems, Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ....................72

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) ....................60

*Yeda Research v. Mylan Pharmceuticals, Inc.*,
906 F.3d 1031 (Fed. Cir. 2018) ....................66

*Yu v. Apple Inc.*,
1 F.4th 1040 (Fed. Cir. 2021) ....................52

**STATUTES AND REGULATIONS**

28 U.S.C. § 1295(a)(4)(A) ....................1

35 U.S.C. § 101 ....................5, 19

35 U.S.C. § 141(c) ....................1

35 U.S.C. § 142 ....................1

35 U.S.C. § 316(d)(3) ....................46

**Page(s)**

35 U.S.C. § 319 .......... 1

37 C.F.R. § 42.121(d)(1) .......... 46

37 C.F.R. § 90.2(a) .......... 1

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the lower court was previously before this or any other appellate court.

The two patents at issue in these consolidated appeals, U.S. Patent Nos. 9,852,004 ("'004 patent") and 10,592,275 ("'275 patent"), are also asserted in *Swarm Technology, LLC v. Amazon.com, Inc. & Amazon Web Services, Inc.*, No. 2:21-cv-00438 (D. Ariz.) and *Juniper Networks, Inc. & Apstra, Inc. v. Swarm Technology LLC*, No. 3:20-cv-03137 (N.D. Cal.). Both of those actions are stayed pending the outcome of these and other appeals.

These patents are also at issue in *Juniper Networks, Inc. v. Swarm Technology LLC*, IPR2021-01445 and IPR2022-00141 (together, the "Juniper IPRs"), appeals from which have been consolidated as *Juniper Networks, Inc. v. Swarm Technology LLC*, Nos. 23-1980 and 23-2076 (Fed. Cir.) (the "Juniper Appeal").

The Juniper IPRs and Juniper Appeal involve distinct prior art and arguments that do not overlap with the issues in these appeals.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board ("Board") issued its final decision on the '275 patent on August 28, 2023. Appx107-142. Amazon Web Services, Inc. and Amazon.com, Inc. (collectively, "Amazon") timely appealed on October 27, 2023, pursuant to 35 U.S.C. § 142 and 37 C.F.R. § 90.2(a). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

## STATEMENT OF THE ISSUES

### A. Swarm's Appeal Issues – '004 Patent

1. Whether substantial evidence supports the Board's finding that the only limitation in dispute—an "agent configured to … search the task pool"—would have been obvious to a skilled artisan over the Lurie and Ethernet prior art, given (i) the Board's extensive analysis and citation of prior art and the "persuasive testimony" of Amazon's expert; and (ii) Swarm's reliance on a new claim construction not raised below.

2. Whether substantial evidence supports the Board's finding that, in Swarm's substitute claims, the limitation "without any communication" introduced new matter not found in the original application, given (i) Swarm's concession that every example in the original application requires "direct" or "indirect" communication, and (ii) Swarm's reliance again on a construction not raised below—this time that "without *any* communication" allows indirect communication.

3. Whether the Board correctly determined that Swarm's substitute claims are also ineligible under 35 U.S.C. § 101 given that they recite nothing more than a computerized version of a project management task board (or "scrum board") implemented using generic computer hardware (e.g., "processors").

### B. Amazon's Cross-Appeal Issue – '275 Patent[1]

Whether the Board erred by narrowly construing the term "proactively" to exclude processors that receive an initial kickoff notification, even when those processors admittedly "can retrieve and complete additional tasks without further notifications"—improperly excluding the specification's examples of what qualifies as "proactively" and otherwise violating the principle that "combinations of prior art that sometimes meet the claim elements are sufficient to show obviousness."

[1] Amazon—the appellee in No. 23-2323 and appellant in No. 24-1095—is identified as "Cross-Appellant" per the consolidation order. CAFC No. 23-2323 ECF No. 14.

# INTRODUCTION

These consolidated appeals address Board final written decisions in two IPRs challenging related Swarm patents.

For the ’004 patent, the Board found all issued claims and all substitute claims to be unpatentable, and those findings are well-supported. Swarm largely seeks to re-litigate facts and raise claim construction issues for terms it never asked the Board to construe.

*First*, Swarm argues that the Board erred by finding that the prior art combination of Lurie and Ethernet Specification renders obvious an “agent … configured to search the task pool.” Having not sought a construction below, Swarm asks this Court to construe this term to “require[] the ability to evaluate and choose among different tasks within the task pool in order to selectively retrieve one with an appropriate task type.” Blue Br. 18-19. This belated claim construction lacks merit. It also would not change the outcome, as the Board correctly found that it would have been obvious for Lurie’s co-processors to “dispatch an agent … to search for” and “determine” “tasks that the [co-processor] can perform.” Appx41-42. That finding is supported by substantial evidence, including the Board’s detailed analysis of Lurie and reliance on the “persuasive testimony” of Amazon’s expert. Appx42.

*Second*, as to the substitute claims, Swarm argues that the Board erred by finding that the negative limitation “without any communication with the controller”

lacks written description support. Swarm relies on a construction that would rewrite the claim phrase "without *any* communication" to allow "indirect communication." This construction—not presented previously—was forfeited. Regardless, the Board correctly analyzed the claim according to its plain terms, precluding "any" communication between the recited components. Swarm does not contend there is written description support under that plain language understanding.

*Third*, Swarm challenges the Board's holding that Swarm's substitute claims are ineligible under 35 U.S.C. § 101 and *Alice Corp. Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014). The Board got it right. The claims are directed to the abstract idea of a "scrum board," a longstanding project management technique in which a manager lists tasks on sticky notes on a centralized board and each team member takes a note, performs that task, and marks it complete. Appx90. The claims lack an inventive concept because they do nothing more than apply this abstract idea using generic computer components. The Board's determinations on the '004 patent are supported by substantial evidence and should be affirmed.

For the '275 patent, by contrast, the Board erred by adopting an improperly narrow claim construction of what constitutes a "proactive" processor. The Board's construction excluded processors that receive an initial "kickoff" notification, even when those processors later "can retrieve and complete additional tasks without further notifications." Appx136-137. That construction is contrary to the plain

meaning of the term and the specification's examples of what qualifies as "proactively."

## STATEMENT OF THE CASE

### A. The Asserted Patents

#### 1. The '004 Patent

The '004 patent describes a distributed processing system having a central processing unit ("CPU," also called a "controller") that places tasks into a "task pool." Appx143, Appx156 (Abstract, 11:35-45). Worker units ("co-processors," also called "solidarity cells") "retrieve tasks" from the pool, "process" the tasks, and notify the task pool when "completed." Appx143, Appx150-151 (Abstract, 2:36-38, Fig. 6). Each co-processor can utilize an "agent," which is "analogous to a network packet" or "data frame," to monitor the task pool, search for and retrieve compatible tasks, and notify the task pool when tasks are complete. Appx150-151 (2:40-46, Fig. 6).

The '004 patent admits the patentee did not invent the concept of distributing tasks to co-processors in a computer system. Appx151 (1:56-2:1). Nor does it purport to invent novel hardware: the "CPU" may be "any single or multi-core processor," such as any "personal computer," and the "co-processors" can be any known "microcontroller … microprocessor … or a standalone computer." Appx153

(5:17-6:12). Indeed, the alleged inventions can be "implemented retroactively on any known computer or computer network." Appx153 (5:45-5:49).

The claims recite the task pool concept at a high level with generic components. Claims 2 and 3, for example, recite a "processing system" with:

- a "task pool";
- a "controller configured to populate the task pool" with tasks of various "type[s]";
- a "first" and "second" "co-processor" each "configured to": "retrieve" a task, "deliver" the task, "process" the task, "generate … resulting data," and "update the task pool to reflect completion"; and
- an "agent" for each co-processor, which is "*configured to search the task pool for tasks*" to be retrieved and processed by the co-processor.

Appx157-158 (emphasis added).

**2. The '275 Patent**

The '275 patent is a continuation of the '004 patent and shares a nearly identical specification. Its claims are substantially similar, but add that the co-processors must "*proactively* retrieve" tasks from the task pool. Appx173-174 (cls. 1, 6, 11) (emphasis added). That is the only '275 patent limitation at issue in this appeal.

The specification describes three ways in which a co-processor (or solidarity cell) can proactively retrieve a task:

1. "The term proactive suggests that each co-processor may be configured (e.g. programmed) to *periodically send an agent to monitor the task pool* for available tasks appropriate to that co-processor."

2. "Each solidarity cell is proactive, in that it obtains a task to perform by *sending its agent to the task pool when the solidarity cell has no processing to perform* or, alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation."

3. "Each cell acts proactively in that it seeks a task 22 from the task pool 13 *as soon as the cell becomes available for further processing*."

Appx167-168, Appx170 (2:48-54, 3:8-12, 8:35-38) (Summary of the Invention and Detailed Description) (emphasis added).

## B. The Prior Art

### 1. Lurie

U.S. Patent Application Publication No. 2007/0124363 ("Lurie") is undisputedly prior art to the '004 and '275 patents. Like these patents, Lurie discloses a distributed computing system in which tasks are distributed to a pool, and then taken and executed one-by-one by remote processors. Appx1219-1277 at Appx1226, Appx1253 (Lurie Fig. 3B, ¶71).[2]

[2] All citations to Lurie throughout are to the copy submitted in the '004 IPR.

The Petition, and therefore this appeal, focuses only on Lurie's "automated task distribution mode," depicted in Figure 3B:




*Fig. 3B*

Appx341-438 at Appx360 (annotated Lurie Fig. 3B).

As shown, a "technical computing client" ("TCC," yellow) submits tasks to be performed. Tasks submitted from the TCC are placed into an "Automatic Task Distribution Mechanism" ("ATD Mechanism," green), which "make[s] them available for distribution to any of the technical computing workers" ("TCWs," blue). Appx1253 (Lurie ¶¶71-72). Swarm concedes that the TCC corresponds to

the claimed controller, the ATD Mechanism corresponds to the claimed task pool, and each TCW corresponds to a claimed co-processor.

As Lurie explains, each TCW "takes a task from" the ATD Mechanism, computes the result, and provides the result back to the ATD Mechanism. Appx1253 (Lurie ¶¶71-72). The TCC does "not … specify the name of a particular technical computing worker [TCW]" and "is not required to have any specific knowledge of the technical computing workers [TCWs]." Appx1253 (Lurie ¶71). Instead, each task in the ATD Mechanism can be taken by "any available" TCW, if appropriate. Appx1253 (Lurie ¶71).

Lurie's system includes various types of tasks and TCWs, not all of which are inter-compatible. Appx1249-1252, Appx1255-1256, Appx1266-1267 (Lurie ¶¶33, 31, 46, 53, 55, 58, 65, 81, 182-83 (describing various types of tasks and workers in Lurie)). Accordingly, each TCW searches for and takes from the ATD Mechanism only tasks that are appropriate for it to complete based on the "operational and/or performance characteristics of the [TCW]." Appx1255 (Lurie ¶81); *see also* Appx1253-1254 (Lurie ¶72).

**2. Ethernet Specification**

*The Ethernet – A Local Area Network, Data Link Layer, and Physical Layer Specifications* ("Ethernet Specification") is the Ethernet networking standard specification published in 1980.

Ethernet Specification describes sending data through a network by formatting the data into "frames," each having five fields: (i) destination address, (ii) source address, (iii) type, (iv) data, and (v) frame check sequence (for error checking). Appx1286-1377 at Appx1314-1315. Figure 6-1 (Appx1315) shows this structure:




Figure 6-1: Data Link Layer Frame Format

Ethernet Specification uses this frame format to define a "local area network" protocol, which is "intended primarily for use in such areas as … distributed data processing." Appx1296. Its "main objective[]" is "compatibility," such that "every

implementation of the Ethernet be able to exchange data with every other implementation." Appx1297.

### 3. The Combination Of Lurie And Ethernet Specification

The various devices in Lurie's system can be "distributed … on a network," and can be "connected … through a variety of connections including" Local Area Networks, or "LAN[s]." Appx1219, Appx1250 (Lurie Abstract, ¶52). Ethernet Specification describes a LAN protocol, and contemporaneous publications confirm that Ethernet "has been the ubiquitous standard of choice" for LANs for decades. Appx1296 (Ethernet Specification); Appx1480-1485 at Appx1480 (Tang); *see also* Appx1486-1491 at Appx1486 (Hamblen) (reiterating that Ethernet was "ubiquitous" as a shorthand for "LAN").

Ethernet Specification also states that it "is intended primarily for use in such areas as … distributed data processing," to which Lurie is directed. Appx1296; *see* Appx1219 (Lurie Title: "Instrument-Based Distributed Computing System").

## C. Board Proceedings

### 1. The '004 IPR

On December 8, 2021, Amazon filed an IPR challenging all '004 patent claims, 1-12, as obvious on the following grounds:

| Claims | Grounds |
|---|---|
| 1 | Lurie |
| 2-3, 6-11 | Lurie and Ethernet Specification |

| | |
|---|---|
| 4-5 | Lurie, Ethernet Specification, and Sander |
| 12 | Lurie, Ethernet Specification, and Chow |

Appx341-438 (Pet.).[3] The Board instituted the IPR. Appx1744-1776.

Thereafter, Swarm filed a contingent motion to amend ("MTA"), proposing substitute claims 13 and 14 if issued claims 1 or 2 were unpatentable. Appx2. Amazon opposed the MTA. Appx2343-2385 at Appx2353-2375. The Board issued preliminary guidance that the substitute claims improperly added new matter (lacking written description) and failed to claim eligible subject matter under § 101. Appx3304-3323. Rather than propose different substitute claims, Swarm filed a Reply to Amazon's Opposition, and Amazon filed a Sur-reply. Appx3670-3692 at Appx3678-3687. The Board held an oral hearing. Appx4075-4151 (Tr.).

On June 20, 2023, in its Final Written Decision, the Board (1) found that all claims 1-12 were obvious over the identified prior art, including Lurie and Ethernet, and (2) denied Swarm's motion to amend because substitute claims 13 and 14 lacked written description support and patent-eligible subject matter. Appx1-106. The Board did not reach Amazon's other unpatentability arguments regarding substitute claims 13 and 14, including indefiniteness and obviousness. *See* Appx2343-2385 (MTA Opp.); Appx74-103.

---

[3] Swarm does not appeal the Board's finding that claim 1 is unpatentable, Blue Br. 2 n.1, and raises no issues regarding Sander, Chow, or claims 4-12. Accordingly, only Lurie and Ethernet Specification are at issue in this appeal.

#### a. The Board's Determination That All '004 Patent Claims Were Obvious

The Board determined that Lurie's distributed processing system renders claim 1 obvious. Appx18. Swarm did not dispute that Lurie's TCC is a "controller," Lurie's ATD Mechanism is a "task pool," and Lurie's TCWs are "co-processors." Appx25-32. The Board credited Lurie's teaching that "multiple TCWs (first co-processor and second co-processor) 'take[] a task from the [ATD Mechanism] 260 for technical computing of the task, compute a result for the task and provide[] the result back to the [ATD mechanism].'" Appx32 (alterations by Board) (quoting Appx1253-1254, Appx1226 (Lurie ¶72, Fig. 3B)). On appeal, Swarm does not contest these fact findings or the Board's ultimate determination that Lurie renders obvious claim 1.

The Board further concluded that the combination of Lurie and Ethernet Specification renders claims 2 and 3 obvious. Appx33-63. The only part of this determination that Swarm challenges on appeal is the Board's underlying finding that the combination renders obvious the "agent" limitation in claims 2 and 3: "the first[/second] agent is configured to search the task pool for a task of the first[/second] type." Appx7.

The Board's finding was based on the plain teachings of Lurie and Ethernet Specification, as well as expert testimony of Dr. Lowenthal regarding how a skilled artisan would have understood Lurie's disclosure and combined the references.

Because the ’004 patent “explicitly recites that ‘an agent is generally analogous to a data frame in the networking sense,’” the Board agreed with Dr. Lowenthal that a skilled artisan would consider the “data frames” of Ethernet Specification to be “agents.” Appx47 (crediting Dr. Lowenthal’s testimony (Appx689-848 at Appx787-788 (¶214))); *see* Appx152, Appx154 (3:12-17, 8:30-37).[4] Further, because Lurie teaches that its TCWs communicate with the ATD Mechanism over a Local Area Network, of which Ethernet Specification was a well-known example, the Board found it would have been obvious to use Ethernet data frames as agents to assist Lurie’s TCWs in retrieving tasks from the ATD Mechanism. Appx45-49 (citing Appx1250 (Lurie ¶51), Appx787 (Lowenthal ¶213)).

As the Board further explained, Lurie’s system “determine[s] or select[s]” which TCW retrieves and performs each particular task based on the “operational and/or performance characteristics” of the TCW. Appx40 (quoting Appx1255 (Lurie ¶81)). Because Lurie states that the tasks in the ATD Mechanism are “available for distribution to *any* of the [TCWs],” “it is clear that it is the TCWs that are selecting the tasks from the ATD Mechanism.” Appx41 (Board-added emphasis) (quoting Appx1253-1254 (Lurie ¶72)). Thus, as the Board concluded, when Ethernet data frames are combined with Lurie, “the data frames sent by the TCWs

---

[4] All citations to the common specification are to the ’004 patent unless otherwise indicated.

in Lurie as modified by Ethernet Specification *act as agents which search the ATD Mechanism* for tasks that the TCW can perform." Appx39-43, Appx48 (emphasis added).

The Board further credited Dr. Lowenthal's "persuasive testimony" to conclude that "even if Lurie [was] silent as to how TCWs are determined/selected for each task" it nonetheless "would have been obvious" to a skilled artisan "to have the TCW dispatch an agent to select a task that the TCW can perform"—i.e. to perform the claimed searching. Appx41-42 (citing Appx774-785 (Lowenthal ¶¶190-208)).

By contrast, the Board found that Swarm's arguments misstated the Petition, added limitations "not included in the claims," and "d[id] not address the actual system described in Lurie." Appx42-48.

Accordingly, the Board found that the combination of Lurie and Ethernet Specification taught "the first[/second] agent is configured to search the task pool for a task of the first[/second] type," which along with the other limitations not challenged on appeal, was sufficient to find obvious all challenged claims.

#### b. The Board's Finding That Substitute Claims 13-14 Lack Written Description Support

As noted above, Swarm filed a contingent motion to amend, if issued claims 1 or 2 were found unpatentable. Substitute claim 13 recites, in relevant part:

> wherein the processing system is configured to *dynamically accept* the first autonomous co-processor, the second autonomous co-processor, and *an additional autonomous co-processor into the processing system* on a plug-and-play basis *without any communication with the controller*.

Appx76 (emphasis altered). Claim 14 depends from claim 13 and so recites the same.

The Board denied Swarm's motion, finding that Swarm failed to meet its burden to show "support in the original disclosure of the patent for each claim that is added or amended." Appx79. As the Board explained, Swarm failed to identify any support in the original '332 Application for the negative limitation of adding an additional co-processor "without any communication with the controller." Appx80.

To the contrary, the majority of passages identified by Swarm either did not contain "any reference to the negative limitation," or "demonstrate[] that such communication exists." Appx81-82. For example, the '332 Application states that the "CPU ... may recruit" new co-processors, confirming communication between the CPU/controller and the co-processors it recruits. Appx82 (quoting Appx1849-1887 at App1866 ('332 Application ¶52)).

Swarm further relied on an embodiment in which co-processors "connect directly to the task pool," and therefore in Swarm's view did not "communicat[e] with the CPU *directly*." Appx83-84 (Board-added emphasis). As the Board noted, however, the '332 Application states that in this instance the co-processors still communicate with the CPU/controller "indirectly through the task pool." Appx84

(quoting Appx1855 (’332 Application ¶24)). Because the claim requires adding processors “without *any* communication with the controller,” the Board held that indirect communication is also prohibited, and therefore this passage did not support the negative limitation of “without any communication.” Appx83-84 (emphasis added).

#### c. The Board’s Holding That Substitute Claims 13 and 14 Are Not Patent Eligible

The Board also held that substitute claims 13 and 14 lack patent-eligible subject matter under § 101. *See* Appx84-103 & nn.27-28.

At *Alice* step one, the Board explained that these claims are directed to the abstract idea of a “scrum board,” which is “a fundamental human activity long used for project management” in which “‘a project manager list[s] tasks on sticky notes and post[s] them on one side of a board,’” and “‘[a]s the team members collect and perform each task, they individually move the notes from the “incomplete” side of the board to … the “complete” side of the board.’” Appx90 & n.30 (citation omitted). This process “can be completely performed by humans using pens and paper,” and Swarm’s claims simply “apply th[is] well-known process to a specific computer environment” by “replac[ing] … the manager with a controller, the scrum board with a task pool, and the workers with autonomous co-processors.” Appx92.

At step two, the Board found that the claims lack any inventive concept beyond the abstract idea because “nothing in proposed substitute claims 13 and 14

defines an improvement in … computer architecture." Appx97. Instead, the specification confirms that a "controller, a task pool, and autonomous co-processors," are "typical" computer components, and that the invention can be utilized using conventional hardware, namely "*any presently known* or later-developed *computer architecture*." Appx94 (emphasis added) (citing Appx151, Appx153 (1:56-61, 2:11-14, 6:56-58), Appx98 ("[T]he proposed substitute claims merely use conventional hardware and conventional architecture." (citing Appx152-153 (4:24-25, 5:61-6:17))). Thus, the Board held that any alleged claimed improvement "is the result of the use of the concept of a scrum board"—the abstract idea—not any innovation in computer architecture. Appx98.

The Board concluded Swarm's substitute claims are ineligible under § 101.

**2. The '275 IPR**

Amazon filed a separate IPR challenging all claims, 1-17, of the '275 patent as obvious over Lurie, Ethernet Specification, and other references not relevant to this appeal. Appx4266-4361 (Pet.). The Board instituted the IPR. Appx6363-6413. Swarm again filed a contingent motion to amend ("MTA"), which was followed by Amazon's Opposition, the Board's Preliminary Guidance, Swarm's Reply, and Amazon's Sur-Reply. Appx108. The Board held a hearing. Appx9027-9092 (Tr.).

On August 28, 2023, in its Final Written Decision, the Board *sua sponte* construed the term "proactively" and found the claims not unpatentable under that construction.

**a. The Board's Construction of "Proactively"**

Each independent claim of the '275 patent requires a "co-processor configured to … proactively retrieve" or "co-processors … proactively retrieving" tasks from a task pool. Appx173-174 ('275 patent cls. 1, 6, 11).

The Board first recounted the parties' positions: Amazon's Petition explained that the prior art, including Lurie, rendered obvious the challenged claims "under any reasonable construction, including their plain meaning." Appx116. In its Response, Swarm conceded that the term "proactively" was entitled to its "plain and ordinary meaning," which it argued was "a co-processor configured to seek/obtain a new task as the co-processor becomes available to perform further processing." Appx117-118 (citation omitted). In its Reply, Amazon explained that Swarm's argument ignores the specification's statement that "proactive" includes that "each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor." Appx117; Appx7080-7117 at 7098; Appx167 ('275 patent 2:48-51).

The Board initially construed "proactively" to mean "initiating change rather than reacting to events (i.e., not being told to act or not reactionary)." Appx118.

The Board acknowledged that this construction came from neither party, nor from the ’275 patent, which the Board claimed “does not define the claim term ‘proactively’ with reasonable clarity, deliberateness, and precision.” Appx118. The Board noted the patent’s statement that “[t]he term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor,” and another statement that “[e]ach cell acts proactively in that it seeks a task 22 from the task pool 13 as soon as the cell becomes available for further processing.” Appx119-120 (emphases and citations omitted). But the Board dismissed these as mere “suggest[ion]s” or “examples.” Appx119-120.

Importantly, the Board explained further that under its construction, the presence of an initial “kickoff” notification that tasks are available categorically precludes any later proactivity. Appx136-137 (stating that “it does not matter that [the co-processors] can retrieve and complete additional tasks without further notifications” because that is “[c]ontrary to our construction”).

Specifically, Amazon contended that Lurie describes “only one kickoff notification” that “initially starts the processing,” after which “each TCW repeatedly retrieves and processes tasks,” without any further notification or instruction, “until all tasks have been completed.” Appx133-134. This procedure, as Amazon and Dr. Lowenthal explained, was the well-known “bag-of-tasks” technique. Appx134

(citing Appx7342-7347 (Lowenthal ¶¶71-76)). The Board agreed that Lurie does, in fact, use a "kickoff notification" process. Appx135-136.

However, the Board concluded that Lurie does not teach "proactively retriev[ing]" tasks. Appx137. The Board stated that because Lurie's TCWs "only take[] a task after receiving a kickoff notification," they are "not acting proactively" as to the first task or any subsequent task, regardless of the fact that each TCW "can retrieve and complete additional tasks without further notifications." Appx136-137 (stating that a co-processor that "require[s] a kickoff notification to retrieve a first task" is "[c]ontrary to our construction" of proactively, regardless of the independent retrieval of additional tasks).

Because it concluded that Lurie did not disclose "proactively retrieving" tasks under its construction, the Board did not evaluate whether Lurie or the other prior art disclosed the remaining limitations of the '275 patent claims. Nor did the Board reach Swarm's contingent motion to amend.

## SUMMARY OF THE ARGUMENT

**Swarm's Appeal**

The Board's determination that all claims and substitute claims of the '004 patent are unpatentable should be affirmed.

1. The Board found that the combination of Lurie and Ethernet Specification renders obvious an "agent … configured to search the task pool" in the

’004 patent. That decision is supported by substantial evidence, including the ’004 patent’s express admission that a “networking … data frame” like Ethernet can be an “agent,” Lurie’s teaching that its TCWs “determine[] or select” which tasks in the task pool are appropriate for them to take, and the Board’s crediting of Dr. Lowenthal’s “persuasive testimony” regarding how a skilled artisan would have obviously implemented Lurie using Ethernet Specification.

Swarm’s arguments otherwise lack merit. It argues for a new, narrow construction of “search,” but this is forfeited; Swarm never asked the Board to construe this term, and the Board did not do so. *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1357 n.3 (Fed. Cir. 2018). Regardless, the Board’s well-supported finding that “the data frames sent by the TCWs in Lurie as modified by Ethernet Specification act as agents which search the ATD Mechanism” supports the obviousness of this limitation even under Swarm’s new proposed construction. Appx48. Swarm’s remaining arguments improperly reargue, without regard to the standard of review, factual disputes that the Board already rejected regarding what Lurie teaches and Dr. Lowenthal explained.

2. Substantial evidence supports the Board’s finding that the original application of the ’004 patent lacks written description support for adding new co-processors “without any communication with the controller.” As the Board found, Swarm failed to meet its burden to demonstrate written description support because

it relies on passages stating that the controller "recruits" co-processors or otherwise communicates with them, even if "indirectly." Appx80-84 (quoting Appx1855, Appx1866 ('332 Application ¶¶24, 52)). Swarm's argument on appeal—that the limitation "without *any* communication" allows for communication—is untimely and lacks merit.

3. The Board correctly determined that the substitute claims lack patent-eligible subject matter because they are directed to the abstract idea of a scrum board: a project management technique where a manager places tasks on a board, and each worker can take tasks, complete them, and mark them complete on the board. Appx90-92. The claims merely implement this abstract idea with generic computer hardware, and any purported improvement comes from the abstract idea itself, not any improvement in computer hardware. Appx94-98. Such ideas that are "pervasive in human activity" and can be performed "by a human using a pen and paper" are not patent eligible. *Ericsson, Inc. v. TCL Comm'cn Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020).

**<u>Amazon's Cross-Appeal</u>**

The Board's determination that the '275 patent claims are not unpatentable—which stems from its incorrect construction of the term "proactively" or, at worst, misapplication of obviousness law—should be vacated and remanded.

The Board erroneously construed "proactively" to mean (1) "initiating change rather than reacting to events (i.e., not being told to act or not reactionary)," and therefore (2) an initial "kickoff" notification categorically precludes any later proactivity, even if the co-processors "retrieve and complete additional tasks without further notifications." Appx118, Appx136-137. According to the patent, however, regardless of any initial kickoff notification, "[t]he term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor." Appx167 ('275 patent 2:48-64). Under a correct construction (i.e., any reasonable construction that includes rather than excludes this example), Lurie discloses "proactively retrieving" tasks.

Even if this Court disagrees that the Board's exclusion was a matter of claim construction and instead believes that it was an application of the Board's construction, this application violated the law of obviousness under which "prior art that sometimes meet[s] the claim elements [is] sufficient to show obviousness." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016). That is,

even if the Board were correct that Lurie's retrieval of the first task following a kickoff notification does not qualify as proactive, Lurie still discloses "proactively retrieving" tasks because each "additional task" is retrieved and completed without the worker needing to be told to act, as the Board acknowledged. Appx136-137 (acknowledging that Lurie's co-processors "retrieve and complete additional tasks without further notifications").

## STANDARD OF REVIEW

The Board's legal conclusions—including obviousness, claim construction, and patent eligibility—are reviewed de novo, but its underlying factual findings are reviewed for substantial evidence. *See, e.g.*, *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015); *In re Killian*, 45 F.4th 1373, 1378 (Fed. Cir. 2022). The Board's factual findings on insufficient written description and addition of new matter are reviewed for substantial evidence. *Medytox, Inc. v. Galderma S.A.*, 71 F.4th 990, 996 (Fed. Cir. 2023).

Substantial evidence is a "deferential standard of review," requiring only that "a reasonable mind might accept the evidence as adequate to support the finding." *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1359, 1356 (Fed. Cir. 2021). If two possible conclusions can "reasonably be drawn from the evidence in record, the [Board]'s decision to favor one conclusion over the other … must be sustained." *Id*. at 1359 (citation omitted).

# ARGUMENT

## I. THE BOARD'S DETERMINATIONS THAT ALL ISSUED AND SUBSTITUTE CLAIMS OF THE '004 PATENT ARE UNPATENTABLE ARE PROPER AND SUPPORTED BY SUBSTANTIAL EVIDENCE

The Board correctly held that all issued and substitute claims of the '004 patent are unpatentable.

*First*, the Board's finding that Lurie and Ethernet Specification render obvious an "agent … configured to search the task pool"—the only limitation of the issued claims disputed on appeal—is supported by substantial evidence. Swarm's counter-arguments improperly seek a new claim construction and revisit the Board's well-supported factual findings.

*Second*, the Board's finding that the substitute claims lack written description support for adding co-processors "without any communication with the controller" is also supported by substantial evidence. Swarm concedes that every passage in the original patent application includes at least indirect communication with the controller. That is dispositive. Swarm's untimely argument that "without any communication" should be construed to allow "indirect communication" is forfeited and without merit.

*Third*, the Board correctly found that the substitute claims are ineligible because they are directed to the abstract idea of a scrum board, and merely

implement longstanding human project-management techniques with conventional computer hardware.

### A. Substantial Evidence Supports The Board's Finding That All Issued Claims Would Have Been Obvious

Substantial evidence supports the Board's finding that all issued claims 1-12 of the '004 patent would have been obvious. Appx24-74. On appeal, Swarm addresses only a single limitation in the issued claims: the "agent … configured to search the task pool for a task" in claims 2 and 3. Blue Br. 18-35. Thus, the only question for the issued claims is whether substantial evidence supports the Board's finding that Lurie and Ethernet Specification render obvious using an agent to search the task pool. It does. The Board analyzed Lurie's text and figures in detail, and credited Dr. Lowenthal's "persuasive testimony" on how a skilled artisan would have understood those disclosures and implemented Lurie in view of Ethernet Specification.

#### 1. Substantial Evidence Supports The Board's Finding That Lurie And Ethernet Specification Render Obvious The "Agent … Configured To Search The Task Pool"

Lurie undisputedly discloses a controller ("Technical Computing Client" or "TCC," yellow below), a task pool ("Automatic Task Distribution Mechanism" or "ATD Mechanism," green below), and numerous co-processors ("Technical Computing Worker[s]" or "TCWs," blue below).




*Fig. 3B*

Appx360 (annotated Lurie Fig. 3B). Lurie also undisputedly discloses that the TCC "populat[es] the [ATD Mechanism] with a plurality of first tasks and a plurality of second tasks," as shown. It is further undisputed that, in operation, each TCW "retrieve[s]" a task from the ATD Mechanism, "process[es]" the retrieved task, "generat[es] … resulting data," and "update[s]" the ATD Mechanism "to reflect completion" of the task. The Board made each of these findings in determining that Lurie invalidates claim 1, which Swarm concedes. Appx24-33; Blue Br. 2 n.1.

Building on these findings, the only remaining dispute is whether it would have been obvious to implement Lurie's "retrieving" tasks via an "agent" that would

search the ATD Mechanism for an appropriate task on behalf of the TCW (as recited in claims 2 and 3). The Board found that it would have been: "the data frames sent by the TCWs in Lurie as modified by Ethernet Specification *act as agents which search the ATD Mechanism for tasks that the TCW can perform*." Appx48 (emphasis added). That decision is supported by substantial evidence.

*First*, there can be no reasonable dispute that Ethernet Specification discloses agents. As the Board explained, "Ethernet networks employ the use of data frames when sending information." Appx46 (citing Appx787-788 (Lowenthal ¶214), Appx1314 (Ethernet Specification)). Ethernet discloses a data frame format used to send information across a network, shown below, in which data fields within the frame hold the "destination," "source," and "type," of the data frame, as well as the "data" being transmitted. Appx46 (citing Appx1315 (Ethernet Specification)).




Appx46 (reproducing Fig. 6-1, Appx1315).

The ’004 patent states that “an agent is generally analogous to a data frame in the networking sense” and the ’004 patent’s parent similarly states that “the first agent is a data frame,” as the Board explained. Appx47 (quoting Appx154 (8:30-33), Appx3293-3300 at Appx3299 (U.S. Patent 9,146,777 7:59-60)). Thus, the Board credited the testimony of Dr. Lowenthal that a skilled artisan would have understood the data frames of Ethernet to be agents as that term is used in the ’004 patent. Appx47 (citing Appx787-788 (Lowenthal ¶214)); *see also* Appx788-790 (related explanation by Dr. Lowenthal).

*Second*, the Board found that it would have been obvious for Lurie's TCWs to communicate with its ATD Mechanism using Ethernet data frames. Appx44-49, Appx55 (citing Appx385-386 (citing Appx1250 (Lurie ¶¶51-52), Appx767-770 (¶¶173-80))). Lurie teaches that its TCWs and other components can communicate via "a Local Area Network (LAN)." Appx1250 (Lurie ¶51)). Ethernet Specification specifically teaches "A Local Area Network." Appx1288 (Ethernet Specification). The Board further credited Dr. Lowenthal's testimony that Ethernet was a "standard" and "well known and successful method[] of implementing networked communication over a LAN." Appx45 (quoting Appx787 (Lowenthal ¶213)). Thus, the Board concluded, a skilled artisan "would have had sufficient reasons to combine the relevant teachings of Lurie and Ethernet Specification with a reasonable expectation of success." Appx55.

*Third*, the Board explained that Lurie teaches that each TCW determines and selects tasks appropriate for that TCW. Appx38-53. As the Board noted, Lurie "describes a heterogenous environment" in which many different tasks of many different types may need to be performed (for example, tasks for "different processors," "different libraries," or "different operating systems"). Appx39 (citing Appx1249-1255 (Lurie ¶¶41, 53, 55, 65, 81), Appx2851-2855 (Lowenthal ¶¶36-39, 42-43)). Because of this heterogeneity, not all TCWs are appropriate for all tasks. Thus, as Lurie explains, "the system can determine or select" an appropriate TCW

"to work on a task by operational and/or performance characteristics of the [TCW]." Appx1255 (Lurie ¶81); *see also* Appx39 (quoting Dr. Lowenthal's explanation of same).

The Board, citing Lurie, confirmed that this "determin[ing] or select[ing]" functionality is performed by each TCW searching for and selecting only appropriate tasks. Appx40 (citing Appx1255 (Lurie ¶81)). The TCW is the only component that could do so. Appx40. This selection process cannot be performed by the TCC, for example, because the TCC does not "know the specifics" of what TCWs exist or are available. Appx40 (citing Appx1251 (Lurie ¶61)). And the selection process cannot be performed by the ATD Mechanism because Lurie states that the ATD Mechanism makes tasks "available for distribution to *any* of the [TCWs]," rather than assigning tasks to a particular compatible TCW. Appx41 (Board-added emphasis) (quoting Appx1253 (Lurie ¶72)). Thus, the Board correctly concluded, "that leaves the TCWs as the only components remaining for determining how they are selected for each task." Appx41.

In view of the above teachings of Lurie and Ethernet Specification, the Board credited Dr. Lowenthal's "persuasive testimony, which is supported by the evidence in the record" that the obvious way to implement Lurie's TCW selection functionality, when implemented via Ethernet, would have been "to have the TCW dispatch an agent to select a task that the TCW can perform." Appx41 (citing

Appx780-784 (Lowenthal ¶¶203-05, 207)). As the Board found, again crediting Dr. Lowenthal, this "would allow the *agent to search for tasks* that the TCW can perform," which would "maximize the efficiency of the system." Appx41 (emphasis added) (citing Appx781-784 (Lowenthal ¶¶204-07)).

Dr. Lowenthal detailed how a skilled artisan would have understood Lurie's "determin[ing] and select[ing]" functionality to be a form of "associative lookup," and it would have been obvious to implement this lookup via Ethernet such that the "agent, when dispatched to the task pool, carries a payload that includes th[e] index, name, or function pointer referencing the function that the co-processor is configured to perform, so that the agent can search for and find a task type matching th[at] function." Appx781-785 (Lowenthal ¶¶204-08) (incorporating Appx786-800 (Lowenthal ¶¶212-19, 236-37)).

Thus, considering all of these teachings, the Board correctly concluded that Amazon "has sufficiently shown that the data frames sent by the TCWs in Lurie as modified by Ethernet Specification act as agents which search the ATD Mechanism for tasks that the TCW can perform." Appx48. Indeed, the Board found that, on the strength of Dr. Lowenthal's persuasive testimony, this functionality would have been obvious "even if Lurie [were] silent as to how TCWs are determined/selected for each task." Appx41. Lurie's text and figures and Dr. Lowenthal's supporting testimony are, at minimum, "evidence that 'a reasonable mind might accept' 'as

adequate to support' the Board's factual findings"—which is substantial evidence. *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1386 (Fed. Cir. 2023) (citation omitted).

#### 2. Swarm's Claim Construction Challenge Is Forfeited, And In Any Event Irrelevant

On appeal, Swarm contends for the first time that the claim phrase "search the task pool" requires "the ability to evaluate and choose among different tasks within the task pool in order to selectively retrieve one with an appropriate task type." Blue Br. 18-19. This argument is untimely. As Swarm admits, neither party asked the Board to construe this term, and the Board did not do so. Blue Br. 18; *see* Appx2238-2239 (P.O. Resp.); Appx11-17. Swarm cannot "introduce new claim construction arguments on appeal." *Elbit Sys. of Am., LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1357 n.3 (Fed. Cir. 2018).

Swarm's claim construction argument is also wrong on the merits. Swarm does not argue that the intrinsic evidence supports its new construction, as required by *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). Instead, its only purported evidence is a footnote apparently citing an unattributed textbook excerpt on an Indian government website, which is not of record and is dated 2024—11 years after the relevant timeframe. Blue Br. 19 n.2. That cannot carry the day.

In any event, Swarm's new construction would not change the Board's conclusion. Swarm argues that searching requires "evaluat[ing] and choos[ing]

among different tasks within the task pool in order to selectively retrieve one with an appropriate task type," Blue Br. 18-19, but this is precisely what the Board found to be obvious: Lurie's TCW "search[es] the ATD Mechanism to select a task that it can perform" by utilizing an "agent [that] ha[s] the ability to determine the type of task in order to determine whether the TCW can perform that task." Appx42. That decision is supported by substantial evidence for the reasons discussed. *Supra* at 28-35.

### 3. Swarm's Remaining Scattershot Challenges Re-Litigate The Board's Fact Findings And Misapprehend Its Decision

Swarm raises a litany of additional arguments. All lack merit because they ask this Court to revisit the facts in the first instance, misapprehend the Board's decision, and rely on inapposite precedent.

#### a. Swarm Seeks To Redo The Board's Fact Findings

Most of Swarm's arguments second-guess the Board's fact-findings on Lurie. But this Court "may not reweigh this evidence on appeal." *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1333 (Fed. Cir. 2016). Swarm makes three arguments along similar lines, each of which fails.

*First*, Swarm argues that Lurie "provides no disclosure that its TCWs have the ability to 'search' for their own tasks" because, in Swarm's view, it is Lurie's ATD Mechanism—not its TCWs—that "determines which tasks are to be performed by each TCW," and "assigns a selected task to a particular TCW." Blue Br. 19-22.

That is incorrect. The Board rejected this argument, explaining that while paragraph 81 alone of Lurie may not "explicitly state" whether the "TCW selects tasks from the task pool" or the ATD "assigns" tasks, the "disclosure of Lurie, as a whole," conclusively discloses the former, not the latter. Appx40 (citing Appx1255 (Lurie ¶81)).

Specifically, the Board found that "it is clear" that the ATD Mechanism *does not* determine or assign tasks because Lurie states that the ATD Mechanism makes tasks "'available for distribution to *any* of the [TCWs].'" Appx41 (Board-added emphasis) (quoting Appx1253 (Lurie ¶72)). As the Board correctly explained, if the ATD Mechanism "assign[ed] tasks, then paragraph 72 would have described how the task was made available to the assigned TCW, as opposed to any TCW." Appx41. Indeed, as explained above, the Board further explained that even if the entirety of Lurie were "silent" on this issue (which it is not), it still "would have been obvious … to have the TCW dispatch an agent to select a task that the TCW can perform" in view of Lurie's remaining disclosure and Dr. Lowenthal's explanation. Appx41 (citing Appx780-784 (Lowenthal ¶¶203-07)).

Swarm's bombastic assertion that "the foundational operating principle in Lurie is that the ATD determines, selects, assigns, and distributes tasks … in each and every ATD embodiment, without exception," Blue Br. 21, is incorrect for the

same reasons. Swarm cites nothing for this proposition, which directly contradicts the Board's factual findings regarding Lurie's actual operation. Appx40-41.

Importantly, even if Swarm had presented an alternative reading of Lurie that was equally as viable as the Board's view (it does not), this Court still must affirm. In the face of "two alternative theories" about what the prior art discloses, this Court does not "determine which theory [it] find[s] more compelling" on substantial evidence review. *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1371 (Fed. Cir. 2020) (affirming Board obviousness determination).

*Second*, Swarm argues that the Board "admit[ted] that Lurie fails to disclose TCWs that search for and select the appropriate task." Blue Br. 23 (capitalization normalized). The Board did no such thing; nor does Swarm identify where the Board supposedly made this admission. *See* Blue Br. 23-27. Instead, Swarm quotes selected paragraphs from Lurie, out of context, to repeat its twice-rejected argument that Lurie's ATD Mechanism must assign tasks, rather than its TCW searching for tasks. Blue Br. 24-26. This, again, is exactly the interpretation of Lurie that the Board *rejected*, instead concluding that "the ATD Mechanism *is not assigning the tasks*" to specific TCWs. Appx41 (emphasis added) (citing Appx1253-1254 (Lurie ¶72)). Swarm's repeated calls to "reweigh evidence on appeal" are improper, as this Court only "determines whether substantial evidence supports the Board's fact

findings." *In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011). It does, as discussed. *Supra* at 28-35.

The Board's decision to credit Amazon's and Dr. Lowenthal's interpretation of Lurie "is the epitome of a decision that must be sustained upon review for substantial evidence"—even if the Board might have reasonably found otherwise in the first instance. *Teva Pharms. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1349, 1359 (Fed. Cir. 2021) (citation omitted).

*Third*, Swarm argues that Dr. Lowenthal's testimony is "conclusory" and "unsupported." *See* Blue Br. 28-33. The Board disagreed, and credited Dr. Lowenthal's explanations of the prior art as "substantive" and "persuasive testimony." Appx42, Appx53, Appx65. This Court should "decline to disturb these credibility determinations." *Elbit*, 881 F.3d at 1358.

Swarm's specific challenges to Dr. Lurie's testimony also lack merit. For example, Swarm contends that "[t]he Board's [Final Written Decision] relies on Lowenthal ¶194 for the proposition that … Lurie's system 'must have the ability to determine which TCW should be assigned which tasks.'" Blue Br. 29 (quoting Appx39). In fact, the Board relied on Lurie itself (Paragraph 81) for that conclusion:

> Because of this heterogeneous environment, a person having ordinary skill in the art would have understood that Lurie's system must have the ability to determine which TCW should be assigned which tasks for maximum efficiency. *See* Ex. 1007 [Lurie] ¶81.

Appx39. The Board then credited Dr. Lowenthal's Paragraph 194 to find that it would have been obvious to implement this "determin[ing]" by "us[ing] indicia of task type." Appx39 (citing Appx776 (Lowenthal ¶194)) ("A POSITA would have understood that Lurie thus discloses that tasks have indicia of task type …." (citing Appx1255 (Lurie ¶81))). Swarm's reliance (at 30) on *TQ Delta, LLC v. CISCO Systems, Inc.*, in which the expert's declaration was "[u]ntethered to any supporting evidence," 942 F.3d 1352, 1362 (Fed. Cir. 2019), is irrelevant: Dr. Lowenthal and the Board cited to the precise paragraphs of Lurie supporting their conclusions. Appx39.

Swarm's remaining arguments similarly fail. For example, Swarm contends that Dr. Lowenthal's testimony "fails to support the logical leap from selecting to searching." Blue Br. 31. But Swarm admits that the "plain meaning of 'search the task pool'" is "selectively retriev[ing]" a task of an appropriate type. Blue Br. 18-19. In any event, Dr. Lowenthal explains that the obvious way for Lurie's TCWs to "determine or select" a task, as Lurie teaches, is to perform an "associative lookup" search. Appx780-785 (Lowenthal ¶¶203-08).

Swarm relies solely on attorney argument to dispute Dr. Lowenthal's conclusions, citing no supporting testimony from its own expert. But Swarm's "'[a]ttorney argument is not evidence'" and "cannot rebut" the admitted and credited

evidence here, such as the actual text of Lurie and Dr. Lowenthal's explanation. *See Elbit*, 881 F.3d at 1359 (citation omitted).

In short, the Board permissibly relied on Lurie's text and figures, and Dr. Lowenthal's "persuasive" supporting testimony, to conclude that "the data frames sent by the TCWs in Lurie as modified by Ethernet Specification act as agents which search the ATD Mechanism for tasks that the TCW can perform." Appx48.

#### b. Swarm Misapprehends The Board's Decision And The Petition

Next, Swarm misapprehends the Board's findings and Amazon's Petition in four ways.

*First*, Swarm argues that Ethernet Specification "provides no disclosure of how to search, much less what to search." Blue Br. 22. But neither Amazon's Petition nor the Board relied on Ethernet Specification teaching searching a task pool. Rather, Amazon argued and the Board concluded that Ethernet Specification teaches the use of data frames (which are "agents" as that term is used in the '004 patent), and it would have been obvious to utilize Ethernet's data frames to perform the searching and assigning functionality described in Lurie. *See, e.g.*, Appx48.

As this Court has held, a patentee cannot "defeat the Board's conclusion of obviousness" by arguing that an individual teaching fails to "disclose[] the disputed claim limitations"—because, for obviousness, it is "the proposed *combination*" that matters. *Fleming v. Cirrus Design Corp.*, 28 F.4th 1214, 1222 (Fed. Cir. 2022).

That Ethernet alone may not disclose searching the task pool is irrelevant. The test instead is whether "a person of ordinary skill in the art would have been motivated to combine the prior art in a way such that the combination discloses the claim limitations." *Id.* This is what the Board found: "the data frames sent by the TCWs in Lurie as modified by Ethernet Specification act as agents which search the ATD Mechanism for tasks that the TCW can perform." Appx48.

*Second*, Swarm argues that the Board "fails to show a suggestion to modify Lurie to include an 'agent … configured to search the task pool.'" Blue Br. 23 (capitalization normalized). Not so. The Board explained that Ethernet data frames are "agents," and that a skilled artisan would have understood that these agents could be used to implement Lurie because Lurie describes connecting its devices via "Local Area Network[s]," for which Ethernet was a well-known protocol. Appx55 (citing Appx1250 (Lurie ¶51), Appx767-770 (Lowenthal ¶¶173-80)); *see also* Appx45-47 (Board further describing rationale to combine Ethernet with Lurie).

The Board further credited Dr. Lowenthal's testimony that utilizing an "agent" such as Ethernet's data frames "to search for tasks that the TCW can perform" would "maximize the efficiency" of Lurie's system. Appx41 (citing Appx783-784 (Lowenthal ¶207)). As Dr. Lowenthal explained in the cited paragraph, Lurie describes selecting a TCW to perform a given task "by operational and/or performance characteristics," and the most efficient way to accomplish this

selection would be to have each co-processor utilize an agent to "retrieve and complete tasks that are particularly suited for a specific TCW." Appx783-785 (Lowenthal ¶¶207-08) (citing Appx1221, Appx1253, Appx1255 (Lurie Fig. 1B, ¶¶71-72, 81)). That is more than sufficient motivation to modify Lurie. *See Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.* 464 F.3d 1356, 1368 (Fed. Cir. 2006) (when a proposed modification "results in a product or process that is more desirable, for example because it is … more efficient," an "implicit motivation to combine [or modify] exists … even absent any hint of suggestion in the references themselves").

*Third*, Swarm argues that the Board's decision "is at odds with its earlier position." Blue Br. 25-27. This is incorrect. The "earlier position" Swarm refers to is the Board's Preliminary Guidance on Swarm's Contingent MTA, which was not addressing the claims at issue here, but only the substitute claims. *See* Appx3304-3322. Moreover, Swarm identifies no inconsistency between the passage it quotes, and the Board's Final Written Decision. *See* Blue Br. 25-26. There is none. The Preliminary Guidance passage quoted by Swarm relates to when and whether Lurie uses "notification[s]," which is a wholly separate issue unrelated to the Board's analysis of "search[ing] the task pool." *Compare* Blue Br. 25, *with* Appx36-43 (Final Written Decision not discussing notifications in regard to "search the task pool" limitation). Moreover, the Board's "Preliminary [G]uidance is just that,

preliminary"; the Board "is not bound to" its initial findings, and "can change its views of merits on [a] more fulsome record, [or] due to application of [a] different standard or proof at [the] final merits stage." *Sisvel Int'l SA v. Sierra Wireless, Inc.*, 81 F.4th 1231, 1240-41 (Fed. Cir. 2023) (citing *Medytox, Inc. v. Galderma S.A.*, 71 F. 4th 990, 999-1000 (Fed. Cir. 2023)).[5]

Swarm's similar argument that the Board "contradicts its own finding that Lowenthal's testimony is not 'supported,'" Blue Br. 27-28, is likewise flawed. Swarm quotes a portion of the Board's Preliminary Guidance regarding "proactively interrogating the task pool"—a limitation not found in claims 2 or 3, or in any issued '004 patent claim. Blue Br. 27-28 (quoting Appx3320-3321). That analysis is unrelated to, and does not contradict, the Board's determination that Lurie and Ethernet render obvious searching a task pool.

*Fourth*, Swarm contends that "the Board failed to address the merits of Swarm's search argument: that the combination fails to teach or suggest searching the task pool." Blue Br. 33. That is incorrect. The passage Swarm cites is part of the Board's analysis of claim limitations [3h] and [3i], which recite a "co-processor includ[ing] a first agent comprising a first source address, a first destination address,

[5] Swarm's citation to *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1366 (Fed. Cir. 2016), is unavailing. *Arendi* stands for the proposition that the Board may not use "common sense," without more, to fill in a missing limitation. *Id.* Here, the Board did not rely on "common sense" but rather analyzed the text and figures of Lurie and the supporting "persuasive testimony" of Dr. Lowenthal. Appx38-47.

and a first payload." Appx43-49. The Board correctly held that Swarm never "raised [an] argument about 'search the task pool'" regarding those two limitations. Appx49.

But there can be no question that the Board squarely considered, and rejected, Swarm's argument that the combination of Lurie and Ethernet fails to teach searching the task pool. That is the thrust of the Board's conclusion: "Petitioner has sufficiently shown that the data frames sent by the TCWs in Lurie as modified by Ethernet Specification *act as agents which search the ATD Mechanism for tasks* that the TCW can perform." Appx48 (emphasis added).

The Board's finding that Lurie and Ethernet Specification together disclose an "agent … configured to search the task pool" is supported by substantial evidence and should be affirmed.

### B. Substantial Evidence Supports The Board's Finding That The Substitute Claims Add New Matter

The Board denied Swarm's motion to amend because Swarm failed to show that substitute claims 13 and 14 had written description support in the original '332 Application. That fact finding is supported by substantial evidence. Swarm does not contest that fact finding, but instead belatedly argues that the claim limitation "without *any* communication" actually allows *some* communication. The Board should reject that untimely and meritless claim construction argument.

#### 1. Substantial Evidence Supports The Board's Finding That The '332 Application Lacks Support For Adding Co-Processors "without any communication with the controller"

Under 35 U.S.C. § 316(d)(3), a motion to amend "may not … introduce new matter." The Patent Owner bears the burden to show, by a preponderance of evidence, that a motion to amend complies with this requirement. 37 C.F.R. § 42.121(d)(1). Proposed amended claims introduce new subject matter if they lack sufficient written description support in the patent's original disclosure—here, the '332 Application that issued as the '004 patent. *See Fleming*, 28 F.4th at 1220.

Applying these principles, the Board correctly found that Swarm failed to show written description support in the '332 Application for the limitation "dynamically accept[ing] … [an] additional autonomous co-processor into the processing system on a plug-and-play basis *without any communication with the controller*," as recited in each substitute claim. Appx79-84. As the Board explained, because this is a "negative limitation" requiring the absence of communication between the co-processor to be added and the controller, "there is adequate written description when, for example, 'the specification describes a reason to exclude the relevant [element].'" Appx79 (quoting *Novartis Pharms. Corp. v. Accord Healthcare, Inc.*, 38 F.4th 1013, 1016 (Fed. Cir. 2022)).

On its face, the '332 Application contains no description of dynamically adding a co-processor without any communication with the controller, nor does it

provide any reason to exclude such communication. As the Board explained, the passages Swarm identified "simply discuss adding processors or the plug-and-play feature … without any reference to the negative limitation." Appx81-82 (citing Appx1853, Appx1859-1860, Appx1866-1870 ('332 Application ¶¶13, 36, 52, 54, 59, 62)). In fact, one of Swarm's passages affirmatively demonstrates communication between the co-processor and the controller, contrary to the claim limitation, as "the CPU 11 may recruit cells from other cell systems." Appx82 (quoting Appx1866 ('332 Application ¶52)).[6]

Swarm further relied on an embodiment in which "the co-processors 'connect directly to the task pool.'" Appx83-84 (quoting Appx1895 ('332 Application ¶18)). As the Board correctly explained, this does not mean the co-processors act "without any communication with the controller," as claimed. Rather, as the '332 Application states, the co-processors communicate with the controller "*indirectly through the task pool*." Appx84 (Board-added emphasis) (quoting Appx1855 ('332 Application ¶24)). Because Swarm's substitute claims require adding co-processors "without *any communication* with the controller," an embodiment in which the co-processors explicitly communicate with the controller, albeit "indirectly," cannot meet Swarm's burden. Appx84 (emphasis added).

---

[6] The '332 Application and the '004 Patent use "CPU" interchangeably with the claimed "controller," and use "cells" or "solidarity cells" interchangeably with the claimed "co-processors." Appx151, Appx156 (2:47-59, 11:35-40); Appx82.

The Board's findings were supported by substantial evidence.

### 2. Swarm's Claim Construction Challenge Is Forfeited And Meritless

On appeal, Swarm argues that the Board "erroneously construed the phrase 'without *any* communication,'" and that this phrase means "without any *direct* communication," while allowing for indirect communication. Blue Br. 60 (emphasis altered); *see* Blue Br. 54-60.[7] That argument fails for two reasons.

*First*, Swarm never asked the Board to construe the term "without any communication" at all, let alone to mean "without any direct communication." *See* Appx1806-1847; Appx3324-3341. Swarm therefore "forfeited its proposed claim construction by not presenting it to the Board during IPR." *IOENGINE, LLC v. Ingenico Inc.*, 100 F.4th 1395, 1402 (Fed. Cir. 2024). Swarm's argument (at 57) that the Board erred by failing to conduct a "*Phillips* analysis or cit[e] to intrinsic or extrinsic evidence" is equally unavailing. Again, Swarm never proposed a construction, and so cannot now fault the Board for failing to provide a construction analysis. *See id*.

*Second*, regardless, Swarm's claim construction argument lacks merit. As this Court held in *Phillips*:

---

[7] Swarm does not argue that the '332 Application supports the substitute claims under the Board's correct construction. *See* Blue Br. 61-68 (arguing support only under Swarm's new construction allowing for indirect communication).

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.

415 F.3d at 1314. This is one such case. On its face, the claim limitation "without *any* communication" means what the Board said it means: the absence of *any* communication, direct or indirect. Appx84.

Notably, Swarm and its expert repeatedly endorsed this position throughout the case up until this appeal, arguing that "the Substitute Claims recite co-processors that … perform their activities without any communication with the controller." Appx3338 (P.O. Reply); *see also* Appx3330 (P.O. Reply) (Swarm arguing that "a POSITA would understand that a goal of the [underlying] Application is to avoid communication between the co-processors and the CPU"); Appx3384-3385 (Nelson ¶38) (Swarm's expert testifying to same); Appx3388 (Nelson ¶44) (Swarm's expert claiming that the '004 patent "conveys the elimination of any need for communication between the CPU and the co-processors").

Nothing in the claim language or specification supports the notion that "without *any* communication" actually allows for some (indirect) communication. Swarm argues that the claim language itself contemplates indirect communication when a task is transferred from the controller, to the task pool, to the co-processor. Blue Br. 57-58. That misses the mark. The limitation in question requires

"dynamically accept[ing]" an "additional" co-processor "without any communication with the controller." Whether the system can perform *other* functions, like transferring tasks, without communication with the controller is irrelevant.

Swarm's case law citations (at 56) do not save its unsupported construction. These cases stand for the general proposition that the Court should hesitate to apply a construction "that renders asserted claims facially nonsensical." *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010). That is not the situation here. There is nothing "nonsensical" about a claim that allows for indirect communication in some circumstances (such as when transferring tasks), but does not allow "any communication" in other circumstances. In fact, the opposite is true: Swarm's construction is "facially nonsensical" by construing "without any communication" to mean "with some communication."

Even if giving the term "without *any* communication" its plain meaning rendered the claims nonsensical (and it does not), that would still be the correct result. "Even 'a nonsensical result does not require the [C]ourt to redraft the claims …. Rather, where as here, claims are susceptible to only one reasonable interpretation, and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated.'" *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (citation omitted).

This Court must "construe the claim as written, not as [Swarm] wish[es] they had written it," and thus "without any communication" must be construed, as the Board held and the claim states on its face, to exclude *any* communication, whether direct or indirect. *Id.*; *see also Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 782 (Fed. Cir. 2010) ("[W]e do not redraft claims to contradict their plain language in order to avoid a nonsensical result.").

The Board's finding that Swarm failed to demonstrate written description support for the "without any communication" limitation—and the Board's resulting denial of Swarm's motion to amend—is supported by substantial evidence.

### C. The Board Correctly Held That The Substitute Claims Lack Patent-Eligible Subject Matter

The Board denied Swarm's motion to amend for the additional, independent reason that substitute claims 13 and 14 fail to claim patent-eligible subject matter under § 101 as a matter of law. That, too, is correct.

The substitute claims are patent-ineligible because they are directed to the abstract idea of a scrum board, a longstanding project management technique for retrieving and completing tasks from a pool. In addition to the Board in this case, two district court judges and two additional Board preliminary guidance decisions likewise found that the claims of the '004 patent and/or its related patents are directed to the abstract idea of a "scrum board." *See Swarm Tech. LLC v. Amazon.com Inc.*, 561 F. Supp. 3d 861, 866 (D. Ariz. 2021) (granting motion to

dismiss ’004 and ’275 patents because they “are directed towards the abstract idea of a scrum board”); *Juniper Networks Inc. v. Swarm Tech. LLC*, No. 3:2-cv-03137, 2022 WL 3031211 (N.D. Cal. Aug. 1, 2022) (same for parent ’777 patent); *Juniper Networks, Inc. v. Swarm Tech., LLC*, IPR2021-01445, Paper 32 (P.T.A.B. Sept. 14, 2022) (preliminary guidance finding substitute claims of ’004 patent directed to same abstract idea); *Juniper Networks, Inc. v. Swarm Tech., LLC*, IPR2022-00141, Paper 22 (P.T.A.B. Nov. 28, 2022) (preliminary guidance finding proposed substitute claims of child ’275 patent directed to same abstract idea).

The substitute claims here do no more than apply the abstract idea of a scrum board to a computing environment, using admittedly conventional computer components. The substitute claims are not to an improved computing architecture, and certainly not to any improvements beyond those inherent in the abstract idea itself. Swarm’s arguments otherwise misstate the law and rely on conclusory expert testimony that the Board properly rejected.

### 1. The Substitute Claims Are Directed To The Abstract Idea Of A Scrum Board

#### a. The Focus Of The Claim Language Is Team Members Retrieving and Completing Tasks From A Pool, As With A Scrum Board

Step one of the *Alice* inquiry asks “what the patent asserts to be the focus of the claimed advanced over the prior art” with a “focus on the language of the asserted claims themselves, considered in light of the specification.” *Yu v. Apple Inc.*, 1 F.4th

1040, 1043 (Fed. Cir. 2021) (citation omitted). Here, the language of the substitute claims confirms that they are directed to the abstract idea of team members retrieving and completing tasks from a common pool—a fundamental human organizational concept exemplified in the project management technique known as a scrum board. As the Board correctly found, "[a] scrum board works by first having a project manager list tasks on sticky notes and post them on one side of a board"; then, "[a]s the team members collect and perform each task, they individually move the notes from the 'incomplete' side of the board to the other side, the 'complete' side of the board." Appx90 n.30.

The substitute claims here are directed to that same abstract idea, substituting generic computer components for the manager and team members. They recite a computer system in which (1) a controller populates a task pool, (2) individual processors retrieve and complete tasks from the pool, and (3) processors can be added or removed. Thus, the claim is directed to a recognized category of abstract idea: a method reflecting human organizational activity. *See Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016).

For example, a project manager and team could perform the activities of substitute claim 13:

| | |
|---|---|
| 13. A processing system, comprising<br>a task pool;<br>a controller configured to populate the task pool with a plurality of first tasks having indicia of a first task type and a plurality of second tasks having indicia of a second task type | Project-management using:<br>a task pool (e.g. white board)<br>a project manager who populates the task pool with tasks of various types (e.g. posting sticky notes) |
| a first autonomous co-processor configured to perform tasks of the first type and successively: proactively interrogate the task pool to retrieve a first task from the task pool without being instructed to do so by the task pool; deliver the first task to the first autonomous coprocessor; process the first task; generate first resulting data; and update the task pool to reflect completion of the first task, all without any communication between the first autonomous co-processor and the controller; | a first team member who retrieves a task (on a sticky note) from the board, returns to her desk, completes the task, and updates the task pool to reflect completion (e.g., by putting a checkmark on the sticky note and returning it), without being instructed to do so |
| a second autonomous co-processor configured to perform tasks of the second type and configured to successively: proactively interrogate the task pool to retrieve a second task from the task pool without being instructed to do so by the task pool; deliver the second task to the second autonomous co-processor; process the second task; generate second resulting data; and update the task pool to reflect completion of the second task, all without any communication between the second autonomous co-processor and the controller; | a second team member who likewise retrieves and completes tasks from the task pool, also without being instructed to do so |
| wherein after the first autonomous co-processor updates the task pool to reflect completion of the first task, the task pool is configured to send a notification to the controller indicating that the first task is completed; wherein after the second autonomous co-processor updates the task pool to reflect completion of the second task, the task pool is configured to send a | wherein, after a team member updates the board with their completed task sticky notes, the project manager learns from viewing the board that the task has been completed |

| | |
|---|---|
| notification to the controller indicating that the second task is completed; and | |
| wherein the processing system is configured to dynamically accept the first autonomous coprocessor, the second autonomous co-processor, and an additional autonomous co-processor into the processing system on a plug-and-play basis without any communication with the controller | wherein the team members can pitch in without talking to the project manager (e.g., simply by showing up and working on tasks from the board) |

The same is true of substitute claim 14:

| | |
|---|---|
| The processing system of claim 13, wherein: the first autonomous co-processor includes a first agent configured to search the task pool for a task of the first type; | the first team member sends her assistant to the white board to find and retrieve tasks (sticky notes) appropriate for the first team member's job duties; |
| the second autonomous co-processor includes an agent configured to search the task pool for a task of the second type; and | the second team member does the same; |
| wherein the task pool is configured to simultaneously contain the plurality of first tasks having indicia of the first task type and the plurality of the second tasks having indicia of the second task type | the white board can simultaneously have sticky notes of tasks appropriate for the first team member and the second team member |

Thus, as the Board found, the substitute claims "do[] no more than apply the features of a scrum board to computer components … replac[ing] the manager with a controller, the scrum board with a task pool, and the workers with autonomous co-processors in order to apply the well-known process to a specific computer environment." Appx92. The fact that the basic process recited in the claims can be performed "'in the human mind or using a pencil and paper'" (or a whiteboard) is "a

telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (citation omitted).

#### b. Swarm's Arguments Mischaracterize The Record And The Law

Swarm's contention that the claims are not directed to an abstract idea because "both the claims and the specification teach a specific, improved parallel multiprocessor architecture," Blue Br. 36, is unsupported. Rather, the '004 patent specification confirms that its purported "architecture" is merely the well-known concept of "parallel processing," which it admits was "typical." Appx151 (1:56-61, 2:11-14). Indeed, the specification refutes Swarm's argument because it makes clear that no new "architecture" is needed: the purportedly inventive features "may be incorporated into *any presently known* or later-developed *computer architecture*." Appx152 (4:24-29) (emphasis added). That admission is unequivocal: the purported invention does not provide any new "architecture."

Similarly, and contrary to Swarm's reliance (at 36) on *DDR Holdings*, *LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014), the claimed invention is not "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer[s]." Rather, every supposed computer benefit that the claims provide is equally provided in the human context by a scrum board. For example, Swarm contends that, in prior computer systems:

> a substantial amount of the controller's bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks; responding to interrupts from co-processors when a task is completed; and responding to other messages from co-processors.

Blue Br. 37. But substituting human project management terms in place of computer components reveals an equally true statement. In the absence of a scrum board:

> a substantial amount of the [manager]'s bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks; responding to interrupts from co-[workers] when a task is completed; and responding to other messages from co-[workers].

The truth of this statement confirms that the supposed advantages Swarm touts are not improvements in computer technology itself, but benefits stemming from the abstract idea (the scrum board project management concept) applied using computers. Where, like here, a claim's purported advances "are not different in kind from those that would accrue in the [real world] analogue," the claim is not patent eligible. *PersonalWeb*, 8 F.4th at 1318; *see FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (claims ineligible where "humans in analogous situations" have performed that task for decades).

The same is true for each of Swarm's remaining supposedly technological improvements: (1) "adding or removing co-[worker]s … creates additional overhead burden on the [manager]"; (2) "co-[worker]s are frequently idle while awaiting a new … task assignment from the [manager]"; and (3) "if the [manager] becomes overloaded," or "becomes temporarily disconnected or unavailable, the

processing activity of the co-[worker]s may quickly come to a halt." Blue Br. 37-38. These are truisms in every workplace, and can be solved with the use of a scrum board, which is not an improvement in computer technology. Being "written in technical jargon" does not save the claims from being directed to an abstract idea. *Ericsson, Inc. v. TCL Commc'n Tech. Holdings. Ltd.*, 955 F.3d 1317, 1326 (Fed. Cir. 2020).

Even if Swarm was correct that the specification described a new architecture (it is not), that is not sufficient to take the claims out of the realm of an abstract idea. This Court's decision in *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013), is instructive. There, the specification described a purportedly new "architecture" in considerable detail. *Id.*; Appx2945-3019 at Appx2965 (U.S. Patent 7,013,284 8:28-30). Yet the claims were ineligible because "the system claims themselves only contain generalized software components arranged to implement [the] abstract concept on a computer." *Accenture*, 728 F.3d at 1345. So too, here, where the claims recite only generalized components like a "controller," "co-processor," and "task pool," arranged to implement the abstract idea of retrieving and completing tasks on a computer. *Id.*; *see Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338-39 (Fed. Cir. 2017) (rejecting patentee's reliance on "purported innovative 'scalable architecture'" because that was not in the claims).

Swarm's attempt to distinguish *Accenture* because the patent in that case recited "generic computer components" and "typical hardware," Blue Br. 41, is unavailing. The same is true here. As the Board recognized, the patent specification "makes it clear that conventional components and architecture can be used." Appx98. For example, the '004 patent confirms that CPUs and co-processors are part of "[a] typical multiprocessor system." Appx151 (1:56-57). The purported invention does not require any "particular manner" of "perform[ing] the … processing." Appx153 (5:37-39). The "task pool" can be any hardware or software for storing tasks, and the "agent" can be any "software module, analogous to a network packet," that co-processors use to access the pool. Appx152, Appx153 (3:14-15, 6:56-7:7). And the "tasks" themselves are unspecified—they can be anything, require no particular programming, and can be described at a high "level of abstraction." Appx152 (3:36-38).

Swarm's reliance on *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253 (Fed. Cir. 2017), similarly falls flat. There, this Court found a claim to be patent eligible where "the plain focus of the claims is on an improvement to computer functionality itself," namely computer memory with "faster searching and more effective data storage." *Id.* at 1258. That is not the case here, as discussed. Rather, any purported improvement "comes from applying the concept of a scrum board, demonstrating that the computer is simply invoked as a tool for applying that abstract

idea." Appx96. Swarm claims that this case is like *Visual Memory* because "claim 13 recites a specific parallel multiprocessor computing architecture." Blue Br. 40. But, again, that is inconsistent with the '004 patent's express statement that the invention can be implemented on "*any presently known* or later-developed *computer architecture*." Appx152 (4:24-29) (emphasis added).

Next, Swarm claims that the Board erred by applying a "scrum board analogy," and that "[t]he Board's 'analogous to' analysis fails to consider the character of the claim as a 'whole.'" Blue Br. 43. That mischaracterizes the Board's decision, which expressly states that it was not relying on a mere "analogy" of the claims to a scrum board:

> Our conclusion *is not based on whether the proposed substitute claims are analogous to a scrum board*. Instead, our conclusion is based on the applicant taking the well-known concept of a scrum board and applying it to a computer environment. The "[a]utomation or digitization of a conventional method of organizing human activity … on a computer does not bring the claims out of the realm of abstractness."

Appx92-93 (emphasis added) (quoting *Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022); citing *Credit Acceptance Corp. v. Westlake Servs*., 859 F.3d 1044, 1055 (Fed. Cir. 2017)). As Swarm argued, *Alice* step one considers the claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." Blue Br. 45 (emphasis and citation omitted). That is what the Board did here, when it concluded that "the proposed substitute claims do no more than

apply the concept of a scrum board for use in a processing system." Appx93 (citing *Intellectual Ventures*, 838 F.3d at 1314).[8]

Lastly, Swarm points to the fact that Walmart has attempted to patent a "Hybrid Digital Scrum Board." Blue Br. 46-48. That is irrelevant. That (attempted) patent is not at issue and has no bearing here.

### 2. The Substitute Claims Lack An Inventive Concept

At step two, the substitute claims add nothing inventive to the abstract scrum board idea, instead implementing it in a computer environment with conventional computer hardware and functions retrieving and completing tasks from a pool.

#### a. The Claims Recite Conventional Computer Hardware And Functions

The claims recite generic computer components ("controller," "co-processors," "task pool") and functions (sending and receiving communications, retrieving information, and performing "tasks). *Supra* at 59-60. Those are the same "basic functions of a computer" and "purely functional and generic" components that courts have found merely automate an abstract idea in a "particular technological environment"—which is insufficient to add an inventive concept.

---

[8] Swarm's reference to an Arizona District Court's use of the word "analogy," Blue Br. 45, is similarly inapplicable. That decision is not before this Court, and in any event, the Arizona court found that the "scrum-board analogy has some merit." Appx1967. The only reason it was not "dispositive" there was because the Arizona court declined to resolve the § 101 issue at the 12(b)(6) stage. Appx1967.

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 225-26 (2014) ("data processing system" and "data storage unit" are non-inventive); *see also, e.g.*, *Accenture*, 773 F.3d at 1338-39 (storing task rules in database, determining tasks using "task engine," populating tasks on "task assistant," and transmitting tasks for completion are not inventive); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018) ("parallel processing" is "generic" and non-inventive); *Eolas Techs. Inc. v. Amazon.com, Inc.*, Nos. 2022-1932, et al., 2024 WL 371959, at *6 (Fed. Cir. Feb. 1, 2024) ("distributed processing" is not inventive).

Accordingly, the Board correctly recognized that "the proposed substitute claims merely use conventional hardware and conventional architecture," which can be used "in their off-the-shelf condition." Appx98 (citing Appx153 (5:61-6:17)). The specification passages cited by the Board confirm, for example, that (1) a co-processor can be known hardware such as "a microcontroller, a microprocessor, application processor," "standalone computer," or other "general or special purpose co-processor"; (2) the controller can be "any single or multi-core processor"; and (3) the task pool can be any "region of physical memory." Appx153 (5:17-19, 5:66-67, 6:56-58). *See supra* 59-60; *see also, e.g.*, *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1358 (Fed. Cir. 2024) ("Where, as here, the specification 'describes the components and features listed in the claims generically,' it 'support[s] the

conclusion that these components and features are conventional.'" (citation omitted)).

Although the Board did not need to rely on it, Dr. Lowenthal provided a detailed analysis of the substitute claims, explaining that their supposedly novel architecture was actually "a parallel processing paradigm known as the 'bag of tasks,' which has been known and practiced in the art for decades." Appx2879-2885 (Lowenthal ¶¶99-109). Dr. Lowenthal provided numerous examples showing that the parallel processing paradigm of Swarm's claim was not inventive and further explained, with reference to specific prior art, that every component and function recited in the substitute claims was conventional, and would have been known to a skilled artisan before the '004 patent. Appx2886-2890 (Lowenthal ¶¶110-18).

#### b. Any Advantage Flows From The Abstract Idea

A purported advance that reflects "the abstract idea itself … cannot supply an inventive concept." *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1363-64 (Fed. Cir. 2020) (citation omitted). Here, as discussed, each purported technological advantage "flow[s] from the use of a scrum board," and therefore cannot provide an inventive concept. Appx99. For example, Swarm contends:

> By configuring the controller to deposit tasks into a task pool, and configuring autonomous co-processors to proactively retrieve and process tasks without any communication with the controller … the processing capacity of the [co-processors] may be more fully exploited, inasmuch as the [co-processors] need not wait idly for an instruction from the CPU.

Blue Br. 38 (alterations in original). Again, substitution shows that this improvement stems from the abstract idea, not any technological improvement: by teaching a team manager to place tasks on a scrum board, and teaching workers to proactively retrieve and process tasks without any communication with the manager, the processing capacity of the workers would go up, inasmuch as the workers need not wait idly for an instruction from their manager. Where, as here, the purported benefits of the claim "flow from performing [the] abstract idea in conjunction with a well-known [computer] structure," they are "not improvements to [computer] functionality," and therefore the claims are not eligible. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018).

#### c. Swarm's Arguments Misstate The Record And The Law

Swarm identifies no inventive concept apart from the abstract idea of a scrum board. Each of Swarm's arguments misstates the law, the Board's decision, or both.

*First*, Swarm claims that the Board "abstain[ed] from th[e] step-two analysis" and "refus[ed] to consider the underlying facts." Blue Br. 48-49. That is incorrect. The Board expressly considered Swarm's arguments and evidence, and decided that they do not demonstrate "any improvement to computer functionality," as the claims "merely use conventional hardware and conventional architecture." Appx98 (citing Appx153 (5:61-6:17)); *see* Appx96-103 (applying *Alice* step two via Steps 2A Prong Two and Step 2B of the Board's Guidance framework).

*Second*, Swarm argues that under the Board's analysis, no claim would ever pass *Alice* step two. Again, Swarm misunderstands the Board's decision. Blue Br. 48-50. The Board did not say that if a claim is directed to an abstract idea, it necessarily lacks an inventive concept. Rather, the Board found that Swarm's substitute claims do not recite any improvement to computer technology beyond the use of a scrum board. Appx97-98. As the Board explained, cases like *Ancora* result in patent-eligible claims where the claim "specifically identifie[s] how a functionality improvement is effectuated," but no such specific improvement is identified in Swarm's claims. Appx96.

*Third*, Swarm argues that the Board "summarily dismisse[d] Swarm's non-conventionality evidence" with reference to the Lurie prior art. Blue Br. 50-51. Not so. The Board's decision contains 50 pages analyzing the Lurie prior art's disclosures. Appx24-74. The Board referenced that analysis to explain that "Lurie teaches a decentralized system in which the TCWs search the ATD Mechanism for tasks," which is exactly "what Patent Owner claims is unconventional." Appx102. Thus, Swarm's effort to show unconventionality based on Lurie was contrary to Lurie itself, confirming that these ideas were known to skilled artisans. Appx102. Although the Board did not need to cite it, this point is further supported by Dr. Lowenthal's thorough rebuttal of Swarm's supposed non-conventionality evidence, which shows that every limitation of the substitute claims, and the combination of

those limitations, was in the prior art and conventional at the time. Appx2879-2890 (Lowenthal ¶¶99-118). Moreover, the Board explained that Swarm's reliance on Lurie—and its attempt to show differences over prior art—is misplaced because it goes to obviousness and novelty (Appx102); those "are separate inquiries" from eligibility. *Two-Way Media*, 874 F.3d at 1340.

*Lastly*, Swarm contends that the Board "failed to consider Swarm's expert testimony about the non-generic and unconventional nature of the claim elements" because it did not "cite … Dr. Nelson's expert testimony." Blue Br. 52. That is incorrect. "[F]ailure to explicitly discuss every fleeting reference or minor argument does not alone establish that the Board did not consider it." *Yeda Rsch. v. Mylan Pharms., Inc.*, 906 F.3d 1031, 1046 (Fed. Cir. 2018); *see Novartis AG v. Torrent Pharms. Ltd.*, 853 F.3d 1316, 1328 (Fed. Cir. 2017) ("[T]here is no requirement that the Board expressly discuss each and every negative and positive piece of evidence lurking in the record to evaluate a cursory argument.").

The Board did not expressly cite Dr. Nelson's testimony that the claims are unconventional, nor did it expressly cite to Dr. Lowenthal's testimony that the claims were conventional. But the Board's thorough consideration of these arguments is reflected in its statement that "Patent Owner argues that the proposed substitute claims require the components to operate in an unconventional manner," and its corresponding conclusion that it "d[id] not agree with Patent Owner's argument."

Appx101-102. The Board expressly held that all of Patent Owner's purported improvements stemmed from the abstract scrum board idea itself—and therefore were not inventive as a matter of law. Appx102. Thus, it is clear from the Board's decision that it considered—and rejected—Swarm's unconventionality arguments. *See* Appx92-103. Nothing more is required.

The Board's determination that the substitute claims are ineligible should be affirmed.

## II. THE BOARD'S DETERMINATION THAT THE '275 PATENT CLAIMS ARE NOT UNPATENTABLE SHOULD BE VACATED

The Board's decision upholding the '275 patent claims hinged on an erroneously narrow construction of "proactively" that precluded processors from ever retrieving tasks proactively if there was an initial kickoff notification. The Board construed the term to mean (1) "initiating change rather than reacting to events (i.e. not being told to act or not reactionary)," and therefore (2) an initial kick-off notification categorically precludes any later proactivity. That narrow construction was wrong as it disregards the plain meaning of the term "proactive" and the specification's examples of that term.

Alternatively, even if this Court views part (2) as merely an application of the Board's construction in part (1), the Board's decision is still wrong as a matter of law and lacks substantial evidence. The Board violated the principle that "combinations of prior art that sometimes meet the claim elements are sufficient to

show obviousness" as evidenced by the Board's statement that "it does not matter that [Lurie's workers] can retrieve and complete additional tasks without further notifications" after an initial kickoff notification. Appx137.

### A. The Board Incorrectly Construed "Proactively"

The '275 patent claims require "a first co-processor configured to … proactively retrieve a first task from the task pool," and "a second co-processor configured to … proactively retrieve a second task from the task pool." Appx173-174 ('275 patent cls. 1, 6). Claim 11 recites a substantially similar limitation: "co-processors … proactively retriev[e] a task … from the task pool." Appx174. The Board construed the term "proactively" to mean "initiating change rather than reacting to events (i.e., not being told to act or not reactionary)," which the Board contended was its "ordinary and customary meaning." Appx118. The Board explained further that under its construction, if there is an initial kickoff notification that tasks are available, a co-processor *never* can be considered proactive, even if it later "can retrieve and complete additional tasks without further notification." Appx136-137.

The Board's construction is wrong for three reasons.

*First*, the Board's interpretation is inconsistent with the specification's clear explanation of what "proactively" includes:

> The term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor.

Appx167 ('275 patent 2:48-51). This explanation makes plain that "proactive," particularly in the claimed context of proactively retrieving tasks, means or at least includes that co-processors periodically send an agent to monitor the task pool for tasks to retrieve. Appx167 ('275 patent 2:48-51). A claim term's ordinary meaning must be determined "in the context of the claim, specification, and prosecution history," which in this example does not foreclose (and indeed is without regard to) an initial kickoff notification that tasks are available before the co-processors send an agent for monitoring. *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 259 (Fed. Cir. 2022) (citing *Phillips*, 415 F.3d at 1313-14).

The Board dismissed the specification's clear expression of "proactive" as merely "an example of acting 'proactively,'" based on the use of the phrases "*suggests*" and "*may be* configured," but then adopted a construction that excludes this example. Appx119. That was legal error. The specification "can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001).

Even if the Board was correct that this sentence is exemplary, and not

definitional, it remains the single best example (and by the Board's own admission, *an* example) in the record of what "proactive" means in the context of the '275 patent, and excluding such a preferred example "is rarely, if ever correct and would require highly persuasive evidentiary support." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) (citation omitted). The Board identified no such support.

*Second*, the Board erred by adopting a supposed "ordinary meaning" that is narrower than any usage in the specification. In addition to stating that "the term proactive suggests … periodically send[ing] an agent to monitor the task pool," as discussed above, the '275 patent contains two further statements regarding what "proactive" may mean, in certain instances:

- "Each cell act acts proactively in that it seeks a task 22 from the task pool 13 as soon as the cell becomes available for further processing." Appx170 ('275 patent 8:29-38), or
- "Each solidarity cell is proactive, in that it obtains a task to perform by sending its agent to the task pool when the solidarity cell has no processing to perform, or alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation. Appx168 ('275 patent 3:8-12).

None of these passages support the Board's unduly narrow construction. To the contrary, these passages discuss acting "proactively" only in terms of when the worker "becomes available for *further processing*." Appx170 ('275 patent 8:29-38) (emphasis added). In other words, the passages are silent on how processing is initiated in the first place, but relate only to how co-processors seek *additional* work once initial processing is complete. Similarly, each passage states that the co-processor or solidarity cell fetches another task when it has the processing capacity to do so, but the passages are *silent* on the question of whether there is an initial kickoff notification. Appx167-170 ('275 patent 2:48-51, 3:8-12, 8:29-38).

Accordingly, the Board committed legal error by adopting a purported "plain and ordinary meaning" that is narrower than any of the examples in the specification. It is "axiomatic" that the Board or this Court may "not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of … the specification." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013). The Board turned that principle on its head by purporting to apply an ordinary meaning that is in fact narrower than any usage of the term in the '275 patent. Because the three passages cited above are the only explanations in the intrinsic record for what constitutes "proactive" retrieval of tasks, a construction that is narrower than—and therefore excludes—those examples cannot be correct. *See Kaufman*, 34 F.4th at 1372.

Even if the Board's construction had perfectly aligned with the latter two passages (it does not), the proper plain meaning construction should encompass all of the '275 patent's explanations of what "proactive" means. "If the intrinsic record supports several definitions of a term, the term may be construed to encompass all such consistent meanings" so that the patentee "'obtain[s] the full scope of its plain and ordinary meaning.'" *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281-82 (Fed. Cir. 2017) (citation omitted); *see Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001) (where specification provided multiple "possible readings" of a term, it was reversible error for district court to adopt "narrower meaning" rather than "giv[e] the term the full range of its ordinary meaning (which would encompass [all] readings)").

Here, the "full scope of [the] plain and ordinary meaning" must include, at least, periodically sending an agent to monitor the task pool as described in the '275 patent as an "example" of proactive retrieval. *Wasica*, 853 F.3d at 1282 (citation omitted); Appx167 ('275 patent 2:48-51).

*Third*, the Board's construction here led to an absurd result, which is evidence of its error: the Lurie prior art matches the "example" of "proactively retrieving"

tasks provided in the ’275 patent specification,[9] and yet the Board found that Lurie does not disclose that limitation. That cannot be correct.

Specifically, the Board admitted that one “example of acting ‘proactively’ in the context of the ’275 patent” is, as the specification states, “that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor.” Appx119 (quoting Appx167 (’275 patent 2:48-51)). The Board then further admitted that this is exactly the argument Amazon put forward for obviousness: Lurie teaches that “each TCW has an agent that identifies available tasks appropriate to that TCW from the task pool … and retrieves an available, appropriate task to deliver to the TCW.” Appx132 (citing Appx1249, Appx1255, Appx1257 (Lurie ¶¶43, 81, 91), Appx5006-5007 (Lowenthal ¶183)). The Board did not dispute that explanation, but nonetheless found that Lurie does not teach “proactively retrieving” tasks because it does not “initiat[e] change by seeking a task … without being notified to do so”—*i.e.*, the initial “kickoff” notification necessarily precludes *any* subsequent proactivity—a requirement made up whole cloth by the Board and not found in any example in the ’275 patent of what it means to be “proactive.” Appx136-137.

---

[9] Indeed, the Board cited Dr. Lowenthal’s explanation of Lurie as “support” for its claim construction. Appx122 (citing Appx7334-7335 (Lowenthal ¶56) (citing Appx4995-4998, Appx5000-5001 (Lowenthal ¶¶164-68, 173))).

This absurdity emphasizes the legal error in the Board's construction. It cannot be correct that prior art disclosing the very "example" of "proactive" activity in the '275 patent somehow fails to disclose "proactive" activity for purposes of obviousness. *See Kaufman*, 34 F.4th at 1372.

### B. The Board Violated The Law Of Obviousness In Evaluating Lurie

If this Court disagrees that the Board's exclusion of any initial "kickoff" was a matter of claim construction (as Amazon contends) and instead believes that it was an application of "initiating change rather than reacting to events (i.e. not being told to act or not reactionary)," then the Board erred by misapplying the law of obviousness when concluding that Lurie does not teach "proactively retriev[ing]" tasks from the task pool.

As the Board acknowledged, Amazon and its expert explained that Lurie's system practices a technique called the "bag-of-tasks," in which the system "provides only one kickoff notification that initially starts the processing," after which "each TCW repeatedly retrieves and processes tasks until all the tasks have been completed," without any further notification or instruction after the kickoff. Appx133-134 (citing Appx1231-1233, Appx1256-1258, Appx1263 (Lurie Figs. 5B-5D, ¶¶86-88, 95-97, 128), Appx7334-7347 (Lowenthal ¶¶56-76), Appx4998, Appx5023-5024 (Lowenthal ¶¶168, 225)). The Board appeared to agree with this explanation, "credit[ing] the aforementioned testimony of Dr. Lowenthal's because

it is consistent with the disclosures in Lurie that we highlight above, most notably the kickoff notification." Appx136.

Notwithstanding this, the Board concluded that:

> Even assuming that Amazon is correct in that Lurie's system executes a textbook bag-of-tasks technique, Amazon fails to appreciate that each TCW 270A–N still requires a kickoff notification before it begins retrieving and completing tasks. As we explain above, because Lurie's TCWs 270A–N require a kickoff notification to retrieve a first task, it does not matter that they can retrieve and complete additional tasks without further notifications. In our view, Lurie's TCWs 270A–N are reactive—not proactive—because they require receipt of a kickoff notification to retrieve a first task.

Appx137. That conclusion was legal error, leaving the Board's nonobviousness determination unsupported by substantial evidence.

Under the bag-of-tasks technique, the Board explained that each TCW "can retrieve and complete additional tasks without further notifications" after the initial kickoff notification. Appx137. Thus, even if the initial task retrieved following the kickoff notification does not meet the Board's definition of proactive, every subsequent task that is "retrieve[d] and complete[d] … without further notifications" is "initiating change rather than reacting to events," and "not being told to act or not reactionary," as the Board construed the term "proactive." Appx136-137. For example, if a TCW retrieves and completes 100 tasks, at least 99 of those tasks (all but the first) are retrieved proactively even under the Board's definition because they occur without "being told to act" and without any further notification.

Indeed, at oral argument, one of the Board judges acknowledged this was the case regarding Lurie: "It does seem that in the first instance, maybe it's not proactive on the initial kick off notification, *but thereafter it is*." Appx9063 (Tr. 37:16-23) (emphasis added).

As a matter of law, Lurie's proactive retrieval of "additional tasks" is sufficient to disclose "proactively retrieving" because "prior art that sometimes meet[s] the claim elements [is] sufficient" for obviousness. *Unwired Planet v. Google Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016). In *Unwired Planet*, the claim recited prioritizing information in "farther-over-nearer order[]." *Id.* at 998. The prior art prioritized information "alphabetical[ly]," but the Board found this limitation to be met because alphabetical prioritization would "sometimes," although not always, result in farther-over-nearer ordering (for example when placing Afghanistan before Niger, when the user is closer to Niger). *Id.* at 1002. This Court affirmed, noting that "it is enough that the combination would *sometimes* perform" the claim limitations. *Id.* at 1002 (emphasis added).

So too, here. As the Board admits, Lurie's bag-of-tasks approach means that, even if TCW requires a "kickoff notification" to retrieve an initial task, "additional tasks" are "retrieve[d] and complete[d] … without further notifications." Appx137. Thus, every "additional task" is "proactively retriev[ed]," which is sufficient to disclose the limitation even if the Board is correct that the initial task was retrieved

in a non-proactive manner. Indeed, the obviousness case here is stronger than in *Unwired Planet* because the proactive nature of retrieval is the entire purpose of Lurie's system, unlike in *Unwired Planet* where meeting the claim limitations was incidental (but still sufficient for obviousness). As Dr. Lowenthal explained, acting without notification is the entire purpose of Lurie's bag-of-tasks technique, which "reduces redundant message traffic by making repeated task availability notifications unnecessary." Appx134 (citing Appx7342-7347 (Lowenthal ¶¶71-76)); *see also* Appx7318-7319 (Lowenthal ¶27). Thus, Lurie discloses "proactive" retrieval of tasks, even if not the initial task.

This conclusion is further bolstered by the fact that claims 1, 6, and 11 are all "comprising" claims, in which a "collaborative intelligence system" or "method of using collaborative intelligence" "comprises," co-processors that proactively retrieve tasks. Appx173-174 ('275 patent cls. 1, 6, 11). As a matter of law, "[b]ecause 'comprise' is inclusive or open-ended, the use of the term does not exclude unrecited elements." *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1352 (Fed. Cir. 2017). Thus, even if Lurie's system includes non-proactive retrieval of a first task immediately after an initial kickoff notification, the system still comprises numerous proactive retrievals by TCWs in that they "retrieve and complete additional tasks without further notifications," in the Board's terminology, which is sufficient to demonstrate obviousness. Contrary to the Board's holding, the

inclusion of an unrecited element (one non-proactive retrieval) does not negate the inclusion of additional proactive processors and retrievals that meet the claim limitation. *Regeneron*, 864 F.3d at 1352. Thus, under a correct application of the law, Lurie disclosed "proactively retriev[ing]" tasks.

## CONCLUSION

The Board's determination that all issued and substitute claims of the '004 patent are unpatentable should be affirmed.

The Board's determination that all claims of the '275 patent were not shown to be unpatentable should be vacated, and the case remanded.

Dated: July 19, 2024

Respectfully submitted,

*/s/ Adam M. Greenfield*

Adam M. Greenfield
Gabriel K. Bell
David A. Zucker
Ashley N. Finger
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200

Kimberly Q. Li
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

*Counsel for Cross-Appellants Amazon.com, Inc. and Amazon Web Services, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Circuit Rule 32(b)(3) and Federal Rule of Appellate Procedure 32(g)(1), I hereby certify that the foregoing brief complies with the type-volume limitations in Federal Circuit Rule 32(b)(1), because it contains 16,497 words, excluding the exempted parts under Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this brief was prepared using Microsoft Word 365 in 14-point Times New Roman font.

Date: July 19, 2024

Respectfully submitted,

*/s/ Adam M. Greenfield*
Adam M. Greenfield