Nos. 23-2323, 24-1095

# United States Court of Appeals for the Federal Circuit

**SWARM TECHNOLOGY LLC,**
*Appellant*,

v.

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Cross-Appellants*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in *Inter Partes* Reviews Nos. IPR2022-00283, IPR2022-00633

## APPELLANT SWARM TECHNOLOGY LLC'S RESPONSE AND REPLY BRIEF

Michael K. Kelly
Christine N. Jones
Daniel J. Anderson
**NEWMAN JONES, PLLC**
14747 N. Northsight Blvd.
Suite 111-143
Scottsdale, Arizona 85260
mkelly@newmanjones.com
(480) 686-7762

Meredith Martin Addy
**ADDYHART P.C.**
10 Glenlake Parkway
Suite 130
Atlanta, Georgia 30328
meredith@addyhart.com
(312) 321-4200

***Attorneys for Appellant Swarm Technology LLC***

August 28, 2024

## CERTIFICATE OF INTEREST

Counsel for Appellant Swarm Technology LLC ("Swarm") certifies the following:

1. Please provide the full names of all entities represented by undersigned counsel in this case.

   Swarm Technology LLC

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   None/Not Applicable

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   None/Not Applicable

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   Daniel R. Pote, Newman Jones, formerly of Jennings Strouss & Salmon

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   Juniper Networks, Inc. v. Swarm Technology LLC, No. 3:20-cv-3137 (N.D. Cal.)

   Swarm Technology LLC v. Amazon.com, Inc., No. 2:21-cv-438 (D. Ariz.)

   Juniper Networks, Inc. v. Swarm Technology LLC, Nos. 23-1980, 23-2076 (Fed. Cir.)

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None/Not Applicable

August 28, 2024

/s/ *Michael K. Kelly*

Michael K. Kelly

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........................................................................i

TABLE OF AUTHORITIES ........................................................................v

SUMMARY OF THE ARGUMENT........................................................................1

ARGUMENT ........................................................................4

I. AMAZON FAILS TO RECONCILE THE LEGAL ERRORS AND FACTUAL DEFICIENCIES UNDERLYING THE BOARD'S OBVIOUSNESS CONCLUSION ........................................................................4

A. Swarm Has Always Argued that the Plain Meaning of "Agent … Configured to Search the Task Pool" Requires "Search"....................4

B. Amazon's Analysis Highlights the Lack of Substantial Evidence Supporting the Board's Conclusions ....................................................6

C. Amazon Ignores the Board's Failure to Find a Motivation to Modify Lurie to Include an "Agent … Configured to *Search* the Task Pool".....10

1. Amazon Fails to Explain the Absence of any Board Analysis of Motivation to Modify Lurie ..................................10

a. The Board Points to No Teaching or Suggestion to Modify Lurie From Ethernet, Lurie, or the Knowledge of a POSITA ..............................................12

b. The Board Does Not Provide an Explanation for Why a POSITA Would Modify the Prior Art.........................13

c. The Board Committed Legal Error by Using the "One Obvious Way" Gap Filler in Lieu of a Reasoned Obviousness Analysis....................................14

2. Ethernet Also Fails to Teach or Suggest that a "Data Frame" Has the Capability to "Search"....................................17

D. Amazon Ignores that the Board's Modifications to Lurie Fundamentally Change Lurie's Operation.........................................18

II. SUBSTITUTE CLAIMS 13 and 14 ARE PATENT ELIGIBLE .................21

A. *Alice* Step 1: The Substitute Claims are Directed to a Specific, Improved Parallel Multiprocessor Computing Architecture ..............21

1. Contrary to Amazon's Arguments, the Substitute Claims have Nothing to do with a "Scrum Board"...............................25

2. Amazon Ignores the Claimed Improvements to Multiprocessor Computing Systems ........................................28

B. *Alice* Step 2: The Substitute Claims Contain an Inventive Concepts, Including Autonomous Co-Processors that Successively and Proactively Interrogate a Task Pool without Communication with the CPU........................................................................33

III. THE SUBSTITUTE CLAIMS SATISFY THE WRITTEN DESCRIPTION REQUIREMENT ..........................................................38

A. The Board Committed Legal Error In Holding That The Substitute Claims Add New Matter...................................................................38

1. The Board Incorrectly Construed the Element "Without Any Communication"..............................................................38

2. Swarm Has Not Forfeited Its Proposed Claim Construction Of The Phrase "Without Any Communication".......................42

B. Contrary to Amazon's Arguments, the '332 Application Includes Ample Support For the Proper Interpretation of Adding Co-Processors "Without Any Communication with the Controller" .......45

IV. THE BOARD CORRECTLY HELD THAT THE '275 PATENT CLAIMS ARE NOT UNPATENTABLE....................................................49

A. The Board Correctly Construed "Proactively" ..................................50

1. Amazon's Reliance on a Specific Sentence in the Specification Ignores the Context in Which that Sentence Appears.........................................................................50

2. The Board's Construction Encompasses the Statements Relied Upon By Amazon .......................................................52

B. The Board Correctly Applied This Court's Obviousness Law to Lurie.........................................................................................55

CONCLUSION ..........................................................................................61

CERTIFICATE OF COMPLIANCE ..........................................................a

# TABLE OF AUTHORITIES

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.*,
725 F.3d 1315 (Fed. Cir. 2013) .......... 54

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
882 F.3d 1121 (2018) .......... 34

*Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) .......... 28

*Alice Corp. Pty Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .......... passim

*Al-Site Corp. v. VSI Int'l Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) .......... 11, 14

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) .......... 24

*Andersen Corp. v. Fiber Composits, LLC*,
474 F.3d 1361 (Fed. Cir. 2007) .......... 41

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) .......... 14, 16, 17

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) .......... 46

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) .......... 33

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) .......... 38, 39

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) .......... 50

*Conoco, Inc. v. Energy & Env'tl Int'l, L.C.*,
406 F.3d 1349 (Fed. Cir. 2006) .......... 57

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)....................................................................34

*Cornell Rsch. Found., Inc. v. Vidal*,
No. 2020-2334, 2022 WL 1634223 (Fed. Cir. May 24, 2022) ...........................57

*Data Engine Techs. LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018)......................................................................26

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
469 F.3d 1005 (Fed. Cir. 2006)....................................................................50

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)...........................................................23, 28, 33

*Google LLC v. EcoFactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024).....................................................................44

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) ....................................................................10

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020).......................................................................45

*In re Gordon*,
733 F.2d 900 (Fed. Cir. 1984).......................................................................19

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006).......................................................................10

*In re Wilson*,
424 F.2d 1382, (C.C.P.A. 1970) ...................................................................13

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016).....................................................................28

*IOENGINE, LLC v. Ingenico Inc.*,
100 F.4th 1395 (Fed. Cir. 2024)...............................................................42, 43

*Karlin Tech., Inc. v. Surgical Dynamics, Inc.*,
177 F.3d 968 (Fed. Cir. 1999).......................................................................41

*Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*,
566 U.S. 66 (2012) ....................25, 32

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*,
721 F.2d 1563 (Fed. Cir. 1983) ....................13

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................55

*Novartis Pharms. Corp. v. Accord Healthcare, Inc. et al.*,
38 F.4th 1013 (Fed. Cir. 2022) ....................46

*Ortho-McNeil Pharm., Inc. v. Mylan Lab'ys, Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................40

*Perfect Web Techs., Inc. v. InfoUSA, Inc.,*
587 F.3d 1324 (Fed. Cir. 2009) ....................16

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ....................27, 28

*Phillips v. AWH Corp*.,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ....................39, 50

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
600 F. App'x 755 (Fed. Cir. 2015) ....................19

*Rexnord Corp. v. Laitram Corp.*,
274 F.3d 1336 (Fed. Cir. 2001) ....................41

*Summit 6, LLC v. Samsung Elecs. Co*.,
802 F.3d 1283 (Fed. Cir. 2015) ....................45

*Swarm Tech. LLC v. Amazon.com Inc.*,
No. CV-21-00438-PHX-DWL,
2022 WL 3585835 (D. Ariz. Aug. 22, 2022) ....................26

*Synopsys, Inc. v. Mentor Graphics Corp*.,
839 F.3d 1138 (Fed. Cir. 2016) ....................34

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*,
17 F.4th 155 (Fed. Cir. 2021) ....................9

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017) ............................................................24, 32, 33

*Visual Memory LLC v. NVIDIA Corp.*,
No. CV 15-789-RGA,
2016 WL 3041847 (D. Del. May 27, 2016). .....................................................32

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
853 F.3d 1272 (Fed. Cir. 2017) ........................................................................41

**Statutes**

35 U.S.C. § 101 ........................................................................................2, 32, 34

35 U.S.C. § 102 ...............................................................................................34

35 U.S.C. § 103 ...............................................................................................34

## SUMMARY OF THE ARGUMENT

The Board's decision on the '004 Patent is both legally and factually irreconcilable, as Amazon's brief highlights through its incongruous arguments for each of the '004 Patent and the '275 Patent. The Board has now decided six IPRs on this family of three related patents. In two, the Board declined to institute.[1] In three other IPRs, the Board determined that all challenged claims were not unpatentable.[2] However, in this sixth IPR, the Board hangs its obviousness hat on an unsupportable interpretation of Lurie. Why would Lurie's TCW dispatch an undisclosed agent to perform an undisclosed search for an unassigned task, when Lurie's system has already selected a TCW to process the task and has notified the selected TCW of that task's availability? It would not and does not. For at least this reason, and those below, the Board's decision on the '004 Patent should be reversed.

---

[1] IPR2023-00390, Paper 7 (U.S. Patent No. 9,146,777) (declining to institute); *accord id.*, Paper 9 (denying Director review); *see also* IPR2021-01317, Paper 15 (U.S. Patent No. 9,146,777) (declining to institute); *accord id.*, Paper 17 (denying rehearing).

[2] IPR2021-01445, Paper 62 (U.S. Patent No. 9,852,004) (FWD in favor of patent owner); *accord id.*, Paper 64 (denying rehearing); IPR2022-00141, Paper 53 (U.S. Patent No. 10,592,275) (FWD in favor of patent owner); IPR2022-00633, Paper 36 (U.S. Patent No. 10,592,275 (FWD in favor of patent owner).

**U.S. Patent No. 9,852,004**

1. Amazon fails to address the Board's legal error in finding claims 2 – 12 obvious. The plain meaning of "agent … configured to search the task pool" requires searching the contents of the task pool. Neither the references, nor the knowledge generally available to the skilled artisan, disclose or suggest this missing claim element.

Amazon fails to address the Board's error in relying on Dr. Lowenthal's testimony to modify Lurie's TCWs to perform the claimed search function. Dr. Lowenthal's testimony on this determinative issue is insufficient because it is based solely on Dr. Lowenthal's own speculation and finds no support in the prior art. Dr. Lowenthal simply fills the gaps in the prior art with his own unsupported conclusions. Therefore, this Court should reverse the Board's obviousness decision.

2. Amazon goes "all-in" on the Board's legal error in determining that substitute claims 13 and 14 are not patent eligible under 35 U.S.C. § 101 based on "conventional components" and a flawed analogy to a physical scrum board. Notwithstanding the alleged use of conventional components, or Amazon's contrived analogy, the substitute claims recite a parallel multiprocessor computing architecture, are directed to improvements to the function and operation of a computer as a tool, and are thus patent eligible. Moreover, the Board and Amazon ignore the evidence that the claimed parallel multiprocessor computing architecture

is unconventional. Yet, because the claims recite an unconventional arrangement and activity in the field of multiprocessor computing, they are patent eligible.

3. The Board also committed legal error in holding that substitute claims 13 and 14 add new matter. The Board adopted an erroneous construction of the phrase "without any communication," presented by Amazon for the first time at oral argument. That construction renders the claims nonsensical and is, at the same time, inconsistent with how both Amazon and Swarm interpreted that phrase during the IPR. Swarm consistently advocated throughout the IPR that the plain and ordinary meaning of "without any communication" is without any ***direct*** communication. Under the proper construction, there is more than adequate written description support in the '332 application. Accordingly, this Court should reverse the Board's denial of Swarm's MTA and instruct the Board to issue the proposed substitute claims 13 and 14.

**U.S. Patent No. 10,592,275**

4. In appealing the Board's decision on the '275 Patent, Amazon complains that the Board's plain and ordinary meaning of "proactive" is somehow unduly narrow, and if properly construed, the claims would be obvious. Yet, as the Board correctly notes, both parties argued for the plain meaning of "proactive." Amazon's new criticism, that select specification statements do not fall within the Board's construction, rings hollow; these statements plainly support the Board's

construction. Regardless, under either the Board's construction or Amazon's incorrect proposed construction, the prior art does not render the claims obvious because neither Lurie nor Ethernet teach or suggest the "proactive" limitation. Moreover, neither reference teaches or suggests "autonomous" co-processors, a limitation that Amazon fails to address. Hence, the Board's decision on the '275 Patent should be affirmed.

## ARGUMENT

### I. AMAZON FAILS TO RECONCILE THE LEGAL ERRORS AND FACTUAL DEFICIENCIES UNDERLYING THE BOARD'S OBVIOUSNESS CONCLUSION

#### A. Swarm Has Always Argued that the Plain Meaning of "Agent … Configured to Search the Task Pool" Requires "Search"

Contrary to Amazon's assertion (RedBr. 35), Swarm is not introducing a new construction on appeal. Swarm maintains that the limitation "agent … configured to search the task pool" should be accorded its "ordinary and customary meaning." *See* BlueBr. 18-19 (citing record); *see also* Appx1716; Appx1836; Appx2238-Appx2239; Appx2254; Appx2261-2262; Appx3348; Appx3364; Appx2323 (Amazon acknowledging Swarm's construction). ***Swarm's construction is the***

***plain meaning***; the Board's error lies in failing to give any weight to the "search" requirement.[3]

The Board's interpretation of an "agent … configured to search the task pool" is incorrect because it only requires the agent to retrieve or "obtain a task from the task pool" (Appx0039), and the Board thereby "read out" any requirement that the agent "search," i.e., "interrogate" the task pool. Appx0031 (Board setting forth Swarm's description of the limitation from the '004 Patent); *see also* Appx2254; Appx0154, 8:24-40; Appx2174 ¶53. An agent *configured to* ***select a task from*** *the task pool* cannot be the correct interpretation because it departs from the plain meaning of "***search***" and effectively eliminates the *search* requirement from the claim.[4] Appx0158, 15:1-2, 15:5-6; *see also* Appx0154, 8:24-28; Appx0155, 9:19-22 ("the agent 30A may search for a match between the task type of the ready tasks 22 and the types of that task that the cell 12A is able to perform …."); *id.* 9:32-34 ("the agent 30A *searches* the task 22 descriptors for an executable instruction ….") (emphasis added).

---

[3] Amazon does not address the fact that Swarm has always argued that the prior art fails to disclose or suggest the "search" limitation of claims 3(f) and 3(g). BlueBr. 33-34.

[4] Even the Board recognizes that "select" is distinct from "search": "[I]n order for the TCW to ***search*** the ATD Mechanism to ***select*** a task that it can perform, …." Appx0042 (emphasis added).

In dismissing Swarm's plain meaning of an "agent configured to search the task pool," Amazon simply parrots the Board's improper forfeiture conclusion (Appx0049), and in doing so, Amazon fails to address the specific facts and prior arguments set forth in Swarm's opening brief (BlueBr. 33-35).

**B. Amazon's Analysis Highlights the Lack of Substantial Evidence Supporting the Board's Conclusions**

The entirety of the Board's conclusion that Lurie teaches "[an] agent … configured to ***search*** the task pool" is premised on its conclusion that Lurie's TCWs select or determine which tasks they will perform.[5] *See generally* Appx0039-0042. Both Amazon and the Board point to Lurie's ¶81 as the evidence that Lurie's "TCW selects or determines which tasks it will perform." Appx0040; *see also* RedBr. 33 (citing Appx0040 (FWD) further citing Appx1255 (Lurie ¶81)). However, Lurie ¶81 does not constitute substantial evidence supporting the Board's conclusion. What's more, Lurie ¶81 in fact proves the opposite of the Board's conclusion.

Lurie's ¶81 does not teach how a TCW might select, much less search for, tasks it will perform. Rather, and this is critical, Lurie's ¶81 teaches how the system

[5] Amazon incorrectly disputes Swarm's assertion that the Board's FWD is at odds with its earlier position. RedBr. 43 (citing BlueBr. 25-27). This is demonstrably false. The Board's Preliminary Guidance found that "Petitioner has not shown . . . any disclosure in Lurie where a [TCW] obtains a task without first being notified that the task is available." Appx3320. Indeed, Lurie's use of a task notification (sent to the selected TCW) moots the need for the TCW to search the task pool.

"***select[s]***" the "***technical computing worker***" to work on a task. Appx1255 (emphasis added). Stated differently, Lurie's ¶81 teaches how ***TCWs***, not tasks, are selected. Amazon and the Board attempt to shoehorn TCWs into Lurie's "system" to "determine or select" arguing that "the TCW is the ***only component*** that could do so," (RedBr. 33) (emphasis added) but the result of this interpretation is simply incoherent.

Consider, for example, the following bracketed replacements within Lurie ¶81 that Amazon and the Board's interpretation require:

- "the [TCW] can determine or select the [TCW] to work on a task …." Appx1255 (Lurie ¶81).
- "[f]or determining a [TCW] to work on a task, the [TCW] may discover any … operational and performance characteristics … of a [TCW] … through any interface of the [TCW] …." Appx1255 (Lurie ¶81).

The notion of a TCW interfacing with itself in order to discover its own operational and performance characteristics in order to select a TCW to work on a task is nonsensical and indeed necessitates a different interpretation of Lurie's use of the term "system" in ¶81.

Contrary to Amazon and the Board's interpretation, the "system" described by Lurie's ¶81 can only be understood to be referring to either the TCC or the ATD

Mechanism.[6] With regard to a TCC, Lurie's ¶81 describes "any of the embodiments depicted in FIGS. 3A-3D." *Id*. Figure 3A depicts Lurie's "direct distribution system" useful for a TCC user that "desire[s] a high level of control over which [TCW] executes a particular task." Appx1252 ¶68. In the direct distribution mode, the TCC "submits task 1 to [TCW-A], submits task 2 to [TCW-B], and submits task N to [TCW-N]. Accordingly, Lurie's use of the term "system" to "determine or select the [TCW]" in ¶81 is a reference to the TCC in the context of FIG. 3A.

With regard to the ATD Mechanism, Amazon argues that "the selection process cannot be performed by the ATD mechanism because Lurie states that the ATD Mechanism makes tasks 'available for distribution to any of the [TCWs],' …." RedBr. 33. But this is merely an attempt to leverage the ambiguity of a single sentence to reconstruct Lurie in hindsight of the '004 Patent. Reading Lurie in its entirety reveals that the ATD Mechanism does in fact select and/or distribute the task itself to the TCWs. *See* BlueBr. 26-27 (myriad citations to Lurie's ATD Mechanism selecting and/or distributing tasks).

---

[6] Appx1257 ¶88 (The [ATD mechanism] provides notification to the [TCW] of the availability of the task (step 538). In an exemplary embodiment, the task is sent, by the job manager 265 to the [TCW] as notification to perform.").

Amazon relies on Dr. Lowenthal's conclusory statement that an "obvious way for Lurie's TCWs to 'determine or select' a task, as Lurie teaches, is to perform an 'associative lookup' search" RedBr. 40 (citing Appx0780-0785). However, the Board did not rely on "associative lookup," much less Dr. Lowenthal's statement. *See* Appx0039-0042. Amazon's assertion is incorrect in any event. Dr. Nelson explained in detail why associative look-up is antithetical to "searching" a task pool. Appx2181-2184 ¶¶70-81 (demonstrating that an "associative lookup" is not a "search").

Lurie's ¶81 does not describe how tasks are selected, but instead describes how TCWs are selected. Moreover, Lurie's ¶81 does not support the use of a TCW to determine or select the TCWs. The only components of Lurie's system that can rationally be expected to select TCWs to work on a task are the TCC and ATD Mechanism, and these components are described by Lurie to do just that. Thus, not only does Lurie ¶81 not constitute substantial evidence supporting the Board's conclusion, it in fact proves the Board's conclusion to be erroneous. This Court should therefore reverse the Board's obviousness decision. *See, e.g., Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 165-66 (Fed. Cir. 2021) (reversing Board's decision due to lack of substantial evidence because the only evidence on record supported the patent owner).

### C. Amazon Ignores the Board's Failure to Find a Motivation to Modify Lurie to Include an "Agent … Configured to *Search* the Task Pool"

Amazon fails to address Swarm's arguments that neither Lurie, nor Ethernet, nor the knowledge available to a skilled artisan, disclose or suggest an "agent … configured to ***search*** the task pool." RedBr. 36-41; BlueBr. 19-22. Instead, Amazon merely rehashes the Board's decision, ignoring Swarm's arguments that the Board failed to establish any ***motivation to modify*** Lurie to include the missing ***search*** element. RedBr. 41-43; BlueBr. 23-28.

#### 1. Amazon Fails to Explain the Absence of any Board Analysis of Motivation to Modify Lurie

In an obviousness analysis when one reference must be modified, the Board must identify the motivation to modify the reference. *See, e.g.*, *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006))) . The absence of a motivation to modify therefore constitutes an absence of substantial evidence resulting in legal error in the obviousness analysis.[7]

[7] *See also In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("The mere fact that the prior art may be modified in the manner suggested … does not make the modification obvious unless the prior art suggested the desirability of the modification.").

The extent of the Board's explanation of a motivation to modify Lurie's data frames to search for tasks is below:

> Moreover, even if Lurie is silent as to how TCWs are determined/selected for each task, it would have been obvious to a person having ordinary skill in the art to have the TCW dispatch an agent to select a task that the TCW can perform. Ex. 1003 ¶ 203. A person having ordinary skill in the art would have understood that this would allow the agent to search for tasks that the TCW can perform. Ex. 1003 ¶¶ 204–205. Doing so would maximize the efficiency of the system. Ex. 1003 ¶ 207.

Appx0041.

Yet this explanation is conclusory and devoid of the required reasoned analysis. First, the Board ***presumes*** that Lurie's data frames search for tasks, and second, the Board relies solely on skill in the art to provide the suggestion to modify Lurie to add an agent to ***perform*** the presumed searching: "it would have been obvious to a person having ordinary skill in the art to have the TCW dispatch an agent to select a task." Appx0041. The Board improperly relies on the level of skill in the art to provide the suggestion to modify Lurie. *See Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999) (The level of skill in the art cannot be relied upon to provide the suggestion to combine references or "operate to supply missing knowledge or prior art to an obviousness requirement").

Stated another way, the Board fails to explain ***why*** a POSITA would have been motivated to modify Lurie's TCWs to search the ATD mechanism. The Board concedes that "Lurie does not explicitly state whether the TCW *selects* tasks from

the task pool ….” Appx0040 (emphasis added). But then, to make the jump from “select” to “search to task pool,” the Board then assumes “that it would have been obvious to [facilitate searching by placing the claimed task type indicia in Lurie’s data frame] . . . when combining the teachings of Lurie and Ethernet Specification.” Appx0042. But even the inclusion of task types in Lurie’s data frame is not enough to allow Lurie to search.

The Board fails to articulate why a POSITA would have been motivated to use Ethernet to modify Lurie’s data frames to act as agents that search the task pool. Nor can it; both Ethernet and Lurie are completely silent on the ability to search. Although Amazon relies on Dr. Lowenthal, he also fails to point to any specific teaching in the references or within the knowledge one skilled in the art that would suggest modifying Lurie to search. *See* RedBr. 42-43.

#### a. The Board Points to No Teaching or Suggestion to Modify Lurie From Ethernet, Lurie, or the Knowledge of a POSITA

The Board’s newly found reliance on Dr. Lowenthal to support its determination that a POSITA would “have the TCW dispatch an agent to *select* a task that the TCW can perform” is conclusory at best. Appx0041 (citing Appx0780-0782 ¶¶203-205) (emphasis added); *see* BlueBr. 31-32. This Court has repeatedly emphasized that “[r]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some

rational underpinning to support the legal conclusion of obviousness." *KSR,* 550 U.S. at 418 (quoting *Kahn*, 441 F.3d at 988).

Rather than point to a specific suggestion in the prior art or within the knowledge of a skilled artisan to modify Lurie's TCW to search, Dr. Lowenthal simply redefines Lurie to include the elements of claim 3, relying solely on his opinion of an alleged POSITA's "knowledge." *See* BlueBr. 28-33; Appx0776-0784 ¶¶194, 203-205, 207. Although Dr. Lowenthal states that a POSITA "would have understood that Lurie's system must have the ability to determine which TCW should be assigned which tasks for maximum efficiency," (Appx0039), he provides no analysis as to what efficiencies might result from the modification or how they would come about. More importantly, however, Dr. Lowenthal's "efficiency" argument – which consists of a single sentence – ***presumes*** that Lurie's data frames search, and simply notes that using data frames to perform the searching would be an efficient way to determine which TCWs should be assigned which tasks.[8]

#### b. The Board Does Not Provide an Explanation for Why a POSITA Would Modify the Prior Art

The need to articulate a motivation to modify a reference is particularly compelling when seeking to modify a reference to include a claim element that is

[8] *See Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567 (Fed. Cir. 1983); *In re Wilson*, 424 F.2d 1382, 1385 (CCPA 1970) ("All words in a claim must be considered in judging the patentability of that claim against the prior art.").

altogether missing from the references, such as the search requirement of claims 2 and 3. *See Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016) ("common sense is typically invoked to provide a known *motivation to combine*, not to supply a missing claim limitation." (emphasis in original)).

In the present case, although the Board determined that it would have been obvious to modify Lurie's data frames to search the ATD for tasks, the Board failed to explain where a POSITA would find this motivation within the general skill in the art. The Board cannot short circuit its analysis by concluding that it would have been obvious to use data frames to conduct a search, without any explanation of why it would have been obvious for Lurie's TCWs to search the ATD in the first place. *See Al-Site*, 174 F.3d at 1324 ("Skill in the art does not act as a bridge over gaps in substantive presentation of an obviousness case ….").

#### c. The Board Committed Legal Error by Using the "One Obvious Way" Gap Filler in Lieu of a Reasoned Obviousness Analysis

In short circuiting its obviousness analysis, the Board opined that a POSITA "would have understood that Lurie's system ***must have the ability*** to determine which TCWs should be assigned which tasks for maximum efficiency." Appx0039 (emphasis added). However, even accepting that assumption, there still remains a logical gap between Lurie's ability to determine which TCWs should be assigned which tasks (Appx1250 ¶53; Appx1255 ¶80; Appx1259 ¶100), on the one hand, and

modifying Lurie to use a data frame that includes a function to search the task pool, on the other hand. Appx0039. To fill this evidentiary gap, the Board improperly speculated that "one obvious way" to determine which TCW should be assigned which tasks is "to use indicia of a task type" in data frame. Appx0039.

The Board's reliance on the impermissible gap filler "one obvious way" is essentially equivalent to the impermissible use of the terms "plainly obvious," "ordinary creativity," or "common sense" in lieu of the type of reasoned analysis required by *KSR*. For example, in *DSS Technology Management, Inc. v. Apple Inc.* the only disputed limitation was the transmitters "being energized in low duty cycle RF bursts." 885 F.3d 1367, 1370 (Fed. Cir. 2018). The Board held that it would have been "plainly obvious" to modify the prior art server to transmit with the same burst pattern as the portable devices in the system, which used low duty cycle RF bursts. *Id.* at 1373. The Board held that modifying the server to also use low duty cycle RF bursts required no more than "ordinary creativity." *Id.* This Court disagreed, reasoning that the Board improperly resorted to a "gap-filler," similar to resorting to "common sense." *Id.* at 1374.

The same error in analysis occurred here. Where the most Dr. Lowenthal could say about the reason to combine is that it generically would increase

"efficiency." Appx0039; *see also* Appx0783 ¶207.[9] That is not enough to "close the gap" to modify Lurie to "search" when neither Lurie nor Ethernet disclose the ability to search.

As articulated in *Arendi,* while common sense may be invoked to provide a known motivation to combine, it may not be used to supply a missing claim limitation. *Arendi*, 832 F.3d at 1361 ("common sense is typically invoked to provide a known *motivation to combine*, not to supply a missing claim limitation."). The *Arendi* court recognized that in *Perfect Web Technologies, Inc. v. InfoUSA, Inc.,* 587 F.3d 1324 (Fed. Cir. 2009) the Federal Circuit did authorize the use of common sense to supply a missing claim limitation, but *Perfect Web* was "the only case Appellees identifies [sic] in which common sense was invoked to supply a limitation that was admittedly *missing* from the prior art, the limitation in question was unusually simple and the technology particularly straightforward." *Arendi*, 832 F.3d at 1362 (distinguishing *Perfect Web*).

The *Arendi* court concluded that:

> [W]hile "common sense" can be invoked, even potentially to supply a limitation missing from the prior art, it must still be supported by evidence and reasoned explanation. In cases in which ***"common sense" is used to supply a missing limitation***, as distinct from a motivation to combine, moreover, our search for a

[9] The Board relies again on the general statement at Lurie ¶81, which again says nothing about Lurie's TCW's being able to "search the task pool" or improving "efficiency." Appx0039.

> reasoned basis for resort to common sense ***must be searching***. And, ***this is particularly true where the missing limitation goes to the heart of the invention***.

*Arendi*, 832 F.3d at 1363 (emphasis added).

The Board improperly used the gap filler "an obvious way" instead of a reasoned explanation of why and how a POSITA would have modified Lurie's data frames to include the ability to perform searching operations. This Court should therefore reverse the Board's obviousness determination.

#### 2. Ethernet Also Fails to Teach or Suggest that a "Data Frame" Has the Capability to "Search"

Swarm agrees that Lurie's TCWs communicate with the ATD mechanism, and that the TCWs may use passive data frames to do so. However, Lurie provides no disclosure as to the contents of any such data frames. And, although Ethernet expressly discloses data frames, Ethernet's data frames are *agnostic* as to the contents of the payload. *See, e.g.,* Appx1315, Figure 6-1 (Data Link Layer Frame Format, merely describing generically "Data."). Nothing in Ethernet teaches or suggests what that "Data" might be, much less that it be imbued with a search capability. Ethernet does not even mention the ability to "search." That feature is disclosed *only* in the '004 patent claims.

In this regard, Amazon argues that "there can be no reasonable dispute that Ethernet Specification discloses agents." RedBr. 30. That is incorrect. Ethernet does not disclose "agents." Ethernet simply discloses data frames, and Amazon does

not dispute that an Ethernet data frame – by itself – is incapable of searching anything. *See, e.g.,* Appx1315, Figure 6-1; BlueBr. 22-23. Only when a data frame is specifically configured to search is it possible for it to actually perform a search. *See*, *e.g.*, Appx0156, 12:45-46 ("the first agent is *configured* to search the task pool for a task of the first type") (emphasis added).

Although the Board concludes that Lurie can be modified to include Ethernet's data frames, the combination still does not teach or suggest how Ethernet's data frames may be configured to "search." Once again, Lurie and Ethernet, even if properly combined, fail to teach or suggest the ability to "search the task pool."

### D. Amazon Ignores that the Board's Modifications to Lurie Fundamentally Change Lurie's Operation

Even assuming, *arguendo*, that Lowenthal, Amazon, or the Board had explained ***why*** a POSITA would have been motivated to modify Lurie with Ethernet's data frames to perform the missing search element, the proposed modification would impermissibly change the principle of operation of Lurie, making the teachings of the references insufficient to render the claims *prima facie* obvious. See *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959). This, in turn, renders the Board's obviousness conclusion legally deficient.

This Court has long held that combinations or modifications that change the "basic principles under which the [prior art] was designed to operate" (*In re Ratti*,

270 F.2d at 813), or that render the prior art "inoperable for its intended purpose," *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984), fail to support a conclusion of obviousness. *See also Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 758-59 (Fed. Cir. 2015) (nonprecedential) (affirming Board's determination that the proposed combination was improper because doing so "would fundamentally alter [the reference's] 'principle of operation,'" and "[s]uch a change in a reference's 'principle of operation' is unlikely to motivate a person of ordinary skill to pursue a combination with that reference.")

In the present case, to justify its conclusion that it would have been obvious to modify Lurie to include the missing search element, the Board made several intermediary determinations, which are inconsistent with Lurie's core operational principle, namely, that the ATD distributes the tasks. For example, in a decision denying institution on a related patent (U.S. Patent No. 9,146,777), the Board found:

> Similarly, Lurie describes how the TCW receives a notification before obtaining a task: 'When the task is submitted to the object exchange repository 662 by the job manager 265, the technical computing worker 270 receives a notification and ***takes the task from the object exchange repository 662 by performing a take operation.***' Ex. 1007 ¶ 97; *see also* Prelim. Resp. 29.

*Amazon.com, Inc. v. Swarm Tech. LLC,* IPR2023-00390, Paper 7 at 17 (PTAB Jul. 5, 2023) (emphasis added). *See also* Appx1249 ¶¶0045, 0048; Appx1251 ¶0061 ("The [ATD] mechanism 260 allows the [TCC] 250 to delegate the management of task distribution to the [ATD] mechanism 260."); Appx1252 ¶0064; Appx1254

¶¶0074 (describing FIG. 3C's "taking" of "Task1"), 0077 (the TCWs "receives tasks from" the [ATD]); Appx1254-1257 ¶¶0078, 0082, 0086, 0087 (TCW "registers to receive a task from the job manager 265 or ATD 260"); Appx1257 ¶0088 ("the task [itself] is sent, by the job manager 265 to the [TCW] 270 as notification to perform the task"). Indeed, what would be the purpose of an "automatic task distribution mechanism" if it did not distribute the tasks but held them for the TCW to search through? And why would the TCW come back to the ATD to search for a task after the ATD had already distributed it to the TCW? *See* BlueBr. 26 – 27.

Even assuming, *arguendo*, that the Board had provided reasoned explanations for its proposed modifications to Lurie, they would nonetheless be unsupported by substantial evidence and insufficient to support an obviousness conclusion because they: i) run counter to the intended purpose of Lurie's design; ii) impermissibly change the principle of operation of Lurie; iii) contradict the basic teachings of Lurie; and iv) require a substantial reconstruction and redesign of the elements shown in Lurie. *In re Ratti*, 270 F.2d at 813

This Court should therefore reverse the Board's obviousness conclusion for the additional reason that the Board's modifications to Lurie fundamentally change Lurie's operation.

## II. SUBSTITUTE CLAIMS 13 AND 14 ARE PATENT ELIGIBLE

Swarm submitted its Motion to Amend (Appx1806-1848), proposing substitute claims 13 and 14 (Appx1841-1843) to replace original claims 1 and 2 if the Board found either original claims 1 or 2 unpatentable. Appx1811. Because the Board found original claim 1 unpatentable—which Swarm does not appeal—Swarm seeks this Court's review of the Board's denial of Swarm's motion to amend. BlueBr. 2 (Statement of the Issues No. 2 and 3).

### A. *Alice* Step 1: The Substitute Claims are Directed to a Specific, Improved Parallel Multiprocessor Computing Architecture

Amazon incorrectly argues that the substitute claims cannot be directed to a new multiprocessor computing architecture because the '004 Patent describes generic "computer components" (RedBr. 5, 19, 52, 55, 59, 61) and states that various features may be incorporated into "any presently known or later-developed computer architecture." *Id.* 19, 56, 60; *but see* BlueBr. 36-42, 48-54. Amazon's analysis misapprehends computing components, computing architectures, and the '004 Patent's references to the same.

The '004 Patent does not purport to use or suggest using conventional computer components in their conventional condition or according to a conventional multiprocessor architecture. Instead, the components must be "configured (e.g., programmed)" to operate according to the claimed computing system. Appx0151, 2:41. For example, "[t]he CPU 11 may be any single or multi-core processor,

applications processor or microcontroller," however, such a device must also be "configured for use within the system 10 by programming it to recognize and communicate with the task pool 13 and divide the computing requirements into threads, as described below." Appx0153, 5:17-44; *see also* Appx0154, 7:8-8:13, and Appx0155-0156, 10:58-11:20 (providing details for configuring the CPU division of computing requirements into tasks/threads). Similarly, the co-processors are "configured" to autonomously and proactively "retrieve tasks from a task pool populated by a [CPU]." Appx0151, 1:16-18; *see also e.g.*, Appx0154-0155, 8:17-9:5 (additional details for configuring co-processors).

For this reason, the '004 Patent states that its inventions "may be implemented retroactively on any computer or computer network having an operating system ***that may be modified or otherwise configured to implement the functionality described herein***."[10] Appx0153, 5:45-49 (emphasis added); *see also* Appx0152, 4:24-25 ("[v]arious features may be ***incorporated into*** any presently known, or later-developed computer architecture") (emphasis added). Thus, when the computing system's devices or architecture are modified according to the claimed multiprocessor computing system, the devices operate together as an

[10] In referring to the '004 Patent's discussion about implementing retroactively, Amazon crops its quote, without appropriate signals, and omits the phrase requiring "modified or otherwise configured to implement the functionality described herein." RedBr. 7

unconventional, improved parallel multiprocessor computing architecture. This Court should therefore disregard Amazon's attempts to mischaracterize the proposed substitute claims as merely using "conventional hardware and conventional architecture." RedBr. 19, 62, 64; *see also id.*, 24, 53, 59, 61, 63 (arguing the same).

As a direct result of the claimed configuration and architecture, a claimed controller (e.g., a laptop, gaming console, or smart phone) can seamlessly exploit the untapped computing resources of a swarm of autonomous co-processors (e.g., smart light bulbs, home appliances, electrical receptacles, and vehicles) without burdening the controller with additional task distribution and device connection management overhead. Appx0156, 11:35-12:24; *see also* Appx0154-0155, 8:59-9:13. This improved parallel multiprocessor computing architecture is patent eligible.

At a fundamental level, electrical engineers design the architecture for integrated circuits (or "chips") by designing the structure, organization, and behavior of elemental components within the integrated circuit. Appx1913 ¶23. It is well-known that the elemental components of a chip architecture are simply conventional resistors, diodes, capacitors, transistors, etc. Notwithstanding the conventionality of these elemental components, their unique structure, organization, and behavior within a chip has been held to be patent eligible. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (holding "some improvements in computer-

related technology when appropriately claimed are undoubtedly not abstract, *such as a chip architecture … and the like*.") (emphasis added).

Similarly, electrical engineers architect computing systems by designing the structure, organization, and behavior of the components within the computing system. Appx1913 ¶24. Similar to the integrated circuits described above, it is well-known that the elemental components of a multiprocessor computing architecture are conventional components, such as central processing units (CPUs), co-processors, memory, communication interfaces, etc. Notwithstanding the conventionality of the elemental components of a multiprocessor computing architecture, the unique structure, organization, and behavior of those components within the computing system is not abstract and, hence, patent eligible. *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1262 (Fed. Cir. 2017) ("[n]or is the [] patent's use of conventional computer components, by itself, fatal to patent eligibility where the claims 'are directed to an improvement in the functioning of a computer.'"); *see also Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1344–45 (Fed. Cir. 2018) (finding eligibility for "an asserted improvement based on assigning certain functions to particular computer components and having them interact in specified ways.").

If Amazon's analysis were true, improved configurations and arrangements of computer components that improve their function and operation of the computer

would never be eligible simply because they were implemented with conventional computer components. Such cannot be the state of the law. *See Alice Corp. Pty Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) ("we tread carefully in construing this exclusionary principle lest it swallow all of patent law."); *see also Mayo Collaborative Servs. v. Prometheus Lab'ys., Inc.*, 566 U.S. 66, 71 (2012).

#### 1. Contrary to Amazon's Arguments, the Substitute Claims have Nothing to do with a "Scrum Board"

The notion that the operation of the claimed multiprocessor computing architecture can be abstracted and analogized to a scrum board used to organize human activity is trivial. *See* RedBr. 53-55 (charting the inappropriate analogy between computer operation and a manager and his employees). Regarding Amazon's scrum board analogy—upon which the Board erroneously bases its conclusions—the Arizona District Court (the most recent Federal Court to review the '004 Patent claims) underscored, "[this] Court understands the [scrum board] analogy but disagrees that it carries the day for purposes of [*Alice*] step one." *Swarm*

*Tech. LLC v. Amazon.com Inc.*, No. CV-21-00438-PHX-DWL, 2022 WL 3585835, *18 (D. Ariz. Aug. 22, 2022); *see generally* Appx1949-1969.[11]

This Court held that "merely trac[ing] the invention to some real-world analogy" is "not enough." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1011 (Fed. Cir. 2018). Instead, the eligibility question is "whether the claim is 'directed to' the abstract idea itself." *Id.* Here, the substitute claims are not *directed to* or preemptive of any human activity, regardless of whether that human activity is centered around an actual whiteboard or a computerized one. And a claim should not be found to be *directed to* an abstract idea that it does not preempt. *Alice Corp.*, 573 U.S. at 216 (2014) (describing "the concern that drives this exclusionary principle as one of pre-emption.").

Walmart's "Hybrid Digital Scrum Board" patent application,[12] on the other hand, is a perfect example of ineligible claims *directed to* the abstract idea of a scrum board, and a comparison of it to the substitute claims is instructive. The *Walmart*

---

[11] Amazon's reference to negative eligibility decisions of "two district court judges" (RedBr. 51) ignores that they were without prejudice to amend the complaint. Moreover, Amazon conspicuously omits reference to this third eligibility decision favorable to Swarm, that entered Swarm's amended complaint, and that Amazon answered on the merits. *Swarm Tech. LLC v. Amazon.com Inc.*, No. CV-21-00438-PHX-DWL, 2022 WL 3585835 (D. Ariz. Aug. 22, 2022).

[12] Appx2104-2125. *See also* Appx2128-2135 (USPTO finding the *Walmart* claims directed to the abstract idea of a scrum board)

patent application includes claims directed to generic computer components (e.g., processor, memory, display) that are organized in a typical hardware configuration, to "display[] the electronic scrum board" and enable "[a] user … to view and manipulate an authorized sticky note of the plurality of electronic sticky notes." Appx2118. *Walmart's* claims are *directed to* the abstract idea of a scrum board and would arguably preempt the use of a scrum board. They endeavor to organize human behavior, and the organization of human behavior is the specific process that is improved. As a result, the benefits derived from using the *Walmart* digital scrum board—the organization of employee activity—are "not different in kind from those that would accrue in the [real world] analogue …." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1318 (Fed. Cir. 2021).

By contrast, the '004 Patent's substitute claims have nothing to do with organizing human behavior. Instead, the focus of the claims is on an improvement in computers as tools. The substitute claims recite improvements to the computing system itself, independent of *what* the system is used to compute, whether it be "data encryption; graphics, video, and audio processing; direct memory access; mathematical computations; data mining; game algorithms, [etc.]" Appx0152, '004 Patent, 4:10-23.

The *Walmart* computer does not operate in an improved manner. Instead, the *Walmart* claims are just like those of *Accenture*, where the hardware was "composed

of generic computer components," and the system was that of "***a typical hardware configuration of a workstation*** …." *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1343 (Fed. Cir. 2013) (emphasis added). Like *Walmart*, Accenture's claims literally organized human behavior (processing of "insurance-related tasks"), and it was the organization of human behavior that was improved, not the computer itself. *Accenture*, 728 F.3d at 1343 (Fed. Cir. 2013). The other cases cited by Amazon similarly fail to provide any improvement to computers as tools. *See, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) (finding claims for an electronic post office for email review/delivery ineligible); *PersonalWeb*, 8 F.4th 1310 (finding content-based identifiers used to catalogue digital information ineligible).

#### 2. Amazon Ignores the Claimed Improvements to Multiprocessor Computing Systems

Unlike the cases cited by Amazon, the substitute claims do not recite the "typical hardware configuration of a workstation" (*Accenture*, 728 F.3d at 1343), and they do not simply improve "economic or other tasks for which a computer is used in its ordinary capacity." *Enfish*, 822 F.3d at 1336. The substitute claims recite improvements to a multiprocessor computing system as a tool, independent of *what* is being processed by the computing system. Appx0152, 4:10-23.

The substitute claims recite that "autonomous co-processor[s]" join the multiprocessor computing system "without any communication with the controller"

and "proactively interrogate the task pool … without being instructed to do so by the task pool." Appx1841-1842. Consequently, the available computing resources of a smart phone can seamlessly assist the computing requirements of a gaming console; and a lightbulb or thermostat can become autonomous and proactive co-processors to a laptop.[13] Appx0156, 11:35-12:24.

Additional improvements to the computer itself are also described by the '004 Patent, wherein:

> the processing capacity of the solidarity cells 12 may be more fully exploited, inasmuch as the cells need not wait idly for an instruction from the CPU 11. This approach has the additional benefit of reducing CPU overhead by relieving the CPU of the need to send a request to a cell to retrieve a task from the task pool. These advantages render the system 10 more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU.

Appx0154-0155, 8:64-9:5. The substitute claims recite a new computing architecture and embody quintessential improvements to the computer itself and are therefore patent eligible under *Alice* step one.

Amazon mistakenly contends that "the '004 patent specification confirms that its purported 'architecture' is merely the well-known concept of 'parallel

[13] Scrum boards do not enable managers to exploit previously untapped human resources (e.g., non-employees or children).

processing,' which it admits was 'typical.'" Red Br., 56. Amazon is mistaken and Amazon misapprehends the '004 Patent's discussion of computing architectures.

The "typical multiprocessor system" described by the '004 Patent includes a CPU configured to distribute tasks directly to co-processors, which in turn, "report to the CPU" when tasks are completed. Appx0151, 1:56-60. Swarm's expert, Dr. Nelson, referred to this conventional configuration as a "'controller/responder' architecture" where "the CPU is configured to directly manage and control the computational activity of the co-processors," and "the co-processors [] are configured to operate as responsive devices." Appx1913 ¶25. Amazon's expert agreed that the controller/responder architecture was a conventional architecture. Appx2884 ¶107.

The '004 Patent describes the conventional computer architecture as disadvantageous because:

> [A] significant amount of CPU bandwidth is consumed by task distribution; waiting for tasks to be completed before distributing new tasks (often with dependencies on previous tasks); responding to interrupts from co-processors when a task is completed; and responding to other messages from the co-processors. In addition, co-processors often remain idle while waiting for a new task from the CPU.

Appx0151, 1:63-2:3.

In contrast to the "responders" of the conventional architecture, the claimed co-processors are "autonomous" and they "proactively interrogate the task pool to retrieve a [first/second] task from the task pool *without being instructed to do so by the task pool* …." Appx1841 (emphasis added). They retrieve and process the tasks, generate resulting data and update the task pool "without any communication between the [first/second] autonomous co-processor and the controller …." *Id.* Moreover, the computing system "dynamically accept[s]" a plurality of co-processors "on a plug-and-play basis without any communication with the controller." Appx1842.

The result of the above is "[a] multiprocessor architecture" that "reduces CPU management overhead, and which also more effectively harnesses and exploits available co-processing resources" (Appx0151, 2:4-7) and is "more efficient than traditional computer architectures in which auxiliary modules and co-processors are dependent on instructions from the main CPU." Appx0155, 9:2-5. These are improvements to the function and operation of the computing system itself, enabling the system to "operate faster and more efficiently, with ***increased processing capacity, flexibility, fault tolerance, and reliability***." Appx1931 ¶73 (emphasis added).

Amazon incorrectly argues that these improvements are analogous to those achieved by humans when organized with a scrum board and therefore render the

claims patent ineligible. RedBr. 57, 63-64. But Amazon's argument follows the same line of reasoning put forward by the district court that was reversed in *Visual Memory*. In that case, the district court found that the claims "were directed to 'the abstract idea of categorical data storage,' which humans have practiced for many years." *Visual Memory*, 867 F.3d at 1257. Using an analogy, the district court described "'a library [that] may have an easily accessible section for popular novels, while maintaining less accessible storage for less-requested materials.' *Visual Memory LLC v. NVIDIA Corp.*, No. CV 15-789-RGA, 2016 WL 3041847, at *4 (D. Del. May 27, 2016)." Appx8145.

Reversing the district court's eligibility holding, this Court found:

> To be sure, the concept of categorical data storage underlies the '740 patent's claims in that claim 1 requires a programmable operational characteristic that "determines a type of data stored by said cache." But this is not enough to doom a claim under § 101 because the claims are not so limited, and "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. at 71, 132 S.Ct. 1289; *see also Alice*, 134 S.Ct. at 2354 ("[A]n invention is not rendered ineligible for patent simply because it *involves* an abstract concept." (emphasis added)).

*Visual Memory*, 867 F.3d at 1262.

Notwithstanding the use of conventional components or the analogy to an underlying abstract idea, this Court found the *Visual Memory* claims eligible because

they were "directed to an improvement in the functioning of a computer." *Id.* (quoting *Enfish*, 822 F.3d at 1338). Similarly, the substitute claims in the present case recite, and are directed to, an improved parallel multiprocessor computing architecture and are therefore eligible, scrum board analogies notwithstanding.

The Court should therefore reverse the Board and hold that substitute claims 13 and 14 are patent eligible under *Alice* step one.

### B. *Alice* Step 2: The Substitute Claims Contain an Inventive Concepts, Including Autonomous Co-Processors that Successively and Proactively Interrogate a Task Pool without Communication with the CPU

The Board uses circular logic to find the substitute claims ineligible under *Alice* step two. Specifically, the Board determined that "[t]he '004 patent describes implementing the claimed system with generic computer components." Appx0101. And then the Board finds "[t]herefore, we determine that the additional limitations beyond the abstract idea cover merely conventional activity and do not provide an inventive concept." *Id.*

Contrary to the Board's circular analysis, this Court has held that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Moreover, "the second step of the *Alice*/*Mayo* test is satisfied when the claim limitations 'involve more than the performance of "well-understood, routine, [and] conventional activities

previously known to the industry.''' *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (2018) (quoting *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347-48 (Fed. Cir. 2014) (quoting *Alice*, 573 U.S. at 225)).

In this case, the arrangement and activities of "a [first/second] autonomous co-processor" that "proactively interrogate the task pool to retrieve a [first/second] task [having indicia of a first/second task type] from the task pool without being instructed to do so by the task pool" and "without any communication" with the controller was not well-understood, routine, or conventional in the multiprocessor computing industry. Blue Br. 48-54; Appx3337-3340; Appx3389-3411.

Swarm provided ample evidence of this fact, including a thorough review of the multiple references advanced by Amazon describing the conventional architecture of the multiprocessor computing industry (hereinafter the "conventionality references"). *Id*. However, the Board declined to review such evidence, arguing that "'[t]he search for a § 101 inventive concept is . . . distinct from demonstrating § 102 novelty' or § 103 obviousness." Appx0102 (quoting *Synopsys, Inc. v. Mentor Graphics Corp*., 839 F.3d 1138, 1151 (Fed. Cir. 2016)).

It is self-evident that §101 is distinct from §§102 and 103, but it is unclear how the Board could reliably establish factual findings regarding what are well-understood, routine, [and] conventional activities previously known to the

multiprocessor computing industry, without engaging in meaningful analysis of the conventionality references or other evidence submitted by the parties.

The only attempt the Board made to review conventionality was with regard to Lurie, finding that Lurie teaches a "system in which the TCWs search the ATD Mechanism for tasks …." Appx0102. But this finding, even if true,[14] does not demonstrate that Lurie's TCWs are proactive or operate autonomously, which is precisely what Swarm asserted was unconventional activity. *See e.g.*, Appx1834-1835; Appx3337-3340. Moreover, the Board could not render any such finding regarding Lurie's TCWs without running afoul of its own holdings. For example, in the '275 Patent FWD, this same board found that "Amazon has not demonstrated that Lurie alone or in combination with Ethernet Specification teach or suggests 'proactively retriev[ing] a first task from the task pool.'" Appx0134-0135; *see generally* Appx0131-0137.

Indeed Lurie, like each of the conventionality references advanced by Amazon, teaches the conventional controller/responder architecture that is the antithesis of Swarm's "autonomous" and "proactive" co-processors. Again, quoting the Board's own finding, "[i]n our view, ***Lurie's TCWs*** 270A-N ***are reactive—not***

[14] As detailed in Section I.B., *supra*, Swarm disputes the Board's finding that Lurie's TCWs select or search for tasks.

***proactive***—because they require receipt of a kickoff notification to retrieve a first task." Appx0137 (emphasis added).

Like the Board's FWD, Amazon's response brief conspicuously avoids meaningful analysis or discussion of its own conventionality references. These references establish that the Substitute Claims include more than the performance of the well-understood, routine, and conventional activities previously known to the industry (i.e., the conventional controller/responder architecture). *See, e.g.,* Blue Br. 53-54; Appx3401-3402 ¶78; *see generally* Appx3337-3340 and Appx3389-3411.

For example, Amazon's *Cirne* reference teaches that its co-processors (called "machines") are responders under a central "Scheduler" acting as a controller. *Cirne* describes "[t]he Scheduler receives from the user the description of the tasks that compose the application, chooses which machine runs each task, submits the tasks for execution, and monitors their progress." Appx3119; *see also* Appx3402-3403 ¶¶79-84.

As another example, Amazon's *Batheja* reference teaches its co-processors (called "workers") are responders under an "inference engine" (located within a "network management module") acting as a controller. *Batheja* describes "[w]orker operation during the compute phase is monitored and managed by the network management module …." Appx1431; *see also* Appx3403-3404 ¶¶85-86. The inference engine makes decisions about how to control a worker based on "the

worker's current availability status and passes an appropriate signal back to the worker." Appx1432. Such control signals include, "*Start, Stop, Pause* and *Resume*." *Id*.

Further references, such as *Bates* and *Chow* provide additional examples of the conventional controller/responder architecture from which the Substitute Claims depart. *See* Appx3337-3340 and Appx3389-3411 (discussing each of Amazon's conventionality references in detail).

The Board's *Alice* step 2 analysis relied on circular logic and unsupported and contradicted findings. The Board failed to consider multiple conventionality references raised by Amazon itself and ignored Swarm's expert testimony regarding the unconventionality of the Substitute Claims, including the unconventionality of Swarm's "autonomous" and "proactive" co-processors within the field of parallel multiprocessor computing. Swarm's unconventional activity and arrangement of computing components were not well-understood, routine, or conventional activities previously known to the multiprocessor computing industry. This Court should therefore reverse the Board and hold that substitute claims 13 and 14 are patent eligible.

## III. THE SUBSTITUTE CLAIMS SATISFY THE WRITTEN DESCRIPTION REQUIREMENT

### A. The Board Committed Legal Error In Holding That The Substitute Claims Add New Matter

The Board's decision regarding lack of written description support is incorrect as a matter of law and is unsupported by substantial evidence. Specifically, the Board's determination that the phrase "without any communication" in substitute claims 13 and 14 lacks written description support was predicated on an erroneous construction that renders the claims logically inconsistent. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010) ("A claim construction that renders asserted claims facially nonsensical 'cannot be correct.'") (internal citations omitted).

Swarm challenges the Board's flawed construction, and this challenge is not, as Amazon argues, forfeited; Swarm has consistently advocated throughout the IPR for the plain and ordinary meaning of that phrase. As explained below, a proper construction of the phrase "without any communication" finds more than adequate written description in the applications from which the '004 Patent claims priority.

#### 1. The Board Incorrectly Construed the Element "Without Any Communication"

The Board, without a proper analysis or indeed *any* reference to intrinsic or extrinsic evidence, dropped a conclusory sentence into its Final Written Decision that incorrectly construes the negative limitation "without any communication" in

substitute claim limitation 13[g]. Appx0084. More particularly, after noting that "limitation [13g] requires the addition [of co-processors] to be done 'without any communication'," the Board quickly concludes—without support or discussion—that *"[a]ny communication includes both direct and indirect communication.*" *Id.* (emphasis added). This construction is improper because (1) it is unsupported by any facts of record including intrinsic and extrinsic evidence, and (2) it adopts an interpretation that substantially narrows—and indeed contradicts—the ordinary meaning of the element "without any communication" as used in the specification and in the context of the substitute claims.

The Board legally erred by failing to provide any analysis or explanation, let alone a consideration of the relevant *Phillips* factors, to support its construction of the phrase "without any communication." Appx0084; *see* 37 C.F.R. 42.100(b) ("a claim proposed in a motion to amend . . . shall be construed using the same claim construction standard that would be used to construe the claim in a civil action …."). Here, the Board offers no support for its claim construction. Rather, the construction is cursorily accepted as the ***premise*** for its written description, rather than being ***informed by*** its written description. *See* Appx0084.

Even if the Board had articulated a rationale for its faulty claim construction, the construction itself improperly renders the claims meaningless or nonsensical. *See Becton, Dickinson & Co*, 616 F.3d at 1255; *see also Ortho-McNeil Pharm., Inc. v.*

*Mylan Lab'ys, Inc*., 520 F.3d 1358, 1362 (Fed. Cir. 2008). By construing "without any communication" to preclude *indirect* communication in the context of the claims, the Board adopts a construction that contradicts other claim limitations in the same claim, including a controller populating a task pool with tasks that may be retrieved from the task pool by co-processors. Indeed, the Board's construction could only be supported by an embodiment in which the controller exists in a vacuum, untethered and unable to communicate—even indirectly via the "task pool"—with the co-processors. If the claims are interpreted in a way that fails to comprehend indirect communication between the controller and co-processors, then the "processing system" of the claims is no longer a "system"; it is merely a collection of isolated components. This Court should not indulge such an inconsistent construction that is contrary to the intrinsic record.

It is also significant that dependent claim 10 of the '004 Patent (which depends from claim 1) requires that *all* communications between the controller and co-processor occur via indirect communication. Appx0158, 16:28-31 ("wherein the controller is configured to communicate with the first co-processor and the second co-processor only indirectly through the task pool."). By use of the word "only" in front of "indirectly" in claim 10, the principle of claim differentiation requires that claim 1 be interpreted to encompass something broader, i.e., communication that occurs either "directly" or "indirectly." *Andersen Corp. v. Fiber Composits, LLC*,

474 F.3d 1361 (Fed. Cir. 2007), ("[The claim differentiation doctrine] is based on 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)).

In arguing that Swarm's plain meaning claim construction lacks merit, Amazon cites various statements by Swarm's expert as well as Patent Owner's Reply, concluding that "Swarm and its expert repeatedly endorsed [the position that "without any communication" means the "absence of *any* communication, direct or indirect.]" *See* RedBr. 49. This is a creative use of the word "endorsed." The cited sections merely relate to the use of the phrase "without any communication" without any discussion of whether such communication is "direct" and "indirect." Stated another way, this is a transparent example of Amazon "begging the question"—assuming as a premise the very thing it is attempting to prove.

Ultimately, the Board adopted an extremely narrow, logically inconsistent construction that fails to encompass the plain and ordinary meaning. *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1281-82 (Fed. Cir. 2017); *see also Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001) (where specification provided multiple "possible readings" of a term, it was reversible error for district court to adopt "narrower meaning" rather than "giv[e] the term the full range of its ordinary meaning (which would encompass [all] readings) ….").

The Board therefore committed legal error by adopting a purported "plain and ordinary meaning" that is improperly narrow, absurd in its application to the claim, and adopted without any analysis or the opportunity for Swarm to be heard regarding this construction.

In this regard, Swarm respectfully requests this Court to correct the Board's faulty construction of the claim element "without any communication" based on the plain meaning of that language in the context of the claims and the specification. Indeed, and proper claim construction will confirm that the phrase means without direct communication (Appx0158, 16:28-31), and that the phrase has adequate written description support.

**2. Swarm Has Not Forfeited Its Proposed Claim Construction Of The Phrase "Without Any Communication"**

Amazon argues that "Swarm never asked the Board to construe the term 'without any communication' at all, let alone to mean 'without any direct communication'" and therefore Swarm "'forfeited its proposed claim construction by not presenting it to the Board during IPR.'" RedBr. 48 (quoting *IOENGINE, LLC v. Ingenico Inc.*, 100 F.4th 1395, 1402 (Fed. Cir. 2024)). This argument should be flatly rejected.

As a preliminary matter, the *IOENGINE* case cited by Amazon is inapposite. In that case, appellant explicitly and consistently argued for one claim construction during the IPR, then proposed an *entirely new* claim construction on appeal.

*IOENGINE*, 100 F.4th at 1401 ("[i]n each of its Patent Owner Responses, IOENGINE requested that the Board construe 'interactive user interface' [in accordance with one construction]. On appeal, however, IOENGINE proposes a new claim construction that it never proffered to the Board ….").

In contrast, Swarm's construction is not a new construction. Since the beginning of this case, Amazon and Swarm have agreed that an "indirect" communication—via an intermediary—did not qualify as a form of "any communication" that is precluded by the claim limitation "without any communication." Amazon's own Petition argued that there was no communication where devices are separated by an intermediate device. Appx0379-0380 ("Lurie expressly confirms that the TCC does not communicate with the TCWs during this process, as the ATD Mechanism 'provides a level of indirection' between the TCC and the TCWs."); Appx0758 (same); Appx0754 ¶123 ("[a] POSITA would have understood that the TCC does not communicate with the TCWs, but that both the TCC and TCW rely on the automatic task distribution mechanism as an intermediary."); Appx0383 ("acceptance occurs without communicating with the TCC, because the TCW contacts an intermediary (the ATD Mechanism) instead."); Appx0764-0765 ¶166 (same).

It was at oral argument that Amazon completely reversed its construction of "without any communication"—in the context of its opposition to Swarm's motion

to amend—arguing that "indirect communication is still communication." Appx4146. In this, Amazon seeks to have it both ways, arguing for one construction of "without any communication" to show a limitation was taught by Lurie, and advancing an mutually exclusive construction of "without any communication" to argue that the substitute claims lacked written description support.[15]

Responding to Amazon's changed construction at oral argument, Swarm's counsel countered "[Amazon] stated that this indirect communication is still a communication. I think to take that position would frustrate the entirety of the application [and] the claims. … [Amazon's position] would make the claim[ed] inventions impossible because [] communication would always exist indirectly." Appx4147-4148.

Because Swarm's claim construction has been consistent during the IPR and this Appeal, this Court should reject Amazon's argument that Swarm somehow forfeited its claim construction argument on appeal. *See Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1057 n.3 (Fed. Cir. 2024) (finding no waiver when a party's "argument on [an] issue ha[d] been sufficiently consistent" at trial and at the

[15] As a result, the Board's FWD perpetuates conflicting constructions, finding on the one hand that Lurie's TCC and TCWs do not communicate because "the TCWs communicate only with the [intermediate device] and not the TCC," (Appx0032) and finding on the other hand that "indirect communication via the [intermediate device]" is a communication. Appx0084.

appellate level ((quoting *Summit 6, LLC v. Samsung Elecs. Co*., 802 F.3d 1283, 1290 (Fed. Cir. 2015))); *see also In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) ("[This] court mainly uses the term 'waiver' when applying the doctrine of 'forfeiture.'").

### B. Contrary to Amazon's Arguments, the '332 Application Includes Ample Support For the Proper Interpretation of Adding Co-Processors "Without Any Communication with the Controller"

In its "new matter" analysis, the limitation that the Board focuses on—which is not in any respect "new"[16]—is the phrase "without any communication." As detailed above, the Board adopts a construction that is inconsistent with the specification, then, not surprisingly, concludes that the specification does not support that claim construction.

Under a proper construction of the phrase "without any communication," i.e., "without any *direct* communication," there is ample written description support in the '332 application, as exhaustively documented throughout Swarm's IPR and Appeal documents. *See, e.g*., Blue Br. 61-68.

---

[16] The claim limitation "without any communication" found in substitute claim 13 was already present in original claim 1 of the '004 Patent. Appx0157; Appx1841-1842. That is, the limitation *was not added* by amendment—it was always there. Therefore, it is, as a threshold matter, improper for this claim limitation to be considered "new matter." *See* Blue Br. 54-55.

The test for determining compliance with the written description requirement is simply whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date, rather than the presence or absence of literal support in the specification for the claim language. *Ariad Pharms., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010). With respect to a negative limitation, such as "without any communication," Swarm need only show that the '332 Application: i) includes express or inherent disclosure of the negative limitation; ii) offers a reason to exclude or a list of advantages of using the relevant element in the disclosure; or iii) distinguishes between the negative limitation and alternatives to it in the disclosure. *See Novartis Pharms. Corp. v. Accord Healthcare, Inc. et al.*, 38 F.4th 1013, 1016-1018 (Fed. Cir. 2022).

With respect to express and/or inherent support, the '332 Application (referring to FIG. 1 of the '332 Application; Appx1900) clearly states that "[i]n some embodiments, the CPU 11 communicates with the cells 12 only indirectly through the task pool." Appx1855 ¶0024. Support is further provided, for example, in its explanation that the co-processors 12 "may connect directly to the task pool 13, such as by a wired configuration that does not require a switching fabric 14 to handle communications." Appx1895 ¶0018; Appx1867 ¶0054. Dr. Nelson confirmed that in wiring the co-processors directly to the task pool without the use of a switching

fabric, "a POSITA would understand . . . the co-processors are inherently incapable of communicating with the CPU directly." Appx3385 ¶40; Appx3331.

The '332 application further teaches that "adding the programmed first cell to the network comprises establishing a communication link between the first cell and the task pool." Appx1872 ¶0080. The task pool may establish this connection using its "authentication requirements or protocols" (Appx1866 ¶0053) such that the "co-processors may be added and remove without reprogramming the CPU 11 to account for the changes to the system 10." Appx1867 ¶0054. Amazon's own expert confirmed that direct registration with an intermediary device (and not the controller) demonstrates to a POSITA that the "registration does not involve any communication with the TCC (controller)." Appx0762-0763 ¶161.

With respect to "reasons to exclude" communication with the CPU/controller, the '332 Application states, for example, that "[a] multiprocessor architecture [is] thus needed which reduces CPU management overhead …." Appx1851, and this objective—the reduction of CPU management overhead—is *raison d'être* of the '332 Application. *See*, *e.g.*, Appx3329-3330 ("a POSITA would understand the specification to convey that the inventor intended, as a major objective of the '696 Application, to provide a multiprocessor system that reduces or eliminates any CPU processing time spent managing or *communicating with* the co-processors") (emphasis added); *see also* BlueBr. 66-67 (discussion of the autonomous nature of

the co-processors, including their autonomy with respect to joining the system independently of the CPU).

With respect to distinguishing between the negative limitation "without any communication" and alternatives to it in the disclosure, the specification clearly includes embodiments where, on one hand, "the CPU 11 may … communicate directly with the [co-processors] without using the task pool as an intermediary" and, on the other hand, "the CPU 11 communications with the [co-processors] only indirectly through the task pool." Appx1855-1856 ¶0024. Alternatives are also incorporated into FIG. 1 and its supporting description. In one embodiment, the CPU and co-processors can be connected by the switching fabric, which "facilitates communication" between the devices. Appx1852 ¶0011. Alternatively, the co-processors can be directly wired to the task pool, without a switching fabric, such that each of the co-processors are inherently incapable of direct communication with the controller. Appx1867 ¶0054.

In view of the foregoing, the specification reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date, and that the Board committed legal error by using a flawed claim construction to find otherwise. *See, e.g.*, Appx3383-3389 ¶¶32-46 (Dr. Nelson testifying that a POSITA would understand that the inventor of the '696 Application was in possession of Substitute Claim element [13g] at the time of filing.").

Accordingly, using a proper construction of the phrase "without any communication," substitute claims 13 and 14 clearly have written support in the specification, and this Court should reverse the Board's determination that Swarm failed to satisfy the written description requirement.

## IV. THE BOARD CORRECTLY HELD THAT THE '275 PATENT CLAIMS ARE NOT UNPATENTABLE

Amazon's argument for reversing the Board's decision on the '275 Patent epitomizes Amazon's misperception of the '275 Patent claims. For example, Amazon correctly notes that the Board construed a co-processor acting "proactively" to mean "initiating change rather than reacting to events (i.e. not being told to act or not reactionary)," but then complains that this construction precludes a co-processor acting reactively in response to a predicate notification. BlueBr. 67. Amazon now asks this Court to construe "proactively" contrary to its plain and ordinary meaning, such that the phrase "proactively retrie[ving] a first task from the task pool," would be satisfied in Lurie by activity that occurs only *after* a notification is sent to the TCW that a task is available to retrieve. RedBr. 68. Amazon's proposed construction of "proactive" thus defies logic and common sense.

Indeed, this appeal is the first time Amazon has provided either tribunal with its proposed definition of "proactively." At the Board, both Swarm and Amazon relied on the term's plain and ordinary meaning. And, "despite being put on notice that Swarm argues the claim term 'proactively' has a particular meaning, Amazon

does not provide an explicit construction for this claim term." Appx0117; Appx7098-7108. However, now that the Board has construed "proactively," as Amazon requested, under the plain and ordinary meaning (Appx0118), Amazon disagrees. RedBr. 68-74.

### A. The Board Correctly Construed "Proactively"

In construing the term "proactively," the Board first looked at the intrinsic record of the '275 Patent to confirm that Swarm had not specifically defined "proactively" it in a manner different from its ordinary meaning. Appx0118, citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-17 (Fed. Cir. 2005) (*en banc*))). Next, the Board recognized the "heavy presumption" that the claim term carries its ordinary and customary meaning. Apx0118 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). Based on that well-settled rubric, the Board determined the ordinary and customary meaning of "proactively" to be "initiating change rather than reacting to events (i.e., not being told to act or not reactionary)." Appx0118.

#### 1. Amazon's Reliance on a Specific Sentence in the Specification Ignores the Context in Which that Sentence Appears.

Amazon extracts one sentence from the specification to argue that "proactively" can include "periodically":

> The term proactive suggests that each co-processor may be configured (e.g., programmed) to periodically send an agent to monitor the task pool for available tasks appropriate to that co-processor.

RedBr. 68-69 (quoting Appx0167, 2:48-51). Swarm does not dispute that "proactively" may include "periodically," as the specification provides. However, Amazon takes this sentence out of context and ignores the previous two sentences that further define what the claimed invention requires:

> In various embodiments ***the co-processors are referred to as autonomous, proactive solidarity cells***. In this context, the term autonomous implies that a co-processor may interact with the task pool ***without being instructed to do so*** by the CPU or by the task pool.

Appx0167, 2:44-48 (emphasis added). So, in addition to being "proactive," the co-processors are also "autonomous," reinforcing that a co-processor "may interact with the task pool without being instructed to do so …." *Id.* All of the claims require the co-processor not only to be "proactive," but also to be "autonomous":

> the first and second co-processors autonomously work together in solidarity with the task pool to complete the common objective.

Appx0173, 14:47-49 (Claim 1); *accord* Appx0174, 16:30-42 (Claim 11); *see also* Appx0174, 15:16-18, 15:26-28 (Claim 6) ("all without any communication between the first [second] co-processor and the controller"). Therefore, regardless of whether Swarm's "proactive" co-processors can operate "periodically," Amazon does not address that the co-processors must also be "autonomous."

### 2. The Board's Construction Encompasses the Statements Relied Upon By Amazon

Next, Amazon incorrectly argues that the Board's construction is too narrow by relying on two additional specification statements. RedBr. at 70 (citing Appx0170, 8:29-38 and Appx0168, 3:8-12). According to Amazon, both of these two statements "are *silent* on the question of whether there is an initial kickoff notification." RedBr. 71 (emphasis in original). Yes, they are silent; the '275 Patent is silent on an infinite number of things that it does not practice. The '275 Patent never discusses an "initial kickoff notification" because that is contrary to the invention of the '275 Patent, its claims, and indeed, proactivity. An initial kickoff notification to the co-processors is precisely what ***does not*** happen in the '275 Patent claims.

Amazon argues that the Board's construction of "proactive" is narrower than any of the examples in the specification. Not so. Indeed, the examples cited by Amazon are a subset of the broader construction adopted by the Board. To wit, the first statement identified by Amazon—that "each cell acts proactively in that it seeks a task 22 from the task pool 13 as soon as the cell becomes available for further processing"—is but one example of "initiating a change rather than reacting to events (i.e. not being told to act or not reactionary)." Appx0118. This context of the statement further confirms this interpretation:

> The cells advantageously maintain solidarity with each other and with the CPU 11, thereby helping the system 10 to perform complex computations by autonomously and proactively retrieving tasks from the task pool 13. The cells 12 act autonomously in that they may act independently of the CPU 11 or any other coprocessor. Alternatively, a cell may be acted upon or instructed directly by the CPU. Each cell acts proactively in that it seeks a task 22 from the task pool 13 as soon as the cell becomes available for further processing.

Appx0170, 8:29-38. In this specific example, it is the cell itself that initiates an action (seeking a task from the task pool), and it does so without being told to act.

The same can be said for the second statement identified by Amazon:

> Each solidarity cell is proactive, in that it obtains a task to perform by sending its agent to the task pool when the solidarity cell has no processing to perform or, alternatively, when the solidarity cell is able to contribute processing cycles without impeding its normal operation.

Appx0168, 3:8-12. Again, this is but one example of "initiating a change rather than reacting to events (i.e. not being told to act or not reactionary)." Appx0118. In this particular example, it is the cell itself that initiates an action (obtains a task to perform by sending its agent to the task pool), and it does so without being told to do so. *See also* Appx0172 11:25-28 ("when a cell is either idle or otherwise has available processing capacity, its agent proactively interrogates the task pool ….").

Amazon further argues that the Board's construction fails to cover at least "periodically sending an agent to monitor the task pool …." RedBr. 72. Not so, because a "co-processor [that is] configured (e.g., programmed) to periodically send

an agent to monitor the task pool for available tasks," is a co-processor that will initiate a change (e.g. sending an agent to monitor the task pool) without being told to do so. Appx0167, 2:48-51. Moreover, the periodic sending of an agent to monitor the task pool is precisely the result that would be expected when a co-processor is programmed to check whether it has available processing capacity and if so, send its agent to the task pool. Appx0168, 3:8-12, Appx0170, 8:29-38; *see also* Appx0172, 11:25-28 ("when a cell is either idle or otherwise has available processing capacity, its agent proactively interrogates the task pool ….").

Therefore, "periodically sending an agent to monitor the task pool" is wholly consistent with both the Board's construction of "proactive" as well as the other examples provided by the specification to which Amazon points. Amazon's reliance on *3M Innovative Properties* is inapposite because the Board adopted the plain and ordinary construction of the term "proactive" and did "not narrow a claim term beyond" that plain and ordinary meaning. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013); RedBr. 71.

Lastly, Amazon's argument ignores the additional claim requirement that the cells act "autonomously." A construction that would render other claim terms meaningless cannot be correct. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395

F.3d 1364, 1372 (Fed. Cir. 2005) (holding the construction that "gives meaning to all the terms of the claim is preferred over one that does not do so.").[17]

### B. The Board Correctly Applied This Court's Obviousness Law to Lurie

In analyzing Lurie, the Board correctly found that "Lurie discloses that TCW 270 registers with object exchange repository 662 to be notified when a task becomes available or otherwise appears in object exchange repository 662." Appx0135 (citing Appx1258 ¶0093 (Lurie)). Then, "[i]n response to receiving the notification, TCW 270 retrieves the task …." *Id.* The Board therefore concluded that "Lurie's object exchange repository 662 located within the ATD mechanism 260 sends a kickoff notification to TCW 270 when a task becomes available or otherwise appears." Appx0135-0136, *accord* Appx0136, n.5. Therefore, Lurie's TCW 270 cannot "proactively" retrieve tasks as required by the '275 Patent claims because it must first "register[] with the object exchange repository 662 to be notified when a task becomes available or otherwise appears in object exchange repository 662." Appx0135 (citing Appx1258 ¶93). Indeed, as the Board found, "each of Lurie's TCW's 270A-N does not proactively interrogate ATD mechanism 260 without

---

[17] Amazon's third "absurd result" argument about the claim construction as applied to Lurie (RedBr. 72-74), is more appropriately addressed under the obviousness section, and Swarm does so. *See* Sec. IV.B., *infra*.

receiving a notification to do so." Appx0134 (citing Appx8104-8105). Hence, Lurie fails to satisfy the "proactive" limitations in the '275 Patent and thus prohibits a finding of obviousness.[18] *See* Sec. I.B., *supra* (demonstrating that Lurie's TCW does not and cannot select its own task).

In order to make its obviousness argument, Amazon ignores the Board's fact finding that all of "Lurie's TCWs 270A-N only take a task ***after*** receiving a kickoff notification." Appx0136, n.5 (emphasis added). Instead, Amazon now argues that "even if the initial task retrieved following the kickoff notification does not meet the Board's definition of proactive, every subsequent task that is 'retrieve[d] and complete[d] … without further notifications' is … [allegedly] 'proactive.'" RedBr. 75 (citing Appx0136-0137). Amazon goes even further, arguing that "if a TCW retrieves and completes 100 tasks, at least 99 of those tasks (all but the first) are retrieved proactively even under the Board's definition because they occur without 'being told to act' and without any further notification." RedBr. 75. However, that is directly contrary to the Board's fact finding. The Board found that the "cited disclosures to Lurie do not appear to explain how the TCWs repeatedly take tasks to perform after an initial notification.… Here, each TCW obtains only

---

18 The FWD here (Appx0134) relies on statements made in the Preliminary Guidance from the proposed, substitute claims for the '275 Patent, which contains the very same limitation as the proposed substitute claims for the '004 Patent.

the task for which it was notified by the ATD mechanism." Appx8117 (Preliminary Guidance), cited at Appx0134. Moreover, Lurie satisfies what the Board determined was not "proactive," i.e., "reacting to events" such as a notification. Appx0118.

Amazon also improperly asserts that the Board credited Amazon's "bag-of-tasks" argument. RedBr. 74. However, that is incorrect. Instead, the Board determined that, even if Lurie implements a bag-of-tasks, Lurie does not render the claims obvious: "Even assuming Amazon is correct in that Lurie's system executes a textbook bag-of-tasks technique, Amazon fails to appreciate that each TCW 270A-N still requires a kickoff notification before it begins retrieving and completing tasks." Appx0137. Indeed, "each TCW obtains only the task for which it was notified by the ATD mechanism." Appx8117 (cited at Appx0134). Amazon also tries to claim the Board's adoption of Dr. Lowenthal's testimony supports Amazon's position on obviousness (RedBr. 75), but the Board saw Amazon's expert's testimony differently:

> [Dr. Lowenthal] also testifies that the "one initial notification … kick[s] off the procedure" because it "***informs all registered TCWs [270]*** that one or more tasks are available."

Appx0136 (emphasis added). The Board has wide discretion in crediting expert testimony. *See, e.g., Conoco, Inc. v. Energy & Env'tl Int'l, L.C.*, 406 F.3d 1349, 1362-63 (Fed. Cir. 2006); *see also Cornell Rsch. Found., Inc. v. Vidal*, No. 2020-2334, 2022 WL 1634223, *3 (Fed. Cir. May 24, 2022) (nonprecedential) (Board

crediting appellant's expert in support of appellee's argument that claim limitations were inherent results of prior art combinations). Indeed, the Board is specific that, contrary to its construction of "proactively," "Lurie's TCW 270 only takes a task after receiving a kickoff notification and, and therefore, it is not acting proactively." Appx0136.

Accepting for purposes of argument that all registered TCW's 270 must receive *at least* a kickoff notification before retrieving tasks,[19] what Amazon seems to be arguing is that, because those registered TCWs can retrieve more than one task *after receiving the kickoff notification*, then those subsequent tasks are done proactively.[20] RedBr. 75 ("every subsequent task that is 'retrieve[d] and complete[d] … without further notifications' is 'initiating change rather than reacting to events,'

[19] Lurie is clear that the system determines which TCW will work on a specific task and sends a notification to that TCW as a result. Appx1255 ¶81 (The system "determine[s] or select[s] [TCW] to work on a task ….); Appx1257 ¶88 (The [ATD mechanism] provides notification to the [TCW] of the availability of the task (step 538). In an exemplary embodiment, the task is sent, by the job manager 265 to the [TCW] as notification to perform.").

[20] Note that Amazon's argument that TCWs can receive more than one task after an initial notification is also contrary to the specification. *See e.g.*, Appx1250 ¶0053; Appx1252 ¶¶0063-0064; Appx1254-1255 ¶¶0075, 0077, 0078, 0081; Appx1256-1258 ¶¶0086-0088, 0092 (all paragraphs showing ATD Mecahnism (or its job manager) or TCC distributing tasks to TCW, and not showing TCW taking a task without a notification for that task).

and 'not being told to act or not reactionary,' ….").  However, the Board addressed and specifically rejected this nuance:

> [B]ecause Lurie's TCWs 270A-N require a kickoff notification to retrieve a first task, it does not matter that they can retrieve and complete additional tasks without further notifications.

Appx0137.  The Board further found that "Lurie's TCW's 270A-N are reactive—not proactive—because they require receipt of a kickoff notification to retrieve a first task."  Appx0137.  And indeed, there is nothing in Lurie that discloses TCW's going back to the Task Pool a second or a third time without a second or a third notification.

Even applying Amazon's incorrect construction of "proactive," the combination of Lurie and Ethernet still fails to render the '275 Patent claims obvious for at least two reasons: (a) Amazon fails to address the claims' further requirement that the co-processors "autonomously work together" (Appx0173, 14:47-49; *accord* Appx0174, 15:15-18, 26-28; 16:35-36); and (b) Amazon fails to argue that Ethernet discloses the limitations missing from Lurie.  That makes sense because Ethernet does not disclose or suggest such limitations.

Independent claims 1 and 11 specifically require that the co-processors both "proactively," and "autonomously" work together.  Appx0173, 14:47-49; Appx0174, 16:33-42.  Additionally, in claim 6 the co-processors are "autonomous" as described in the specification: "co-processor may interact with a task pool without

being instructed to do so by the CPU or by the task pool." Appx0167, 2:46-48; *accord* Appx0174, 15:12-18, 22-27 ("a [first/second] co-processor configured to successively: … all without any communication between the [first/second] co-processor and the controller").

Even if the Court adopted Amazon's interpretation of "proactively," Lurie still would not satisfy the '275 Patent claims' requirement that the co-processor also act autonomously, i.e., without being instructed to do so by the CPU or by the task pool. Appx0167, 2:44-48. Indeed, none of Lurie's TCWs ever act without receiving a predicate notification, regardless of whether Lurie's TCW is performing its first or its 100th task. Therefore, Lurie's TCWs do not and cannot act autonomously.

Amazon makes no argument that Ethernet supplies the missing limitations of "proactively retrieving." That makes sense because Ethernet merely provides a "Data Link Layer Frame Format," which includes a destination, source, type, data, and frame check sequence." Appx0130 (citing Appx1315, FIG. 6-1). Nothing in Ethernet discloses or suggests "proactively retrieving" anything.

## CONCLUSION

The Court should reverse the Board's decision that original claims 2-12 of the '004 Patent are obvious. This Court should also reverse the Board's decisions that proposed substitute claims 13 and 14 lack written description support and are directed to ineligible subject matter. The Court should affirm the Board's decision holding that no claims of the '275 Patent are unpatentable.

August 28, 2024

Respectfully submitted,

/s/ *Michael K. Kelly*

Meredith Martin Addy
**ADDYHART P.C.**
10 Glenlake Parkway
Suite 130
Atlanta, Georgia 30328
meredith@addyhart.com
(312) 321-4200

Michael K. Kelly
Christine N. Jones
Daniel J. Anderson
**NEWMAN JONES, PLLC**
14747 N. Northsight Blvd.
Suite 111-143
Scottsdale, Arizona 85260
mkelly@newmanjones.com

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

***Swarm Technology LLC v. Amazon.com, Inc.***
Nos. 23-2323, 24-1095

This brief complies with the relevant type-volume limitation of the Federal Rule of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally-spaced typeface and includes 13,656 words.

Dated: August 28, 2024

By: /s/ *Michael K. Kelly*
Micheal K. Kelly